CLERK'S OFFICE
A TRUE COPY
Apr 24, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| United States of America<br>v.<br>Hannah C. Dugan<br>DOB: (XX/XX/1959)<br><br>Defendant(s) | Case No. 25-M-397 (SCD) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **April 18, 2025** in the county of **Milwaukee** in the **Eastern** District of **Wisconsin**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1505 | Obstructing or impeding a proceeding before a department or agency of the United States |
| 18 U.S.C. § 1071 | Concealing an individual to prevent his discovery and arrest |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

_Complainant's signature_

Lindsay Schloemer, Special Agent, FBI
_Printed name and title_

Sworn via telephone; transmitted via email pursuant to Fed. R. Crim. 4.1

Date: 04/24/2025

_Judge's signature_

City and state: Milwaukee, Wisconsin

Stephen C. Dries, United States Magistrate Judge
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Lindsay Schloemer, being first duly sworn, hereby depose and state as follows:

## I. Background and Experience.

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since 2014. I am currently assigned to the Milwaukee Field Office. As such, I am an investigative or law enforcement agent of the United States authorized under Title 18, United States Code, Section 3052, that is, an officer of the United States who is empowered by law to conduct investigations, to make arrests, and to collect evidence for various violations of federal law. I am also a Certified Public Accountant ("CPA") and worked as a CPA for seven years before my employment with the FBI.

2. I am currently assigned to a White-Collar Crimes Squad, which investigates public corruption crimes, civil rights crimes, and financial crimes. During my tenure with the FBI, I have participated in investigations involving the corruption of public officials, to include facilitation payments and kickbacks. I have participated in all aspects of investigations including, among other things, executing arrest warrants.

3. I base this affidavit upon personal knowledge and upon information reported to me by other federal law enforcement officers during and as part of their official duties, all of whom I believe to be truthful and reliable. In this affidavit, "case agents" refers to me and other FBI Special Agents who directly have participated with me in this investigation. I also base this affidavit upon information provided by citizen witnesses and other information as described below.

## II. Purpose of Affidavit.

4. I make this affidavit in support of a criminal complaint charging **HANNAH C. DUGAN (b. 1959)**: with (1) obstructing or impeding a proceeding before a department or agency

of the United States, in violation of Title 18, United States Code, Section 1505; and (2) concealing an individual to prevent his discovery and arrest, in violation of Title 18, United States Code, Section 1071.

5. This affidavit is intended to show merely that there is probable cause for the requested criminal complaint and does not set forth my complete knowledge regarding this matter.

## III. Probable cause.

### A. Background.

6. I am aware from a review of public records that on March 18, 2025, Eduardo Flores-Ruiz ("Flores-Ruiz") (b. 1994) was charged in Milwaukee County Circuit Court Case Number 2025CM000814 with three counts of Battery-Domestic Abuse-Infliction of Physical Pain or Injury.

7. Agents from the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement, Enforcement and Removal Operations ("ICE ERO") identified Flores-Ruiz as an individual who was not lawfully in the United States. A review of Flores-Ruiz's Alien Registration File ("A-File") indicated that Flores-Ruiz is a native and citizen of Mexico and that Flores-Ruiz had been issued an I-860 Notice and Order of Expedited Removal by United States Border Patrol Agents on January 16, 2013, and that Flores-Ruiz was thereafter removed to Mexico through the Nogales, Arizona, Port of Entry. There is no evidence in the A-File or DHS indices indicating that Flores-Ruiz sought or obtained permission to return to the United States.

8. The Milwaukee ICE ERO Office determined through biometric fingerprint comparison that the fingerprints of the individual charged in Milwaukee County Case Number 2025CM000814 match those in the A-File for the Eduardo Flores-Ruiz removed from the United

States as described above. On or about April 17, 2025, an authorized immigration official found probable cause to believe Flores-Ruiz was removable from the United States and issued a warrant for his arrest. The warrant provided, "YOU ARE COMMANDED to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien [Flores-Ruiz identified on warrant]." Upon his arrest, Flores-Ruiz would be given a Notice of Intent/Decision to Reinstate Prior Order. He would then have an opportunity to contest the determination by making a written or oral statement to an immigration officer.

