UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

    *Plaintiff,*

    *v.*                              Case No. 25-CR-0089-LA

HANNAH C. DUGAN,

    *Defendant.*

---

## DEFENDANT'S MEMORANDUM SUPPORTING MOTION TO DISMISS

---

## I.

### INTRODUCTION

This is an extraordinary prosecution that poses a threat to federalism and judicial independence. In practical terms of American governmental design, consider starkly what it proposes.

One morning, plainclothes federal agents with badges and baseball caps on a bench outside a state courtroom decided how they wanted a judge to control that courtroom and the people in and near it. For not doing as they wished, the judge faces federal criminal charges.

Judges, like legislators and executive officials, are not above the law. But they do enjoy a judicial immunity with deeper roots than the Republic itself. Similarly, the Constitution makes the federal government the supreme sovereign. The framing generation was wary of giving too much authority to the new federal government. Federalists and anti-federalists alike, they would have blanched at the prospect of the federal government prosecuting state judges for official acts. While the Reconstruction Amendments gave the federal Congress distinct powers to prevent state officials from denying federal constitutional rights to people, it did not invite Congress to criminalize the judicial acts of state judges under its Article I powers.

This prosecution is barred by judicial immunity long rooted in common law and by the Tenth Amendment and the Constitution's vertical separation of powers. The Court can also avoid those constitutional questions by acknowledging that neither statute the government invokes reaches official acts of state court judges. Unlike the only statute the Supreme Court has found to abrogate state judges' criminal immunity, 18 U.S.C. § 242, the statutes here were not enacted pursuant to the Fourteenth Amendment and were not focused on state action. There is no reason to think that Congress, when enacting 18 U.S.C. §§ 1071 and 1505, envisioned their application to the official acts of state court judges or abrogated judicial immunity.

The Court faces the duty, then, of dismissing the indictment now. These proceedings have been barred from the start.

## II.

### ALLEGATIONS

Because Judge Dugan rightly asserts judicial immunity and the Tenth Amendment as bars to prosecution, the Court should not engage in factfinding. A bar like immunity blocks proceedings at the outset. *See generally* section III.D and *Trump v. United States*, 603 U.S. 593, 630 (2024) ("The essence of immunity is 'its possessor's entitlement not to have to answer for his conduct' in court").[1]

Yet the Court must decide whether the conduct the indictment alleges falls within a judge's official functions, at their perimeter, or altogether outside official duties and powers. Only acts that are wholly or partly within a judge's official functions get immunity, as Judge Dugan explains below.

She takes the indictment's allegations at face value. They are not all accurate. But the Court can assume them true for purposes of the bars she asserts here.

---

[1] The law of English-speaking nations long has recognized several outright bars to prosecution. In addition to immunity, others that come to mind are infancy and *autrefois convict* or *autrefois acquit*. As to the latter two, *see* IV WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 329–30 (1769). Those now are implemented through the Fifth Amendment's double jeopardy clause and the Fourteenth Amendment as to the states. *See Abney v. United States*, 431 U.S. 651, 653, 659–62 (1977) (double jeopardy a bar to prosecution, allows interlocutory appeal under collateral order doctrine); *Benton v. Maryland*, 395 U.S. 784 (1969) (Fifth Amendment double jeopardy protection incorporated into Fourteenth Amendment due process clause). At one time, too, English law recognized so-called idiocy or lunacy as a bar to prosecution; what today we might call incompetency or serious mental disease or defect. IV BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND at 22–25 (addressing infancy, idiocy and lunacy. Blackstone grouped the last two together).

The first count alleges that on Good Friday, April 18, Judge Dugan knowingly concealed a defendant, E.F.R., who appeared that morning in her courtroom, aware that a warrant had been issued for his arrest. That count offers no detail.

But the second count does. It concerns the same defendant. That count accuses her of "corruptly endeavor[ing]" to influence, obstruct and impede the due and proper administration of law under which a "pending proceeding," the "administrative arrest" of the same man, was "being had" by a federal agency. She supposedly confronted ICE agents and told them falsely that they needed a judicial warrant, then directed them to leave the public hallway outside her courtroom to go to the chief judge's office a few feet away. She then addressed the defendant's case off the record while some of the agents were in the chief judge's office. Next, she directed the defendant and his lawyer out of her courtroom through a "non-public jury door," causing him to emerge into the same public hallway.[2] She finally told the defendant's lawyer that the defendant could appear by Zoom for his next court date.

The day before arraignment, Judge Dugan moved to dismiss this indictment as barred by judicial immunity and by the allocation of power retained by the states—and denied the federal government—under the Tenth Amendment to the United States Constitution. She renews and explains that motion now.

---

[2] The indictment omits this detail, but there is no dispute that the jury door opened into the same public hallway 15 feet or less to the right of the usual courtroom door (as one faces that door from the public hallway). Two federal agents saw him emerge there.

By 1607 judicial immunity would have barred this prosecution in England, or in the colonies that became the United States of America. Today in our United States, judicial immunity bars it still. So does the structure of the United States Constitution itself, encapsulated in the Tenth Amendment. Dismissal here flows from a straightforward application of long-settled law. The indictment itself is an ugly innovation. Its dismissal will not be.

## A. History of Judicial Immunity.

As the Supreme Court explained in *Pulliam v. Allen*, 466 U.S. 522, 529 (1984), "The starting point in our analysis is the common law. Our cases have proceeded on the assumption that common-law principles of legislative and judicial immunity were incorporated into our judicial system and that they should not be abrogated absent clear legislative intent to do so."

Since at least the early seventeenth century, English judges have been immune from criminal prosecution for official acts. Early nineteenth-century America adopted the same rule. The lone abrogation of judicial immunity is for judicial acts that violate a person's civil rights. The Reconstruction Amendments made that possible.

"Judicial immunity has been around a long time." *Rockett v. Eighmy*, 71 F.4th 665, 668 (8th Cir. 2023). In the early 1600s, Lord Edward Coke held that a judge could not be prosecuted for conspiracy for judicial acts in presiding over a murder trial. *Floyd v. Barker*, 12 Co. Rep. 23, 25, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607).

Judicial immunity from prosecution continued through the common law into the early years of our republic. "The doctrine which holds a judge exempt from a civil suit *or indictment*, for any act done, or omitted to be done by him, sitting as judge, has a deep root in the common law." *Yates v. Lansing*, 5 Johns. 282, 291, 1810 WL 1044 (N.Y. Sup. Ct. 1810) (italics added), *aff'd*, 1811 WL 1445 (N.Y. 1811).

