# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    **v.**                                   **Case No. 25-CR-89**

**HANNAH C. DUGAN,**

    **Defendant.**

---

# REPORT AND RECOMMENDATION
# ON DEFENDANT'S MOTION TO DISMISS

---

On May 13, 2025, a grand jury sitting in the Eastern District of Wisconsin returned a two-count indictment against Milwaukee County Circuit Court Judge Hannah C. Dugan. (Docket # 6.) Dugan is charged in Count One with knowingly concealing a person for whose arrest a warrant and process had been issued, in violation of 18 U.S.C. § 1071. She is charged in Count Two with obstruction of the United States Department of Homeland Security's removal proceedings, in violation of 18 U.S.C. § 1505. Dugan was arraigned on the charges and entered a plea of not guilty. (Docket # 17.) A jury trial before the Honorable Judge Lynn Adelman will be scheduled after resolution of pretrial motions.

Dugan moves to dismiss the indictment under Fed. R. Crim. P. 12(b) on the grounds that she, as a judge, is immune from criminal prosecution for judicial acts, that her prosecution violates the limits of federal power under the Tenth Amendment, and that the indictment could be dismissed under the canon of constitutional avoidance. (Docket # 21.) Additionally, two parties seek leave to file amicus curiae briefs. (Docket # 25; Docket # 32.)

The government opposes Dugan's motion (Docket # 28) and objects to the filing of both amicus briefs (Docket # 29; Docket # 39).

For the reasons explained below, I recommend that Dugan's motion to dismiss be denied. Further, the parties' requests for leave to file amicus briefs are granted.

## BACKGROUND

The indictment charges as follows:

### Count One

On or about April 18, 2025, Dugan knowingly concealed E.F.R., a person for whose arrest a warrant and process had been issued under the provisions of the law of the United States, so as to prevent the discovery and arrest of E.F.R., after notice and knowledge of the fact that a warrant and process had been issued for the apprehension of E.F.R., in violation of 18 U.S.C. § 1071;

### Count Two

On or about April 18, 2025, Dugan did corruptly endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely the administrative arrest of E.F.R. for purposes of removal proceedings conducted by the United States Department of Homeland Security, by committing affirmative acts to assist E.F.R. to evade arrest, including:

> a) confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;
>
> b) upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of

the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

c) addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

d) directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

e) advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

In violation of 18 U.S.C. § 1505. (Docket # 6.)

## LEGAL STANDARD

Fed. R. Crim. P. 12(b)(1) provides that a party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits. When deciding a motion to dismiss a criminal indictment, the court assumes that the indictment's factual allegations are true and must "view all facts in the light most favorable to the government." *United States v. Calhoun*, 710 F. Supp. 3d 575, 579 (N.D. Ill. 2024) (citing *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999)). The Federal Rules of Criminal Procedure, however, "do not provide a mechanism analogous to the motion for summary judgment in the Federal Rules of Civil Procedure." *United States v. Abramson*, No. 18 CR 681, 2023 WL 349842, at *3 (N.D. Ill. Jan. 20, 2023). Thus, if the "defense raises a factual dispute that is inextricably intertwined with a defendant's potential culpability, a judge cannot resolve that dispute on a Rule 12(b) motion." *Id.* (citing *United States v. Sampson*, 898 F.3d 270, 281 (2d Cir. 2018)).

## ANALYSIS

Dugan moves to dismiss the indictment on three grounds. First, she argues that as a state court judge acting within the scope of her official duties, prosecution is barred by judicial

immunity. Second, Dugan argues that under the allocation of power retained by the states under the Tenth Amendment, this federal prosecution violates the Constitution's separation of powers. And third, she argues the indictment should be dismissed under the canon of constitutional avoidance.

### 1. *Judicial Immunity*

Because the parties differ in their views on the applicable law, it is instructive to begin with a survey of the law on judicial immunity before turning to Dugan's arguments and to the application of the law to this case.

### 1.1 The History of Judicial Immunity in Civil Lawsuits

Judicial immunity is a long-recognized concept dating back over 400 years to English common law, insulating the judiciary from civil liability. *See* Jeffrey M. Shaman, *Judicial Immunity from Civil and Criminal Liability*, 27 San Diego L. Rev. 1, 3 (1990) (citing *Floyd v. Barker*, 77 Eng. Rep. 1305 (Star Chamber 1607)). Prior to the creation of the right to appeal, a losing litigant would seek nullification of a false judgment and a fine against the judge who rendered it. *Id*. However, once an appeals system was put into place, giving a dissatisfied litigant an avenue for redress, the concept of judicial immunity arose and was gradually accepted under the common law. *Id*.

### 1.1.1 The Early Years

The seminal case, *Floyd v. Barker*, decided by Lord Coke in 1607, addressed the question of whether a judge presiding over a murder trial could be prosecuted in another court for criminal conspiracy. *See* Note, *Judicial Immunity at the (Second) Founding: A New Perspective on § 1983*, 136 Harv. L. Rev. 1456, 1464 (2023). Lord Coke concluded that judges were immune from such prosecutions, stating: "a Judge, for any thing done by him as Judge, by

4

immunity. Second, Dugan argues that under the allocation of power retained by the states under the Tenth Amendment, this federal prosecution violates the Constitution's separation of powers. And third, she argues the indictment should be dismissed under the canon of constitutional avoidance.

### 1. *Judicial Immunity*

Because the parties differ in their views on the applicable law, it is instructive to begin with a survey of the law on judicial immunity before turning to Dugan's arguments and to the application of the law to this case.

### 1.1 The History of Judicial Immunity in Civil Lawsuits

Judicial immunity is a long-recognized concept dating back over 400 years to English common law, insulating the judiciary from civil liability. *See* Jeffrey M. Shaman, *Judicial Immunity from Civil and Criminal Liability*, 27 San Diego L. Rev. 1, 3 (1990) (citing *Floyd v. Barker*, 77 Eng. Rep. 1305 (Star Chamber 1607)). Prior to the creation of the right to appeal, a losing litigant would seek nullification of a false judgment and a fine against the judge who rendered it. *Id*. However, once an appeals system was put into place, giving a dissatisfied litigant an avenue for redress, the concept of judicial immunity arose and was gradually accepted under the common law. *Id*.

### 1.1.1 The Early Years

The seminal case, *Floyd v. Barker*, decided by Lord Coke in 1607, addressed the question of whether a judge presiding over a murder trial could be prosecuted in another court for criminal conspiracy. *See* Note, *Judicial Immunity at the (Second) Founding: A New Perspective on § 1983*, 136 Harv. L. Rev. 1456, 1464 (2023). Lord Coke concluded that judges were immune from such prosecutions, stating: "a Judge, for any thing done by him as Judge, by

4

the authority which the King hath committed to him, and as sitting in the seat of the King (concerning his justice) shall not be drawn in question before any other Judge . . . ." 77 Eng. Rep. at 1307. In other words, Lord Coke pronounced a rule of absolute immunity for all judicial acts.

*Floyd* is also important for articulating for the first time what are now considered some of the modern policies that underlie the doctrine of judicial immunity. Shaman, 27 San Diego L. Rev. at 3. Judicial immunity serves the following purposes according to Lord Coke: (1) it ensures the finality of judgments; (2) it protects judicial independence; (3) it avoids continual attacks upon judges who may be sincere in their conduct; and (4) it protects the system of justice from falling into disrepute. *Id*.

