UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

  v.                                      Case No. 25-CR-89 (LA)

HANNAH C. DUGAN,

        Defendant.

## RESPONSE TO DEFENDANT'S OBJECTIONS
## TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The United States of America, by Acting United States Attorney Richard G. Frohling, hereby responds to defendant Hannah C. Dugan's objections to the Magistrate Judge's Report and Recommendation. For the following reasons, and those stated in the report and the government's prior response, this Court should overrule Dugan's objections and deny her motion to dismiss.

## **INTRODUCTION**

Dugan faces a two-count indictment alleging that on April 18, 2025, she attempted to unlawfully prevent the arrest of "E.F.R.," who was wanted on a federal immigration warrant for "purposes of removal proceedings conducted by the United States Department of Homeland Security." (Dkt. 6.) More particularly,

the indictment alleges that Dugan, upon learning that federal agents planned to execute the warrant in the Milwaukee County Courthouse:

> knowingly concealed E.F.R. to prevent his discovery and arrest on a warrant, in violation of 18 U.S.C. § 1071 (Count One); and

> corruptly endeavored to influence, obstruct, and impede E.F.R.'s arrest on a warrant by committing affirmative acts to assist E.F.R. in evading such arrest, in violation of 18 U.S.C. § 1505 (Count Two).

(Dkt. 6.)

> The affirmative acts alleged in Count Two include:

> a. confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;

> b. upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

> c. addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

> d. directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

> e. advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

(Dkt. 6 at 2.)

2

Dugan moved to dismiss the indictment based on judicial immunity, and alternatively, because of the "vertical separation of powers" in the Tenth Amendment. *See* Dkt. 15, 21, 45. More particularly, Dugan argued that she is entitled to absolute immunity from prosecution, claiming that the common law permits only three categories of crimes against judges, that none of them is charged here, and that she must avoid trial altogether. And citing the Tenth Amendment, she argued that the federal government lacks authority to prosecute state-court judges for official acts. *See id.*

In response, the government explained that judges have immunity from civil suit but not from federal criminal prosecution, and if judicial immunity applies at all, it immunizes only "judicial acts," which does not help Dugan because she acted outside her official role. *See* Dkt. 28 at 8-20. The government also explained that the Tenth Amendment provides no personal immunity and does not prevent the prosecution of state officials, including judges, for violating federal law.

In a 37-page report, Magistrate Judge Joseph thoroughly analyzed the parties' submissions. *See* Dkt. 43. Judge Joseph applied the proper standard of review, namely, that the indictment's allegations are presumed true and viewed most favorably to the government. Next, after an exhaustive review of the history of judicial immunity, she found no authority to bar this prosecution and rejected

3

Dugan's argument as an unprecedented and unauthorized expansion of judicial immunity outside its historical civil-law context. The magistrate judge also found that Dugan's reliance on the Tenth Amendment and the principle of constitutional avoidance was misplaced.

Dugan now has objected, essentially repeating the arguments that the magistrate judge rejected. For the reasons set forth below, because the magistrate judge's analysis was comprehensive and correct, the Court should overrule Dugan's objections and deny her motion pursuant to Fed. R. Crim. P. 59(b)(3).

## ARGUMENT

### I. The doctrine of judicial immunity applies to civil suits but does not shield Dugan from criminal liability for the acts alleged in the indictment.

In her objections, Dugan asserts that she is beyond the reach of statutes that apply to ordinary citizens who obstruct federal arrests because, unlike them, she is entitled to immunity for her "official acts" as a Wisconsin state court judge. (Dkt. 45 at 1.) In particular, Dugan claims that the magistrate judge's report and recommendation "clash[es] with first principles" and a doctrine of judicial immunity that dates back "four centuries," as well as the Supreme Court's recent decision in *Trump v. United States*, 603 U.S. 593 (2024). (Dkt. 45 at 2-3, 8.)

Dugan is wrong about the application and scope of judicial immunity. In the simplest terms, to quote the magistrate judge: "[J]udges are not immune from

4

criminal prosecution for acts wholly outside their official roles as judges," and even when a judge's actions are "related to official duties," there is no immunity for conduct that violates the criminal law. (Dkt. 43 at 26-27.) Instead, "generally, a judge is immune from *a suit for money damages*" for judicial acts. *Mireles v. Waco*, 502 U.S. 9 (1991) (per curiam) (emphasis added). The protection of judges from civil liability arose because it was in the public interest to have judges who were at liberty to exercise their independent judgment about the merits of a case without fear." *Dennis v. Sparks*, 449 U.S. 24, 31 (1980). But it does not protect judges from prosecution for their official acts.

