UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

   *Plaintiff*,

   *v.*                                    Case No. 25-CR-0089-LA

HANNAH C. DUGAN,

   *Defendant.*

**DEFENDANT'S REPLY SUPPORTING**
**OBJECTIONS TO REPORT & RECOMMENDATION**

## I.

### INTRODUCTION

After more than two months of briefing, the government is no closer to justifying this overreaching federal prosecution of a state court judge for acts within her official duties: acts that were part of a judge's job, untainted by graft or abuse of power for personal gratification and denying no constitutional rights. A fundamental point still escapes the government. It is the *acts* at issue here—a judge's official acts—that are immune from prosecution, not the person. On a proper assertion of an immunity bar, like here, a court does not get to the actor's state of mind or "motives," as the Supreme Court put it in *Trump v. United States*, 603 U.S. 593, 618–19 (2024). Motive is irrelevant because the official judicial acts are immune; beyond prosecution as official steps and nothing more.

This Court can avoid the constitutional issues by interpreting the statutes at issue—ordinary crimes, not enacted pursuant to the Reconstruction Amendments, and targeting non-judicial conduct—to not reach official, judicial acts. The statutes do not come close to satisfying the clear-statement principle reflected in decisions like *Gregory v. Ashcroft*, 501 U.S. 452 (1991), that protects the values of federalism.

## II.

### REPLY

"When applied to the paradigmatic judicial acts involved in resolving disputes between parties who have invoked the jurisdiction of a court, the doctrine of absolute judicial immunity has not been particularly controversial," the Supreme Court explained in a late twentieth-century civil case, *Forrester v. White*. Instead, the Court continued, "Difficulties have arisen primarily in attempting to draw the line between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges. Here, as in other contexts, immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227 (1988) (italics in original). As a person, a judge can obstruct justice like anyone else. But when a judge acts officially, in a judicial role, the acts are immune.

This indictment involves "paradigmatic judicial acts" and those protecting the functions of the state courts. As the magistrate judge found, Judge Dugan's five specific indicted acts were "all part of a judge's job." Dkt. 43 at 30. That drew no cross-objection from the government.

The acts alleged here are core judicial acts. They were not "administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Forrester*, 484 U.S. at 227. They certainly were not unofficial, personal, or outside "a judge's lawful jurisdiction," *id.*, as in federal prosecutions of state judges for graft or other garden-variety crimes unrelated to a judge's day job.

By contrast, all of the cases the government cites on page 10 of its response (Dkt. 46) are that: unofficial and outside a judge's lawful jurisdiction, like soliciting sexual favors in exchange for favorable judicial treatment, or choosing to sit for an FBI interview and lying. *See United States v. Moreland*, Crim No. 17-00066 (M.D. Tenn.); *United States v. DeLaughter*, Crim. No. 09-0002-GHD-SAA (N.D. Miss.), both cited at Dkt. 46 at 10. The other cases the government cites there, some of which Judge Dugan discussed earlier, likewise involved wildly unofficial acts: sexually harassing a clerk of court and conspiring to distribute methamphetamine (*Cochran*); conspiring to obtain hydrocodone illegally (*Baumgartner*); or committing perjury as a grand jury witness (*Kugler v. Helfant*). Or they concerned official acts violating constitutional rights and laws enacted under the Reconstruction Amendments, like conspiring to violate 18 U.S.C. §§ 241, 242, and actually violating § 242.

The contrast between those cases and this one is sharp and striking. Judge Dugan's indicted acts all were clearly judicial or protected the function of the state courts, without more. Not so the acts in the cases that both the government and the defense cite.

**A**. **Criminal Judicial Immunity Applies to Most Official Acts, and All Here.**

Judge Dugan's division of judicial immunity in criminal cases is not "amorphous," Dkt. 46 at 13, 18; it is what the composite of cases reveal. Most official acts of a judge fall

within judicial immunity. Since Congress passed acts implementing the Reconstruction Amendments, as the enforcement clauses in each newly allowed Congress to do, official acts denying individual rights under those amendments fall outside judicial immunity. And all unofficial acts, including the subset that involve graft or self-serving criminal behavior, also fall outside judicial immunity. The lines separating those three simple piles of cases are no more "gerrymandered," Dkt. 46 at 13, than any process of case law accretion ever is.