9. The Milwaukee ICE ERO Office was aware that on April 18, 2025, Flores-Ruiz was scheduled to attend a hearing in his criminal case. The hearing was set to take place in Courtroom 615, in front of Milwaukee County Circuit Court Judge **HANNAH C. DUGAN.** Based on the above information, on April 18, 2025, members of the Milwaukee ICE ERO Task Force traveled to the Milwaukee County Courthouse, with Flores-Ruiz's arrest warrant in hand, for the purpose of executing the warrant.

10. I am aware that law enforcement routinely executes warrants and makes arrests in the public areas of buildings such as the Milwaukee County Courthouse. The reasons for this include not only the fact that law enforcement knows the location at which the wanted individual should be located but also the fact that the wanted individual would have entered through a security checkpoint and thus unarmed, minimizing the risk of injury to law enforcement, the public, and the wanted individual. As such, members of the Milwaukee ICE ERO Task Force developed a plan to arrest Flores-Ruiz in a public area outside of Courtroom 615 following his scheduled criminal court appearance before **Judge DUGAN**.

11. I am aware that two prior arrests in public areas of the Milwaukee County Courthouse Complex of individuals who were not lawfully present in the United States had

3

received public attention. Both incidents involved individuals who had been charged with criminal offenses but who were not in custody and appearing for scheduled hearings in their criminal cases. I also am aware that pursuant to its policies, which had been made known to courthouse officials, the Milwaukee ICE ERO Task Force was focusing its resources on apprehending charged defendants making appearances in criminal cases – and not arresting victims, witnesses, or individuals appearing for matters in family or civil court.

### B. Arrival of arrest teams at the Milwaukee County Courthouse and notification of intended arrest.

12. Six members of the Milwaukee ICE ERO Task Force planned to take part in the arrest of Flores-Ruiz on April 18, 2025. This included ICE ERO Deportation Officer A, Customs and Border Protection Officer A, FBI Special Agents A and B, and Drug Enforcement Administration ("DEA") Special Agents A and B. The agents were generally dressed in plain clothes and intended to effectuate the arrest in as low-key and safe of a manner as possible.

13. At approximately 8:00 am on April 18, 2025, Deportation Officer A and CBP Officer A arrived at the Milwaukee County Courthouse, presented identification to a security guard, and explained that they were present to make an arrest. Deportation Officer A and CBP Officer A were asked to show not only their credentials but also their badges. The security guard stated that she needed to speak with a supervisor. A shift sergeant with Milwaukee County Sheriff's Office was contacted and spoke to Deportation Officer A. They discussed the details of the planned arrest, including in which courtroom Flores-Ruiz was set to appear. The sergeant asked that any arrest wait until after the completion of the scheduled hearing before **Judge DUGAN**. As this was standard practice, Deportation Officer A and CBP Officer A agreed, and they were allowed to proceed unescorted to the public hallway outside of Courtroom 615.

14. The other members of the arrest team were already present in the sixth floor public hallway when Deportation Officer A and CBP Officer A arrived. Before Deportation Officer A and CBP Officer A arrived outside of Courtroom 615, FBI agents A and B had advised the courtroom deputy for Courtroom 615 that law enforcement was there to arrest Flores-Ruiz. FBI Agent A displayed his credentials to the courtroom deputy and informed him that they were there to assist ICE in arresting Flores-Ruiz. They agreed that the arrest would take place after Flores-Ruiz's court appearance. The agents then left the courtroom and took positions at different locations in the public hallway.

15. Case agents have interviewed the courtroom deputy present in Courtroom 615 on April 18, 2025, who corroborated the above information. The courtroom deputy had opened the doors to the courtroom at approximately 8:15 am and reported that individuals began checking in for the list of matters scheduled for that morning. The courtroom deputy had received a list of individuals appearing that day, and the courtroom deputy checked in defendants while attorneys checked in with the clerk.

16. The courtroom deputy explained that at approximately 8:15 am, FBI agents advised that they were working with ICE and were planning to arrest Flores-Ruiz. The courtroom deputy asked that the agents wait outside and arrest Flores-Ruiz after the hearing. The agents agreed and left the courtroom.