It continued up to the Civil War. *Hamilton v. Williams*, 26 Ala. 527, 533, 1855 WL 345 (Ala. 1855) (recognizing the rule "that a judge is exempt from a civil suit, or indictment, for any act done, or omitted to be done by him, sitting as a judge"), quoting *Yates*, 5 Johns. at 282–91.

In the aftermath of the Civil War, Congress passed and the states ratified the Thirteenth, Fourteenth, and Fifteenth Amendments: the Reconstruction Amendments. All three amendments contain an enforcement clause. U.S. CONST. amend. XIII, § 2 ("Congress shall have power to enforce this article by appropriate legislation"); U.S. CONST. amend. XIV, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article"); U.S CONST. amend. XV, § 2 (similar).

This was a significant innovation. John Bingham, the principal drafter of the first section of the Fourteenth Amendment, believed the amendments gave Congress the power to enforce the Bill of Rights. ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION xxiv, 64 (2019).

And enforce Congress did. In 1866, Congress passed the first of the Enforcement Acts, which, in part now codified in 18 U.S.C. § 242, made it a crime for any person acting under the color of law to deprive another person of constitutional rights. *Id.* at 66. The acts passed over President Johnson's veto. He argued that the "legislation thus proposed invades the judicial power of the state." *Id.*; VETO MESSAGE FROM THE PRESIDENT OF THE UNITED STATES, President Andrew Johnson (March 27, 1866).[3]

But the Reconstruction Amendments did not alter the general rule of judicial immunity. Late nineteenth century courts understood that "judges . . . are not liable to an ordinary criminal process, like an indictment, for official doings however corrupt." *See* FLOYD R. MECHEM, A TREATISE ON THE LAW OF PUBLIC OFFICES AND OFFICERS § 1023, at 677–78 (1890), citing, *inter alia*, *Floyd*, 12 Co. Rep. at 25.

In 1871, the Supreme Court relied on *Yates* and Lord Coke's *Floyd* to recognize continued judicial immunity in civil cases. *Bradley v. Fisher*, 80 U.S. 335, 347 ns.12 & 13, 347–48 (1871), citing *Yates*, 5 Johns. at 291 and *Floyd*, 12 Co. Rep. at 25.

---

[3] Available at: https://www.presidency.ucsb.edu/documents/veto-message-438.

And as cases arising from the Enforcement Acts came to the Supreme Court, immunity persisted for judges' official acts. In *Ex Parte Virginia*, a state court judge, Judge Coles, was indicted for refusing to seat black jurors. *Ex Parte Virginia*, 100 U.S. 339, 340 (1879). He raised judicial immunity as a defense. *Id.* at 348. The Court rejected the argument, but it did not say that judicial immunity from criminal prosecution no longer applied. *Id.* at 348–49. First, it held that seating jurors was not a judicial act because it was ministerial. *Id.* at 348. And second, it held that even if it was a judicial act, the judge's refusal to seat black jurors was "outside of his authority" under his own state's law. *Id.* at 348–49. It was not an official act.

In 1896, the Supreme Court relied on judicial immunity to recognize civil executive immunity. *Spalding v. Vilas*, 161 U.S. 483, 498 (1896). In doing so, the Court cited *Bradley*. *Id.* at 493, citing *Bradley*, 80 U.S. 335. And it reiterated the general rule of judicial immunity from *Yates*:

> The doctrine which holds a judge exempt from a civil suit or indictment for any act done or omitted to be done by him, sitting as judge, has a deep root in the common law. It is to be found in the earliest judicial records, and it has been steadily maintained by an undisputed current of decisions in the English courts, amidst every change of policy, and through every revolution of their government.

*Id.* at 494, quoting *Yates*, 5 Johns. at 291.

The Supreme Court eventually concluded that Congress did not intend to abrogate *civil* judicial immunity in the Enforcement Acts, the civil provisions of which are now codified at 42 U.S.C. §§ 1981, 1982, 1983, and 1985. *Pierson v. Ray*, 386 U.S. 547, 553–55 (1967) (Warren, C.J.), citing *Bradley*, 80 U.S. 335.

The Court has, however, in *dicta* in civil cases, said that judges are not entitled to *criminal* judicial immunity in Enforcement Act cases. *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) (denying injunctive relief and observing, "Judges who would willfully discriminate on the ground of race or otherwise would willfully deprive the citizen of his constitutional rights, as this complaint alleges, must take account of 18 U.S.C. § 242"); *Imbler v. Pachtman*, 424 U.S. 409, 428–29 (1976) (recognizing civil immunity but observing, "Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of 18 U.S.C. § 242, [ ] the criminal analog of § 1983") (note omitted).

The rule is clear. Congress abrogated judicial immunity in *criminal* constitutional rights cases but not in *civil* constitutional rights cases. *Pulliam*, 466 U.S. at 530–31, 540–41. "Rather than reading 42 U.S.C. § 1983 to abrogate judicial immunity in the civil liability context the way that 18 U.S.C. § 242 did for criminal liability, the Court instead drew the opposite conclusion." Note, *Judicial Immunity at the (Second) Founding: a New Perspective on § 1983*, 136 HARV. L. REV. 1456, 1471 (2023).

In criminal cases not involving denial of civil rights, though, nothing has changed. In the mid-twentieth century, one court observed:

> The rule of the common law exempting a judge from indictment for any act done or omitted to be done when sitting as a judge still prevails, except as far as it has been changed by particular statutes or by some constitutional provision.

*Commonwealth v. Tartar*, 239 S.W.2d 265, 266 (Ct. App. Ky. 1951), quoting 48 C.J.S., *Judges*, § 71; *see also United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944). "Judicial immunity continues to apply today, not only in prosecutions like *Floyd*, but in civil-rights actions brought under 42 U.S.C. § 1983." *Rockett*, 71 F.4th at 669.

Last year, the United States Supreme Court returned to judicial immunity from criminal charges for official acts, but only indirectly. The 2024 *Trump* decision repeatedly relied on *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), as establishing that the President enjoys absolute immunity for official acts. *Trump*, 603 U.S. at 611. *Fitzgerald* itself was rooted in cases applying absolute judicial immunity, both civil and criminal, to official acts, like *Pierson*. *See Trump*, 603 U.S. at 611, 631. *Pierson*, as Judge Dugan notes above, held that civil "immunity of judges for acts within the judicial role is [ ] well established." *Pierson*, 386 U.S. at 554–55.