The first major application of judicial immunity by the United States Supreme Court occurred in *Randall v. Brigham*, 74 U.S. 523 (1868). In *Randall*, an attorney was accused of obtaining an agreement from a client that was "unconscionable and extortionate, and therefore grossly unprofessional" and was removed from his office as an attorney-at-law. *Id.* at 525–26. In response, the attorney sued the presiding judge for unlawful removal. *Id.* The Court, citing *Floyd*, stated that "it is a general principle applicable to all judicial officers, that they are not liable to a civil action for any judicial act done within their jurisdiction." *Id.* at 535. The Court left open a possible exception to this absolute immunity, however, "where the acts, in excess of jurisdiction, are done maliciously or corruptly." *Id.* at 536.

Three years later in *Bradley v. Fisher*, 80 U.S. 335 (1871), the Court made clear that civil judicial immunity applies even for malicious or corrupt acts. In *Bradley*, Attorney Joseph Bradley was a member of the bar of the Supreme Court of the District of Columbia and Judge George Fisher was one of the justices of that court. *Id.* at 344. While representing a party

5

during a trial before Judge Fisher, Attorney Bradley allegedly "accosted" the judge in a "rude and insulting manner." *Id.* After Judge Fisher effectively disbarred Bradley for his behavior, Bradley sued Judge Fisher for monetary damages. *Id.* at 344–45.

Invoking *Floyd*, the Court noted that the "principle . . . which exempts judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their judicial functions . . . has been the settled doctrine of the English courts for many centuries . . . and has never been denied . . . in the courts of this country." *Id.* at 347. The Court further stated the exemption of judges from civil liability cannot be affected by the motives with which their judicial acts were performed—"The purity of their motives cannot in this way be the subject of judicial inquiry." *Id.* Thus, even though Bradley accused Judge Fisher of "'wantonly, corruptly, arbitrarily, and oppressively intending to remove [Bradley] from his office as an attorney-at-law," *id.* at 338, the Court concluded that judges were not liable in civil actions for their judicial acts, even when such acts were taken in excess of their jurisdiction, *id.* at 351.

### 1.1.2   The Modern Era

In *Pierson v. Ray*, 386 U.S. 547 (1967), the Court granted certiorari to consider whether a local judge was liable for damages under 42 U.S.C. § 1983 for an unconstitutional conviction. *Id.* at 551. Section 1983 allows individuals to civilly sue State actors for depriving them of their rights, privileges, or immunities secured by the Constitution. 42 U.S.C. § 1983. The plaintiffs were members of a group of white and African-American Episcopal clergymen who attempted to use segregated facilities at an interstate bus terminal. 386 U.S. at 549. They sued local police officers and a municipal police justice for false imprisonment after they were

6

convicted of disturbing the peace. *Id.* The plaintiffs alleged that the judge's findings of guilt and sentences were based upon racial discrimination. *Id.* at 551.

The *Pierson* Court had "no difficulty" finding that the judge was immune from liability for damages for his role in the convictions as "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction," citing *Bradley* in support. *Id.* at 553–54. The Court stated that immunity "applies even when the judge is accused of acting maliciously and corruptly, and it is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences." *Id.* at 554 (internal quotation and citation omitted).

Shortly over a decade later, the Supreme Court again addressed judicial immunity in *Stump v. Sparkman*, 435 U.S. 349 (1978). In *Stump*, the mother of a fifteen-year-old girl presented a document entitled "Petition To Have Tubal Ligation Performed On Minor and Indemnity Agreement" to Judge Harold Stump for signature. *Id.* at 351. Judge Stump approved the petition, despite the fact that the petition "was not given a docket number, was not placed on file with the clerk's office, and was approved in an *ex parte* proceeding without notice to the minor, without a hearing, and without the appointment of a guardian ad litem." *Id.* at 360. The minor was sterilized without her knowledge under the pretext of having an appendectomy. *Id.* at 353. After learning the true nature of the surgery years later, the daughter sued multiple parties, including her mother and Judge Stump, for violation of her constitutional rights. *Id.* at 352.

7

The Court concluded Judge Stump was immune from civil liability. The Court reiterated that the "necessary inquiry" in determining immunity is "whether at the time [the judge] took the challenged action he had jurisdiction over the subject matter before him," as a judge "will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Id.* at 356–57 (internal quotation and citation omitted). The Court found that because the court over which Judge Stump presided was one of general jurisdiction, neither the procedural errors he may have committed nor the lack of a specific statute authorizing his approval of the petition in question made him liable. *Id.* at 359–60. Nor did the informality of the proceedings render Judge Stump's actions non-judicial. *Id.* at 361. Rather, the factors determining whether a judge's act is "judicial" relate to the nature of the act itself and the expectations of the parties—"whether it is a function normally performed by a judge" and "whether [the parties] dealt with the judge in his judicial capacity." *Id.* at 362. And in this case, the Court concluded that because Judge Stump performed the type of act normally performed only by judges and did so in his capacity as a circuit court judge; he was immune from civil liability, despite the "unfairness to litigants that sometimes results." *Id.* at 363.

Two years later, in *Dennis v. Sparks*, 449 U.S. 24 (1980), the Court was again faced with the question of judicial immunity for damages under § 1983. In *Dennis,* a state court judge enjoined the production of minerals from certain oil leases owned by the plaintiffs. *Id.* at 25. The appellate court subsequently dissolved the injunction as having been illegally issued. *Id.* The plaintiffs sued the judge for monetary damages under § 1983, alleging that the injunction had been corruptly issued as the result of a conspiracy between the judge and other defendants

8

to deprive plaintiffs of their property, i.e., two years of oil production, without due process of law. *Id.* at 25–26. The court of appeals upheld the district court's finding that the judge was immune from liability under § 1983, whether or not the injunction was issued as the result of a corrupt conspiracy. *Id.* at 26. The Supreme Court affirmed, stating again that the Court has consistently adhered to the rule that judges defending against § 1983 actions enjoy absolute immunity from damages liability for acts performed in their judicial capacities. *Id.* at 27. However, while the judge was immune from suit, the Court concluded that the conspiring parties could still be held liable under § 1983. *Id.* at 28.