To the contrary, the Supreme Court long "has recognized that a judge is not absolutely immune from criminal liability." *Mireles*, 502 U.S. at 10 n.1 (citing *Ex parte Virginia*, 100 U.S. 339, 348-49 (1880)). In fact, the Supreme Court has made clear that "*the judicially fashioned doctrine of official immunity does not reach so far as to immunize criminal conduct proscribed by an Act of Congress.*" *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) (cleaned up; emphasis added). The Court "has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law. Even

judges, cloaked with absolute civil immunity for centuries, could be punished criminally." *Imbler v. Pachtman*, 424 U.S. 409, 428-29 (1976).[1]

Given the pronouncements from the Supreme Court, it is no surprise that many cases have been prosecuted against judges who violate criminal statutes. *See* Dkt. 28 at 9-11 (collecting cases); *see also United States v. Joseph, et al.*, 2020 WL 4288425 (D. Mass. July 27, 2020) (rejecting similar arguments for dismissal). Dugan attempts to explain away the absence of cases supporting her position by arguing that judicial immunity from criminal prosecution is so entrenched that it has always applied, and no extension from civil law is needed. *See* Dkt. 45 at 14 (claiming "the magistrate judge has the relationship between criminal and civil judicial immunity backwards").

Dugan's repetition of the same arguments that she made to the magistrate judge fails to demonstrate error in the report and recommendation. The magistrate

---

[1] *Imbler* and *O'Shea* are discussed below in connection with Dugan's argument about abrogation of immunity in Section 242. Dugan previously criticized the government for not including references to Section 242 when citing these cases. *See* Dkt. 38 at 3 n. 1. To be clear, these cases, which involved immunity under Section 1983, referenced the possibility of criminal liability for civil rights violations under Section 242. In so doing, however, they did not suggest that Section 242 was an exception to a broader rule of judicial immunity for criminal conduct. The idea behind the Court's references to Section 242 was to illustrate that immunity in the civil context — *for civil rights violations* — would not necessarily mean that such violations went unpunished. In this context, it was only natural for the Court to reference Section 242, which it described as "the criminal analog to § 1983." *Imbler*, 424 U.S. at 429.

judge exhaustively analyzed relevant authorities, examining the cases cited above and others that were decided before and after the nation's founding through the modern era. The judge also examined the civil-rights statutes and common law on which Dugan relies. The judge considered Dugan's related contention that only three categories of crimes may be pursued against judges, none of which are charged here. (Dkt. 43 at 5-27.) Having done so, the magistrate judge definitively rejected Dugan's arguments for dismissal. (Dkt. 43 at 27.)

In her objections, Dugan relies heavily on *Floyd v. Barker*, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607). However, as the magistrate judge recognized, *Floyd* has no discernible effect on the question of judicial criminal immunity in this case. (Dkt. 43 at 4.) *Floyd* involved an unusual collision between the Court of the Star Chamber and the common-law courts of Jacobean England. Lord Coke determined that a claim of conspiracy brought against a judge of the Courts of Assize "for any thing done by him as Judge" while trying a murder case was "not examinable in the Star-Chamber," because both the Star Chamber and the Courts of Assize drew their authority from the King and therefore only "the King himself" could review the judge's actions. *Floyd*, 77 Eng. Rep. at 1307. Allowing each of the King's courts to superintend the others in such a manner, Lord Coke reasoned, would "tend[] to the slander of the justice of the King" and thereby "scandal of the King himself"; result in "continual calumniations" that would "subver[t]" the

7

King's authority "to deliver justice to all his subjects"; and usurp the King's prerogative to supervise his judges. *Id.*

Accordingly, *Floyd* arose in an unusual legal context that has no parallel in modern American law—certainly not in this case, involving a federal prosecution of a state judge for federal crimes she committed outside the scope of her judicial duties. To that end, the magistrate judge found only two pertinent cases where the Supreme Court invoked *Floyd*—*Randall v. Brigham*, 74 U.S. 523 (1868), and *Bradley v. Fisher*, 80 U.S. 335 (1871). But, as the magistrate judge observed, those cases cited *Floyd* only "as authority for judicial immunity in the civil context." (Dkt. 43 at 13.) The magistrate judge accurately remarked that, "in the 154 years since *Bradley* was decided, Dugan does not cite, and I have not found, cases where the Supreme Court invoked *Floyd* for the proposition that judicial immunity bars the criminal prosecution of judges for judicial acts." (*Id.*) Dugan's objections likewise fail to produce such a case, and the government knows of none.

Similarly, contrary to Dugan's assertion (Dkt. 45 at 6), the Supreme Court did not adopt judicial immunity in the criminal context in *Spalding v. Vilas* by citing an 1810 state civil case that mentions the word "indictment." *See* 161 U.S. 483, 494 (1896) (citing *Yates* v. *Lansing*, 5 Johns. 282, 291 (N.Y. 1810)). As the magistrate judge correctly recognized, isolated statements in civil cases — like *Spalding* or the smattering of lower-court decisions that Dugan cites — provide "weak support"

8

for Dugan's assertion "of a well-established" doctrine of judicial immunity from prosecution. (Dkt. 43 at 17). And interpreting them that way would be at odds with the Supreme Court's statements rejecting judicial immunity for criminal acts. *See O'Shea*, 414 U.S. at 503; *Imbler*, 424 U.S. at 428-29.