As it has since the beginning, the government asserts that there simply is no judicial immunity in criminal cases, official acts or not. *See, e.g.*, Dkt. 46 at 11. Alternatively, it posits that Judge Dugan's acts were unofficial, even if for sake of argument some official acts of judges are immune from prosecution. To accept the government's arguments, consider what everyone would have to blink away.

1. First, indisputably, the very origins of judicial immunity are in a criminal case, not in a civil case. *Floyd v. Barker*, 12 Co. Rep. 23, 24-25, 77 Eng. Rep. 1305, 1307 (Star Chamber 1607), was about a judge being tried for criminal conspiracy on the basis of his purely judicial acts. It was not about a civil lawsuit against him.

The government tries to distinguish the modern United States from Jacobean England and its judicial structure. Dkt. 46 at 7–8. The differences are not so great, actually: we have separate state and federal courts, all rooted in the Lockean sovereignty of American citizens, just as England at the time had separate courts all rooted in the monarch's sovereignty. But even as to the differences, *Floyd v. Barker* would be no better fit with modern judicial immunity in civil cases than it is with criminal

immunity. In civil cases under 42 U.S.C. § 1983, often the plaintiff is suing a state judge in federal court, just as in *Mireles v. Waco*, 502 U.S. 9 (1991) (per curiam).

2. Second, the government still refuses to acknowledge, let alone cite, *Pulliam v. Allen*, 466 U.S. 522 (1984). In deciding an immunity claim, *Pulliam* emphatically requires a court to look first at common law. *Pulliam*, 466 U.S. at 529. A court next decides whether Congress has abrogated a common law immunity. *Id.* at 529, 539–40. The question is not whether Congress or the Supreme Court created an immunity; it is whether Congress abrogated a common law immunity. *Pulliam* discussed and relied on *Floyd*. *Id*. at 530–31 (writing of *Floyd v. Barker*, "Coke and his colleagues of the Star Chamber had declared the judges of the King's Bench immune from prosecution in competing courts for their judicial acts. In doing so, they announced the theory on which the concept of judicial immunity was built;" discussion continues from there).

So under *Pulliam*, the burden is not on Judge Dugan to demonstrate that Congress or the United States Supreme Court created judicial immunity in criminal cases. The burden is on the government to show that the original criminal judicial immunity has been abrogated. Judge Dugan's argument is not "unprecedented," as the government gasps, Dkt. 46 at 12; it is part of the analysis that *Pulliam* requires.

The government has not shown abrogation. Although it turns now to *Mireles v. Waco*, that short opinion gives it little help. Yes, in a footnote *Mireles* says that the Court has recognized that "a judge is not absolutely immune from criminal liability." *Mireles*, 502 U.S. at 10 n.1. The only citation for that proposition is *Ex Parte Virginia*, 100 U.S. 339 (1880). As Judge Dugan explained in her objections, Dkt. 45 at 12–14, *Ex Parte*

*Virginia* actually held that the acts at issue there were unofficial; not judicial and contrary to state law. If official, note that they would have violated the forerunner to § 242.

Either way, *Ex Parte Virginia* fits neatly into the criminal judicial immunity division that Judge Dugan discerns: most official acts of a judge get criminal immunity; official acts that violate the Reconstruction Amendments are the exception to that rule, as the states rebalanced Congressional power after the Civil War; and unofficial acts, including those linked to some facially judicial act by an unofficial promise of graft or abuse of power for personal gratification, do not get immunity.

Beyond that, *Mireles* does not help the government. The Court recognized that, "Like other forms of official immunity, judicial immunity is an immunity from suit, not just from ultimate assessment of damages." *Mireles*, 502 U.S. at 11. "Accordingly," it continued, "judicial immunity is not overcome by allegations of bad faith or malice, the existence of which ordinarily cannot be resolved without engaging in discovery and eventual trial." *Id*. at 11. Then *Mireles* worked hard to stretch the concept of judicial capacity to envelop the judge's actions there—directing police officers to use excessive force in bringing a tardy public defender to the judge's courtroom—within the scope of judicial authority and immunity. *Id*. at 12–13. This Court would not have to stretch anything to recognize Judge Dugan's alleged acts as judicial.