17. The courtroom deputy told case agents that after an ICE arrest in the courthouse earlier that month, a shift sergeant had asked bailiffs to alert a supervisor at the Milwaukee County Sheriff's Office if ICE agents were in the building. Accordingly, the courtroom deputy notified a shift sergeant.

18. Arrest team members reported that while waiting outside of the courtroom, a woman approached and took photos of arrest team members. DEA Agent B, who was inconspicuously seated away from the group, was not photographed. The individual taking photographs of the agents has been identified by multiple witnesses as an attorney employed by the State of Wisconsin Public Defenders Office ("Attorney A").

19. Team members observed Flores-Ruiz arrive on the 6th floor of the courthouse at approximately 8:43 a.m. He was greeted by his attorney, and the two entered Courtroom 615 together.

    C.    **Judge DUGAN learns of ICE's presence and confronts members of the arrest team.**

20. Witnesses have described **Judge DUGAN's** response to learning of ICE's presence. For example, the courtroom deputy indicated that when Flores-Ruiz arrived, **Judge DUGAN** already was on the bench and conducting proceedings (unrelated to the Flores-Ruiz matter). The courtroom deputy observed Attorney A (the individual who had photographed the agents) enter and approach **Judge DUGAN's** clerk. Attorney A stated that there appeared to be ICE agents in the hallway. Attorney A told the clerk where the agents were seated and what they were wearing.

21. The courtroom deputy reported that the clerk then got up and talked with **Judge DUGAN**. **Judge DUGAN** became visibly angry, commented that the situation was "absurd," left the bench, and entered chambers. At the time, Flores-Ruiz was seated in the gallery of the courtroom.

22. Another individual, Attorney B, was working as an Assistant District Attorney in **Judge DUGAN's** courtroom on April 18, 2025. According to Attorney B, there were

6

approximately eight criminal cases, including Flores-Ruiz's case, scheduled for pretrial hearings that morning. Attorney B was aware that the victims from Flores-Ruiz's criminal case were in court. While Attorney B was busy preparing for that morning's docket, Attorney B heard someone announce, "ICE is here." Shortly thereafter, Attorney B heard **Judge DUGAN** say that she was going to call the Chief Judge before leaving the courtroom.

23. Members of the arrest team reported the following events after **Judge DUGAN** learned of their presence and left the bench. **Judge DUGAN** and Judge A, who were both wearing judicial robes, approached members of the arrest team in the public hallway. Judge A's courtroom is located adjacent to **Judge DUGAN's** courtroom. Witnesses uniformly reported that **Judge DUGAN** was visibly upset and had a confrontational, angry demeanor. **Judge DUGAN** addressed Deportation Officer A and asked if Deportation Officer A was present for a court appearance. When Deportation Officer A responded, "no," **Judge DUGAN** stated that Deportation Officer A would need to leave the courthouse. Deportation Officer A stated that Deportation Officer A was there to effectuate an arrest. **Judge DUGAN** asked if Deportation Officer A had a judicial warrant, and Deportation Officer A responded, "No, I have an administrative warrant." **Judge DUGAN** stated that Deportation Officer A needed a judicial warrant. Deportation Officer A told **Judge DUGAN** that Deportation Officer A was in a public space and had a valid immigration warrant. **Judge DUGAN** asked to see the administrative warrant and Deportation Officer A offered to show it to her. **Judge DUGAN** then demanded that Deportation Officer A speak with the Chief Judge. **Judge DUGAN** then had a similar interaction with FBI Agent B and CBP Officer A. After finding out that they were not present for a court appearance and that they were with ICE, **Judge DUGAN** ordered them to report to the Chief Judge's office.

24. Judge A then escorted members of the arrest team away from Courtroom 615, down the hall, and through a set of double doors towards the reception area for the Chief Judge's office. DEA Agent B, who was not recognized by **Judge DUGAN** and Judge A as being part of the arrest team, remained behind outside of Courtroom 615.