If the *Pierson* holding suggested presidential immunity to criminal liability, it expressly did the same for judicial immunity. *Trump* also twice cited *Fitzgerald,* where it relied on *Spalding*, 161 U.S. 483. *Trump* 603 U.S. at 618, 632 n.3. As discussed above, *Spalding* concluded that civil executive immunity should apply the same as civil judicial immunity for "acts done by them in the course of the performance of their judicial functions." *Spalding*, 161 U.S. at 498.

That is, *Spalding* recognized that common law had not distinguished between absolute judicial immunity from civil and criminal liability related to official acts. *Trump* did nothing to upend this deeply rooted judicial immunity from criminal

liability. Rather, it clarified that the President is entitled to the same immunity from prosecution for official conduct that judges have long held. *Trump*, 603 U.S. at 618.

In short, only conduct plainly well outside the scope of a judge's job and official acts has no immunity at all. *See also Forrester v. White*, 484 U.S. 219, 229 (1988) ("[I]t was the nature of the function performed, not the identity of the actor who performed it, that informed our immunity analysis;" judicial civil immunity case).

Today, then, an American judge has immunity from prosecution for official acts, except for acts that violate basic constitutional liberties of an individual. Congress has gone no further. It cannot under the Reconstruction Amendments.

**B. Modern Scope of Judicial Immunity.**

1. *Unofficial Acts Without Immunity.*

To understand and revisit specifically that scope of judicial immunity, it helps to start concretely with what is *not* within the scope of that immunity. Like anyone else, judges can be prosecuted and convicted under criminal statutes of general application for conduct wholly unrelated to any official or judicial power. For example, state judges who accept sacks or envelopes of cash to acquit murder defendants at future bench trials, regardless of their guilt, can go to federal prison. *See, e.g., United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995) (accepting bribes for acquittals or convictions of lesser included offenses, directly and through bagmen; one the Operation Greylord judges). Likewise judges who accept bribes to fix minor cases. *See United States v. LeFevour*, 798 F.2d 977 (7th Cir. 1986) (also an

Operation Greylord judge). So can state judges who shake down lawyers in civil cases, for loans and other favors. *See United States v. Holzer*, 840 F.2d 1343 (7th Cir. 1988) (another Operation Greylord case).

The same is true of a federal judge who perjures himself and makes false statements while in office about crimes committed before he was a judge, in spite of the judge's argument that he could not be tried on an indictment before impeachment. *United States v. Isaacs*, 493 F.2d 1124, 1132–44 (7th Cir. 1974) (*per curiam* with one judge dissenting in part and concurring in part and one judge dissenting).

Two Pennsylvania judges who accepted kickbacks for sending delinquent boys to private juvenile detention centers went to federal prison. *Pennsylvania: Sentence in 'Kids for Cash' Scheme*, NEW YORK TIMES, at A11 (Nov. 5, 2011). The chief judge of New York's highest state court went to federal prison after harassing a woman with whom he was having an extramarital affair and threatening to kidnap her daughter. *Wachtler Charged in Indictment Detailing Harassment Campaign*, NEW YORK TIMES, at A1 (Feb. 2, 1993) (the initial allegations also included extortion). Judges can go to federal prison for tax evasion. United States Attorney's Office (D. Minn.) PRESS RELEASE, *Former United States Tax Court Judge and Husband Sentenced for Multi-Year Tax Fraud Conspiracy* (June 22, 2017).[4]

---

[4] Available at http://justice.gov/usao-mn/pr/former-united-states-tax-court-judge-and-husband-sentenced-multi-year-tax-fraud.

Finally, if proven, a Kentucky judge soon may learn that swindling federal funds with a phony payroll scheme is an unofficial act. Christopher Leach, *Trial Date Set for KY Judge Accused of Stealing $400,000 with Fake Employee on Payroll*, LEXINGTON HERALD-LEADER (May 16, 2025).[5]

In all, judicial immunity does not apply to three categories of crimes:

- A judge's wholly unofficial acts enjoy no immunity from prosecution. The same remains true for presidents. *Trump*, 603 U.S. at 615–16. For one, a judge who committed crimes before he became a judge, and then lied about them in an IRS interview after he became a judge, had no judicial immunity. Former Illinois Governor Otto Kerner learned that, to recur to one example above. *Isaacs*, 493 F.2d at 1132–44. Likewise a judge who evades her own federal income taxes, to recur to another.

- As noted above, a judge whose official acts deprive an individual of constitutional rights that the Thirteenth, Fourteenth, or Fifteenth Amendments protect is subject to criminal prosecution, if Congress has used its enforcement powers under those Reconstruction Amendments to abrogate judicial immunity. *Pulliam*, 466 U.S. at 540–41.

- A judge whose judicial status enables him to exact bribes or kickbacks, to extort lawyers for favorable loans or other personal benefits, or to commit a sexual assault in chambers has no immunity for those extrajudicial crimes, either. Such a judge may have coupled official acts in form—like sentencing delinquent boys to a detention facility—with an ordinary crime, but in these cases the judge always was pursuing self-enrichment or self-gratification and an official act was but an adjunct to the criminal scheme; a *quid pro quo*, often. The Operation Greylord judges and other cases listed above illustrate this category. *See also United States v. Brewster*, 408 U.S. 501, 526 (1972) (concerning legislative immunity; "Taking a bribe is, obviously, no part of the legislative

---

[5] Available at https://www.kentucky.com/news/local/crime/article306554401.html.

process or function; it is not a legislative act. It is not, by any conceivable interpretation, an act performed as a part of or even incidental to the role of a legislator").[6]

2. *Official Acts Within Immunity.*

Outside the setting of depriving people of constitutional rights under the Reconstruction Amendments, official acts within the scope of the judicial function do have absolute criminal immunity. That is true regardless of a judge's actual motives. *Bradley*, 80 U.S. at 354 (judge who disbarred lawyer as sanction for contempt of court was absolutely immune from suit, regardless of alleged malice or corrupt motive). The motives are not even a fair subject of inquiry. *Compare Trump*, 603 U.S. at 618 (as to acts within the core of Article II functions or at least partly implicating those functions, courts may not inquire into the president's motives). At least as to presidents, even acts at the "outer perimeter of his official responsibility" are entitled at least to a presumption of immunity. *Id.* at 614–15. Nothing in *Trump* suggests that judicial immunity is any less broad than presidential immunity, for purposes here.