The judge's co-conspirators argued that if the case went to trial, "the charge of conspiracy and judicial corruption will necessarily be aired and decided, the consequence being that the judge, though not a party and immune from liability, will be heavily involved, very likely as a witness forced to testify about and defend his judicial conduct." *Id.* at 30. The Court concluded, however, that there was no constitutionally based privilege immunizing judges from being required to testify about their judicial conduct in third-party litigation. *Id.* "Nor has any demonstration been made that historically the doctrine of judicial immunity not only protected the judge from liability but also excused him from responding as a witness when his co-conspirators are sued." *Id.* The Court concluded that judicial immunity was not "designed to insulate the judiciary from all aspects of public accountability," such as the normal obligation to respond as a witness when he has information material to a criminal or civil proceeding. *Id.* at 31 (citing *United States v. Nixon*, 418 U.S. 683, 705–707 (1974)). It explained that the concerns underpinning the concept of judicial immunity, a judge's independence and judicial performance, are not similarly found when a judge is required to testify against co-conspirators, noting that "a proceeding in which he cannot be held liable for

damages and which he need not defend, is not of the same order of magnitude as the prospects of being a defendant in a damages action from complaint to verdict." *Id.*

In *Forrester v. White*, 484 U.S. 219 (1988), the Court again was tasked with determining what constitutes a judicial act for immunity purposes. Under Illinois law, a circuit court judge has the authority to hire adult probation officers, who were removable at his discretion. *Id.* at 221. Judge White hired Cynthia Forrester as an adult and juvenile probation officer. *Id.* Judge White subsequently demoted Forrester and then terminated her employment, which Forrester alleged was an act of discrimination based on her sex in violation of the Equal Protection Clause of the Fourteenth Amendment. *Id.* 221–22. After a jury granted an award in Forrester's favor, Judge White moved for a new trial, which was granted, and then moved for summary judgment on the ground that he was entitled to judicial immunity from a civil damages suit. *Id.* at 222. Both the district court and court of appeals agreed that Judge White was immune from damages.

The Supreme Court reversed. In so doing, it noted that "[r]unning through our cases, with fair consistency, is a 'functional' approach to immunity questions" in which the court examines the "nature of the functions with which a particular official or class of officials has been lawfully entrusted" and seeks "to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions." *Id.* at 223. The Court stated that difficulties have arisen in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by a judge. *Id.* at 227. The Court reiterated that "immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches" but also noted that the Court "has never undertaken to articulate a precise and general definition of the class of acts entitled

to immunity." *Id.* The Court found, however, that the cases "suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Id.*

Thus, the Court found that judicial immunity did not apply to acts such as promulgating a code of conduct for attorneys, which is not an act of adjudication but one of rulemaking. *Id.* at 228. It concluded that in this case, Judge White was acting in an administrative capacity when he demoted and discharged Forrester. *Id.* at 229. The Court stated that while those acts may be quite important in providing the necessary conditions of a sound adjudicative system, the decisions at issue, however, "were not themselves judicial or adjudicative." *Id.* The Court stated that absolute immunity is a "strong medicine, justified only when the danger of [officials' being] deflect[ed from the effective performance of their duties] is very great." *Id.* at 230 (alteration in original). And in this case, the danger was "not great enough." *Id.* The Court further found that it was not significant that under Illinois law, only a judge could hire or fire probation officers, finding that: "To conclude that, because a judge acts within the scope of his authority, such employment decisions are brought within the court's 'jurisdiction,' or converted into 'judicial acts,' would lift form above substance." *Id.* Thus, the Court concluded that Judge White was not entitled to absolute immunity for the decision to demote and discharge Forrester. *Id.*

Three years later, in *Mireles v. Waco*, 502 U.S. 9 (1991), the Court again considered whether a judge acted within his jurisdiction, and whether the alleged conduct was a judicial act. *Id.* at 11. The plaintiff was a public defender who was scheduled to appear before the judge. *Id.* at 10. After counsel failed to appear, the judge allegedly ordered law enforcement to forcibly and with excessive force seize and bring the attorney to the courtroom. *Id.* The

11

Court stated that case law makes clear that immunity is overcome in only two sets of circumstances—actions not taken in the judge's judicial capacity and actions taken in the complete absence of all jurisdiction. *Id.* at 11–12. As to the first circumstance, in determining whether an act falls within the judge's judicial capacity, the Court clarified that the relevant inquiry must be the nature and function of the act rather than the act itself. *Id.* at 13. In other words, one must look to the particular act's relation to the general function normally performed by a judge. *Id.*

For instance, in this case, the judge's direction to the court officers to bring a person who is in the courthouse before him is a function normally performed by a judge; however, a judge's direction to carry out a judicial order with excessive force is not. *Id.* at 12. The Court concluded, however, that it cannot scrutinize only the particular act in question, because any mistake of a judge in excess of his authority would become nonjudicial as no improper act is "normally performed" by a judge. *Id.* The Court further explained that because judicial immunity is immunity from suit, not just from damages, judicial immunity is not overcome by allegations of bad faith or malice, which ordinarily cannot be resolved without discovery and trial. *Id.* at 11.

As to the second circumstance, the Court concluded that if the judge authorized and ratified the police officers' use of excessive force, he acted in excess of his authority; however, such an action—taken in the very aid of the judge's jurisdiction over a matter before him—cannot be said to have been taken in the absence of jurisdiction. *Id.* at 13. Thus, the Court found the judge immune.

In sum, the doctrine that a judge enjoys absolute immunity from civil lawsuits for monetary damages when engaging in judicial acts is solidly established. *But see Pulliam v. Allen,*

466 U.S. 522 (1984) (concluding that judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity under § 1983, nor does it bar an award of attorney's fees under § 1988). This is not, however, a civil lawsuit; Dugan has been criminally charged under federal statutes. Thus, the question is whether the clearly established principles governing judicial immunity in civil lawsuits applies to the criminal prosecutions of judges.

### 1.2    Judicial Immunity from Criminal Prosecution

As discussed above, *Floyd* was a criminal case. Thus, the first mention of judicial immunity in the context of a criminal case goes back to *Floyd*. As cited above, the Supreme Court's first major application of judicial immunity was in the two post-Civil War era cases of *Randall v. Brigham* and *Bradley v. Fisher*. And as authority for judicial immunity in the civil context, the *Randall* and *Bradley* Courts invoked *Floyd*. However, although the Supreme Court looked to Lord Coke's pronouncements as a starting point for judicial immunity in civil cases, in the 154 years since *Bradley* was decided, Dugan does not cite, and I have not found, cases where the Supreme Court invoked *Floyd* for the proposition that judicial immunity bars the criminal prosecution of judges for judicial acts.

The most we have gleaned from the Supreme Court about judicial immunity in the context of criminal cases have been in reference to 18 U.S.C. § 242, which is not charged in this case. Section 242, the criminal analogue to 42 U.S.C. § 1983, allows for criminal prosecution for the deprivation of constitutional rights while acting under color of state law. This criminal statute was passed as section 2 of the Civil Rights Act of 1866. *See* 136 Harv. L. Rev. at 1467. Although the language of the statute itself does not address its applicability to judges, the legislative history of the bill is clear that its applicability to state actors, including

13

judges, was of express concern to the drafters. In fact, in vetoing the bill, President Andrew Johnson was concerned that section 2 would subject judges to criminal prosecution if they "render judgments in antagonism with its terms," asserting that the provision "invades the judicial power of the State." CONG. GLOBE, 39th Cong., 1st Sess. 1680 (1866), *available at* https://www.congress.gov/congressional-globe/page-headings/39th-congress/(last visited July 7, 2025).

Upon reconsidering the bill after veto, the bill's sponsor, Senator Lyman Trumbull, responded that "a judge, if he acts corruptly or viciously in the execution or under color of an illegal act, may be and ought to be punished; but if he acted innocently the judge would not be punished." CONG. GLOBE, 39th Cong., 1st Sess. 1758. Similarly, Representative William Lawrence of Ohio stated that "it is better to invade the judicial power of the State than permit it to invade, strike down, and destroy the civil rights of citizens. A judicial power perverted to such uses should be speedily invaded." CONG. GLOBE, 39th Cong., 1st Sess. 1837.