In response to the magistrate court's well-reasoned explanation of why modern Supreme Court decisions likewise do not support her claim of judicial immunity, *see* Dkt. 43 at 6-13 (discussing *Pierson v. Ray*, 386 U.S. 547 (1967); *Nixon v. Fitzgerald*, 457 U.S. 731 (1982); *Stump v. Sparkman*, 435 U.S. 349 (1978); *Dennis*, 449 U.S. 24; *Forrester v. White*, 484 U.S. 219 (1988); *Mireles v. Waco*, 502 U.S. 9 (1991); and *United States v. Trump*, 603 U.S. 593, 630 (2024)), Dugan's objection cites only *Trump*.

*Trump* is clearly distinguishable. That decision held that the *President* has criminal immunity for official acts based on the presidency's "unique position in the constitutional scheme" and the "unique risks to the effective functioning of government" if Presidents were forced to constantly assess whether their decision-making while in office might one day prompt criminal inquiries. 603 U.S. at 611, 613. Applying *Trump* outside the presidential context to the tens of thousands of people across the country who serve in "judicial" roles would be an unwarranted and baseless extension. As the magistrate judge explained: "While Dugan asserts that *Trump* simply extended to the President the same immunity from prosecution

that judges already have, this argument makes a leap too far. *Trump* says nothing about criminal immunity for judicial acts." (Dkt. 43 at 25.)

Consistent with the magistrate judge's analysis, judges have been prosecuted in dozens of cases for a wide range of criminal conduct, including obstruction. *See, e.g.*, *Kugler v. Helfant*, 421 U.S. 117 (1975) (judge indicted on charges of obstruction and lying to a grand jury); *United States v. Cochran*, 682 F. App'x 828 (11th Cir. 2017) (affirming state judge's conviction for witness tampering in violation of § 1512); *United States v. Baumgartner*, 581 F. App'x 522 (6th Cir. 2014) (affirming state judge's conviction for misprision); *United States v. Grubb*, 11 F.3d 426 (4th Cir. 1993) (affirming state court judge's conviction under § 1503 for obstructing grand jury investigation); *United States v. Claiborne*, 727 F.2d 842, 843 n.1 (9th Cir. 1984) (judge prosecuted for urging a grand jury witness to lie, in violation of § 1503); *United States v. Ash*, No. 19-mj-9341-UA (S.D.N.Y. filed Oct. 4, 2019) (state court judge prosecuted under § 1512); *United States v. Moreland*, Crim. No. 17-00066 (M.D. Tenn. May 24, 2018) (state court judge convicted under § 1512); *United States v. Walker*, Crim. No. 14-00093-DCB-FKB (S.D. Miss. Oct. 7, 2014) (state court judge convicted under § 1512); *United States v. DeLaughter*, Crim. No. 09-0002-GHD-SAA (N.D. Miss. July 30, 2009) (state court judge convicted under § 1512 for lying to FBI about case in which he made rulings favorable at the request of a friend); *see also* Dkt. 28 at 9-11 (collecting cases).

Dugan faults the magistrate judge for following—and would have this Court ignore—the Supreme Court and modern practice. She suggests that the Supreme Court's statements in *O'Shea* and *Imbler* should be disregarded as *dicta*, or as strictly applying to violations of civil rights statutes passed under Congress's authority to enforce the Thirteenth, Fourteenth, and Fifteenth Amendments. (Dkt. 21 at 9; 45 at 11.) Dugan's argument also assumes that, because Congress did not explicitly abrogate judicial immunity in either of the statutes charged in the indictment—as it did in 18 U.S.C. § 242 (concerning deprivation of civil rights) – she is immune from prosecution. But there was no judicial immunity from criminal prosecution *in the first place*, and thus, nothing to abrogate.

In other words, Section 242, which arose in a very particular historical context—indeed, partly in response to judges violating civil rights—should not be taken for the proposition that judges are immune from criminal prosecution in the absence of a specific abrogation of immunity. Moreover, Sections 1505 and 1071 have been on the books for many years, during which time (1) the Supreme Court has never indicated that there is any judicial immunity for criminal conduct, and (2) prosecutions of judges have taken place under other generally applicable laws, including under bribery and public corruption statutes that contain no specific abrogation of judicial immunity. *See, e.g., United States v. Hastings*, 681 F.2d 706,

710 (11th Cir. 1982) (involving obstruction of justice under § 1503 and conspiracy under § 371); *see also* Dkt. 28 at 9-11 (collecting cases).