3. Third, the government asks all to blink away more than two centuries of explicit state and federal appellate references to criminal judicial immunity. Those began with the venerable Chancellor Kent, *Yates v. Lansing*, 5 Johns. 282, 290–94, 1810 WL 1044 (N.Y. Sup. Ct. 1810), have included the U.S. Supreme Court, *Spalding v. Vilas*, 161 U.S.

6

Case 2:25-cr-00089-LA   Filed 07/30/25   Page 6 of 16   Document 47

483, 494 (1896), and have continued at least through *Rockett v. Eighmy*, 71 F.4th 665, 668 (8th Cir. 2023). *See also* Dkt. 45 at 5–7.

The references are in *dicta*, true. But they are there; they exist. They are an indirect product of sound prosecutorial discretion and the truth that prosecutions like this are almost unprecedented. Why, if the government is right that there is no such thing as judicial immunity in criminal cases, would so many courts so consistently have acknowledged—even in *dicta*—that there *is* judicial immunity from indictment for official acts? Would appellate courts bring up indictments at all, if judges simply have no immunity from criminal charges for their official acts and never have in this country?

No; courts would not. These cases all reflect the common law doctrine of judicial immunity from indictment. That again is where *Pulliam* requires federal courts to start on an immunity claim. If the common law supports an immunity claim and there is no evidence that Congress ever abrogated it (as it did, narrowly and exceptionally, in 18 U.S.C. §§ 241, 242, on specific, limited authority of the enforcement clauses of the Reconstruction Amendments),[1] then immunity applies. Or, alternately, the statutes do not reach official conduct.

---

[1] The government omits words from one quotation and "clean[s] up" immediate context from another, to suggest that two Supreme Court decisions support its broad proposition that there is no judicial immunity in criminal cases. Dkt. 46 at 5–6. It did this before, too, with the two cases. Dkt. 28 at 8–9. In the passage of *Imbler* at Dkt. 46 at 5–6, the government omits the rest of the second sentence it quotes. In full, that sentence reads, "Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally *for willful deprivations of constitutional rights on the strength of 18 U.S.C. § 242,[] the criminal analog of § 1983." Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) (italics added for emphasis and note omitted). Then, in quoting *O'Shea*, Dkt. 46 at 5, the government omits that passage's citations to *Bradley v. Fisher*, 80 U.S. 335 (1871), and *Ex Parte Virginia*, among other cases. The passage that the government 'cleans up' immediately follows the text of 18 U.S.C. § 242. For all, *see O'Shea v. Littleton*, 414 U.S. 488, 503 (1974).

Acknowledging the same earlier omissions, the government contends that neither case suggested "that Section 242 was an exception to a broader rule of judicial immunity for criminal conduct." Dkt. 6 n.1. But they did; *Imbler* especially. An exception to Tenth Amendment limitations is exactly what the enforcement clauses in

The reason that there are no Supreme Court decisions explicitly recognizing and applying judicial immunity in a criminal prosecution seems obvious: with only two exceptions in all of American history, the United States Department of Justice (after July 1870; United States District Attorneys before then) have had the restraint and good judgment not to indict state judges for official acts that violated no individual constitutional rights under the Thirteenth, Fourteenth, or Fifteenth Amendments and were devoid of graft or self-gratification. Judge Dugan and a Massachusetts judge are it; the only two such cases that the parties or the magistrate judge have discovered since the founding. Every other case, including those that Judge Dugan discussed in earlier briefs and that the government adds now, Dkt. 46 at 10, are prosecutions for unofficial acts altogether or for unofficial acts because they involve graft or self-dealing. Federal courts, including the Supreme Court, long have recognized all of these unofficial acts cases as outside immunity, just as they have recognized that prosecutions of federal legislators for bribery do not violate the Speech or Debate Clause. U.S. CONST. art. I, § 6, cl. 1. The gravamen in all is obvious unofficial wrongdoing wholly incomparable to, say, telling a defendant and his lawyer which door to use in leaving the courtroom.[2]

---

each of the three Reconstruction Amendments created. They are the only authority for current 18 U.S.C. §§ 241, 242 and their civil analogs, statutes that Congress enacted under those enforcement clauses to give concrete remedies for violation of the Thirteenth, Fourteenth, and Fifteenth Amendments. *See* Dkt. 45 at 7 & n.4, 10, and 11–14 for Judge Dugan's fuller discussion of the exception that these three amendments and the statutes enacted under them establish.