25. The courtroom deputy reported observing a portion of the above-described events in the hallway. According to the courtroom deputy, shortly after **Judge DUGAN** was advised of ICE's presence, the courtroom deputy left the courtroom to look for an unrelated defendant (whom the courtroom deputy was seeking to arrest for an open warrant). The courtroom deputy saw **Judge DUGAN** in her robe in the public hallway telling one of the federal agents that he needed to go talk to the Chief Judge. **Judge DUGAN** appeared visibly angry and was walking quickly. As soon as the agent entered the Chief Judge's vestibule area, the courtroom deputy saw **Judge DUGAN** walk south down the hallway and enter a locked door near Courtroom 615. I am familiar with the floor plan for the sixth floor of the courthouse and believe the door **Judge DUGAN** entered led to a non-public hallway from which she could access her courtroom and chambers.

26. DEA Agent B, who had remained in the hallway and had not been recognized as a member of the arrest team, reported that **Judge DUGAN** walked around the hallway and appeared to be looking for additional agents before she returned to her courtroom.

27. Once inside the office of the Chief Judge, Deportation Officer A showed Judge A his credentials and the administrative warrant. Judge A asked the Chief Judge's clerk to make a copy of the warrant and asked whether the Chief Judge was available. The clerk advised that the Chief Judge was not in the building but later advised that he was on the phone. At that point, Judge A left, and Deportation Officer A went inside a more private area of the Chief Judge's office to speak with him on the phone. During their conversation, the Chief Judge stated he was working

8

on a policy which would dictate locations within the courthouse where ICE could safely conduct enforcement actions. The Chief Judge emphasized that such actions should not take place in courtrooms or other private locations within the building. Deportation Officer A asked about whether enforcement actions could take place in the hallway. The Chief Judge indicated that hallways are public areas. When the Chief Judge expressed interest in talking to ICE ERO management about this policy, Deportation Officer A provided him with contact information for ICE ERO's Assistant Field Office Director.

28. While Deportation Officer A was speaking with the Chief Judge, DEA Agent A, CBP Officer A, and FBI Agents A and B waited in the vestibule area outside the Chief Judge's Office. DEA Agent A departed the area after a short while. **Judge DUGAN's** courtroom deputy then approached the remaining arrest team members and stated that the courtroom deputy was not the one who had notified **Judge DUGAN** about their arrest plans. The courtroom deputy also made a comment about **Judge DUGAN** "pushing" Flores-Ruiz's case through, which the arrest team interpreted to mean that **Judge DUGAN** was attempting to expedite Flores-Ruiz's hearing.

### D. Judge DUGAN escorts Flores-Ruiz through a "jury door" to avoid his arrest.

29. Multiple witnesses have described their observations after **Judge DUGAN** returned to her courtroom after directing members of the arrest team to the Chief Judge's office. For example, the courtroom deputy recalled that upon the courtroom deputy's return to the courtroom, defense counsel for Flores-Ruiz was talking to the clerk, and Flores-Ruiz was seated in the jury box, rather than in the gallery. The courtroom deputy believed that counsel and the clerk were having an off-the-record conversation to pick the next court date. Defense counsel and Flores-Ruiz then walked toward each other and toward the public courtroom exit. The courtroom deputy then saw **Judge DUGAN** get up and heard **Judge DUGAN** say something like "Wait, come with me."

9

Despite having been advised of the administrative warrant for the arrest of Flores-Ruiz, **Judge DUGAN** then escorted Flores-Ruiz and his counsel out of the courtroom through the "jury door," which leads to a nonpublic area of the courthouse. These events were also unusual for two reasons. First, the courtroom deputy had previously heard **Judge DUGAN** direct people not to sit in the jury box because it was exclusively for the jury's use. Second, according to the courtroom deputy, only deputies, juries, court staff, and in-custody defendants being escorted by deputies used the back jury door. Defense attorneys and defendants who were not in custody never used the jury door.