---

[6] Note that Judge Dugan lists here mostly federal prosecutions of state court judges. If she considered state prosecutions of state judges for unofficial acts, the list of examples could go on indefinitely. Consider just one state. In California, within the last several weeks a state judge was convicted of murdering his wife as they watched television at home. CNN, *Jury Convicts a California Judge of Second-Degree Murder in His Wife's Shooting Death* (April 22, 2025), available at https://www.cnn.com/2025/04/22/us/california-judge-convicted-wife-shooting. Three decades earlier, another California state judge was convicted for sexual battery of a female lawyer in his chambers. Julio Moran, *Former Judge Convicted of Sexual Battery*, LOS ANGELES TIMES (April 29, 1995), available at https://www.latimes.com/archives/la-xpm-1995-04-29-me-60251-story.html.

A judge's official function and acts in turn are broad. They only begin in the courtroom itself. Perhaps foremost, a judge can err on a legal rule or in legal reasoning without falling outside the scope of official acts. That is why all states and the federal government have appellate courts.

Beyond that obvious truth, and without beginning to exhaust the list of official acts, a judge clearly performs official functions when she refuses to acknowledge lawyers who fail to stand when they speak to the court or, for that matter, fail to sit and speak directly into a microphone when they speak. Judges can control courtroom attire of anyone in attendance. A judge may, for specific example, jail someone for contempt if he refuses to remove his hat in the courtroom. Jon King, *Montana Mountain Man Sent to Jail After Refusing to Remove Hat*, NEWSTALK KGVO (Jan. 28, 2014);[7] *see also People v. Rainey*, 224 Cal.App.2d 93, 36 Cal. Rptr. 291 (1964). He may preclude parties or spectators from wearing buttons or other displays of support in the courtroom. *Norris v. Risley*, 918 F.2d 828, 832 (9th Cir. 1990), citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564 (1980). Judges can decide which table counsel and parties will use. *Webster v. State*, 680 S.W.2d 906 (Ark. 1984). They can prevent people from entering or leaving the courtroom at critical times, such as during the reading of final jury instructions. *State v. Brown*, 815 N.W.2d 609,

---

[7] Available at https://newstalkkgvo.com/montana-mountain-man-sent-to-jail-after-refusing-to-remove-hat.

617 (Minn. 2012); *U.S. ex rel. Tenner v. Gilmore*, No. 97-C-2305, 1998 WL 721115, at *11 (N.D. Ill. Oct. 8, 1998).

In rare circumstances, such as where witness safety or the appearance of a child witness demands, judges can clear a courtroom of spectators altogether, at least briefly. *United States ex rel. Latimore v. Sielaff*, 561 F.2d 691, 695 (7th Cir. 1977); *United States v. Yazzie*, 743 F.3d 1278, 1290 (9th Cir. 2014). Judges can direct which spectators or parties will leave the courtroom first, and where others will go. Indeed, that happened at the arraignment in this case. *See* John Diedrich, Daniel Bice, & Vanessa Swales, *Milwaukee Judge Hannah Dugan pleads not guilty to two criminal charges at federal hearing,* MILWAUKEE JOURNAL SENTINEL (May 15, 2025) ("At the end of the hearing, Dugan and her lawyers were escorted down a hallway from the second-floor courtroom, and the media were not allowed by courthouse security to follow.").[8]

Judges can jail or otherwise sanction anyone in the courtroom summarily for contempt of court. *Sacher v. United States*, 343 U.S. 1, 11 (1952). They can call cases in any order they please and adjourn or commence court at an hour they choose. *Morris v. Slappy*, 461 U.S. 1, 11 (1983) (broad discretion must be granted to trial courts on matters of continuances); *Barton-Smith v. State*, 848 S.E.2d 384, 389

---

[8] Available at: https://www.jsonline.com/story/news/2025/05/15/what-to-expect-at-court-appearance-for-wisconsin-judge-hannah-dugan/83605808007/.

(Ga. 2020) (no abuse of discretion when judge adjourned for the day in the middle of defendant's cross-examination of a witness).[9]

Outside the courtroom, judges may control anything and everything in the courthouse that impinges on (or could affect) proceedings within the courtroom. Judges may clear the hallway of demonstrators or others who threaten to disrupt proceedings by noise or otherwise. *Morrison v. Walker*, No. 1:13-CV-327, 2015 WL 11102144, at *2 (E.D. Tex. Sept. 24, 2015) (judicial immunity where judge had deputy use "physical force" to remove disruptive visitor from hallway outside of courtroom). They may order an obstreperous party—even the accused in a criminal case—removed from the courtroom for bad behavior, including while evidence proceeds. *Illinois v. Allen*, 397 U.S. 337, 346 (1970); *see also State v. Bush*, 714 P.2d 818, 823 (Ariz. 1986) ("the trial judge has the primary responsibility for controlling the conduct of spectators in the courtroom and the courthouse" and, if necessary, "may clear the courtroom and the courthouse of those who may be intimidating witnesses or other court personnel").

Judges may sequester witnesses outside the courtroom and, by prior restraint, order them not to learn or discuss testimony. *See* FED. R. EVID. 615(a), (b)

---

[9] In this case, the government intimates criminal *scienter* in the allegation that Judge Dugan called E.F.R.'s case too quickly. Had she instead delayed calling the case for hours, or even carried it over to the afternoon calendar (as Milwaukee County judges sometimes do), presumably the government would contend that this also would show intent to obstruct. Judicial immunity does not, cannot, turn on whether a state judge handles her calendar in accord with some Goldilocks 'just right' timetable set by federal law enforcement agents.

and similar or identical rules in every state. They may designate overflow rooms where members of the public must watch proceedings by closed-circuit television, if courtroom capacity requires. *United States v. Barrow*, No. CR 20-127 (CKK), 2021 WL 3602859, at *11 (D.D.C. Aug. 13, 2021).