Subsequent to the Act's passage, the Supreme Court upheld a judge's prosecution for a constitutional violation in *Ex parte Virginia*, 100 U.S. 339 (1880). In this case, a state court judge was criminally charged for excluding Black jurors from jury selection in violation of the Thirteenth and Fourteenth Amendments. *Id.* at 344. The judge argued that Congress could not punish a state judge for his official acts and by selecting a jury, he was performing an official judicial act. *Id.* at 348. The Court disagreed, stating that the duty of selecting jurors is a ministerial act; however, even if the act was judicial, the judge had no authority to select jurors in violation of the Constitution. *Id.* at 348–49.

14

Approximately 100 years later, while addressing judicial immunity in the civil context of § 1983, the Court invoked the threat of judicial prosecution under § 242 in response to arguments that civil immunity provides no recourse against corrupt judges. *See O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) ("On the contrary, the judicially fashioned doctrine of official immunity does not reach so far as to immunize criminal conduct proscribed by an Act of Congress.") (internal quotation and citation omitted); *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights on the strength of 18 U.S.C. s 242, the criminal analog of s 1983."); *Dennis*, 449 U.S. at 31 ("But judicial immunity was not designed to insulate the judiciary from all aspects of public accountability. Judges are immune from § 1983 damages actions, but they are subject to criminal prosecutions as are other citizens.").

In sum, although the 17th Century English case of *Floyd* declared judges immune from criminal prosecution for judicial acts, the Supreme Court has only cited *Floyd* in civil cases for the proposition that judges are immune for purpose of civil damages. The only context in which the Supreme Court has spoken on judicial immunity from criminal prosecution is regarding § 242, and the Court found that judges are *not* immune from criminal prosecution under this statute.

### 1.3    Dugan's Arguments

Dugan argues that English law and subsequent American common law begins with the position of absolute judicial immunity save for very limited, specifically articulated exceptions, such as Congress' statements in passing § 242. She contends that without Congress similarly expressing an intent to abrogate the common law of judicial immunity for

criminal prosecution of judges under §§ 1071 and 1505, it follows that she is immune from prosecution under those statutes.

Guided by this history, Dugan contends that only three exceptions have been made in which judges can be criminally prosecuted, none of which applies to her case. First, she argues that a judge can be prosecuted for her wholly unofficial acts. Second, she argues that a judge can be prosecuted for criminal deprivation of a constitutional right under § 242. And third, she argues that a judge can be prosecuted if she conducts an official act, but the act is coupled with an ordinary crime for the pursuit of self-enrichment or self-gratification. (Docket # 21 at 13–14.)

### 1.3.1 Common Law

*Floyd* is at the foundation of Dugan's argument for the existence of absolute immunity to criminal prosecution for judicial acts. *Floyd* does pronounce such a rule. However, while review of the history of judicial immunity supports that Lord Coke's pronouncements have taken root in American common law regarding judicial immunity in *civil* cases, the same cannot be said regarding criminal prosecutions. As discussed above, the only time the Supreme Court has cited to *Floyd* has been in support of judicial immunity in a civil case. I am not persuaded, therefore, that *Floyd* has taken root in American common law to shield judges from criminal prosecution for judicial acts as Dugan asserts.

Dugan cites to several more recent (i.e., the 19th Century) lower court cases, where, in the context of a civil case against a judge, the court cited the general proposition that since common law, judges are exempt from "a civil suit, or indictment, for any act done, or omitted to be done by him, sitting as a judge." *Hamilton v. Williams*, 26 Ala. 527, 530 (1855); *see also Yates v. Lansing*, 1810 WL 1044, at *7 (N.Y. Sup. Ct. 1810) ("The doctrine which holds a

16

judge exempt from a civil suit or indictment, for any act done, or omitted to be done by him, sitting as judge, has a deep root in the common law."). She also cites an Eighth Circuit case from two years ago, *Rockett v. Eighmy*, 71 F.4th 665 (8th Cir. 2023), in which the court states that "[j]udicial immunity continues to apply today, not only in prosecutions like *Floyd*, but in civil-rights actions brought under 42 U.S.C. § 1983." *Id.* at 669. But again, these are not criminal cases and the court's brief invocation of immunity from both "civil suit and indictment" provides weak support for the existence of a well-established principle of judicial immunity for judicial acts in criminal cases.

Dugan further cites several 20th Century cases that she again argues advances the concept that judges are immune from criminal prosecution for their official acts not involving constitutional rights. (Docket # 38 at 6.) These cases, however, are similarly unconvincing. She cites *Com. v. Tartar*, 239 S.W.2d 265 (Ky. 1951), a case addressing whether a judge is criminally immune for conducting "misfeasance in office." (Docket # 21 at 9–10.) The court in *Tartar* concluded that "misfeasance of a judicial officer, acting in his official capacity, did not constitute a criminal offense under the common law." 239 S.W.2d at 266. "Malfeasance or misfeasance in office," which some states make criminal either by statute or common law rule, precludes criminal liability by judicial immunity unless the malfeasance or misfeasance is accompanied by bad faith. Shaman, 27 San Diego L. Rev. at 18–19. But Dugan is not charged under a state statute or common law prohibition on malfeasance or misfeasance in office, she is charged under federal criminal statute for general offenses not related to malfeasance or misfeasance in office. Thus, *Tartar* is inapposite.

Dugan also cites to *United States v. Chaplin*, 54 F. Supp. 926 (S.D. Cal. 1944) in support of her argument. (Docket # 21 at 10.) In *Chaplin*, a judge was indicted for criminal conspiracy

to deprive civil rights in violation of a precursor to 18 U.S.C. § 242. The court concluded that the judge was criminally immune because he was acting within the scope of his judicial duties. While the court acknowledged the Supreme Court's holding in *Ex parte Virginia*, it distinguished the case based on the fact that the *Ex parte Virginia* judge was performing a ministerial rather than a judicial act in selecting jurors. *Id.* at 933. While the *Ex parte Virginia* Court did find the judge was conducting a ministerial act, the Court also stated that even if the selection of jurors could be considered a judicial act, the judge had no authority to exclude jurors on the basis of their race. 100 U.S. at 348–49. Furthermore, to the extent any doubt remained after *Ex parte Virginia* whether judges could be prosecuted for a criminal deprivation of constitutional rights, all doubt was removed by the Supreme Court's subsequent pronouncements in *O'Shea*, *Imbler*, and *Dennis*.

In short, I am unconvinced that these cases establish settled law on judicial immunity from criminal prosecutions related to official judicial acts as exists in the context of a civil lawsuit for monetary damages.

### 1.3.2 Dugan's § 242 Argument

Dugan contends that without Congress expressing an intent to abrogate the common law of judicial immunity for criminal prosecution of judges under §§ 1071 and 1505 as it did for prosecutions under § 242, it follows that she is immune from prosecution under those statutes. This argument assumes the truth of two underlying premises—(1) that judicial immunity from criminal prosecution is established in American common law and (2) that § 242 is an exception to that rule. As discussed above, the case for a common law judicial immunity in criminal cases rests on *Floyd* and *Floyd* has only been cited by the Supreme Court

18

in civil cases. Thus, there is weak evidence for the existence of a common law judicial immunity from criminal prosecution for official judicial acts.