As the magistrate judge correctly recognized, Dugan's unprecedented argument that Congress must clearly abrogate judicial immunity assumes that: (1) "judicial immunity from criminal prosecution is established in American law," which has only "weak evidence"; and (2) "§ 242 is an exception to that rule," which "overlooks the specific historical context in which § 242 was passed." *See* Dkt. 43 at 15-16, 18-19. The magistrate judge also correctly declined to require Congress to "comb through every federal criminal statute to indicate which statutes to apply to judges and which do not." (Dkt. 43 at 19.)

The magistrate also correctly rejected Dugan's related assertion that judicial immunity permits the prosecution of only three "categories" of crimes against judges and that none apply to her. As Dugan would have it, judges may be prosecuted for "wholly unofficial acts" (first category), deprivation of constitutional rights under § 242 (second category), and actions related to their judicial duties *if they engaged in self-serving activity* like fraud (third category). Only the third category merited discussion under the facts presented, and the magistrate judge agreed with the government that there was no authority limiting so-called "judicial act" prosecutions to those involving crimes with a self-serving motive. (Dkt. 43 at 20.) To quote the magistrate judge: "But whether a judge seeks

his own self-gratification or self-enrichment is not the distinguishing feature for immunity. What matters is whether the judge, even in performing her official duties, is accused of committing a crime." (Dkt. 43 at 20.)

The magistrate judge explained that Dugan's categories were inconsistent with historical prosecutions of judges, including in cases like *Wallace v. Powell*, 2009 WL 4051974 (M.D. Pa. Nov. 20, 2009), and *Claiborne*, 727 F.2d 842, cases in which Dugan concedes that judges were validly convicted for criminal acts. *See* Dkt. 43 at 20; Dkt 45 at 16-17. Dugan characterizes these cases as concerning unofficial acts, which (in her view) only tangentially implicated judicial acts. But there is no need to draw these amorphous lines in the first place, because no authority supports that judicial-criminal immunity exists and that it depends on such permutations.

Dugan's assumption of immunity wrongly inverts the analysis on a motion to dismiss charges that are properly pled in an indictment. Even in her view, criminal prosecutions of state judges are undisputedly permitted in certain circumstances. However, this does not in any way imply the creation of categories where prosecutions are forbidden in other circumstances. Dugan is simply attempting to explain away the historical prosecution of judges in a gerrymandered way, that even then relies on amorphous and contestable distinctions to carve her case out. If it were in fact true that judges enjoy general

13

judicial immunity subject to certain defined exceptions, one would expect that some court at some point would have said so.

Quite simply, the Supreme Court has never retreated from its observation that judicial immunity does not apply in criminal cases. As such, whether something is a judicial act has never been the focus. Rather, the dividing line is whether the conduct fits the elements of a criminal statute. The magistrate judge's recommendation followed these principles.

At a minimum, Dugan's objection would not provide a sound reason to dismiss the indictment now. Accepting her claim about the nature of her prosecution would require fact-finding, which is untenable on a motion to dismiss, a principle that the magistrate judge followed (Dkt. 43 at 3) (citing *Yashar*, 166 F.3d at 880) and to which Dugan has not objected.

Dugan's proposal also would create a situation in which the same conduct would constitute a "judicial act" for civil immunity purposes but not a "judicial act" for criminal immunity purposes. For example, suppose a judge makes a favorable judicial decision in return for compensation. That is undeniably a judicial act for which there would be civil but not criminal immunity. *See, e.g., Wallace*, 2009 WL 4051974 at *6, *8-9 (holding that judicial decisions were "judicial acts" subject to civil judicial immunity, even if they were motivated by bribery; noting the same judges were indicted for that behavior; and pointing out that

"egregious behavior by judges is subject to prosecution under the criminal law" as a reason justifying absolute civil judicial immunity).

## II. Even if judicial immunity applies, it immunizes only "judicial acts," and Dugan is not being prosecuted for doing "her job" as a state-court judge.

Moreover, even assuming such a fact-specific analysis were appropriate at this stage, it would still not justify dismissal. As the government previously explained, because judicial immunity does not apply, this Court need not inquire into whether the charged acts are "judicial" or "non-judicial" in character. (Dkt. 28 at 15-20.) The magistrate judge did essentially that, discussing "judicial" and "official" acts only to emphasize their irrelevancy to the pivotal issue of whether judicial immunity from prosecution exists at all. It does not, so this Court should likewise decline such an inquiry. However, even if a doctrine of immunity for judicial acts applied in a criminal case, it would not help Dugan. As alleged in the indictment, and discussed further below, Dugan went well beyond her official role when she endeavored to prevent federal law enforcement officers from executing a valid arrest of E.F.R. in a public area of the Milwaukee County Courthouse.