[2] On this small detail, Judge Dugan follows the government on one of its forays outside the scope of the indictment. It is undisputed—and indisputable, given the video evidence—that E.F.R. entered the public hallway about 15 feet to the right of the usual courtroom door, where two agents watched him emerge. So Judge Dugan never "optimized" the man's avoidance of federal agents. *Contra* Dkt. 46 at 28. On the government's own witness statements, she certainly never directed E.F.R. "to access a stairwell." Dkt. 46 at 21. To the contrary, she pointed him to the public hallway. None of this is dispositive now, one way or the other, especially because the magistrate judge found these acts part of a judge's job, Dkt. 43 at 30, and the government does not dispute that finding. But it begs the question why the government overstates or misstates its evidence.

Although the government never addresses this point in Judge Dugan's objections, *see* Dkt. 45 at 18–19, she views judicial immunity much like Justice Amy Coney Barrett sees presidential immunity, but more narrowly. Under Justice Barrett's view, concurring with the majority, the president can be prosecuted for a crime like bribery. *Trump*, 603 U.S. at 650-57 (Barrett, J., concurring in part). Same with judges, Judge Dugan has agreed from the outset. That is true even if the crime of bribery is linked to a facially official act as its *quid pro quo*, because the illicit bargain and linkage is not an official act. *Id*. Where Justice Barrett departed from the majority and agreed with the three dissenters was in asserting that the president's official acts may be used as evidence to help prove the unofficial act that is the crime, even though the core official act itself may not be prosecuted. *Id*. at 655-56.

At this stage, the Court need not decide whether judges enjoy the safe harbor from the rules of evidence that a president enjoys. The answer does not matter here, for this indictment alleges no unofficial acts at all.

4. Fourth, the government ignores Judge Dugan's observation that every rationale American courts ever have offered for judicial immunity in the civil context applies with even greater force to a criminal prosecution. Dkt. 45 at 8–10. The government's silence is understandable: that point is hard, maybe impossible, to refute. It may explain in part why cases like this one are so rare.

5. Fifth, the government has no answer for the line-drawing and problems that the magistrate judge's proposal would create. Grammatically, the government ties itself into a knot trying to explain why a court need not fear prosecutions for possessing

9

or distributing illegal drugs or child pornography, in cases involving either, if the magistrate judge's reasoning (and the government's) prevails. *See* Dkt. 46 at 22–23. Whatever exactly the government means to say there, "that is not the way the criminal justice system operates" or "common-sense," Dkt. 46 at 22, just are not sufficient answers, given this indictment. That is, this indictment also is not the way the criminal justice system is supposed to operate. And it, too, defies common sense.

The problem, then, is not that "Dugan's argument proves too much," as the government writes. *Id*. The problem is that this indictment proves her concerns valid.

6. Finally and importantly, the government asks all to blink away, yet never challenges, the magistrate judge's conclusion that the acts in Count 2 were "all part of a judge's job." Dkt. 43 at 30; *see* Dkt. 46 at 17–18. To be fair, that government posture is consistent with its principal claim that judicial immunity from any indictment simply does not exist. It is consistent, too, with the magistrate judge's conclusion that even a judge's untainted official acts may be prosecuted in federal court if they fit mechanically within the scope of a general criminal statute.

So yes, if the government and the magistrate judge are right, then a judge who orders an immigrant victim, witness, or defendant not be removed from the country until a case is concluded may be indicted and prosecuted for obstructing immigration enforcement efforts. That the judge acted in a purely official capacity—was not seeking a bribe from the immigrant, was not seeking sexual favors, was not personally hiding the immigrant in the basement of his house—matters not, if the government and the magistrate judge are right. His ordinary judicial order has the effect of slowing and

impeding immigration enforcement; off to prison the judge goes for something that was, on the magistrate judge's reasoning, part of his job. Same with the judge overseeing a drug case or child pornography prosecution in which contraband is handled or passed around in evidence.