30. Attorney B similarly explained that after returning to the courtroom, **Judge DUGAN** forcefully motioned for Flores-Ruiz's attorney and a male she did not know (Attorney B had never met Flores-Ruiz) to approach. Flores-Ruiz's attorney appeared to be confused by the judge's gesture but complied with her directive. Judge DUGAN commanded Flores-Ruiz's attorney and the male to leave through a backdoor of the courtroom. Attorney B then saw **Judge DUGAN** escort Flores-Ruiz's attorney and the male through a non-public door near the courtroom's jury box. Shortly thereafter, **Judge DUGAN** came back to the courtroom and conducted hearings on that morning's docket. Later that morning, Attorney B realized that Flores-Ruiz's case had never been called and asked the court about it. Attorney B learned that Flores-Ruiz's case had been adjourned. This happened without Attorney B's knowledge or participation, even though Attorney B was present in court to handle Flores-Ruiz's case on behalf of the state, and even though victims were present in the courtroom.

31. A Victim Witness Specialist (VWS) employed by the Milwaukee County District Attorney's Office was present in Courtroom 615 on April 18, 2025. The VWS made contact with the victims in Flores-Ruiz's criminal case, who were also in court. The VWS was able to identify Flores-Ruiz based upon the victims' reactions to his presence in court. The VWS observed **Judge**

**DUGAN** gesture towards Flores-Ruiz and an unknown Hispanic woman. The VWS stated she believed the Hispanic woman may have been an interpreter. However, based on the VWS's description of the woman and other witness statements, I believe the Hispanic woman to which the VWS referred was Flores-Ruiz's attorney. The VWS stated that **Judge DUGAN** then exited through the jury door with Flores-Ruiz and the Hispanic woman. The VWS was concerned because Flores-Ruiz's case had not yet been called, and the victims were waiting.

32. Another attorney ("Attorney C"), who was in Courtroom 615 on April 18, 2025, to represent a client, also advised case agents that he observed **Judge DUGAN** forcefully direct two individuals, a man and a woman, to leave through the jury door. Attorney C indicated that this was done with a "stern" tone.

### E. Ruiz makes it out of the courthouse and is arrested after a foot chase.

33. After leaving the Chief Judge's vestibule and returning to the public hallway, DEA Agent A reported that Flores-Ruiz and his attorney were in the public hallway. DEA Agent B also observed Flores-Ruiz and his attorney in the hallway near Courtroom 615 and noted that Flores-Ruiz was looking around the hallway. From different vantage points, both agents observed Flores-Ruiz and his counsel walk briskly towards the elevator bank on the south end of the sixth floor. I am familiar with the layout of the sixth floor of the courthouse and know that the south elevators are not the closest elevators to Courtroom 615, and therefore it appears that Flores-Ruiz and his counsel elected not to use the closest elevator bank to Courtroom 615. DEA Agent A followed Flores-Ruiz and his attorney towards the south elevator bank. At approximately 8:50 a.m., DEA Agent A alerted other members of the arrest team that DEA Agent A was on the elevator with Flores-Ruiz. While on the elevator, Flores-Ruiz and his attorney spoke to each other in Spanish,

11

which DEA Agent A did not understand. They exited the elevator on one of the bottom floors of the courthouse and used the Ninth Street public entrance/exit to leave the building.

34. Having received the above-referenced information from DEA Agent A, other members of the arrest team scrambled to locate Flores-Ruiz and arrest him. DEA Agent B and FBI Agents A and B took another elevator down to one of the bottom floors of the courthouse and quickly exited the building onto 9th Street. After DEA Agent A notified the team that Flores-Ruiz was in the front of the courthouse near the flagpole, the agents ran towards the front of the courthouse. FBI Agent B and DEA Agent A approached Flores-Ruiz and identified themselves as law enforcement. Flores-Ruiz turned around and sprinted down the street. A foot chase ensued. The agents pursued Flores-Ruiz for the entire length of the courthouse and ultimately apprehended him near the intersection of W. State Street and 10th Street. Flores-Ruiz was handcuffed and detained. Around 9:05 a.m., or approximately 22 minutes after the arrest team first spotted Flores-Ruiz on the sixth floor of the courthouse, FBI Agent A communicated to the surveillance team that Flores-Ruiz had been arrested. Deportation Officer A and CBP Officer A were notified that Flores-Ruiz was in custody while they were still inside the courthouse speaking with the Chief Judge on the phone.

## IV. Conclusion.

35. Based on the above information, I have probable cause to believe that **Judge DUGAN** violated Title 18, United States Code, Section 1505, and Title 18, United States Code, Section 1071.