For that matter, judges may remove disruptive people from the courthouse entirely, not just from the courtroom. *Stevens v. Osuna*, 877 F.3d 1293, 1305–06 (11th Cir. 2017) ("[T]he issuance of an order removing persons from the courthouse in the interest of maintaining such control is an ordinary function performed by judges"). They may require everyone entering the courthouse to clear a magnetometer or submit to other search at the entrance to the building. WIS. SCR 68.04 ("Day to day security decisions and case specific security are within the discretion of each individual judicial officer. The judicial officer shall consult as needed, with the chief judge, the sworn officers, or the court security officers"); *United States v. Smith*, 426 F.3d 567, 569, 576 (2d Cir. 2005) (underscoring the primary role of judges in controlling access to premises containing courtrooms).

Or they may conduct most court appearances remotely, by teleconference or video conference like Zoom, for their own convenience or the parties' ease. WIS. STAT. §§ 885.56 & 885.60; *see also* WIS. STAT. § 885.50.

More, a judge's official functions allow her to control conduct beyond even the courthouse. In some states today and in many places at one time, if a jury pool runs low, a judge may order the sheriff to dragoon passersby or bystanders

and press them into jury service as talesmen. *See, e.g., Lovejoy v. United States*, 128 U.S. 171, 173 (1888) (federal statute allowing use of talesmen if jury panel exhausted was not impliedly repealed by later statute); *Miera v. Territory*, 81 P. 586 (N.M. 1905) (the then-territory of New Mexico); WIS. STAT. § 756.07 (today).

Judicial power extends further still. Almost universally, a judge may require jurors—who have done nothing wrong at all—to leave their houses for days or weeks on end and spend nights under watch of sheriff's deputies or marshals, in crummy motel rooms stripped of televisions and telephones. Such is the plight of a sequestered jury. *United States v. Holovachka*, 314 F.2d 345, 352 (7th Cir. 1963) (district judge exercised sound discretion when it sequestered jury over the objection of the defendant). Or a judge may reach into kitchens and living rooms of jurors, miles from the courthouse and long after the business day, to restrict or outright foreclose access to the internet, televisions, social media, newspapers, and radios all in the name of preventing taint by information acquired outside court. *See* NEW YORK PATTERN JURY INSTRUCTIONS, Civil 1.11 (2013) ("It is important to remember that you may not use any internet services, such as Google, Facebook, Twitter or any others to individually or collectively research topics concerning the trial, which includes the law, information about any of the issues in contention, the parties, the lawyers or the court").

Again, these examples do not come close to an exhaustive list of judicial powers and official functions. They only illustrate the point.

3. *This Case*.

By any measure, though, Judge Dugan's indicted conduct is within the core of a judge's official acts and immunity. Here the government prosecutes her for official acts themselves, and only for her official acts. The charged acts are devoid of the self-enrichment or self-gratification that marks earlier cases in which judges were convicted for using judicial status as leverage or opportunity for a bribe, kickback, or favor, or to commit another crime. And they did not trench on any individual's constitutional rights protected under the Reconstruction Amendments.

On the indictment's own terms, her every action related to a pending case assigned to Judge Dugan's branch of the Milwaukee County Circuit Court, and thus to her courtroom, while she was on duty and robed. Every action concerned the people scheduled to appear before her that morning. She sought to ascertain what legal authority, if any, federal agents had to snatch from that courthouse a defendant with an active criminal case in her branch. Those agents were immediately outside her courtroom in the public hallway near the doors. Her acts concerned directing some of the agents to the chief judge, who, by appointment of the state supreme court, had the greatest administrative authority over the whole courthouse. *See* WIS. SCR 70.18, 70.19(1), 70.20, 70.21, 70.34.

The indictment describes actions concerning how and when Judge Dugan handled a defendant's appearance in court, within the parameters of her

morning docket and calendar. Her actions concerned what flexibility she would allow him for future appearances. Or they concerned which courtroom door a defendant would use to emerge into the same public hallway at the same time he would have in any event: through the doors at the end of the courtroom's aisle, or instead at most 15 feet away through the door just beside one of the courtroom's interior walls.

The indictment includes no hint of self-dealing. It includes no hint of bribery, extortion, kickbacks, tax evasion, stealing, harassment, sexual assault, or other extrajudicial misconduct. No hint of unlawful coercion, threat, or thuggery. No hint, in fact, of any *ultra vires* exercise of ordinary judicial power. Although the first count echoes the statute's reference to concealment, nothing in the indictment (or in the earlier criminal complaint) suggests any actual concealment of anyone or anything. In sum, nothing in this indictment sounds a claim of anything like the unofficial acts and extrajudicial self-dealing that have sent state judges to face trial on federal criminal charges.[10]

---

[10] The most similar case in recent times concerned a Massachusetts state court judge, Shelley M. Richmond Joseph, and her court officer. According to the press release from the United States Attorney's Office announcing Judge Joseph's indictment, she and her court officer were aware that an ICE agent was waiting with a warrant outside the courtroom in the lobby. But she directed the court officer to escort the defendant, his lawyer, and an interpreter from the courtroom, downstairs to a lock-up. From there, the court officer used his security access card to release the defendant through the sally-port exit. United States Attorney (D. Mass.) PRESS RELEASE (April 25, 2019), available at https://www.justice.gov/usao-ma/pr/massachusetts-district-court-judge-and-court-officer-indicted-obstruction-justice. After a change in Administration, a new United States Attorney dismissed that indictment on condition that the judge refer herself to the state judicial disciplinary agency. WGBH, *Feds Drop Case Against Newton Judge Charged in Immigrant's Escape* (Sept. 22, 2022), available at https://www.wgbh.org/news/local/2022-09-22/feds-drop-case-against-newton-

Most importantly, the indictment alleges nothing within the limited scope as to which Congress has—or could have—abrogated judicial immunity for official acts. Again, the Reconstruction Amendments granted Congress the power for the first time to enforce individual civil and constitutional rights against state actors. U.S. CONST. amend. XIV, § 5 ("The Congress shall have power to enforce, by appropriate legislation, the provisions of this article"). Congress did that with what are now 18 U.S.C. §§ 241, 242. It permitted state judges, among others, to be held liable criminally for violating people's constitutional rights under color of state law. The Supreme Court later recognized that limited abrogation of judicial immunity. *Imbler*, 424 U.S. at 429, citing *O'Shea*, 414 U.S. at 503.