Moreover, arguing that the lack of judicial immunity from prosecution for a violation of § 242 establishes that judges are immune from criminal prosecution under every other criminal statute overlooks the specific historical context in which § 242 was passed. And as the government argues, must Congress comb through every federal criminal statute to indicate which statutes apply to judges and which do not? I am unconvinced that the absence of judicial immunity for violations of § 242 establishes that judges are immune for judicial acts under all other criminal statutes.

### 1.3.3   Dugan's Three Exceptions to Judicial Immunity

Again, Dugan asserts that there are only three categories of cases for which judges are not immune from criminal prosecutions. First, a judge can be prosecuted for his wholly unofficial acts. Second, a judge can be prosecuted for criminal deprivation of a constitutional right under § 242. And third, a judge can be prosecuted if he conducts an official act, but the act is coupled with an ordinary crime for the pursuit of self-enrichment or self-gratification. (Docket # 21 at 13–14.)

The first category, wholly unofficial acts, does not merit discussion. The parties do not dispute that judges are not immune from prosecution for criminal acts wholly unrelated to their official duties. (Docket # 21 at 11.) Dugan cites, as an example, a state court judge in California who was recently convicted of murdering his wife as they watched television at home. (*Id.* at 14 n.6.) No one contends that this judge could reasonably invoke judicial immunity as a defense in that case.

Dugan's second category, criminal deprivation of constitutional rights under § 242, is discussed in depth above. Dugan is not charged under § 242 and agrees that judges are not immune from prosecution under § 242. (*Id.* at 9.) Thus, I will not address this category further.

Dugan's third category of cases, where judges are prosecuted for actions related to their duties as judges but are coupled with self-serving criminal activity such as accepting bribes or kickbacks, warrants further discussion. Dugan argues that these cases are distinguishable from other crimes for immunity purposes because of their self-serving nature. She contends that she, in contrast, was acting selflessly (Docket # 38 at 10) with "no hint of self-dealing" (Docket # 21 at 21). But whether a judge seeks his own self-gratification or self-enrichment is not the distinguishing feature for immunity. What matters is whether the judge, even in performing her official duties, is accused of committing a crime.

Take, for example, the infamous "Kids for Cash" scheme in which two Pennsylvania judges, Judges Michael Conahan and Mark Ciavarella, accepted kickbacks for sending juveniles to particular private detention centers. *Wallace v. Powell*, No. CIV.A 3:09-CV-0291, 2009 WL 4051974, *1 (M.D. Pa. Nov. 20, 2009). The judges were alleged to have used their influence as judicial officers to select the Pennsylvania Child Care and Western Pennsylvania Child Care as detention facilities, and intentionally filled those facilities with juveniles to earn their co-conspirators excessive profits. *Id.* Judges Conahan and Ciavarella were paid approximately $2.6 million for their influence. *Id.*

Conahan was specifically alleged to have done, amongst other things, remove funding from the Luzerne County budget from the Luzerne County facility; sign a secret "Placement Guarantee Agreement" with the Pennsylvania Child Care on behalf of Luzerne County; and grant an injunction which prevented the results of an audit of the Pennsylvania Child Care

facility from being disclosed to the public. *Id.* Ciavarella was alleged to have sentenced thousands of juveniles to detention in violation of their constitutional rights. *Id.* Both judges allegedly pressured court probation officers to make recommendations in favor of incarcerating juvenile offenders; concealed their unlawful proceeds; and failed to disclose their financial relationships with the other defendants. *Id.*

The judges were civilly sued under § 1983 for their actions. The court, considering the Supreme Court's jurisprudence on judicial immunity to date, found that judges have absolute immunity for conduct pursuant to their role as judicial officers. *Id.* at *6. The court determined that judicial immunity applies if a judge has jurisdiction over the dispute and conducted a judicial act, as opposed to an administrative, executive, or legislative one. *Id.* at *7. The plaintiffs argued that because the judges' decisions were made corruptly, or in a predetermined fashion, they were not judicial acts. *Id.* at *8. The court disagreed, stating, for example, that the allegation that Conahan had a corrupt motive for issuing an injunction was no different than the allegations against the judge in *Dennis*, where the Supreme Court found judicial immunity. *Id.* The court stated that Ciavarella's determinations of delinquency and sentences imposed were judicial acts, and the fact they were made corruptly or with malice was irrelevant. *Id.* However, to the extent the judges' actions were not judicial in nature, such as Conahan's signing of a "Placement Agreement" or the budget requests, judicial immunity did not shield this conduct. *Id.*

The court acknowledged that because of judicial immunity, Ciavarella would escape civil liability for the vast majority of his conduct, no matter how corrupt. *Id.* at *9. The court also stated, however, citing *O'Shea*, that the judges were still subject to criminal prosecution, noting that the "judges here have been indicted by a federal grand jury for the conduct for

which damages are sought in this case." *Id.* at *6. And Judges Conahan and Ciavarella were indeed indicted under federal racketeering laws. (*See* Indictment, Docket # 1 in *United States v. Conahan, et al.*, Case No. 09-CR-272 (M.D. Penn. 2009).)

What the "Kids for Cash" case shows is that while judges may be civilly immune for judicial acts, regardless of their motives, it does not follow that they are also criminally immune for their wholly judicial acts. Recall, the court found that Ciavarella's determinations of delinquency and sentences were clearly judicial acts. And while judicial immunity shielded him from civil liability, it did not protect him from criminal prosecution for the same acts.

Dugan cites to *United States v. Claiborne*, 727 F.2d 842 (9th Cir. 1984) as a "close call" regarding whether a judge is truly conducting wholly official acts in the context of criminal immunity. (Docket # 38 at 3.) In *Claiborne*, a federal judge was indicted for soliciting and receiving $30,000.00 from a Nevada brothel owner in return for being influenced in the performance of official acts, specifically, decisions regarding motions in a pending case. The judge was further accused of accepting money from this same individual in return for promising to secure the reversal of his criminal tax evasion conviction by bribing one or more of the judges of the Ninth Circuit Court of Appeals. *Id.* at 843. In finding the judge was not immune from criminal prosecution, the court stated that the "Constitution does not immunize a sitting federal judge from the processes of criminal law." *Id.* at 845.

The court rejected the argument that judicial independence would be diminished by subjecting judges to criminal prosecution. *Id.* at 848. The court found that judges enjoy the same protection as ordinary citizens from vindictive prosecution and that criminal prosecution "encounters several procedural barriers-such as the indictment, burden of proof, and presumption of innocence." *Id.* The court further concluded that "criminal conduct is not

part of the necessary functions performed by public officials" and punishment for such conduct would not interfere with the operation of a branch of government. *Id.* Rather, it "can scarcely be doubted that the citizenry would justifiably lose respect for and confidence in a system of government under which judges were apparently held to be above the processes of the criminal law." *Id.* at 849.