Central to Dugan's arguments is the misconception that she is charged for committing "official acts in the course of her ordinary duties" as a "state judge," and she was doing "her job" and "nothing more." (Dkt. 15 at 5; 21 at 2; 45 at 1, 4.) The government addressed this in its prior response, refuting Dugan's factual

claims that went beyond the four corners of the indictment, were contradicted by materials provided in discovery, and presented a view of the indictment *least* favorable to the government. (Dkt. 28 at 5-7.) For example, Dugan asserted that agents "disrupted active proceedings," "disrupted [Dugan's] courtroom," and "decided how they wanted [Dugan] to control [her] courtroom and the people in and near it." (Dkt. 15 at 5; Dkt. 21 at 1, 17-18). Dugan continues to make these unsupported claims in her objections. (Dkt. 45 at 1, 24-25.)

As the government indicated, none of this is true, and nothing in the indictment or the anticipated evidence at trial supports it. (Dkt. 28 at 5-7.) Instead, all events arose from Dugan's unilateral, non-judicial, and unofficial actions outside the role of a Wisconsin state judge by obstructing a federal immigration matter over which she had no authority. (Dkt. 28 at 7.) The evidence will show that her actions included pausing an unrelated case, leaving her courtroom, disrupting proceedings in a colleague's courtroom, clearing agents out of the public hallway, quickly returning to her courtroom, directing E.F.R.'s attorney to "take your client out and come back and get a date" and then to go through the jury door and "down the stairs," stating she would take "the heat" for her actions, and then physically escorting E.F.R. and his attorney into a non-public hallway with access to a stairwell that led to a courthouse exit.

Endeavoring to obstruct an unrelated proceeding before a different sovereign—in a public space where federal agents had every right to enforce federal law—is not "a function normally performed by a [state court] judge." *Stump*, 435 U.S. 349. As the Court observed in *Ex parte Virginia*, a judge does not engage in a judicial act when she acts "outside of [her] authority and in direct violation of the spirit" of a criminal statute. 100 U.S. at 348.

Now, in her objections, Dugan claims that the magistrate judge "agrees that every act this indictment names is 'part of a judge's job.'" *See* Dkt. 45 at 1, 4 (quoting Dkt. 43 at 30). Going even further, Dugan says that the allegations are "official acts and the magistrate judge does not contend otherwise." (Dkt. 45 at 4.)

Dugan misstates the magistrate judge's analysis, which refutes, rather than supports, her official-acts argument. At the outset of evaluating Dugan's motion, the magistrate judge properly relied on the truth of the allegations in the indictment and declined to resolve any "factual dispute that is inextricably intertwined with [Dugan's] potential culpability." *See* Dkt. 43 at 2-3.

Dugan's objections nonetheless seize on a sentence much later in the report where the magistrate judge used the phrase "part of a judge's job" in paraphrasing some of the indictment's allegations. (Dkt. 43 at 30.) In doing so, the magistrate judge was addressing—and rejecting—Dugan's attempt (i) to expand judicial immunity outside civil law and (ii) to distinguish other official-acts cases (like self-

17

enrichment) that, according to Dugan, are within the three permissible categories of crimes that can be prosecuted against judges. *See* Dkt. 43 at 26-28.

Thus, the magistrate judge did not endorse Dugan's official-acts argument, factually or legally. Rather, after tracing the history of judicial immunity in the United States, the judge asked and answered the question posed by Dugan's argument: "Applying the principles above, does judicial immunity shield Dugan from prosecution because the indictment alleges she violated federal criminal law while performing judicial duties? The answer is no." (Dkt. 43 at 27.) The magistrate judge continued, reasoning that: "The indictment here, as in *Joseph*, alleges that Dugan acted 'corruptly.' And as the *Joseph* court found, to the extent immunity exists in the criminal context, it does not shield against corruption. In my view, this is consistent with the cases where judges were prosecuted for performing official acts that were intertwined with bribery or extortion—even where judges are acting in their official role, when the judicial acts violate criminal law, judicial immunity does not bar prosecution." *See id.* at 29.

Although the magistrate judge allowed that some of the allegations describe conduct that could be considered "part of a judge's job," *see* Dkt. 43 at 30, she ultimately attributed no weight to this observation because "[a]t bottom, the indictment does not charge Dugan for 'opining on the fly,' managing her courtroom, or allowing someone to appear by Zoom for future hearings." (*Id.* at

18

30.) Instead, the judge recounted the allegations again, concluding that the indictment does not rely on Dugan's unsupported interpretation of "official acts" any more than the cases in which even Dugan agrees charges were properly brought. *See* Dkt. 43 at 30.[2]

Dugan is not immune from prosecution simply because she encountered federal agents while working at the courthouse. She was not just doing "her job" when she added extraneous activities to her legitimate actions as a state judge to defeat the enforcement of federal immigration law. As Dugan has acknowledged, she "was elected by the people of Milwaukee County *to adjudicate their disputes and administer the laws of Wisconsin*." WIS. CONST. ART. VII, §§ 2, 7. (Dkt. 15 at 50 (emphasis added). Her actions to prevent arrest on a federal warrant, and to obstruct federal immigration proceedings, could not have been in furtherance of that state judicial authority because Dugan has no judicial authority with respect to federal law.