But what is inconsistent is the government claiming all the same that Judge Dugan was not doing her job, at least not lawfully, while the federal agents here were lawfully "doing their jobs." Dkt. 46 at 20. Three times the government insists that the agents had the right to arrest in a "public area" or "public space" of the Milwaukee County Courthouse. Dkt. 15, 17, 25.

No, they did not, under the Department of Homeland Security's own internal rules. According to the ICE Directive on *Enforcement Actions in or Near Courthouses* (January 21, 2025),[3] civil immigration enforcement actions in or near courthouses "should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and use the court building's non-public entrances and exits." Note that the current administration issued that directive.

Judge Dugan cannot enforce that internal executive branch rule or claim specific legal rights under it. She can point out the hypocrisy, though, of the government arguing that she was so far outside the proper bounds of her job that arrest and federal felony prosecution are appropriate, while simultaneously claiming inaccurately that the agents were within the bounds of their jobs.

---

[3] Available at www.ice.gov/about-ice/ero/protected-areas#:~:text=As%20of%20March%202025%2C%20ICE,near%20a%20place%20of%20worship

11

### B. The Tenth Amendment is Not an Afterthought.

Wisconsin elects its state judges. They all must run periodically in general elections to gain or keep office. WIS. CONST. art. VII, §§ 2, 4(1), 5(2), 7, 9. That may not be the best way to fill a judicial branch.

But it is the mode that Wisconsin voters, through a constitutional convention and successive state legislatures since 1848, chose and have kept. The Tenth Amendment to the United States Constitution, not yet sixty years old when Wisconsin entered the union, guaranteed Wisconsinites the power and right to make that choice: to construct their judiciary as they wish and to supervise their own judges, within bounds of a republican form of government. U.S. CONST. art. IV, § 4. Better still, if and when Wisconsin chooses appointment, retention elections, or some other merit structure for filling and overseeing its judiciary, the Tenth Amendment will assure the state the power and right to do that.

Meanwhile, the modes of making and managing the state judiciary that Wisconsin chose are far superior to ICE agents, or any other federal executive branch functionaries, superintending the state's courts and deciding what its judges can and cannot do. That mode—a state judiciary subservient to federal law enforcement agents in day-to-day, moment-to-moment operation of the state's courtrooms and courthouses—is what this federal indictment tacitly seeks to impose.[4]

---

[4] No more can the indictment accomplish that end by extending two federal statutes to conduct, a state judge's official acts, that Congress has no power to punish (and never has suggested that it seeks to punish). The Tenth Amendment restrains all three branches of the federal government from powers and rights that the states and people retained. *See generally Printz v. United States*, 521 U.S. 898, 918–23 (1997) (discussing division of powers between state and federal governments generally, all reinforced by the Tenth Amendment, and then among branches within the separate governments); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 801 (1995).

In doing so, the government treats the Tenth Amendment like a minor side issue. The Supreme Court takes a different view, and in the specific context of state judges. In *Gregory*, the Court required a clear or plain statement from Congress before extending a general statute to cover state judges subject to state-law restrictions. 501 U.S. at 460–61.

That principle makes the statutes here inapplicable to Judge Dugan's judicial acts, apart from judicial immunity. Sections 241 and 242 provide a model of what a clear statement looks like, as they target official acts, under color of state law, that deny constitutional rights. The statutes here do the opposite: they are entirely general.

This is not the first time recently that the federal government has ignored or underestimated the Tenth Amendment. A 2025 civil complaint that the Department of Justice filed against Illinois and the city of Chicago in the Northern District of Illinois was more explicit. There, the government complained that sanctuary statutes and ordinances illegally sought to require criminal arrest warrants for removable aliens, rather than the civil warrants that the complaint said Congress permits. *United States v. Illinois*, No. 1:25-CV-01285, Complaint ¶ 11 (N.D. Ill.) (Dkt. 1). That should sound familiar here: like the first act alleged in Count 2. The *Illinois* complaint also alleged that the statutes and ordinances were an "intentional effort to obstruct" federal immigration enforcement. *Id.*, Complaint at ¶¶ 6; *see also id.*, ¶¶ 63, 71 (referring to "obstruct[ing]" federal immigration enforcement), and ¶ 39 (citing 8 U.S.C. § 1324, a criminal statute punishing concealing, harboring, or sheltering removable aliens). Again, that all is familiar.