But that gives the government no help here. Nothing in the indictment alleges that Judge Dugan violated any individual's constitutional rights. Not even close. And the federal government itself has no rights that the Constitution confers or protects. It has powers, yes; but rights, no. Nothing in the Fourteenth Amendment would allow Congress to abrogate judicial immunity, then, as to any act alleged in this indictment, even if Congress wanted to do that. The evidence that Congress ever has sought to do that, or hoped to do that? Zero.

judge-charged-in-immigrants-escape. State disciplinary proceedings remain pending against Judge Joseph. NPR/WBEZ Chicago, *Wisconsin Judge's Case is Rare But Not Unprecedented. There's Another Near Boston* (May 17, 2025), available at https://www.npr.org/2025/05/17/g-s1-67288/wisconsin-judge-hannah-dugan-immigrant-ice-case-boston-shelley-joseph. Setting aside judicial immunity issues, the allegations here are less serious than those against Judge Joseph.

To the contrary, the Supreme Court has held that Congress evinced no intention to strip absolute judicial immunity even when a judge's official acts violated the due process rights of a human being protected by the Fourteenth Amendment. *Pierson*, 386 U.S. at 554–55 (42 U.S.C. § 1983 did not abolish judicial immunity for such judicial acts, even if malicious or corrupt). Section 5 of the Fourteenth Amendment is the high-water mark of congressional authority to remove or limit judicial immunity. And this case, alleging official judicial acts that did not trench on any individual constitutional right, is nowhere near that.

This all means the federal government has indicted Judge Dugan only for doing what judges may do as a matter of official acts not denying the civil or constitutional rights of individuals. That indictment fails.

## C. The Tenth Amendment: Vertical Separation of Powers.

Usually, when lawyers and judges speak of the separation of powers, they refer to the allocation of core duties, and the overlap at the edges, among three branches of one sovereign's government. They explore what is legislative, executive, and judicial in its essence and where peripheral powers overlap or are shared. Put another way, they consider the horizontal separation of powers. In the federal system, that is an exercise in making meaning of the U.S. Constitution's structure, for of course the Constitution includes no express 'separation of powers' clause. But since the country's earliest years, the United States Supreme Court has understood it to compel such a separation, assuring the useful constraints of tension among the

branches of government. *See, e.g., Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) (judiciary, not Congress, is final arbiter of Constitution's meaning and the Constitution prevails over any contrary legislation or other law); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (extensive exploration of the boundary between executive and legislative powers, all as the judiciary determines those powers and their bounds).

Just as its structure necessarily implies a horizontal separation of powers, the Constitution's structure also establishes a vertical separation of powers.[11] That is, federal law is supreme in its allocated realm. U.S. CONST. art. VI, cl. 2. There, it tops any state law to the contrary. But its realm is limited and explicitly demarcated. The states—or the people at base—retain all governmental powers not allocated expressly to the federal government. No sovereign, neither federal nor the many states, is subordinate to another. Yet the federal and state governments are separated vertically, in a sense, with each bound to respect the other's realm.

And, similar to horizontal separation of powers, there are a few shared spaces at the edges of authority granted to (federal) or retained by (state) each. One example is the so-called "dormant" Commerce Clause. *See, e.g., Md. Comptroller of Treasury v. Wynne*, 575 U.S. 542, 548–51 (2015); *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588

---

[11] While still at the University of Wisconsin Law School, Professor Victoria Nourse was first to make popular use of this term in a context broader than, but including, the one Judge Dugan describes here. *See* Victoria Nourse, *The Vertical Separation of Powers*, 49 DUKE L.J. 749 (1999). Nourse herself borrowed the term from Justice Kennedy. *See Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy, J., concurring); Nourse, *Vertical Separation of Powers*, 49 DUKE L.J. at 751 n. 10.

U.S. 504, 514–15 (2019) (both noting that, while Commerce Clause is an affirmative grant of power to Congress and not a limitation on state power, still states may not discriminate unduly against out-of-state goods or undercut a national economic market even when Congress has not acted).

The Tenth Amendment is the most explicit assertion of this vertical separation of powers. It reads in full:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

U.S. CONST. amend. X.

But that amendment is not the only structural and textual marker of vertical separation of powers. The Third Amendment, for another, reflects that same balance, forbidding the federal government from commandeering people's homes and property to house federal troops in peacetime, or outside of law in wartime. U.S. CONST. amend. III.

As the Supreme Court has interpreted it in the last two decades, the Second Amendment is another marker with great contemporary salience: it preserves the right of the populace to bear arms, implicitly to reserve the possibility of taking them up in individual or collective self-defense. The latter is not just against foreign invaders, but implicitly against an overreaching domestic sovereign. *See District of Columbia v. Heller*, 554 U.S. 570, 591–95 (2008). Even the dissenters agreed that there is a role for a citizen militia. *Heller*, 554 U.S. at 637 (Stevens, J., dissenting).

Here specifically, the Constitution's vertical separation of powers means the Court must assess whether the federal government, through its executive branch, has lawful power to exact criminal punishment from Judge Dugan for doing in and near her state courtroom as the indictment contends. This is the core question here under the Tenth Amendment.

That is, has the federal government constitutional power to command a state government officer not to do as it alleges Judge Dugan did in the discharge of her official duties under state law? To tell her, no, you cannot muse that we need a judicial warrant to arrest someone in your state courthouse; no, you cannot send some of us down the hall to confer with your chief judge; no, you cannot handle a routine court appearance off the record and while some of us are not directly outside your courtroom in the hallway; no, you cannot usher a person out a second door so that he re-enters the hallway a few feet from the doors we expected him to use; and no, you cannot allow a party in a case pending before you to make future court appearances by Zoom? More, can the federal government insist that a state judge answer federal criminal charges if she does any or all of those things?

It cannot. The federal government does not count this power among those delegated to it under the Constitution. While a state judge is bound by federal law in deciding cases, *Testa v. Katt*, 330 U.S. 386, 392–94 (1947), the issues here are not about adjudication that honors proper federal law when state law conflicts with it. The Supremacy Clause applies first to the Constitution, and the Tenth Amendment

is part of that same Constitution. A federal assertion of power that offends the Tenth Amendment enjoys no supremacy.

Nothing in the Constitution allows the federal government to superintend the administration and case-by-case, daily functioning of state courts as this indictment proposes. Even less has the federal government the power to supersede the judgment of state judges in and near their courtrooms, on prosaic matters like the indictment alleges. *See also* WIS. SCR 68.04.