Dugan argues that in *Claiborne*, the judge, despite conducting the judicial acts of handling motions, "sold his office." (Docket # 38 at 3.) While true, this fact does not make *Claiborne* a "close call" as to whether immunity would apply. Rather, *Claiborne* reiterates the accepted principle that even when performing clearly judicial acts, such as deciding motions in a pending case, a judge is not immune from criminal prosecution for committing crimes while conducting the judicial act. While many of these cases involve crimes where the judge's motivation was financial gain, it does not follow and there is no authority for the proposition that criminal prosecution is limited to such cases.

### 1.3.4 Dugan's Reliance on *Trump v. United States*

Finally, Dugan cites to the Supreme Court's recent decision in *Trump v. United States*, 603 U.S. 593 (2024), where the Court found the President absolutely immune for criminal prosecution for conduct within his exclusive sphere of constitutional authority. While acknowledging that *Trump* was addressing immunity in the context of the President, Dugan argues that the Court indirectly addresses judicial immunity because, in her view, *Trump*'s pronouncement of Presidential immunity is grounded in the proposition that judges have absolute immunity in criminal cases for judicial acts.

In *Trump*, like here, the parties did not dispute that criminal immunity does not apply to a President's unofficial acts. *See id.* at 615. As to official acts, however, in arguing the

President is absolutely immune from criminal prosecution for acts within the outer perimeter of his official responsibilities, President Trump looked to *Nixon v. Fitzgerald*, a civil case in which the Court concluded that, "In view of the special nature of the President's constitutional office and functions, we think it appropriate to recognize absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Id.* at 606 (citing *Fitzgerald*, 457 U.S. at 756). Trump argued that given the Court's pronouncement in *Fitzgerald* regarding civil immunity for acts on the "outer perimeter," he must be absolutely immune from criminal prosecution for such acts as well. *Id.*

The Court agreed, finding that the "nature of Presidential power requires that a former President have some immunity from criminal prosecution for official acts during his tenure in office," and with respect to the exercise of his "core constitutional powers," the immunity must be absolute. *Id.* As to non-core official actions falling within the "outer perimeter" of his official responsibilities, the Court concluded that the President has at least a presumptive immunity from criminal prosecutions. *Id.* at 614. The Court found that the government can overcome this presumption by showing that applying a criminal prohibition to the act would pose no dangers of intrusion on the authority and functions of the Executive Branch. *Id.* at 615.

In coming to this conclusion, the Court reiterated that the President is not above the law. *Id.* at 642. It stated that the "President, charged with enforcing federal criminal laws, is not above them." *Id.* at 614. However, the Court also found that it had to balance two competing interests—the President's ability to execute the duties of his office "fearlessly and fairly" and the fact that federal criminal law seeks to redress a wrong to the public as a whole,

not just to an individual. *Id.* at 614. In finding this balance, the Court concluded that the separation of powers principles necessitate the President having absolute immunity for core constitutional powers and at least a presumptive immunity for all official acts. *Id.* at 642.

Dugan argues that because the *Trump* decision repeatedly relied on *Fitzgerald*, and because *Fitzgerald* was rooted in cases applying absolute judicial immunity, it follows that *Trump*, in fact, simply "clarified that the President is entitled to the same immunity from prosecution for official conduct that judges have long held." (Docket # 21 at 10–11.) While Dugan asserts that *Trump* simply extended to the President the same immunity from prosecution that judges already have, this argument makes a leap too far. *Trump* says nothing about criminal immunity for judicial acts. And in *Fitzgerald*, while the Supreme Court looked to the historical jurisprudence regarding civil judicial immunity, the Court was clear that the grant of absolute immunity for civil damages for "outer perimeter" acts of the President was due to the "special nature of the President's constitutional office and functions." *Fitzgerald*, 457 U.S. at 756. Similarly in *Trump*, the Court noted that the President occupies a unique position in the constitutional scheme as the only person who alone composes a branch of government. 603 U.S. at 610.

Even so, absolute criminal immunity exists only for a President's "core constitutional powers," meaning those powers specifically articulated in the constitution, such as the power to pardon and the power to veto. *See id.* at 634. It is in those limited cases, because of the separation of powers, that a President's motive cannot be considered. *Id.* at 618. Thus, even if a president is accused of taking a bribe to grant a pardon, because a pardon is a "core" power given to the President by the constitution, it would violate the separation of powers for the judicial branch to question it. However, for the non-core powers, the Supreme Court did

not grant the President blanket immunity, instead saying these acts are only presumptively immune and this immunity could be overcome by showing that criminal prohibition posed no dangers of intrusion on the separation of powers. *Id*. at 615.

Perhaps in some future case the Supreme Court will expand the judicial immunity principles it has so firmly established in the civil context to the criminal prosecution of judges as Dugan urges. At this time, however, I am unconvinced that either the common law or the *Trump* decision provide the authority for applying the civil framework of absolute judicial immunity for judicial acts to the prosecution of judges for crimes that relate to official duties.

> 2. *Summary of the Existing Law on Judicial Immunity*

Having reviewed the law on judicial immunity in both the civil and criminal contexts and having considered the parties' arguments on the existing precedent, the applicable law can be summarized as follows. In the civil context, it is well-established and undisputed that judges have absolute immunity from civil lawsuits for monetary damages when engaging in judicial acts. While it is not always crystal clear what constitutes a "judicial act," the Supreme Court counsels courts to consider whether the act is a function normally performed by a judge and whether the parties dealt with the judge in his judicial capacity. *See Stump*, 435 U.S. at 362. The Court has stated there is an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform. *Forrester*, 484 U.S. at 227. The Court has articulated that judicial immunity is not overcome by allegations of bad faith or malice. *Mireles*, 502 U.S. at 11.

In the criminal context, review of the case law supports the following. First, judges are not immune from criminal prosecution for acts wholly outside their official roles as judges. Dugan cites several examples that fit into this category, such as a state court judge who was

convicted of murdering his wife as they watched television at home and a state court judge who was convicted of sexual battery of a female lawyer in his chambers. (Docket # 21 at 14 n.6.)

Second, judges are not immune from prosecution for the criminal deprivation of constitutional rights under 18 U.S.C. § 242.

And third, judges are not shielded by judicial immunity from criminal prosecution for acts, though related to official duties, are in violation of criminal law. *See, e.g.*, *Claiborne*, 727 F.2d 842; *Wallace v. Powell*, 2009 WL 4051974.

      *3.     Application of Judicial Immunity to the Allegations in the Indictment*

Applying the principles above, does judicial immunity shield Dugan from prosecution because the indictment alleges she violated federal criminal law while performing judicial duties? The answer is no. As discussed above, there is no firmly established absolute judicial immunity barring criminal prosecution of judges for judicial acts. Other than the 17th Century English case of *Floyd*, the United States Supreme Court has only applied the concept of judicial immunity for judicial acts in civil cases. Even before the lower courts, with the exception of the single "malfeasance in office" case cited by Dugan, the cases Dugan cites in support of her argument arise in the civil context.

Further, the category of cases where judges were prosecuted for conduct performed in their official role also answers this question in the negative. For example, in the "Kids for Cash" scheme described above, sentencing juveniles is indisputably within the scope of a judge's official duties. Thus, the *Wallace* court found the judges immune from civil suit. 2009 WL 4051974, at *9. The judges were still, however, prosecuted criminally because even

though the judges were performing official duties, their otherwise criminal conduct did not shield them from prosecution.