Dugan nonetheless appears to equate the authority of the federal government to that of a "duly elected Wisconsin state judge." (Dkt. 45 at 26.) Both

---

[2] Even in the civil context (where immunity applies), the Supreme Court has made clear that whether actions were "part of a judge's job" is not the standard. In *Forrester*, 484 U.S. 219, for example, the Court distinguished "between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Id.* at 228. Although the latter functions may be part of a judge's job, they are not "judicial acts" which trigger immunity from civil liability.

19

by law and Dugan's own reckoning, she cannot point to any basis empowering her to involve herself with federal agents who were enforcing federal law outside of Dugan's courtroom. On April 18, 2025, federal agents were not, despite Dugan's mischaracterization, acting in a manner that they "preferred;" they were doing their job, enforcing federal law, independent of and unrelated to Dugan's "job" and authority as a state judge. Agents took steps *not* to affect Dugan's docket. It was Dugan's unilateral decision to step outside her authority and obstruct federal agents, not by "musing" about the federal arrest warrant they were executing (*see* Dkt. 45 at 24), but by taking affirmative actions that went beyond her state judicial role to prevent E.F.R.'s arrest on the warrant, in violation of federal law, all of which the magistrate judge correctly assumed to be true in deciding the motion.

Dugan is wrong to claim that her actions alleged in the indictment, construed in the most favorable light to the government, were those of a "duly elected Wisconsin state judge" who "was performing the duties that both Wisconsin law and her chief judge assigned her [under] Wis. Stats. § § 753.03, 757.01, [and] Wis. SCR 70.19(3)(a)." (Dkt. 21 at 28-29; Dkt. 45 at 26.) Nothing in those statutes or court rules, or any others not cited by Dugan, authorizes a Wisconsin judge to intervene in the enforcement of federal immigration law. *See Arizona v. United States*, 567 U.S. 387, 399 (2012) (federal law preempts state-court

jurisdiction over federal immigration law); *see also Int'l Ass'n of Machinists v. Allen*, 904 F.3d 490, 498 (7th Cir. 2018).[3]

Dugan also argues that Magistrate Judge Joseph misunderstands *Wallace*, 2009 WL 4051974, the "Kids for Cash" case, in which judges received kickbacks from detention facilities to place juveniles at their institutions. *See* Dkt. 45 at 17-19. She argues that the "official acts" in those cases were merely the means by which the judges accomplished their "unofficial graft." That description actually undermines Dugan's argument. Like the judges in *Wallace*, Dugan may have used some judicial "acts" or tools (like wearing her robe when directing agents out of a public hallway, falsely telling them they needed a judicial warrant, adjourning a case off the record after initially telling the lawyer to get her client out and come back for a new date, and directing a litigant to use a non-public door to access a stairwell), but those judicial "acts" or tools were simply the means by which she used to commit the crime of obstructing federal law enforcement officers. That Dugan may have had a non-monetary motive, such as disagreement with federal

---

[3]In her objection, Dugan asserts that the magistrate judge misread *Ex parte Virginia*, 100 U.S. 339. However, Dugan's own reading of that case cuts against her. According to Dugan, the Supreme Court "held that *state* law gave the judge no authority to exclude Black jurors, which underscored the conclusion that his acts were not judicial at all." (Dkt. 45 at 13) (emphasis supplied by Dugan). Applying Dugan's reading of *Ex parte Virginia* to the indictment's allegations against her, phrased as she does, would read: "*Wisconsin* law gave Dugan no authority to obstruct agents executing a federal warrant, which underscores the magistrate judge's conclusion that Dugan's acts were not judicial at all."

immigration policy, does not mean that the magistrate judge somehow "misunderstood" *Wallace.*

Dugan also objects to the recommendation based on the supposed lack of a limiting principle for judicial acts, saying that judges would be "vulnerable to prosecution by the federal executive any time they handle a trial involving contraband in evidence" like "child pornography or a drug case," or "schedule a hearing in ways that inconvenience—and thus arguably impede—federal officers." (Dkt. 45 at 1-2.) Dugan's argument proves too much.