In its later brief opposing dismissal of the complaint, the Justice Department made an argument that once more echoes here. "Defendants erroneously characterize their

13
Case 2:25-cr-00089-LA    Filed 07/30/25    Page 13 of 16    Document 47

obstruction of federal immigration enforcement," the government wrote, "as their prerogative under the Tenth Amendment." *United States v. Illinois*, No. 1:25-CV-01285, Plaintiff's Memorandum in Opposition to Defendants' Motions to Dismiss at 23 (Dkt. 50).

Last Friday, a federal district judge rejected the Justice Department's claims. The court dismissed the entire government complaint on Tenth Amendment grounds. *United States v. Illinois*, No. 1:25-CV-01285 slip op. at 54–57, 57–63 (N.D. Ill. July 25, 2025) (Dkt. 86) (even if state and local legislative sanctuary policies obstruct immigration enforcement, they are lawful because of the Tenth Amendment; citing specific concerns about anticommandeering and DOJ's attempt to overextend intergovernmental immunity).

So, no, the Tenth Amendment is not an afterthought or a make-weight argument here. It is a bulwark against exactly the federal overreach we are watching now.

### C. Constitutional Avoidance Doctrine.

After arguing, now and earlier, that the indictment's bare allegation of the mental element of "corruptly" in Count 2 saves it, the government pivots to dismiss *Snyder v. United States*, 603 U.S. 1 (2024). Only the criminal act matters in *Snyder*, says the government: the Court decided that 18 U.S.C. § 666 applies just to *quid pro quo* bribes, not to gratuities, so *Snyder* adds nothing in this case.

That is how *Snyder* limited prosecutable acts under § 666. But the Court also faulted the government for offering no workable definition of "corruptly." 603 U.S. at 15-16. It underscored this: a statute that applies to countless state and local officials must give clearer notice of what is criminal. *Id.* at 15-16. The same capacious mental element, "corruptly," appears in Count 2 here and raises overreach concerns under the Tenth Amendment. These

concerns trigger the clear-statement rule of *Gregory*. In any event, these statutes can and should be interpreted to avoid the constitutional questions embedded in this extraordinary use of ordinary federal criminal statutes to target state judicial acts.

## III.

### CONCLUSION

In this country as Americans have known it, the federal government has no power or right to prosecute a state judge for any of the five acts or decisions that the indictment alleges. Federal law enforcement agents and prosecutors can dislike, dispute, or disagree with those decisions and acts, no question. But they cannot prosecute a state judge for doing as Judge Dugan did here. Her acts were judicial, official, and nothing more or worse.

The Court should dismiss the indictment. This prosecution is and has been barred by immunity, narrowly but rightly understood. The Tenth Amendment also blocks it.

Dated at Madison, Wisconsin, July 30, 2025.

Respectfully submitted,

HON. HANNAH C. DUGAN, *Defendant*

*s/ Dean A. Strang*
John H. Bradley
Wisconsin Bar No. 1053124
R. Rick Resch
Wisconsin Bar No. 1117722
William E. Grau
Wisconsin Bar No. 1117724
Dean A. Strang
Wisconsin Bar No. 1009868

STRANG BRADLEY, LLC
613 Williamson Street., Suite 204
Madison, Wisconsin 53703
(608) 535-1550
john@strangbradley.com
rick@strangbradley.com
william@strangbradley.com
dean@strangbradley.com

                                              *s/ Steven M. Biskupic*
                                              Steven M. Biskupic
                                              Wisconsin Bar No. 1018217

STEVEN BISKUPIC LAW OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com

                                              *s/ Jason D. Luczak, Nicole M. Masnica*
                                              Jason D. Luczak
                                              Wisconsin Bar No. 1070883
                                              Nicole M. Masnica
                                              Wisconsin Bar No. 1079819

GIMBEL, REILLY, GUERIN & BROWN LLP
330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
(414) 271-1440
jluczak@grgblaw.com
nmasnica@grgblaw.com