Consider the brief opinion in *Page Co. v. MacDonald*, 261 U.S. 446 (1923). There a resident of Ontario, Canada, brought suit against a Massachusetts corporation in Massachusetts state court. The corporation then sued her in federal court in Massachusetts, claiming that her state action was libelous. The corporation served her with the federal summons and complaint while she was attending a proceeding in the state court case. She pled in abatement, alleging statutory immunity from service while attending a court proceeding.

The Supreme Court sustained her claim of immunity from service of process under those circumstances. That immunity was founded on "the necessities of the judicial administration," and both federal and state courts have equal interest in those necessities. *Page Co.*, 261 U.S. at 448. In other words, the federal government could not claim that its judicial administration interests overrode the state's judicial administration interests in its own courts. In effect, that is exactly what the federal executive branch claims here.

And this dispute arises in the context of ordinary state judicial and criminal enforcement proceedings. Empirically, almost all criminal cases are in state courts in this country, under state law. That is a natural consequence of the fact that the states retain the general police power: they did not delegate that power to the federal government, although valid federal powers sometimes may produce similar results. *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146, 156 (1919) (Brandeis, J.); *see also Berman v. Parker*, 348 U.S. 26, 32 (1954) (explaining breadth of "police power").

This case, involving just the ordinary work of a state court, is quite unlike the peculiar power of the federal government to control adoption of Indian children in state courts through the Indian Child Welfare Act, even though marriage, adoption, and domestic relations generally are reserved to states. *See Haaland v. Brackeen*, 599 U.S. 255, 272–91 (2023) (ICWA does not violate anti-commandeering doctrine of Tenth Amendment because of Congress's express, plenary authority under Article I, § 1 to legislate with respect to Indian tribes; rejecting Tenth Amendment arguments across the board in the specific context of adoption of Indian children). The federal government has no similar express grant of authority here that would give it the control that this indictment asserts.

Judge Dugan instead had that authority and control. She is a duly elected Wisconsin state judge, WIS. CONST. art. VII, § 7, and here was performing the duties that both Wisconsin law and her chief judge assigned her. WIS. STAT. §§ 753.03,

757.01, WIS. SCR 70.19(3)(a). The state has a comprehensive system for correcting errors on direct appeal or by writ in appropriate cases (and for refusing to correct them as probably harmless, another notable official act within judicial power). WIS. STAT. chs. 808, 809. It has a code of judicial ethics. WIS. SCR Ch. 60. It has an established system of judicial discipline, including a disciplinary body, the Wisconsin Judicial Commission. That Commission has the power to enforce those ethical requirements. WIS. CONST. art VII, § 11; WIS. STAT. § 757.83; WIS. ADMIN. CODE §§ JC 1 through JC 6. The judicial disciplinary process under state law extends to the conduct alleged in this indictment. WIS. SCR 60.02, 60.03; WIS. ADMIN. CODE § JC 3.07.[12] And Wisconsin allows removal of judges by impeachment, recall, or address. WIS. CONST. art. VII, §§ 1, 11, 13.

All of these means of filling the state judiciary, overseeing it, and disciplining it are squarely within the powers retained by states under the U.S. Constitution. The states delegated the federal government no power to interfere with or replace state power—and state law—as to any of these functions. For that matter, Congress never has claimed that it was exercising any such claimed power in enacting the two statutes at issue here, 18 U.S.C. §§ 1071 and 1505.

This case fits the reasoning of *Gregory v. Ashcroft*, 501 U.S. 452 (1991), then. There, the Supreme Court held that, in the absence of a plain statement by Congress,

---

[12] As the public knows, the Wisconsin Supreme Court already has invoked its disciplinary power by suspending Judge Dugan during the pendency of this case.

the Court would not apply the ADEA to state court judges because it was "at least ambiguous whether Congress intended that appointed judges . . . be included" in that federal age discrimination law. *Gregory*, 501 U.S. at 470. Absent a plain statement of congressional intent, *Gregory* relied on the long line of cases recognizing "the authority of the people of the States to determine the qualifications of their most important government officials." *Id.* at 463. That is an authority that lies at the heart of representative government, *Gregory* noted, and "is a power reserved to the States under the Tenth Amendment." *Id.*

By contrast, this is not akin to a case in which a state court protective order alone makes a person a prohibited firearm possessor under federal law. That federal statute operates outside of state courts, plays no role in dictating when or whether state judges should issue or deny protective orders, and is subject only to enforcement by federal authorities. *Cf. United States v. Wilson*, 159 F.3d 280, 287–88 (7th Cir. 1998) (as to Tenth Amendment commandeering worries, "The present case, involving a federal criminal statute to be implemented by federal authorities, implicates no such concerns"). Here, the federal government instead seeks to contort federal statutes to punish actions in a state courthouse by a state judge herself in or near her courtroom, and within the scope of her official duties.

The Tenth Amendment brooks none of that. That has been true since its ratification in late 1791. Little wonder, then, that Congress has not asserted any power to apply these two statutes to state judges in circumstances like this

indictment alleges. This prosecution is barred under the Tenth Amendment and the Constitution's vertical separation of powers, too.

**D. Duty to Dismiss.**

Civil cases in which a defendant can assert a bar, like qualified or absolute immunity, are common. Courts can, and must, dismiss those cases at the outset. *Mitchell v. Forsyth*, 472 U.S. 511, 525–27 (1985) (executive branch official with only qualified immunity has a right to dismissal or immediate appeal; "The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial;" italics in original).

Unlike the civil docket, criminal cases in which the accused rightly can assert an immunity bar—not just a defense or objection, but an outright bar—to a federal prosecution are rare. Yet when they arise, as here, a court has a duty to dismiss an indictment just the same as a civil complaint.

    1. *Nature*.

The duty to dismiss this indictment as barred by the judicial immunity that attends official acts does not turn on a judge's motives. Indeed, those motives are beyond inquiry. *Trump*, 603 U.S. at 618–19; *Bradley*, 80 U.S. at 347 (as to judicial immunity specifically, "Nor can this exemption of the judges from civil liability [for judicial acts] be affected by the motives with which their judicial acts were performed. The purity of their motives cannot in this way be the subject

of judicial inquiry"). "Nor may courts deem an action unofficial merely because it allegedly violates a generally applicable law." *Trump*, 603 U.S. at 619.