As discussed earlier, Dugan tries to distinguish her case by arguing that the charged acts are "devoid of the self-enrichment or self-gratification that marks earlier cases in which judges were convicted for using judicial status as leverage or opportunity for a bribe, kickback, or favor, or to commit another crime." (Docket # 21 at 20.) Again, the distinction that takes these official duty cases out of the shield of immunity is not self-enrichment or the motive of the judge. It is whether the criminal law has been violated. In other words, a judge's actions, even when done in her official capacity, does not bar criminal prosecution if the actions were done in violation of the criminal law.

Furthermore, consider the only case with similar allegations to this case. In *United States v. Joseph*, a judge on the Massachusetts District Court, Judge Shelley Richmond Joseph, was, similar to Dugan here, federally charged with obstruction of justice and obstruction of a federal proceeding in violation of §§ 1512 and 1505. In that case, an ICE officer working for the Department of Homeland Security arrived at the courthouse to take into custody an individual who had been arrested days earlier who was allegedly the subject of an immigration detainer and warrant based on a final order of removal. *United States v. Richmond Joseph*, No. 19-CR-10141, 2020 WL 4288425, at *1 (D. Mass. July 27, 2020). The DHS intended to detain the individual and effect his removal from the United States in the event he was released from state custody. *Id.* Joseph allegedly facilitated this individual's departure from the courthouse using the rear sally port door of the lockup on the courthouse's lower level, rather than through the main door leading from the courtroom to the lobby where the ICE officer was waiting. *Id.*

28

Joseph moved to dismiss the indictment on judicial immunity grounds and the parties "hotly contest[ed]" whether judicial immunity insulates against criminal liability or was restricted to civil lawsuits. *Id*. at *3. The district court declined to resolve the question, finding that even if judicial immunity did extend to the criminal context, it would only apply where a judge performed judicial acts within her jurisdiction. *Id*. And in this case, the indictment alleged that Joseph acted "corruptly" and such immunity, to the extent it exists, does not shield corruption or bribery. *Id*. The court concluded that it was "not within this Court's province on a motion to dismiss to determine whether judicial immunity, even if its reach encompasses criminal liability, provides a viable shelter for Joseph in the circumstances alleged here." *Id*.[1]

The indictment here, as in *Joseph*, alleges that Dugan acted "corruptly." (Docket # 6 at 2.) And as the *Joseph* court found, to the extent immunity exists in the criminal context, it does not shield against corruption. In my view, this is consistent with the cases where judges were prosecuted for performing official acts that were intertwined with bribery or extortion— even where judges are acting in their official role, when the judicial acts violate criminal law, judicial immunity does not bar prosecution.

I agree with Dugan and the amicus brief of the former judges that a judge plays many roles when sitting on the bench in a courtroom. She must not only interpret and apply the law to the facts, she must also ensure the efficient running of her courtroom. Thus, I agree that

---

[1] Joseph appealed the district court's denial on judicial immunity grounds. The First Circuit dismissed the appeal, concluding that it lacked jurisdiction to review the district court's dismissal "based on her asserted common-law defense of judicial immunity." *United States v. Joseph*, 26 F.4th 528, 534 (1st Cir. 2022). As Dugan does here, Joseph argued that judicial immunity protected her against not just conviction, but against prosecution. *Id*. at 533. The First Circuit disagreed, finding that "judicial immunity -- even assuming that it applies in this criminal case -- does not provide a right not to be tried that can serve as a basis for interlocutory review." *Id*. The court ultimately concluded that Joseph could not obtain interlocutory review of her judicial immunity defense unless she could show that her claimed right not to be tried was explicitly grounded in a statute or the Constitution, which she could not do, relying instead on common law. *Id*. at 534.

determining whether a warrant establishes probable cause; directing people outside her courtroom to talk with the Chief Judge about a planned arrest; addressing a case off the record; telling people in her courtroom what door to use to re-enter the public hallway; and allowing a party to appear by Zoom are all part of a judge's job. I also agree with Dugan and the former judges that the appellate courts are the proper forum to address disagreements with a trial judge's opinions, errors, or mistakes. However, I do not agree that the case law supports that these judicial acts bar prosecution where the indictment alleges that the acts were done "corruptly" or to facilitate violation of the criminal law.

At bottom, the indictment does not charge Dugan for "opining on the fly," managing her courtroom, or allowing someone to appear by Zoom for future hearings. There are no, and there cannot be, federal statutes criminalizing such conduct. Rather, the indictment charges Dugan with violating federal criminal laws by (1) "knowingly conceal[ing] E.F.R., a person for whose arrest a warrant and process had been issued under the provisions of the law of the United States, so as to prevent the discovery and arrest of E.F.R., after notice and knowledge of the fact that a warrant and process had been issued for the apprehension of E.F.R., in violation of 18 U.S.C. § 107" and by (2) "corruptly endeavor[ing] to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely the administrative arrest of E.F.R. for purposes of removal proceedings conducted by the United States Department of Homeland Security, in violation of 18 U.S.C. § 1505."

This conclusion does not leave judges acting in their official capacities or judicial independence at the mercy of prosecutors. As the Ninth Circuit stated in *Claiborne*, judges enjoy the "same protections as ordinary citizens from vindictive prosecution." 727 F.2d at

30

848. A prosecutor seeking to charge a judge of a criminal offense, if proceeding by criminal complaint as was the case here, must satisfy the reviewing judge that there is probable cause a federal crime has been committed. Additionally, the prosecutor must then present his case to a grand jury as required by the Fifth Amendment. And ultimately, the prosecutor must prove each of the elements of the charged offense beyond a reasonable doubt to a unanimous jury of twelve citizens.

For these reasons, I recommend that Dugan's motion to dismiss the indictment based on judicial immunity be denied.

> 4.    *Tenth Amendment*

Next, Dugan argues that her prosecution violates the Tenth Amendment's separation of powers. (Docket # 21 at 23–31.) The Tenth Amendment provides that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Tenth Amendment "restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, . . . is essentially a tautology. Instead, the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 156–57 (1992).

Dugan argues that the federal government, through its executive branch, lacks power to exact criminal punishment on a state court judge for "doing in and near her state courtroom as the indictment contends." (Docket # 21 at 26.) The crux of Dugan's argument is that her prosecution under federal law effectively overrides the State of Wisconsin's ability to administer its courts, stating that the Constitution does not allow the federal government "to

superintend the administration and case-by-case daily functioning of state courts as this indictment proposes." (*Id.* at 27.)

In *Joseph*, the Massachusetts judge and her co-defendant courtroom deputy raised a similar Tenth Amendment challenge. They argued that they were being charged for their lawful decision not to assist ICE in administering immigration laws, for the judge's decisions regarding how to manage her courtroom, and for the deputy's exercise of his daily duties. 2020 WL 4288425, at *4. The district court found that addressing these constitutional arguments "require the assessment of disputed facts, characterizations of the events underlying the Indictment, or other evidentiary analysis. Such fact-laden determinations are outside the scope of a motion to dismiss." *Id.*

The same is true here. The indictment alleges Dugan violated two federal statutes, 18 U.S.C. §§ 1071 and 1505, and cites the respective statutory language for both. Whether Dugan violated these statutes as the government accuses, or whether she was merely performing her judicial duties as Dugan asserts, these are questions for a jury that cannot be resolved on a motion to dismiss. Additionally, that the allegations could also be addressed, or are better addressed, by the state's own judicial discipline procedures does not, as a matter of constitutional law, require dismissal of the indictment.[2] For these reasons, I recommend Dugan's motion to dismiss on Tenth Amendment grounds be denied.