The criminal law, indeed, the proper functioning of the entire criminal-justice system, both on the state and federal level, requires law-enforcement officers and undercover agents to handle or seize contraband, government analysts to test it, prosecutors to introduce it in court, and court personnel—judges, clerks, and jurors—to possess it in their official duties. Under Dugan's framework, in which complete judicial immunity from criminal law is needed to protect judges from prosecution in these every-day scenarios, the rest of the operatives in the criminal justice system, from jurors to government analysts to law enforcement officers to undercover agents, would be left subject to criminal charges for attending to their duties. But that is not the way the criminal justice system operates. Recognizing the common-sense proposition that operatives in the criminal justice system do not violate the criminal law on mere proof, without

more, that they are in good faith carrying out their required duties, does not translate into a need to recognize blanket judicial immunity for all acts done under the guise of a judge's duties.

Additionally, Dugan overlooks the limiting principle that the crimes charged in the indictment, like all crimes, have elements, defined by Congress and the courts, not prosecutors, who must prove them beyond a reasonable doubt. The magistrate judge recognized this, emphasizing that Dugan is charged with knowingly concealing E.F.R. to prevent his discovery and arrest on a warrant, in violation of 18 U.S.C. § 1071 (Count One); and with corruptly endeavoring to influence, obstruct, and impede E.F.R.'s arrest on a warrant by committing affirmative acts to assist E.F.R. in evading such arrest, in violation of 18 U.S.C. § 1505 (Count Two). (Dkt. 43 at 1-2, 30.) The indictment does not charge Dugan with impeding federal agents by "inconveniencing" them; there is no such crime.

### III. The Tenth Amendment does not preclude criminal prosecution of state judges who commit federal crimes.

The magistrate judge also rejected Dugan's argument that the Tenth Amendment bars this prosecution. (Dkt. 43 at 31.) Dugan objects, saying the recommendation "missed the importance of the Tenth Amendment here." (Dkt. 45 at 22.) Dugan does not specify what the magistrate judge supposedly missed; instead, she largely repeats her prior arguments. (Dkt. 45 at 22-27.)

The Tenth Amendment reads: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. As the Seventh Circuit has explained:

> The Tenth Amendment does not itself demarcate the boundary dividing state from federal authority; its text "is essentially a tautology," declaring only that the States retain those powers not surrendered. Whether Congress has invaded the province reserved to the States by the Tenth Amendment is therefore a question that must be answered by inquiring whether Congress has exceeded the limits of authority bestowed upon it by Article I of the Constitution.

*Gillespie v. City of Indianapolis*, 185 F.3d 693, 704 (7th Cir. 1999) (quoting and citing *New York v. United States*, 505 U.S. 144, 156-57 (1992)).

There is no error—directly or by omission—in the magistrate judge's analysis. Dugan's argument was a wide-ranging discussion of federalism that touched upon, among other things, the dormant Commerce Clause, Second Amendment rights, general police power, and the Indian Child Welfare Act. Critically, however, Dugan did not cite a single case saying that the Tenth Amendment—through its "vertical separation of powers" as Dugan framed it— bars the prosecution of a state judge who commits a federal crime. That alone was enough to deny the motion.

As the magistrate judge observed, the "crux of Dugan's argument" was that the Tenth Amendment forbids the federal government from prosecuting Dugan

for acts "in and near her courtroom" because that would unconstitutionally "superintend the administration and case-by-case daily functioning of state courts[.]" *See* Dkt. 43 at 31 (quoting Dkt. 21 at 26). The judge recommended denial because that was a "fact-laden" determination and "presented questions for a jury that cannot be resolved on a motion to dismiss." *See id.* at 32 (citing *Joseph, 2020 WL 4288425* (rejecting similar arguments for dismissal)).

Dugan's objections do not explain why the Tenth Amendment — to the extent it might have any application here — would be so categorical as to require dismissal without any further factual development. Indeed, the magistrate judge adhered to the applicable standard on a motion to dismiss by construing the indictment's allegations as true and considering them in the light most favorable to the government. If anything, Dugan's objections seek to inject even more factual disputes into the mix. *See* Dkt. 45 at 24 (asking additional questions about what the federal government can "command a state government" to do or not to do).

As to the question of federal authority, the immigration enforcement that Dugan attempted to obstruct was lawful — in a public space — and lay wholly within the jurisdiction of the federal government. *See Arizona*, 567 U.S. at 395-99 (federal power over immigration — including removal — is undoubted and exclusive). The sources of this power include the federal government's "constitutional power to 'establish a uniform Rule of Naturalization,' Art. I, § 8, cl.

4, and its inherent power as sovereign to control and conduct relations with foreign states," as well as the Supremacy Clause. *Id.* (citation omitted).

As noted above, Dugan talks about a "vertical separation of powers." But the separation of powers "is an institutional doctrine rather than a personal one," and therefore conveys no "personal immunity from [federal] prosecution or trial" on a defendant like Dugan. *United States v. Schock*, 891 F.3d 334, 337 (7th Cir. 2018) (no personal immunity for a U.S. congressman); *see also Hastings*, 681 F.2d at 708-09 (no personal immunity for federal judge).

Dugan's argument also is difficult to square with the Supremacy Clause and the federal government's authority over immigration and foreign affairs. *See, e.g.*, *United States v. Gillock*, 445 U.S. 360, 370 (1980) (finding "no support" for extending speech-or-debate immunity "to state legislators in federal criminal prosecutions," because "in those areas where the Constitution grants the Federal Government the power to act, the Supremacy Clause dictates that federal enactments will prevail over state exercises of power"); *cf. id.* ("[F]ederal interference in the state legislative process is not on the same constitutional footing with the interference of one branch of the Federal Government in the affairs of a coequal branch."). Indeed, the Supreme Court in *Gillock* expressly rejected the argument that the Tenth Amendment confers on state officials an evidentiary immunity against federal prosecution, holding that appeals to federalism "have no special force with regard

26

to state legislators," "state executive officers *and members of the state judiciary*," even if a federal prosecution impinges upon "traditional state governmental functions." *Id.* at 371 (emphasis added).

## IV. Dugan's invocation of the constitutional avoidance canon is misplaced.

Dugan complains that the terms "corruptly" and "proceeding" are "wholly undefined" in Count Two of the indictment and faults Magistrate Judge Joseph for not wrestling with the meaning of these statutory terms under the rubric of "constitutional avoidance," *i.e.*, as an alternative to addressing judicial immunity or federalism.

The magistrate judge correctly described Dugan's invocation of the constitutional avoidance canon as "misplaced." *See* Dkt. 43 at 32. "Constitutional avoidance" is not a vague precept, but a carefully-delineated rule of statutory construction that "provides that when a serious doubt is raised about the constitutionality of an act of Congress, [a court] will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Nielsen v. Preap*, 586 U.S. 392, 418-419 (2019) (cleaned up). The canon comes into play only when, "after the application of ordinary textual analysis, [a] statute is found to be susceptible of more than one construction." *Id.* "Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases. Instead, the canon permits a court to 'choos[e] between competing

27

plausible interpretations of a statutory text.'" *Jennings v. Rodriguez*, 583 U.S. 281, 298 (2018) (quoting *Clark v. Martinez*, 543 U.S. 371, 381 (2005)).

Dugan cites no case suggesting that a court may rely on the doctrine of constitutional avoidance to bypass the restrictions on a motion to dismiss and decide non-constitutional statutory interpretation questions that are not properly before it, such as the meaning of the terms "corruptly" and "proceeding" in Section 1505. Moreover, Dugan does not posit competing, plausible constructions of those terms. Instead, she appears simply to import her own amorphous (and flawed) conception of judicial immunity into the application of the relevant statutes. Nothing in the statutory text would allow for a plausible construction that includes such ad hoc carveouts. Dugan cannot dispute that if, for example, a bailiff (or a fellow defendant or any other nonjudicial actor) had done some of the things that she did — like ensuring that E.F.R. left the courtroom in a manner optimized to avoid federal agents — that individual could validly be prosecuted. It is therefore difficult to see how her actions do not involve "corruptly" obstructing a federal "proceeding."

Dugan cites but a single case in the "constitutional avoidance" section of her objections, and that case, *Snyder v. United States*, 603 U.S. 1 (2024), does nothing to further her argument. *Snyder* involved the distinction between bribes and gratuities and the question of whether 18 U.S.C. § 666 criminalizes the latter in

situations involving state and local officials. The Supreme Court in *Snyder* held that it did not. That holding has no relevance to this case, and *Snyder* does not shed any light on the canon of constitutional avoidance, much less suggest that the canon has application here. The defendant has failed to show, by her citation to *Snyder* or otherwise, that the magistrate judge erred in characterizing her constitutional avoidance argument as "misplaced." Dugan's argument therefore should be rejected.

## CONCLUSION

Dugan's objections largely re-state arguments about judicial immunity, federalism, and constitutional avoidance that the magistrate judge properly rejected in her comprehensive and well-reasoned report. The Court should overrule Dugan's objections and deny her motion to dismiss.

Respectfully submitted on July 29, 2025.

/s/ Richard G. Frohling
Acting United States Attorney
State Bar No.: 1021952
Email: richard.frohling@usdoj.gov

/s/ Keith Alexander
Criminal Division Chief
State Bar No.: 1053000
Email: keith.alexander@usdoj.gov

/s/ Kelly B. Watzka
Deputy Criminal Division Chief
State Bar No.: 1023186

Email: kelly.watzka@usdoj.gov

/s/ Timothy W. Funnell
Green Bay Branch Chief
State Bar No.: 1022716
Email: tim.funnell@usdoj.gov

/s/ Jonathan H. Koenig
Appellate Co-Chief
State Bar No.: 1045517
Email: jonathan.h.koenig@usdoj.gov

Attorneys for Plaintiff
Office of the United States Attorney
517 East Wisconsin Avenue, Rm. 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738