Not only is there no need for an evidentiary hearing, then, there is no room for one. On its face, this indictment is barred by judicial immunity as every act it alleges falls well within the scope of a judge's official acts—no matter how differently another judge might have handled those (also with immunity) or how much the executive branch of a different sovereign might disagree with them.

2. *Timing*.

The correct time to meet the duty to dismiss is now. *Trump*, 603 U.S. at 635-36; *see also Abney*, 431 U.S. at 659–62 (interlocutory appeal available for denial of a motion to dismiss because double jeopardy bars prosecution); *Kastigar v. United States*, 406 U.S. 441, 448–53 (1972) (recognizing that transactional immunity bars a prosecution altogether, but holding that 1970 statute's grant of use and derivative use immunity satisfies the Fifth Amendment privilege against self-incrimination and does not bar prosecution).

For that matter, even if hypothetically the government could point here to some entirely unofficial act for which Judge Dugan has no judicial immunity, it could not use as evidence in such a non-existent case any of her official acts. *Trump*, 603 U.S. at 631–32.

### E.  Constitutional Avoidance Doctrine.

Although Judge Dugan thinks the Court's duty clear under the judicial immunity doctrine and the Tenth Amendment (and the vertical separation of powers that the latter signals), both of these raise constitutional questions. The Tenth Amendment bar obviously poses express constitutional questions. And even the judicial immunity bar, while rooted in centuries of common law, intersects with the Constitution: after the Civil War, the Fourteenth Amendment did empower Congress, for the first time, to enforce constitutional rights against state actors. True, nothing in this indictment raises any suggestion that Judge Dugan violated any individual's civil or constitutional rights. But the constitutional scope of congressional power to abolish immunity for civil rights violations under Section 5 of the Fourteenth Amendment is nearby.

The Court could consider, then, the canon of constitutional avoidance. "When legislation and constitution brush up against each other, our task is to seek harmony, not to manufacture conflict." *United States v. Hansen*, 599 U.S. 762, 781 (2023). So, even if a party's reading of ambiguous statutory language is not the best one, if that "interpretation is at least 'fairly possible,'" "the canon of constitutional avoidance would still counsel us to adopt it." *Hansen*, 599 U.S. at 781, quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018).

Here, in two ways the Court can avoid the significant constitutional questions that this prosecution raises. First, the Court can decide this case purely

on immunity grounds without reaching the Tenth Amendment and federalism questions. "[C]ommon-law principles of legislative and judicial immunity were incorporated into our judicial system and [] they should not be abrogated absent clear legislative intent to do so." *Pulliam*, 466 U.S. at 529; *see also Filarsky v. Delia*, 566 U.S. 377, 389 (2012). So, the Court need not decide whether Congress *could have* abrogated judicial immunity in the two statutes on which the indictment rests in 18 U.S.C. §§ 1071 and 1505 because Congress did not do so. *Cf.* 18 U.S.C. § 242 (applying to all who act "under color of any law").

Second, the Court easily and rightly can construe 18 U.S.C. §§ 1071 and 1505 to avoid any constitutional concern. The indictment alleges no concealment that would fall within the scope of § 1071. Nothing alleged comes remotely near the sort of conduct that federal courts have concluded may rise to concealment. *See Construction and Application of Federal Statute (18 U.S.C. § 1071 and similar predecessor provision) Making it Offense to Harbor or Conceal Person to Prevent Discovery and Arrest*, 16 A.L.R. FED. 253.

There also is no alleged "proceeding" within the meaning of § 1505. Assume that the federal agents had an administrative warrant for their quarry, as Count 2 of the indictment alleges. The administrative warrant, issued by one ICE employee to another, would have followed reinstatement of the earlier removal order directed at E.F.R. Under federal law, "The alien has no right to a hearing before an immigration judge under such circumstances." 8 C.F.R. § 1241.8(a). That section of

the Code of Federal Regulations makes clear that any proceeding concluded before the arrest of E.F.R. here.

Moreover, nothing attributed to Judge Dugan impeded, or could have impeded, any proceeding. In a similar context, the Seventh Circuit noted that there is no corrupt or wrongful impeding when a defendant has a legal right to affect a proceeding. *United States v. Matthews*, 505 F.3d 698, 705-06 (7th Cir. 2007) (obstructing justice under 18 U.S.C. § 1512(c)(1)), citing *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703–06 (2005) (construing 18 U.S.C. § 1512(b)). Because Judge Dugan acted within scope of her office here, she had a legal right to do as she did.

Then, as courthouse video shows conclusively, after he finished in her courtroom, E.F.R. emerged into the same public hallway where agents expected him. He emerged just a few feet from the back doors of the courtroom. At least two agents saw him walk into that hallway and followed him to the elevator. When and how they then decided to arrest had nothing to do with Judge Dugan.

## IV.

### CONCLUSION

This indictment breaks new ground. Dismissing it will not. Since 1788, by its allocation of governmental power horizontally across three very different branches, and vertically among federal government, state governments, and the people

themselves, our Constitution has provided the hope and the means to hold power to principled, public account.

This indictment would change that. But the rule of law itself, here rightly in service of justice, long has barred what the indictment threatens. Judicial immunity forecloses this prosecution. So do the limits of federal power under the Tenth Amendment.

The Court should dismiss the indictment.

Dated at Madison, Wisconsin, May 29, 2025.

Respectfully submitted,

HON. HANNAH C. DUGAN, *Defendant*

*s/ Dean A. Strang*
John H. Bradley
Wisconsin Bar No. 1053124
R. Rick Resch
Wisconsin Bar No. 1117722
William E. Grau
Wisconsin Bar No. 1117724
Dean A. Strang
Wisconsin Bar No. 1009868

STRANG BRADLEY, LLC
613 Williamson Street., Suite 204
Madison, Wisconsin 53703
(608) 535-1550
john@strangbradley.com
rick@strangbradley.com
william@strangbradley.com
dean@strangbradley.com

*s/ Steven M. Biskupic*
Steven M. Biskupic
Wisconsin Bar No. 1018217

STEVEN BISKUPIC LAW OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com

*s/ Jason D. Luczak, Nicole M. Masnica*
Jason D. Luczak
Wisconsin Bar No.  1070883
Nicole M. Masnica
Wisconsin Bar No. 1079819

GIMBEL, REILLY, GUERIN & BROWN LLP
330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
(414) 271-1440
jluczak@grgblaw.com
nmasnica@grgblaw.com