5.    *The Constitutional Avoidance Doctrine*

Finally, Dugan invokes the canon of constitutional avoidance to support dismissal of the indictment. Dugan's invocation of this canon, however, is misplaced. Constitutional

---

[2] In fact, the *Joseph* case was ultimately resolved with the government agreeing to drop the criminal case in exchange for Joseph's agreement to self-report to the state judicial discipline body. *See* Massachusetts Judge Faces New Scrutiny for Alleged Role in Immigration Case, *available at* https://courtscast.com/massachusetts-judge-faces-new-scrutiny-for-alleged-role-in-immigration-case/(last visited July 7, 2025).

avoidance is a canon of statutory construction that comes into play when the language of a statute is ambiguous; the canon is "a tool for choosing between competing plausible interpretations" of the statute. *Warger v. Shauers*, 574 U.S. 40, 50 (2014) (internal quotations and citations omitted). It counsels courts to first ascertain whether a construction of the statute is fairly possible to allow avoidance of the constitutional question. *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). The canon has "no application," however, "in the absence of . . . ambiguity." *Warger*, 574 U.S. at 50 (internal quotations and citations omitted).

Dugan first invokes the canon to argue that the two statutes under which she is charged—§§ 1071 and 1505—conflict with the Constitution based on the Tenth Amendment argument she raises above and based on the "intersection" between judicial immunity, rooted in the common law, and Congress' enforcement of § 242 against state actors, including judges. (Docket # 21 at 33.) She argues that the Court can avoid constitutional questions by deciding the case on immunity grounds rather than addressing the Tenth Amendment issue. (*Id.* at 33–34.) Again, this is not how the canon of constitutional avoidance is used. Dugan does not allege ambiguity in either statute that would require the Court to consider a plausible interpretation in harmony with the Constitution. She is simply repackaging her Tenth Amendment argument, which, for the reasons explained above, cannot be resolved on a motion to dismiss.

Dugan next invokes the canon to argue that the Court could "easily and rightly" construe §§ 1071 and 1505 to avoid any constitutional concern. (*Id.* at 34.) But Dugan does not raise any constitutional concerns with either statute. She argues that the indictment fails to allege conduct that constitutes "concealment" under § 1071. (*Id.*) This is not a constitutional issue; it is a factual issue to be resolved at trial. She further argues that the

indictment fails to allege a "proceeding" within the meaning of § 1505. (*Id.*) The indictment alleges that Dugan interfered with the removal proceedings of the Department of Homeland Security. While she argues that such removal proceedings cannot, as a matter of law, constitute a "proceeding" for purposes of the statute, once again, she is not arguing that the statute is ambiguous.

Thus, neither of these questions invoke the use of the canon of constitutional avoidance. Dugan raises no questions of ambiguity in the statutes, and I see none to address. Thus, I recommend Dugan's motion to dismiss be denied as to this ground as well.

6. *Factual Disputes Not Properly Resolved on Motion to Dismiss*

In litigating this motion, the parties contest both facts alleged in the indictment and facts beyond what is alleged in the indictment. This too counsels against dismissal. The court cannot resolve disputed questions of fact on a motion to dismiss. *See Abramson*, 2023 WL 349842, at *3. For example, Dugan argues that the federal agents disrupted her courtroom on April 18 to effectuate the arrest (Docket # 15 at 5), while the government asserts that the evidence at trial will show that the agents did not disrupt any proceedings, rather, Dugan affirmatively chose to pause an unrelated case, leave her courtroom, interrupt a colleague's proceedings to get her assistance, and then confront the agents in the public hallway (Docket # 28 at 6–7). Dugan further argues that she had a right to make decisions involving her courtroom and cases, including directing individuals to use a certain door, conducting a case off the record, and opining "off the cuff" on a legal issue and the federal law enforcement agents improperly interfered with her right to make those decisions. (Docket # 38 at 10–12.) The government, however, asserts that Dugan was not simply trying to run her courtroom, but intentionally misdirected the agents to the Chief Judge's office, knowing he was not there,

and then escorted E.F.R. into a non-public hallway with access to a stairwell leading to a courthouse exit to help him evade arrest. (Docket # 28 at 6–7.)

Dugan disputes the government's version of events and the government will have the burden of proving its allegations beyond a reasonable doubt at trial. However, these contested facts cannot be resolved at this juncture.

      7.    *Arguments of the Amici*

Two separate parties have moved for leave to file amicus curiae (friend of the court) briefs in this case. The first motion was filed by 138 former state and federal judges from across the United States. (Docket # 25.) These judges seek to file an amicus brief in support of granting Dugan's motion to dismiss the indictment. The second motion was filed by the Center for American Rights. (Docket # 32.) This organization seeks to file an amicus brief in support of denial of Dugan's motion to dismiss. Both motions are granted, and I thank the amici for their time and contribution to the consideration of the important issues presented by this motion.

Generally, because amici are not parties to the case, they cannot raise issues not advanced by the parties. *See, e.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97 n.4 (1991) ("[W]e do not ordinarily address issues raised only by amici"); *Butler v. Daimler Trucks N. Am., LLC*, 74 F.4th 1131, 1144 n.4 (10th Cir. 2023) (finding that because an "amicus is not a party," the court "ordinarily decline[s] to consider arguments raised only by an amicus"); *Dalombo Fontes v. Gonzales*, 498 F.3d 1, 2 (1st Cir. 2007) ("[W]e will not address an issue raised by an amicus that was not seasonably raised by a party to the case."); *Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991) ("Absent exceptional

circumstances, an issue waived by appellant cannot be raised by amicus curiae."). Thus, I have disregarded any challenges articulated by the amici that were not raised by either party.

## CONCLUSION

It is well-established and undisputed that judges have absolute immunity from civil lawsuits for monetary damages when engaging in judicial acts. This, however, is not a civil case. And review of the case law does not show an extension of this established doctrine to the criminal context. Accordingly, I recommend that Dugan's motion to dismiss the indictment on judicial immunity grounds be denied. I also recommend that the court declines her invitation to dismiss the indictment on Tenth Amendment grounds and on the canon of constitutional avoidance. Finally, it is important to note that nothing said here speaks to the merits of the allegations against Dugan. Dugan is presumed innocent, and innocent she remains, unless and until the government proves the allegations against her beyond a reasonable doubt to a jury at trial.

**NOW, THEREFORE, IT IS RECOMMENDED** that Dugan's Motion to Dismiss the Indictment (Docket # 15) be **DENIED**.

**IT IS FURTHER ORDERED** that the motions to file amicus briefs (Docket # 25 and Docket # 32) are **GRANTED**.

The motion for supplemental jury questionnaire (Docket # 24) will be addressed by Judge Adelman.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections

36

are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 7th day of July, 2025.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge