UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

_____

UNITED STATES OF AMERICA,            )
                                     )
                Plaintiff,           )    Case No. 25-CR-89
                                     )
        v.                           )    Milwaukee, WI
                                     )
HANNAH C. DUGAN,                     )    December 11, 2025
                                     )    9:18 a.m.
                Defendant.           )
_____

TRANSCRIPT OF JURY SELECTION - EXCERPT
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:          United States Dept. of Justice
                                   (ED-WI)
                                   By:  MR. RICHARD G. FROHLING
                                        MS. KELLY BROWN WATZKA
                                        MR. KEITH S. ALEXANDER
                                   Office of the US Attorney
                                   517 E. Wisconsin Ave., Rm. 530
                                   Milwaukee, WI  53202
                                   Ph:  414-297-1775
                                   richard.frohling@usdoj.gov
                                   kelly.watzka@usdoj.gov
                                   keith.alexander@usdoj.gov

For the Defendant                  Steven Biskupic Law Office, LLC
HANNAH C. DUGAN:                   By:  MR. STEVEN M. BISKUPIC
(Present)                          PO Box 456
                                   Thiensville, WI  53092
                                   Ph:  414-828-7233
                                   bisklaw@outlook.com

                                   Gimbel, Reilly, Guerin & Brown
                                   By:  MR. JASON D. LUCZAK
                                        MS. NICOLE M. MASNICA
                                   330 E. Kilbourn Ave., Ste. 1170
                                   Milwaukee, WI  53202
                                   Ph:  414-224-1440
                                   jluczak@grgblaw.com
                                   nmasnica@grgblaw.com

U.S. Official Court Reporter:  JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer-aided transcription.

TRANSCRIPT OF PROCEEDINGS

THE COURT: Okay. This is 25-CR-89, US versus Dugan. And I think we're ready to bring the jurors in. Oh, we should take appearances, sorry. Sorry.

MR. FROHLING: United States -- sorry, go ahead.

THE COURT: Go ahead.

MR. FROHLING: The United States appears by Assistant United States Attorneys Rick Frohling, Kelly Watzka, and Keith Alexander. Also at counsel table is the Government's case agent, FBI Special Agent Erin Lucker. Good morning.

MR. BISKUPIC: Good morning, your Honor. For the defense, defendant's here in person by -- and by her attorneys Steve Biskupic, Nicole Masnica, and Jason Luczak. And also at our table is Richard Gabriel.

THE COURT: So are we ready to bring the prospective jurors in?

MR. BISKUPIC: Sure, your Honor.

MR. FROHLING: Yeah.

THE COURT: Okay.

COURT SECURITY OFFICER: It will be a few minutes.

THE COURT: Okay.

* * * * *

COURT SECURITY OFFICER: All rise for the jury.

(The venire entered the courtroom.)

THE COURT: We all set? I'm sorry.

COURT SECURITY OFFICER: That would be everyone, your Honor.

THE COURT: Okay. Good. This is 25-CR-89, United States of America versus Hannah Dugan, and the first item on the agenda here is to swear an oath, so you can all get ready for that.

THE CLERK: Please raise your right hand.

(The venire is sworn.)

JURORS: I do.

* * * * *

THE COURT: Okay. Thank you. Okay. What I'd like to do now is I'd like to -- to briefly meet with counsel in my chambers back there just for a minute, and then we'll be back. Okay? Sit tight, be comfortable.

(The following proceedings were held in chambers outside the presence of the venire with the Court and counsel present:)

THE COURT: Okay. The record should -- have a seat, make yourself comfortable. Let -- is it on -- we have -- does somebody know how to turn this --

MR. GRAYSON: Do you want this to be private, or do you want this to be --

THE COURT: No, this can be --

MR. GRAYSON: Okay. We can turn this off.

MR. FROHLING: Can they hear in the courtroom?

THE COURT: No, this is for the -- this is for the press. They wanted -- they didn't want private talk in here about the case, so -- but on the other hand, we didn't want this talk to be possibly prejudicial to the jurors, so this is the result.

MR. BISKUPIC: So we're talking about the jurors' private information in a way that the press can hear?

THE COURT: Well, we're talking about -- we haven't really talked about anything yet.

MR. FROHLING: Right. I just would -- I don't think it would be typical practice or a good idea to talk about jurors' personal information in a manner in which the media could then report, even if they're only identified by number.

MS. WATZKA: And there may be other matters, too, that we need to discuss this morning.

THE COURT: Say who -- identify.

MS. WATZKA: Oh.

THE COURT: Identify yourself.

MS. WATZKA: Sorry. This is Kelly Watzka, Judge. In addition to private information related to jurors, who have already represented that it's personal and they don't want that to be shared with the courtroom, there are other matters I think that we need to dress this morning that certainly the Government, perhaps both parties, would agree should not be broadcast to the media.

THE COURT: Okay. The -- well, then let's -- let's -- let's start with something that's not controversial, and that is: Are there any more questions that I should ask?

MR. BISKUPIC: To the big group or private? I mean, obviously we've got a list of private. But to the big group, nothing from the defense.

MS. WATZKA: Probably not. The only -- this is Kelly Watzka again -- the only issue that -- I'm optimistic we're going to finish next week, as well. But there's always a possibility we could bump into the following week, at least Monday, which is a holiday week. And so I don't know if we've -- if it makes sense to also inquire about potential conflicts through at least the following week Monday.

THE COURT: Okay. That's fine. I'll ask that. Anything else?

MR. FROHLING: Not from the Government.

MR. BISKUPIC: Not from the defense.

THE COURT: All right. Let's see.

(Discussion off the record.)

THE COURT: I mean, look, nobody knows exactly how long this is going to take, but I would be stunned if this went into the second week. I mean, I don't know, do you have any ideas on --

MR. BISKUPIC: Agreed. But what about deliberations? Suppose they -- we finish and they take off for the weekend and

want to deliberate Monday and Tuesday?

THE COURT: Well, I'll go out and ask them that; but -- sure, if you want me to. I'm just afraid it might open a can of worms with more issues, but...

MR. BISKUPIC: Would you -- is your plan -- let's say we finish Friday. Do you give them the option of deliberating on Saturday?

THE COURT: I hadn't thought about it, but I would -- it's fine with me if they went to.

MR. BISKUPIC: Yeah. So if they don't, because they want to do the weekend for Christmas shopping --

THE COURT: Well, I'll ask it.

MR. BISKUPIC: I mean, look it, I don't want to -- I don't think we're going to get to Wednesday, you know, where everyone's, oh, my gosh now we're getting to Christmas Eve.

THE COURT: Should I just go out and ask, you can all stay in here for a second? Or you can come out if you want to. I just don't want --

MR. FROHLING: We might -- I think we'd go back just in case, you know, something that's said that we want to discuss.

THE COURT: All right. Well, let's go back and ask them, and then we'll come back here and --

MR. BISKUPIC: How about just one, like -- well, just two of us will go. Defendant should be out there.

THE COURT:  Yeah, that's fine.

MR. BISKUPIC:  You guys can stay here.

THE COURT:  Let me just say, the next thing we thought we -- might be advisable to do is based on the numbers of the jurors to bring them individually in here, all the ones that we've flagged about possible problems.  That would be the next thing that we do in this selection process.  Does that make sense?

MR. BISKUPIC:  Yeah, we would agree with the prosecution that that should be done without the media until you determine what it is.  And then you can make a record later if it's something that you need to do.  I mean, there will be a record.  But that would be our agreement is that you bring a person in.  They have a personal issue.  We don't have this broadcast.  They tell us what the personal issue is.  You determine whether or not --

THE COURT:  Well, the personal issues are -- just came up here are different than the possible issues about somebody being prejudiced in favor of one side or the other.

MR. FROHLING:  Right.  But I think -- you know, obviously they're different lines of questions.  I'm very optimistic we'll be done today.  I think that's -- for jury selection.  I think that's everybody's idea.  But I really don't think it would be a great idea to have a discussion even about the reasons and statements that the jurors make reported

in the media today when we may still be doing jury selection tomorrow, for example. I just -- I'm not sure that that would be anything that any of the parties would think would be a helpful idea.

MR. LUCZAK: And, Judge, if I can make a record, too. The concern --

THE COURT: State your name.

MR. LUCZAK: Jason Luczak.

MR. FROHLING: I'm sorry.

MR. LUCZAK: Sorry. And that was Rick. Your Honor, the concern is that some people have also in their questionnaires indicated that they have safety concerns. And so, you know, this process in order to work needs to have some level of confidentiality that it's not going out to the media, because my concern is that then they will just say nothing and that they won't address the actual concerns that they have with you. And I think that's really the only way we can get a fair jury is if the jurors feel comfortable, you know, saying this without having, you know, a microphone here that's broadcast potentially out, you know, and they have no idea where that information's going. So that's the concern that we have.

THE COURT: Okay. Well, I think that's -- has this come up before?

MR. FROHLING: Yeah, I think so. And we agree with Mr. Luczak -- this is Rick Frohling -- and we agree with Mr.

Luczak's comments on that.  I think in a typical -- I don't know of any other case in which individual juror questions are done in a manner which it's public or the media is there.  Yes, a record's made with a court reporter so there's no question as to what happened.  But that is -- I'm not aware of any time where individual questioning of jurors like this has involved essentially outside individuals.

THE COURT:  All right.  Well, based on the parties' agreement, and I think that it's based on legitimate reasons, I will make a record with regard to any decisions made with respect to individual jurors.  And I'll do the best I can to state the reasons for that decision.  But because of the importance of juror comfort and honesty and openness and willingness to answer questions about their possible prejudice, I think you're -- the parties are right to want to be very careful about that.

All right.  So I'm going to ask this one question, then we'll be back here.

* * * * *

(The following proceedings were held in chambers outside the presence of the venire with the Court and counsel present:)

THE COURT:  Leave the mike on right now.

THE CLERK:  You want it on?

THE COURT:  I want it on for everything we do except

anything that's going to possibly --

THE CLERK: I'll turn it on so you can say let the record show we're in chambers.

THE COURT: Yeah. Okay. Let the record show we're in chambers again, and our plan is to -- to question jurors who indicated in questionnaires some information that caused one or -- one of the parties to raise question. And the parties have -- I think we're not going -- the individual questioning is not going to be done over this -- it's not going to be done publicly. But the -- I do want to make -- I do want to make it clear that we want to let the public know that what we're doing at every possible minute while at the same time protecting individual privacy.

So what's going to happen now is my clerk is going to talk about the names of some of the people that have indicated their -- that should be interrogated further, and then we'll bring them back in for -- for questioning. And if the parties have different -- have other ideas about jurors to flag, we'll -- please bring those -- when we're done with the ones my clerk has identified, if you have other ones, then you're free to bring them up, and we'll deal with them. Okay? Yeah, now we're going to turn the mike off.

THE CLERK: So this is from the first page of your list, the ones that I've flagged based on questionnaires, either original or today, are Nos. 1, 5, 6 and 8.

MR. LUCZAK: So one seems to have a pretty good hardship for cause. I don't know if we want to address that now to strike him for cause, instead of bringing him in.

THE COURT: Go ahead.

MR. LUCZAK: So one indicated that he has training next week Wednesday, and that he -- that that would cause issues with his work. So, I mean, we can address it individually. I just don't know for efficiency purposes if you just want to deal with the hardship issue now, because there's a couple that we flagged for hardship.

MR. FROHLING: It may be short, but he has the training -- a training session, that's just what we know is it's a training session on Wednesday.

MS. WATZKA: And we don't really have a sense -- we don't really have a sense of how firm of a conflict that is, you know, work training.

THE COURT: Why don't we do those later.

MR. LUCZAK: Okay, that's fine.

THE COURT: I mean, I -- do we have enough totally? I mean, we've -- we unleashed a whole batch with this last question. I mean, I don't want to run out.

MS. WATZKA: I think we're going to be okay.

MR. FROHLING: It's about what I thought you would have gotten on the first time you asked it.

MR. LUCZAK: Yeah.

THE COURT: I'm sorry?

MR. FROHLING: I was surprised we didn't get more the first when you asked about --

THE COURT: Yeah.

MR. FROHLING: -- that the first time. I -- it may -- some of them, I don't think, are going to be a conflict. I think we'll still be okay numbers wise.

MR. LUCZAK: Yeah.

THE COURT: Well, I don't have strong feelings if you want to do these hardships. My only concern is not running out. Why don't we tentatively strike them, but if we're -- if after we go through these that we're -- we have a problem, maybe we can then interrogate them more thoroughly or something.

MR. BISKUPIC: Okay. So our suggestion, Judge, keeping with what your clerk just said is -- I mean, I don't want to do the whole page; but if we go a page at a time it might be good, so you've identified -- can you give us those numbers again?

THE CLERK: One, five, six, and eight I flagged based on questionnaires.

MR. BISKUPIC: Okay. We would want to add four and --

MS. MASNICA: I mean, seven made the comment that he heard an NPR story this morning, but didn't provide details of what was in it. And then we had nine as on our list.

MR. FROHLING:  I'd probably say it for the Court:  NPR aired a piece announcing the commencement of this trial this morning.  Does he feel that would be important in forming his opinion, no.

THE COURT:  Let me ask:  Do we have enough information right now that there's a number of jurors that we could say are appropriately in the pool and then see how many we have and how many we need?

MR. BISKUPIC:  Do you want to give us -- I mean, do you want to just start?  Or do you want to like -- I think the parties will probably want to separately talk.

THE COURT:  Well, that's fine.  I mean, I --

MR. BISKUPIC:  It's just so hard to tell until we start hearing from them.

THE COURT:  Well, all right, let's just start.  Let's just start with No. 1.  How about No. 1?

MR. BISKUPIC:  Bring him in and see how hard the hardship is.  It would be quick.  I mean --

MR. LUCZAK:  He's also one that was for the questionnaire.

THE COURT:  I was thinking actually -- I guess I wasn't thinking about -- I was by thinking about No. 2, but --

MR. FROHLING:  Oh, you're --

THE COURT:  Hold on just a second.

(Discussion off the record.)

THE COURT: No. 1 originally you guys expressed concern.

MR. BISKUPIC: Right.

THE COURT: He said it didn't seem right what she did. And now there's this hardship thing, too.

MS. MASNICA: Yeah.

THE COURT: Does the Government -- do you have any objection to getting rid of that one?

MR. FROHLING: Did not seem right what she did, no other strong feelings, can be impartial.

THE COURT: And now there's a hardship issue on top of that. I don't know, do you --

MS. MASNICA: He also said this morning that he believes that she interviewed her -- or interfered with federal agents trying to do their jobs and that he has heard additional news coverage.

MR. FROHLING: Yeah, I missed that other one.

MS. WATZKA: We'll agree.

THE COURT: All right. No. 1 is out.

MR. LUCZAK: All right.

THE COURT: One is out. Okay, how about two?

MS. WATZKA: No. 5?

THE CLERK: The next that we've flagged is No. 5.

THE COURT: Is No. 2 -- let's see if we can get some jurors.

MR. BISKUPIC: Two and three I think are okay.

THE COURT: Two and three okay with everybody?

MR. LUCZAK: Yep.

THE COURT: Okay. We've got two jurors, hey.

MR. BISKUPIC: We're on our way.

THE COURT: We're making progress.

MR. LUCZAK: We flagged four to come in.

THE COURT: Four. Defendants flagged four. Government, what do you think about four? Do we need to interrogate him?

MS. MASNICA: Because four had said this morning that they saw article with a lot of details on the Hannah Dugan case but didn't say what those are or if there's any opinions.

MR. FROHLING: Four, saw article, had the high level details, not lot of details, high level.

MS. MASNICA: Could be a high level of detail. It's one of those.

THE COURT: Four said that they -- that they hadn't -- they hadn't formed any new opinions.

MR. FROHLING: Oh, got you, okay.

MR. BISKUPIC: We don't have an agreement. Let's just bring them in. So four we should bring in.

THE COURT: Okay. Bring in No. 4.

COURT SECURITY OFFICER: Your Honor, apparently some of the jurors have asked to go to the bathroom.

THE COURT: Yeah. Please, let them go.

COURT SECURITY OFFICER: One at a time into the jury room?

THE COURT: Well, not all at once, no.

COURT SECURITY OFFICER: Right, right, just so we keep track of them.

THE COURT: Yeah.

COURT SECURITY OFFICER: Okay.

MR. FROHLING: This is not Wrigley Field.

MS. ESSAK-HERNANDEZ: If anyone needs to write, we've made a little bit of space on some surfaces. You can find more.

(Juror No. 4 entered chambers.)

COURT SECURITY OFFICER: Juror No. 4.

JUROR NO. 4: Hello.

THE COURT: Oh, I'm sorry. Thank you for coming in.

JUROR NO. 4: No problem.

THE COURT: You want to have a seat.

JUROR NO. 4: Sure.

THE COURT: John, turn on the thing. I want to announce to the press we have accepted two jurors. Is that okay or --

MS. WATZKA: We don't -- they could be subject to --

THE CLERK: They could be struck.

THE COURT: Yeah, they could be, all right. Never

mind. Okay.

JUROR NO. 4: Hi.

THE COURT: You don't have any special hardship, do you --

JUROR NO. 4: No.

THE COURT: -- serving on the jury?

JUROR NO. 4: I've got kids and stuff at home, but everyone's got their little things like that.

THE COURT: Yeah. And do you have any opinion or -- about the outcome of the case, how it should come out or whether the --

JUROR NO. 4: Ultimately, just for me, the opinion on the case just comes down to what happened in the court with Hannah and all that and what happened in the hallway and all that that you were talking about earlier. That's all that really matters is the facts there.

THE COURT: Could you decide the case squarely on the evidence that's presented and the law that I instruct you on?

JUROR NO. 4: I think so, yes.

THE COURT: Any of the lawyers have any questions?

MS. MASNICA: I mean, was there -- you just had noted in your questionnaire that you had recently read an article online about Judge Dugan.

JUROR NO. 4: Yeah, so because of the dates of the trial, someone had mentioned this case and said the timeline

was there, so I just Googled in the Hannah Dugan name because that's who they mentioned, and just kind of got the high level of case, what it was about.

MS. MASNICA: And anything that you read, did it cause you to form any opinions or, you know, sway one way or another what you thought?

JUROR NO. 4: I don't think so. I just know it's about, you know, immigration situation and that the defendant is a -- you know, a -- a judge. That's all I really learned from the article.

MS. MASNICA: Okay.

THE COURT: So you could be a fair and impartial juror?

JUROR NO. 4: Sure. I think I could try to do that, yes.

THE COURT: Okay. Well, could you be sure?

JUROR NO. 4: I think so, yes. Yes.

THE COURT: Okay. Thank you.

JUROR NO. 4: Okay. No problem.

MR. LUCZAK: Not trying to put you in the hot seat.

MR. FROHLING: One person on the couch.

THE COURT: Yeah, you're excused.

JUROR NO. 4: Okay. Appreciate it.

(Juror No. 4 left chambers.)

THE CLERK: Next would be No. 5.

THE COURT: So is there any issue about his --

MR. FROHLING: We're not making any sort of movement or motion or request there.

MR. BISKUPIC: He's okay.

THE COURT: Okay. Okay. We've got three.

MR. BISKUPIC: Can I just ask whether it's possible to slide some chairs in? Are we going to be here a while?

THE COURT: I guess so, yeah.

THE CLERK: Lorena and Tony, can you bring in some from the library?

MR. BISKUPIC: There is certain amount of --

(Juror No. 5 entered chambers.)

COURT SECURITY OFFICER: Have a seat on the couch, I guess.

JUROR NO. 5: Okay.

(Discussion off the record.)

THE COURT: I'm just talking to John. I do feel some obligation to the media to explain stuff that can be legitimately explained without interfering with anybody's privacy, because they have a right to know what's going on. I'm --

MR. BISKUPIC: How about at the end of each page you go back on the media record and just say on --

THE COURT: Okay. That's --

MR. BISKUPIC: -- as opposed to doing it each one at a

time or all at the end.

THE COURT: Yeah, that's probably better. I don't -- all -- yeah, because all at the end is -- so how many have we done on this page? Maybe we do it -- how about each -- how many are on each page?

THE CLERK: Nine.

THE COURT: Nine.

THE CLERK: Do it page by page, that makes sense.

THE COURT: Okay. Put them on now so I can say what we are going to do.

THE CLERK: Do you want to question this gentleman first?

THE COURT: Oh, all right. Let's see.

THE CLERK: This is No. 5.

THE COURT: Are you -- oh, *** *****, the reason -- hi. We're voir diring some jurors individually based on the questionnaires. You follow me?

JUROR NO. 5: Yes, sir.

THE COURT: Because we want to get an absolutely fair jury.

JUROR NO. 5: Sure.

THE COURT: And you answered to one of your questionnaires, you said I'm unsure why the law was not followed. And so that sort of raised a red flag about, you know, whether you had already formed an opinion. My question

is:  Have you formed an opinion?

JUROR NO. 5:  No, sir.  No, sir.  No opinion.

THE COURT:  No opinion.

JUROR NO. 5:  Uh-uh, I have not formed one, no.

THE COURT:  Do you have strong feelings about the immigration issue?

JUROR NO. 5:  None, no.  No strong feelings.  No.

THE COURT:  And -- yeah, would you be able to decide the case based on the facts that are adduced in the trial and based on the law that I instruct you on?

JUROR NO. 5:  Absolutely.

THE COURT:  All right.  Any of the lawyers?

MR. BISKUPIC:  When you put down your opinion questioning the presumption of innocence for the defendant means the defendant doesn't have to answer that question. Would you be able to follow that law?

JUROR NO. 5:  Yes.

MR. BISKUPIC:  Okay.  Thank you.

THE COURT:  Anything else?  If not, thank you.  Thank you.

JUROR NO. 5:  Thank you.

THE COURT:  Thank you.  You're excused.

(Juror No. 5 left chambers.)

THE COURT:  Yeah, anybody want to talk about -- talk about it?

MR. FROHLING:  Nothing from the Government.

MR. BISKUPIC:  No.

THE COURT:  Okay.  All right.  He's still in the list. Put the --

THE CLERK:  You want to finish the page?

THE COURT:  I want to just tell the media what we're doing.  Is it green now?

THE CLERK:  It's green.

THE COURT:  This is for the media.  This is Judge Adelman, and we're in chambers, and we're -- we're talking to the individual jurors who one side or the other has raised questions about.  And the questioning we're doing is real personal as to their opinions and possible prejudices, and it elicits information that -- that the lawyers think would make jurors uncomfortable answering candidly.

So it's obviously very important for us to get a jury that is as impartial as possible.  So some of this questioning that we're doing is not going to be -- is not going to be on the record for -- well, it going to be on the record, but it's not going to be broadcast to the media.  And I'm making every effort that I possibly can to make sure that as much as possible is available the media, including information about the jurors.

And when we're done with each -- when we're done with each page of jurors that we're questioning, I'll -- I'll open this

up and put it on the record to the media what decisions we've made and why we've made them to the extent that I can say that. And so, anyway, I just wanted to let the media know that we're trying to have a fair jury; but, also, have the media aware of everything that's going on to the extent that those two goals are not incompatible.

So -- all right. So we'll be back to you soon as Page 1 is over.

THE CLERK: Can you get No. 6, please.

(Juror No. 6 entered chambers.)

THE COURT: Oh, hi, *** ********.

JUROR NO. 6: Yes.

THE COURT: Have a seat. So based on the questionnaires, we're just trying to probe a little bit to find out if jurors can be fair.

JUROR NO. 6: Sure.

THE COURT: Maybe I'll just let the lawyers. Do you have any questions?

MR. FROHLING: Sure. Thank you. You indicated this morning that you're neighbors with Gramling --

JUROR NO. 6: Correct.

MR. FROHLING: -- Gramling-Perez? And I -- you indicated in your questionnaire, too, you're friends with both Judge Perez and her husband?

JUROR NO. 6: Correct.

MR. FROHLING: Okay.

JUROR NO. 6: Yeah.

MR. FROHLING: And you -- you think that would sway you one way or another if she were called as a witness in this case, would you be more likely to believe her based on she's a friend and a neighbor than maybe another witness?

JUROR NO. 6: I think I can form my own opinion based on whatever evidence you present or your version of the case law.

MR. FROHLING: Thank you. I think in addition you indicated in your questionnaire that the courthouse should be a safe place from ICE; is that right?

JUROR NO. 6: Yes.

MR. FROHLING: And that's a belief and view that you have -- you had when you filled out the questionnaire and belief you have today?

JUROR NO. 6: Yes.

MR. FROHLING: And you -- I think you indicated you marched in various protests, including those No Kings protests?

JUROR NO. 6: Just one, uh-huh.

MR. FROHLING: Just one, okay. And you indicated that ICE is a weaponized agency and the system is broken?

JUROR NO. 6: That's true.

MR. FROHLING: And is that going to be something that when an ICE agent or officer testifying and your neighbor

testifying, are you going to view their testimony the same way?

JUROR NO. 6: Could you say that again?

MR. FROHLING: Yeah. So you -- you have some strong opinions about ICE; is that correct?

JUROR NO. 6: Correct, uh-huh.

MR. FROHLING: And then you have a neighbor who's a -- listed as a witness in this case.

JUROR NO. 6: Uh-huh.

MR. FROHLING: And are those things that are going to be, you know, in your mind as you're weighing the evidence and applying the law here?

JUROR NO. 6: I feel like I will listen closely to both sides. And, for me in this case, I feel like it has to do with the interpretation of whatever laws apply. So it would be based more on the facts and the arguments. So I've tried to remain neutral. As soon as I got my letter, I stopped reading any kind of news about this case and the -- does that answer?

MR. FROHLING: Yeah. Thank you.

MS. WATZKA: Can I ask one more question?

JUROR NO. 6: Yeah.

MS. WATZKA: When you say that courthouses should be a safe place from ICE, does that mean that you believe that ICE should not be allowed to execute arrest warrants when they have a warrant for somebody's arrest in a courthouse?

JUROR NO. 6: Is that what happened in this case?

MS. WATZKA: I'm just asking you if an ICE agent had a warrant, do you believe that he or she should not be able to execute that inside a courthouse?

JUROR NO. 6: I'm not sure I understand that.

MS. WATZKA: Sure. If an ICE agent has a warrant for arrest --

JUROR NO. 6: Uh-huh.

MS. WATZKA: -- can they go inside the courthouse, in your opinion -- should they go inside a courthouse and arrest somebody pursuant to that warrant?

JUROR NO. 6: Sure. I'm not exactly sure what the rule of law states in that case.

MS. WATZKA: Sure.

JUROR NO. 6: So I would need to hear --

MS. WATZKA: Yeah. Understand that you're not a legal expert.

JUROR NO. 6: Yeah.

MS. WATZKA: I'm just -- I'm trying to just sort of understand what you mean when you say courthouses should be a safe place from ICE, so maybe I'll just ask that question.

JUROR NO. 6: Yes.

MS. WATZKA: What do you mean by that?

JUROR NO. 6: That if somebody is coming in for a case, they should be able to safely go in and be a part of the -- be a part of the process without being afraid to show up, I

guess.  Does that make sense?

MS. WATZKA:  Yes.  Thank you.

JUROR NO. 6:  Uh-huh.

MR. BISKUPIC:  So if the evidence shows that despite those beliefs about the courthouse being a safe place --

JUROR NO. 6:  Yes.

MR. BISKUPIC:  -- the defendant is either guilty or not guilty based on the law that the judge gives you, you could render a fair and impartial verdict?

JUROR NO. 6:  I'd follow the law, which -- I would follow whatever law there -- that applies to the situation.

MR. BISKUPIC:  Even if it was contrary to the personal view you just --

JUROR NO. 6:  Yeah.

MR. BISKUPIC:  -- admitted.

JUROR NO. 6:  You have to.

MR. BISKUPIC:  You're positive you can do that?

JUROR NO. 6:  Uh-huh.

MR. BISKUPIC:  You have to answer out loud.

JUROR NO. 6:  If what?

MR. BISKUPIC:  You have to answer yes or no.

JUROR NO. 6:  Yes.

THE COURT:  Anything else?  Thank you.

JUROR NO. 6:  Uh-huh.

(Juror No. 6 left chambers.)

MS. WATZKA:  Well, Judge, obviously we've got concerns given this juror's close personal relationship with a witness who will testify on behalf of the defense.  And it's not -- I think you can't look at that in isolation.  It's -- it's how will this juror assess that witness' credibility when compared to multiple witnesses who will testify who are members of an agency that he has expressed has been weaponized and is out of control.  So the concern is that based on the comments that he has made, whether he wants to admit it or not, he's got an implicit bias that will -- you know, has put the thumb on the scale for defense witnesses and has an automatic sort of concern or disbelief of a number of the Government's witnesses in this case.

MR. BISKUPIC:  Judge, from the defense perspective, it's going to be like, okay, if this is going to be the bar, because you're going to get this from both sides, you know, they're going to come in and they're going to have these comments they've already had in their questionnaire.  And then they're going to say under oath either they can or cannot follow the law and the facts as you give it.  And so if this witness is struck, I just want that to be the standard as we go forward for all the jurors that are on the other side of the question who have equally put forward things on their questionnaire.

And, again, I'm sure they're going to come to the same

conclusion is that -- many of them will, we hope they will, that they could be fair and impartial. Ultimately, he said he could be fair and impartial. The prosecution doesn't believe it, and I'm sure there's going to be other ones that we're not going to believe, and so how do you want to handle that?

MR. FROHLING: The only thing we'd add is -- and he's also said he was friends with someone -- with a judge when he didn't know she was a witness. Now she's been named as a witness, she's a friend and neighbor. So I do think this is in a different category.

Mr. Biskupic is right, apply it the same way both ways. That's what we tried to do in our strikes for cause. But you have that coupled with this person being friends with a defense witness I think is a real problem.

THE COURT: Well, I think the earlier -- right in the beginning somebody asked him about whether he would favor her witness over some other -- her testimony over some other testimony. And I think he indicated that he wouldn't. Is that wrong?

MR. LUCZAK: No.

MR. FROHLING: That's what he said here. He did hesitate out there. And I -- and then he'll go back after hearing that testimony and see his neighbor that evening, that just -- that's not a -- that seems pretty a clear conflict in the Government's view.

MR. LUCZAK: I mean, Judge, there was no questioning about like how close they actually were, what their relationship was. We don't even know if it's -- we don't even know what the nature of their relationship is. And I would just add, I mean, there should be somewhat parity going on here with the strikes. However, Hannah Dugan is the one on trial, not ICE. So there should be a -- a weighting more heavily towards bias related to Judge Dugan's actions as opposed to a generalized, you know, dislike for actions that ICE took in other arenas.

I mean, here we're talking about not only ICE, but other system partners that were with them, the FBI, DEA. So I just think when weighting that, that should go into the consideration as well.

MR. FROHLING: And then just one note there, he did state in his questionnaire, too, Mr. Luczak mentioned the FBI, that he's called the FBI and MPD on crimes in his neighborhood. Sometimes they come and care, sometimes they don't. He did indicate, I think, in the questionnaire it was a friend, I think this morning neighbor.

(Discussion off the record.)

THE COURT: Excuse me.

(Discussion off the record.)

THE COURT: Well, I don't think there's enough for cause here. He said he could follow the facts and the law. He

said courthouses should be safe places.  But if the law somehow led him to a different result or led to -- the law and the evidence led to a different result, he would follow that.  So I think he said -- you know, he said what he had to say in order to be -- to withstand a bias challenge.

And he also, as I recall, as I said before, I don't think he elevated -- the fact that Judge Gramling-Perez lives next door to him, he -- I don't -- he said that he would not give her testimony more effect than other people's testimony, and so I don't think -- I'm not sure what the -- what ultimately Gramling-Perez or anybody else is going to say.  I don't know if there's going to be a factual conflict on that.  So I don't think this really amounts to cause, so he's still in the pool.  Oh, yeah, and I also found him credible.  There was no doubt in my mind that he was being honest.

So next one?  What's next?

THE CLERK:  Counsel, I don't have No. 7 marked for individual questioning.  Do you disagree?

MR. LUCZAK:  We did not have that.

MR. FROHLING:  We didn't, no.

THE CLERK:  The next I have is No. 8 based on questionnaire.  You want to get No. 8, please.

(Juror No. 8 entered chambers.)

THE COURT:  Hi, have a seat.  Don't be intimidated by all these lawyers.

(Laughter.)

JUROR NO. 8:  How you doing, everybody?

MR. LUCZAK:  Good, how are you?

MS. WATZKA:  Hello.

THE COURT:  You're *** *****?

JUROR NO. 8:  Yes.

THE COURT:  Okay.  Well, based on the questionnaires, we thought it would be a good idea to ask some prospective jurors -- John -- some prospective jurors --

JUROR NO. 8:  You want me to sit here?

THE COURT:  No, that's okay -- a little more detailed questioning.

JUROR NO. 8:  Uh-huh.

THE COURT:  So this is juror number, what, eight?

JUROR NO. 8:  Eight, yes.

THE COURT:  So why don't I let the parties ask whatever questions they want to.

MR. LUCZAK:  Oh, so you had indicated that you had seen some things on Fox News about the case.  What did you see?

JUROR NO. 8:  Oh, basically they showed -- I saw on the news the video of you talking to the person and that was -- and she was in the hall -- they were in the hallway.  Basically that's about it, you know, just those clips and then --

MR. LUCZAK:  Yeah.  What were they saying on Fox News about that?

JUROR NO. 8:  They --

MR. LUCZAK:  Like what were they saying about --

JUROR NO. 8:  They showed the video and then they were saying how this is -- why she's -- I believe why she's in her situation she's at.

MR. LUCZAK:  Okay.  And, I mean, it was from the perspective she had done something wrong --

JUROR NO. 8:  Yeah.

MR. LUCZAK:  -- or illegal; right?

JUROR NO. 8:  Yeah.

MR. LUCZAK:  Do you share that view?

JUROR NO. 8:  No.

THE COURT:  Why not?

JUROR NO. 8:  Well, I think everybody has their due diligence in their courtroom, and I'm -- I'm a teacher, so I've always had when kids get in fights, we figure this all out.  I get their story, their story, you know, so --

MR. LUCZAK:  Sure.  And so you're willing -- I mean, you're able to listen to the judge's instructions as far as like what the elements are of the offenses that are charged here and basically if there's disputes you're willing to discuss that with your fellow jurors and work that out?

JUROR NO. 8:  Definitely, for sure.

MR. LUCZAK:  Do you think you're able at this point to presume that Ms. Dugan is innocent of the charges?

JUROR NO. 8:  Yes, as of right now, because like I said it was a video of that.  And it was like, well, what exactly is she saying.  You know, I don't know what -- what was the, per se, conversation, you know.

MR. LUCZAK:  Okay.

JUROR NO. 8:  I don't know all that.

MR. LUCZAK:  Yeah.  And I think it was flagged because in your questionnaire you said, "I heard that the judge defendant interfered with federal agents from arresting a person that was in the courthouse."

JUROR NO. 8:  That basically was part of that Fox 6 kind of thing, so...

MR. LUCZAK:  Okay.  So you were just kind of parroting back what you had heard.

JUROR NO. 8:  Uh-huh.

MR. LUCZAK:  But as you sit here today, you haven't made any -- you haven't prejudged this case in any way?

JUROR NO. 8:  No.

MR. LUCZAK:  And you hold the Government to their burden of proving all of the elements beyond a reasonable doubt?

JUROR NO. 8:  I take it you guys are the Government?

MR. LUCZAK:  Yeah, they're the Government.  Sorry we haven't told you who everybody is.

JUROR NO. 8:  Yes, yes, definitely.

MR. LUCZAK:  All right.  Thanks.

THE COURT:  Do you have anything?

MR. FROHLING:  No.

THE COURT:  So, *** *****, I have to be convinced that you could decide the case based on the facts that are adduced at trial and the law as I instruct you on and set aside anything that you've heard.  You could do that?

JUROR NO. 8:  Yes, sir.

THE COURT:  Okay.  Thank you.  I think you're excused.

(Juror No. 8 left chambers.)

THE COURT:  Okay.  There's no problem with him, is there?

MR. BISKUPIC:  No.

MR. FROHLING:  No.

MR. BISKUPIC:  I didn't have anything on nine.

THE CLERK:  I didn't have him flagged, either.  So just to recap on the first page, No. 1 is struck by agreement, and then everyone else on the page is -- remains in the pool?

MR. BISKUPIC:  Yeah.

THE CLERK:  Based on agreement and the judge's order.

THE COURT:  Okay.  Can we -- hello.  For the observers in the media and who's ever listening to this, we've gone through the -- with the first page of our prospective jurors.  And Juror No. 1 has been struck by a mutual agreement.  And the other jurors on that page are still in the pool.  They've all

stated that they could -- that they could decide the case based on the evidence adduced at trial and the law that I instruct the jurors on, and so they're all still -- they remain in the pool.

And now we'll move on to the next page. I guess our goal is to get to 32 today, and then -- and then we'll be -- have made good progress, if we can do that.

So now -- we're now going to start -- we're going to start with jurors on Page 2. Thank you.

THE CLERK: So from this page, the ones that I have flagged are 10, 11, 14, 15, and 16.

MR. BISKUPIC: We would add 18.

MR. LUCZAK: And 12.

THE CLERK: 12 has the travel issue; right?

MR. FROHLING: Ultrasound for the child; right?

MS. MASNICA: Yeah, that's the appointment on 12/22. And No. 13.

THE CLERK: I'm identifying from questionnaires, not from hardships today.

MR. FROHLING: Sorry.

THE CLERK: Based on questionnaires, I have 10, 11, 14,15 and 16, then I understand that there's couple more that have talked about issues if it goes into the following week.

MS. MASNICA: I think the additional supplemental questionnaire, No. 18 ushered out "in order to not be

arrested." I mean, I think that was the opinion that was formed in the new questionnaire. No. 18.

THE CLERK: Well, he also checked no on No. 3, but we can request 18 if you want to.

(Discussion off the record.)

THE CLERK: Bring in No. 10.

MR. BISKUPIC: Okay. Before you do that, the parties -- again, we're making good progress, but we -- I have an agreement that No. 12 can be stricken. On the Monday of the second week, he's got to take his son who's got the special needs, so the parties are -- we can agree.

THE COURT: Okay.

MR. FROHLING: No. 12.

THE CLERK: Yeah, that is fine.

MS. MASNICA: No. 13, she will be out of town on Monday.

MS. WATZKA: I don't have that.

MR. FROHLING: She has 13 leaving the evening of 22nd.

MR. BISKUPIC: Can we just follow up with her with a couple questions?

THE CLERK: Ten.

MR. BISKUPIC: Judge, can I ask, so you're getting to 30 -- what's your number?

THE CLERK: 32.

MR. BISKUPIC: 12.

THE CLERK:  We need 32 with two alternates.

MR. FROHLING:  True.

(Juror No. 10 entered chambers.)

THE COURT:  Well, the lawyers have answers to the additional questions; is that correct?

MS. MASNICA:  Yes.

THE COURT:  So, ma'am, what we're doing here in our efforts to get a fair jury is we're bringing in individuals who -- who gave answers to the questions --

JUROR NO. 10:  Uh-huh.

THE COURT:  -- that we -- that one side or the other or me thought should be questioned further.

JUROR NO. 10:  Okay.

THE COURT:  So go ahead, anyone.

MS. MASNICA:  You had indicated on your questionnaire that you did today that you had seen the surveillance footage from the incident and that you'd also been talking to a coworker about the case?

JUROR NO. 10:  So one of my coworkers asked me if I knew what it was about, and I said I know it's about someone who was harboring someone that ICE was after.  And he's like, oh, is it Hannah Dugan?  And I said, I don't -- I didn't really know.  And so he brought up a video and it showed like different camera angles, different cameras of escorting a gentleman like through the courthouse, so...

MS. MASNICA: Did that coworker that you talked to, did they have opinions about the case and their own personal beliefs?

JUROR NO. 10: He didn't really -- really say.

MS. MASNICA: Okay. And you had indicated that the video footage makes it seem clear that the defendant helped a person exit the building.

JUROR NO. 10: Uh-huh.

MS. MASNICA: I mean, can you feel -- do you still feel that opinion?

JUROR NO. 10: Uh-huh.

THE COURT: Do you feel that that would be -- I mean, knowing that and seeing that information, I mean, if that does not come into evidence or if there are issues with the things you have seen or heard from your coworker, would you be able to set that aside and decide the case fairly, or do you think you would be prejudiced or thinking about that information you learned?

JUROR NO. 10: I guess I would have that in the back of my mind, so I don't know a hundred percent that I could be impartial, so...

MR. LUCZAK: Yeah, your initial reaction, you're kind like swaying side to side --

JUROR NO. 10: Yeah.

MR. LUCZAK: -- like it would be pretty hard; right?

JUROR NO. 10: (Indicating.)

MR. LUCZAK: Yeah, that's understandable.

THE COURT: Anybody else?

MR. FROHLING: No. No questions from us.

THE COURT: Okay. Thank you.

JUROR NO. 10: Thank you.

(Juror No. 10 left chambers.)

MR. BISKUPIC: Move to strike.

MR. LUCZAK: Strike.

MR. BISKUPIC: We'd move to strike for cause.

THE COURT: Okay.

MR. FROHLING: Yep.

THE COURT: No objection? All right. Next one.

THE CLERK: Okay. Now up, No. 11 indicated an issue about working and, also, was as flagged based on the questionnaire. No. 11.

MS. MASNICA: So based on the answer, what she did was wrong and she should not have done what she did.

MS. WATZKA: That's today's? I didn't see that.

THE COURT: What are you talking about?

MS. MASNICA: There's the supplement. It says, "What she did was wrong, and she should not have done what she did. I don't think she had the right to allow a person in her courtroom to leave through a different exit knowing there were agents in the hallway."

(Juror No. 11 entered chambers.)

THE COURT:  That's this particular?

MR. LUCZAK:  Yes.

MS. MASNICA:  Do we want to -- yeah.

THE COURT:  Do we need to?

MR. LUCZAK:  I don't think so.

MS. MASNICA:  I don't think we need to.

THE COURT:  I don't think so.  Okay.  Thank you.  We don't need -- we're questioning people based on questionnaires and stuff.

JUROR NO. 11:  Sure.

THE COURT:  But I -- I don't think we need to ask you more questions.

JUROR NO. 11:  Okay.

THE COURT:  But thank you for coming.

JUROR NO. 11:  That's it?

MR. LUCZAK:  That's it.

JUROR NO. 11:  Okay.  All right.  Thank you.

THE COURT:  Yeah.

(Juror No. 11 left chambers.)

MR. BISKUPIC:  We move to strike for cause.

MR. FROHLING:  No objection.

MS. WATZKA:  No objection.

THE CLERK:  Okay.  So 11 is out.  And 12 we've already agreed to strike; correct?

MR. BISKUPIC: Yeah. 13, can we just ask her when she leaves on the 22nd, and is it -- is it driving, is it an airline ticket?

THE COURT: That's just -- the only issue is a hardship?

MR. BISKUPIC: Yeah. Can we just see when she's leaving?

THE COURT: Okay.

THE CLERK: 13, please.

COURT SECURITY OFFICER: 13.

(Juror No. 13 entered chambers.)

THE COURT: Hi, have a seat.

JUROR NO. 13: Hi there.

THE COURT: Yeah, you were selected for special interrogation.

JUROR NO. 13: I'm honored.

THE COURT: You're honored.

JUROR NO. 13: Yeah.

THE COURT: So I -- the only issue I think that you raised was your vacation or your --

JUROR NO. 13: Correct. My once-a-year vacation.

THE COURT: Where are you going?

JUROR NO. 13: My son lives in Denver.

THE COURT: What time are you leaving?

JUROR NO. 13: I don't remember offhand. So I believe

it's later on in the afternoon, which takes you, you know, usually till evening.  I really want to do this.

THE COURT:  What?

JUROR NO. 13:  I really want to do this.

THE COURT:  Well, okay.

MR. BISKUPIC:  Take the trip or be on the jury?

JUROR NO. 13:  Both.

MR. BISKUPIC:  So --

JUROR NO. 13:  Well, so I did ask when I called because I called earlier.  I had -- and let them know that I have this, and I was not assured, but they said it's pretty much to be done within the five days and to bring it up when I was here, so...

MR. BISKUPIC:  So if you're deliberating on that Monday, now you're looking at your watch.

JUROR NO. 13:  I get it.

MR. BISKUPIC:  Could you still be fair?  I mean, what would happen if you miss your flight?

JUROR NO. 13:  I'd have to get another flight.

MR. BISKUPIC:  And have you already paid for it?

JUROR NO. 13:  Sure.

MR. BISKUPIC:  Is that a hardship to buy another ticket?

JUROR NO. 13:  Well, everything is a hardship nowadays.

MR. BISKUPIC: Sure. Could you still be fair with that hanging over your head if you had to deliberate on Monday?

JUROR NO. 13: That has nothing to with this. I mean, it's an unfortunate thing, you know, that I would miss the flight, but I've missed flights just for other reasons.

MR. BISKUPIC: You can -- you can see our concern; right?

JUROR NO. 13: I do. I do.

MR. BISKUPIC: You think if it's that Monday and you're deliberating and deliberations go into Tuesday, you would be like okay --

JUROR NO. 13: Going in -- so --

MR. BISKUPIC: Let's say it went Monday and Tuesday of the -- of your travel week.

JUROR NO. 13: 22, 23.

MR. BISKUPIC: Yeah. Again, as the judge said, it probably won't, but no one has any control over it except the jurors when they start deliberating. And so what we don't want is someone going, I just -- I give up, whatever you guys think, because I want to leave.

JUROR NO. 13: Yeah. No, I don't think that would be the case. I'd be more worried about not being able to get a flight, so I don't know what to tell you with that note. I'm sure I could be fair, but I would also like to make sure I could get a flight.

THE COURT: If you couldn't -- well, let's say you couldn't get an ideal flight.

JUROR NO. 13: Uh-huh.

THE COURT: I mean, obviously, you could -- you've got to go to Denver, I mean, I suppose there's lots of different flights to Denver.

JUROR NO. 13: Well, there are.

THE COURT: And worse come to worse, you take two flights or something.

JUROR NO. 13: Well, you could drive me.

THE COURT: I could drive you?

(Laughter.)

Yeah, well. So what you're saying is that you could be a fair and impartial juror; and if worse came to worse regarding Denver, you could handle it?

JUROR NO. 13: Oh, sure. I've handled a lot over the years.

THE COURT: Okay. Anything else?

MR. FROHLING: Not -- sorry, behind you, no.

JUROR NO. 13: That's okay.

MR. FROHLING: It's like on an airplane.

THE COURT: Okay.

JUROR NO. 13: Good?

THE COURT: Thank you. You're excused.

JUROR NO. 13: Just let me shake your hand. Nice to

meet you.

(Juror No. 13 left chambers.)

MR. BISKUPIC:  She's okay.

MR. LUCZAK:  Keep her.

MR. FROHLING:  Yeah.

THE COURT:  Kelly, you'll move fast.

MS. WATZKA:  Yeah, always.  I'm stealth.

THE CLERK:  The next is No. 14 based on questionnaire.

THE COURT:  14?

THE CLERK:  14.

MR. LUCZAK:  I'll drive her, Judge, if you don't.

(Juror No. 14 entered chambers.)

THE COURT:  Okay.  You're number -- *** ********,
Juror No. 14?

JUROR NO. 14:  Yes.

THE COURT:  Okay.  Thanks for coming in.  What we're
doing in here is based on the questionnaires there were some
prospective jurors who we thought it was important to ask a few
more questions.

JUROR NO. 14:  Oh, okay.

THE COURT:  So that's all -- that's why you're here.

JUROR NO. 14:  Okay.

THE COURT:  So I -- let me turn it over to the
lawyers, whoever wants to.

JUROR NO. 14:  Can I turn and look at people?

THE COURT: Sit there. The lawyers are over here. Sit there.

JUROR NO. 14: Okay.

MR. LUCZAK: So -- hi, I'm over here -- so on this side, we represent Judge Dugan. That's the Government over there, okay. Just --

JUROR NO. 14: Oh, okay.

MR. LUCZAK: -- to kind of orient you. So in your initial questionnaire you had indicated that you had like seen some media or some stories about that and you wrote that down. Do you remember that?

JUROR NO. 14: Yes.

MR. LUCZAK: And the question that we have is like what opinions did you have whenever you saw those -- those news stories or the media that you saw?

JUROR NO. 14: Well, I mean, they splice clips together and showed like the event that happened. I mean, like the media seems to show things as they want to see them. So it appeared that the judge let the person go, who was, I guess, illegal immigrant according to the news story. Didn't really clarify why they did or whether they broke the law or not. People -- I've seen people reply well, they broke the law, didn't break the law. I guess that's why we're here today to decide whether they broke the law, but --

MR. LUCZAK: Yes.

JUROR NO. 14:  But mostly that's what I saw from the news story.

MR. LUCZAK:  So the news story you saw though, did it make you believe that the judge, Judge Dugan, broke the law?

JUROR NO. 14:  I didn't know the statute of law that they were implying was broken.  I just saw that they showed the person that was in the courthouse.  They showed that they were let out of the courthouse.  As far as why they're let out of the courthouse or whether it was legal or not, like that's the point I couldn't really fully come to a conclusion on.  I just know they stated that it was -- the person was not supposed to be let out of the courthouse.

MR. LUCZAK:  Okay.  So you believe that the story was that the person was not allowed out of the courthouse, that's --

JUROR NO. 14:  That's what it appeared to be.

MR. LUCZAK:  Okay.  And then you filled out another supplemental questionnaire today.  Did you write down any additional information there about --

JUROR NO. 14:  No.  I haven't seen anything since I got the court papers.

MR. LUCZAK:  And how many stories do you think you'd seen, or like have you followed this as the case has progressed or was it just that initial kind of story that you saw?

JUROR NO. 14:  In the past few months, we had -- I

already mentioned back in April -- I didn't realize it was back that far -- I think in the summer I saw some stuff. But like since they sent the questionnaire, I haven't really seen much more about the case.

MR. LUCZAK: When you got the questionnaire, did you figure out what the case was for and do any sort of like research or like look up the what case was about?

JUROR NO. 14: No, I just remembered from previously because like the things from TV or article I had -- like online where it shows quick ad or whatever, I remember hearing about the case, but I didn't really research much past because --

MR. LUCZAK: Yeah, yeah, understandable. So do you have any strong opinions as you sit here about whether or not Judge Dugan is guilty of the crimes for which she's charged with?

JUROR NO. 14: Yeah, I really don't know, honestly. I'm just wondering what the law is. I mean, if they broke the law, they broke the law. Not break the law, not break the law. So I don't really know the law in this case.

MR. LUCZAK: Okay.

JUROR NO. 14: I understand the judge said he'd clarify what the law is. And the questions of the lawyers would say whether this is the law and they broke it. I understand the lawyers want to say didn't break, but the Government attorneys will say did break. So we decide whether

the person broke or didn't break.

MR. LUCZAK:  Okay.  All right.  I have no further questions.

MR. FROHLING:  Just briefly, I think you made mention in your first questionnaire that your wife came to the United States on a visa; is that correct?

JUROR NO. 14:  Yes.

MR. FROHLING:  Is there anything about that process which was a -- either a positive or negative experience for you that would shape, you know, your opinion in the case involving agents from Immigration and Customers Enforcement and Customs and Border Protection?

JUROR NO. 14:  Not particularly.  I mean, it was a process.  It was a long process.  When you want to get married, you want to get married faster.  But we completed the process. And my wife's here now.  So we got married back in 2023, so that part of it's, you know, done with, I guess.  You know, it's updates to the process along the way.  But like, I mean, it's kind of like filing with the DMV and other things, like it's kind of a little drawn out.  But there's steps involved, I guess.

MR. FROHLING:  Thank you.

THE COURT:  I have one question, and that is:  In order to be an appropriate juror, you have to decide the case based only on the evidence that comes in to court and the law

that I instruct you on, and you have to put everything else aside. Are you able to do that?

JUROR NO. 14: I believe so. I want to be objective, you know. Just like, you know, like I said like, media and stuff like try to shape people. But then like, you know, if you can only show a glimpse of whatever they show you. It's like you get the facts presented today or whatever, throughout the course of the trial, I can make a decision based on that, not what people tell us.

THE COURT: Okay. Well, thank you. Appreciate it.

JUROR NO. 14: All right. Sorry. That keeps falling off. Thank you.

(Juror No. 14 left chambers.)

MR. LUCZAK: No, he's fine from us.

MS. WATZKA: Uh-huh.

MR. FROHLING: No motion.

THE CLERK: Okay. The next is 15.

COURT SECURITY OFFICER: 15.

(Juror No. 15 entered chambers.)

THE COURT: The next one, *** ***** ********?

JUROR NO. 15: Yes.

THE COURT: Hi. Thank you. Thank you for -- what we're doing here is based on the questionnaires, either me or the lawyer had questions, wanted to do a little more deeper questioning of some of the jurors, so that's what we're doing.

So you answered the questionnaires -- why don't I -- the lawyers, do you have any questions of *** ********?

MS. MASNICA: Yes. *** ********, when you had initially filled out the questionnaire about the case, you had talked about that you had had some impressions about the judge's conduct. Can you tell me a little bit about that, I mean, that you had believed she was impeding investigators?

JUROR NO. 15: Mostly from just the news that I watched on the case, stuff that was presented in the media. That's kind of how I came to that answer.

MS. MASNICA: Do you know about like what kind of news -- I mean, were you watching -- were there videos or what kind of things were in those news clips?

JUROR NO. 15: It was -- I don't remember any new like videos. It was mostly like details about it that they were talking about in the news.

MS. MASNICA: Okay. And, I mean, what -- your impression on her conduct that she impeded investigators, I mean, does that influence you one way or another about possibly that she had attempted to obstruct one of those officers?

JUROR NO. 15: That's obviously the allegation, but I'm not like somebody that makes final determination before knowing all the evidence.

MS. MASNICA: I mean, at this point, though, do you have some idea formed in your mind that that may have happened

or likely happened?

JUROR NO. 15: It's hard to -- maybe a little bit, but, I mean, I wouldn't say -- I do have an open mind to listen to facts and everything else. But, I mean, I probably had a little bit of an opinion when I first -- if I'm being honest, when I first saw the evidence and kind of -- it's hard not to sometimes --

MS. MASNICA: Yes, it's totally expected.

JUROR NO. 15: -- when you watch a lot of news and stuff like that. I did have a little bit of an opinion.

MS. MASNICA: If there was some -- I mean, if there was some information or evidence that you had seen in the news articles or a summary of something that allegedly happened and then that doesn't come into evidence during this trial, I mean, are you able to set that aside and, you know, either take it as not true or just not use it at all in your discussions with the other jurors or -- and during deliberations?

JUROR NO. 15: Yeah.

MS. MASNICA: Okay. You also discussed that you have -- I mean, generally that if a law enforcement officer were to testify at a trial that you would be more likely to believe them versus maybe a citizen witness.

JUROR NO. 15: Correct.

MS. MASNICA: Okay. Can you just tell me a little bit about that. Is that based on your prior experiences with law

enforcement or military or something?

JUROR NO. 15: Yeah, I mean, I was on -- I was a juror on another case, too, with law enforcement that testified and what not, so some of it was based off of previous experience. My brother-in-law is in the military. I trust law enforcement, and I think that's why they're in the positions they are, just like anyone else that's in a position of power. So I tend to, unless evidence tells otherwise, to trust those people that are put in those positions.

MS. MASNICA: Okay. So if there's sort of a differing testimony about what may have happened during a certain incident if you hear from, you know, some court officials or even just people who worked at the courthouse versus a number of law enforcement officers or ICE officers, I mean, would you be more likely then to believe the law enforcement officers?

JUROR NO. 15: I think I would -- I would listen to the evidence, and I think what's -- whatever is more appealing and what I feel is more truthful I think is what I would go with.

MS. MASNICA: Okay.

MR. BISKUPIC: You don't hold the opinion that law enforcement always tells the truth?

JUROR NO. 15: No. I don't think anyone always tells the truth, to be honest with you.

MR. BISKUPIC: No. I mean, if the evidence shows that

any witness in this case told the truth or didn't tell the truth, regardless of whether they were -- whatever their position was, you could be -- you could judge that fairly and impartially?

JUROR NO. 15:  Yeah.

MR. BISKUPIC:  You're sure?

JUROR NO. 15:  Yes.

MR. BISKUPIC:  With the presumption of innocence?

JUROR NO. 15:  Yes.

MR. FROHLING:  Nothing from the Government.

THE COURT:  Okay.  Thank you.

(Juror No. 15 left chambers.)

MR. LUCZAK:  I -- can I make a record?  I'd move to strike him.  I think that he indicated that he has a bias.  I don't think he was rehabilitated.  I think that he has a bias towards law enforcement.  He did hesitate, so I think from a perspective of he hesitated whenever Ms. Masnica asked the question related to whether you would believe certain witnesses over the testimony of law enforcement officers, I think given that, with the answers that he gave in the questionnaire, I move to strike him.

MR. FROHLING:  We would oppose that.  I think if anything that he was more -- or less equivocal than No. 6, ********, in terms of that.  And Mr. Biskupic asked follow-up questions.  His direct answers and demeanor made clear that he

would judge based on the facts and evidence.

Yes, he had indicated initially that he would have potentially going in, you know, would be more inclined to listen to law enforcement. That was then cleared up that he could be fair and whatever was more appealing, which was more corroborating is how I took that. I would say that's certainly less problematic than a cause that was denied in *US vs. Granger,* 70 F.4th 408, where it was a similar statement by law -- you know, viewing law enforcement as more credible going in, made the same types of answers and not struck for cause.

(Discussion off the record.)

THE COURT: Hold on a minute.

(Discussion off the record.)

THE COURT: Well, he originally said that he had an impression based on media, but he said that if there were facts in evidence which caused that impression to be less accurate that he could be fair. I think it's a close call, but I don't think -- I don't think there's enough to -- for cause. He did say -- he said he could be a fair and impartial juror, but -- so I -- yeah, I'm not going to strike him for cause, although I agree it's a close call.

What's next?

THE CLERK: The next is 16.

(Juror No. 16 entered chambers.)

THE COURT: Hi, *** *********.

JUROR NO. 16:  Yes.

THE COURT:  Based on the questionnaires, we're asking some juror -- prospective jurors more questions.

JUROR NO. 16:  Okay.

THE COURT:  So you were lucky enough to be one of the group.

JUROR NO. 16:  Oh, hurray.  Okay.

THE COURT:  And so I'm going to ask the lawyers, you want to ask anything?

MS. MASNICA:  Yeah.  So you had indicated just in your questionnaire that you filled out this morning that you heard a lot about the case in the media.  I mean --

JUROR NO. 16:  Uh-huh.

MS. MASNICA:  -- can you just kind of tell us a little bit about what you've seen and where you've seen it.

JUROR NO. 16:  Yeah, I live with my parents, and they always have the TV on.  And so it's like just, oh, they're selecting the jury tomorrow, all that stuff.  Then I also see like a lot of ICE protests as well, and -- yeah, just a lot of people talking about just this election coming up and that kind of stuff.

MS. MASNICA:  I mean, has anything in those stories that you've heard or talking to your parents at all about potentially being a juror, I mean, has any of that influenced you one way or another related to Judge Dugan's guilt in this

case?

JUROR NO. 16: If anything, it makes me more interested just because it's such like a hot topic. I wouldn't say that I have an opinion one way or another, but my interest has been like increased.

MS. MASNICA: Okay. And are you -- do you think that, you know, if you just hear the evidence in the courtroom, you know, everything that's presented in the trial, that's what you basically will be deciding the case on, if there was something that you saw in the media or heard maybe from your parents or someone else who maybe shared something with you about it, would you be able to set that aside and not talk about that or use that in your deliberations and only base your decision on this case based on what was presented by the testimony and other evidence in the court?

JUROR NO. 16: Yes, I can do that.

MS. MASNICA: Okay. Thank you.

MR. FROHLING: No questions from us.

THE COURT: Okay. Thank you. You're excused.

JUROR NO. 16: Thank you, guys.

(Juror No. 16 left chambers.)

MR. BISKUPIC: So I think we're both okay with 17?

MR. FROHLING: Yes.

MR. BISKUPIC: I'm just confirming with --

THE CLERK: What about 16?

MR. BISKUPIC:  Yeah, she's okay.  Yeah.

MS. WATZKA:  Yep.

THE COURT:  Okay.

THE CLERK:  And then no issues with 17 or 18?

MR. BISKUPIC:  18 we'd like to be brought in.  We have questionnaire.

THE CLERK:  From the one today?

MS. MASNICA:  18 said an usher -- or that individual was ushered out of the courthouse in order to not be arrested.

THE CLERK:  Was that today?

MS. MASNICA:  Yeah.

THE CLERK:  Oh, I'm sorry, okay.  18, please.

(Juror No. 18 entered chambers.)

JUROR NO. 18:  Good morning.

THE COURT:  Hi.

MS. MASNICA:  Good morning.

THE COURT:  So we had some -- oh, Mr. Biskupic.

MR. LUCZAK:  Sure.

MR. BISKUPIC:  Actually, my cocounsel.

MR. LUCZAK:  So we're -- we're on -- this is the defense side, okay.  In case it's not clear, the Government's over there.  So you've been selected just because of some of the questionnaires that you filled out.

JUROR NO. 18:  Okay.

MR. LUCZAK:  So you had indicated the initial

questionnaire that you would have some, you now, opinions about, you know, that the laws of the country should be enforced and you believe when it comes to national security that the federal government needs to do what is necessary to protect our country.

That second statement, what do you -- what is that in relation to?  Because it's kind of a general statement, but --

JUROR NO. 18:  It is.  I would agree with that.

MR. LUCZAK:  But what -- like what specifically?  Were you thinking about this particular case or --

JUROR NO. 18:  No.  No, I don't think I necessarily was.  I mean, it could be part of that.  But I just think that our -- the federal government or our federal laws, to the degree that it's necessary.

MR. LUCZAK:  So do you believe that people who are here illegally pose a national security risk?

JUROR NO. 18:  Not necessarily.

MR. LUCZAK:  Okay.

JUROR NO. 18:  But they could.  But I'm not saying that every person that is here illegally is a national security threat, if that makes sense.

MR. LUCZAK:  Sure, I understand.  It's just, you know, sometimes when people talk in political terms, you know, they're -- it can be either very specific of what you're talking about, so that's why I just asked you about --

JUROR:  I understand.

MR. LUCZAK:  -- asked you about national security.

JUROR NO. 18:  Sure.  I understand that.

MR. LUCZAK:  And then in the -- in the additional questionnaire that you just filled out this morning, you indicated that you heard that an individual was ushered out of the courthouse in order to not be arrested.

JUROR NO. 18:  That's correct.

MR. LUCZAK:  Okay.  And what was that -- what's that impression based on?

JUROR NO. 18:  It was based on -- I saw it on TV.  It was -- it was on a TV news -- news station.  And it just basically -- it showed an individual being led out, presumably, based on what was said, of the courthouse.

MR. LUCZAK:  Okay.  And what TV --

JUROR NO. 18:  And nothing more than that, quite frankly, sir.

MR. LUCZAK:  -- what station were you watching?  Where did you see that?

JUROR NO. 18:  Gosh.  I believe it was Channel 12.

MR. LUCZAK:  Okay.  Okay.  All right.  I have no further questions.  Thank you.

JUROR NO. 18:  Yes, sir.

MR. FROHLING:  No questions from us.

THE COURT:  Okay.  Thank you.

JUROR NO. 18: You're welcome, sir.

(Juror No. 18 left chambers.)

THE COURT: So you...

(Defense attorneys confer off the record.)

MR. BISKUPIC: He's okay.

MR. LUCZAK: Yeah, no issues.

MR. FROHLING: Yeah, no issues.

THE CLERK: Okay. So in summary from the second page, Nos. 10, 11, and 12 have been struck for cause. 13 through 18 remain in the pool.

MR. BISKUPIC: Agreed. I just want -- so that gets us up to 14.

MS. MASNICA: Uh-huh, yeah.

THE CLERK: I think that's right.

MS. WATZKA: We're cooking with gas now.

MR. LUCZAK: Yeah. You guys ready to put on your case this afternoon?

THE CLERK: All right. We're going to go on the outside record, so the judge can summarize.

MS. MASNICA: Thank you.

THE COURT: Hello. For the people in the -- listening in on the media, we've questioned the jurors who filled out questionnaires on page -- that are listed on Page 2 of the list of prospective jurors, and the results have been that the -- what, Nos. 10, 11, and 12 have all been struck by agreement,

and the rest are the numbers on there are all remaining in the pool. So we're up to 14 jurors now that have been selected to be part of the pool. And so anyway that's -- that's the report for now. We'll get to the next -- the next batch forthwith. Thank you.

THE CLERK: Okay. On the next page, the ones that I have flagged based on comments today and questionnaires are 21, 26, and 27.

MR. FROHLING: We had 22, as well.

THE CLERK: 22?

MR. FROHLING: Yeah.

MR. BISKUPIC: I have 20 and 23.

THE CLERK: Also 20 and 23.

MR. BISKUPIC: 21 was the personal issue.

THE CLERK: Right. That's the health issue.

MS. WATZKA: Right.

THE CLERK: All right. So then 20, 21, 22, 23, 26 and 27 should be brought in.

MR. BISKUPIC: Yep.

THE CLERK: Okay. And 19 is okay?

MR. FROHLING: Yes.

MS. WATZKA: Yes.

(Juror No. 20 entered chambers.)

THE COURT: Sir, hi.

JUROR NO. 20: Hi.

THE COURT: Don't be -- don't let all these lawyers make you feel uncomfortable. We wanted to ask you some more questions based on some information. What was it, from today or the questionnaires? I'm not sure.

MR. BISKUPIC: I think -- have you read about the case?

JUROR NO. 20: No, I haven't.

MR. BISKUPIC: Have you saw it on TV or anything?

JUROR NO. 20: I've heard it like on the headlines for the news, but I usually don't watch local news.

MR. BISKUPIC: What about national news?

JUROR NO. 20: I haven't heard about it on national news.

MR. BISKUPIC: Okay. What do you usually watch on national news?

JUROR NO. 20: I usually watch like BBC News America or CNN.

MR. BISKUPIC: Have you formed any opinion about the case?

JUROR NO. 20: No, I haven't, because I'm not totally here -- totally sure on exactly what -- what's what, you know.

MR. BISKUPIC: Okay. And you -- you could follow the judge's law as he gives it and presume that she's innocent, until the evidence proves otherwise?

JUROR NO. 20: Yes. I think I could.

MR. BISKUPIC:  You have no doubt you can follow that?

JUROR NO. 20:  Yeah, I have no doubt.

MR. LUCZAK:  Can I just ask, so we're on the defense side, just so you know, like who's who here.  That's the Government on that side.

So you had indicated in your questionnaire that you were a witness in a court-martial case; is that correct -- oh, I'm sorry, I got the wrong -- strike that.  You were never in a court-martial; correct?

JUROR NO. 20:  No, no.

MR. LUCZAK:  All right.  Okay.  No further questions.  Thank you.

THE COURT:  So you could be a fair juror, follow the law that I instruct you on, and listen to the evidence presented in court?

JUROR NO. 20:  Yeah.

THE COURT:  Okay.  Thank you.  You're excused.

JUROR NO. 20:  Thank you.

(Juror No. 20 left chambers.)

THE CLERK:  21, please, Ron or Ann.  21.

COURT SECURITY OFFICER:  21?  We're at 21.

MR. GABRIEL:  That was 20 -- okay.

THE COURT:  That was sort of anticlimactic.

MR. LUCZAK:  Yeah.

MR. BISKUPIC:  We got our numbers wrong.

MS. MASNICA:  I don't think we did.

MR. LUCZAK:  I don't think we did.

MS. MASNICA:  It's the right person.

MR. LUCZAK:  He just forgot.

(Juror No. 21 entered chambers.)

JUROR NO. 21:  Good morning.

MR. LUCZAK:  Good morning.

THE COURT:  Hi.

JUROR NO. 21:  Hello.

THE COURT:  So you're the lawyer?

JUROR NO. 21:  No.

THE COURT:  Oh, no.  I'm sorry.  I get confused.

MR. FROHLING:  He didn't mean to insult you.

THE COURT:  You had some issue about whether it was possible for you to be comfortable hearing the dates or something was it?

JUROR NO. 21:  So the main issue is that I'm the primary caregiver for a one-year-old and a three-year-old.  And while I've sort of cobbled together child care for now, on the 22nd, if the case runs over into the next week, I -- I won't have any child care because my husband will be out of town.

THE COURT:  So you -- yeah, so -- so you're fine being a juror except on -- a juror, but on the 22nd, that week, you have a problem or the --

JUROR NO. 21:  I mean, I have a one-year-old and a

three-year-old, and I'm their primary caregiver, so the whole -- the whole week is -- it's -- it's going to be really hard for the family; but, you know, we -- we can make it work.

THE COURT: I couldn't imagine -- I can't imagine that this case could go beyond the 22nd. I mean, I find it very difficult to think that it will go one minute past a week from tomorrow. But, you know, we've got to be careful. So could you make it work if it went another day?

JUROR NO. 21: I don't know who would watch my children. Also, we were told in the jury orientation that primary caregivers, stay-at-home caregivers for children under the age of ten had an exception.

THE COURT: Oh, well, we won't -- look, we're not going to force you --

JUROR NO. 21: Okay.

THE COURT: -- to be on the jury.

JUROR NO. 21: The other -- I was the one with the personal health exception. I'm also dealing with morning sickness, and I need to eat like every hour so that I don't get sick. So I don't know if you really want me in your jury snacking on granola bars in the box.

THE COURT: Well, that's not a problem.

MS. WATZKA: Well, I might beg to differ having been there.

THE COURT: Okay. You're out.

(Laughter.)

(Juror No. 21 left chambers.)

THE CLERK:  So No. 21 excused by agreement?

MR. BISKUPIC:  Correct.

THE CLERK:  All right.  The next is No. 22, *** *****, based on the questionnaire.

(Juror No. 22 entered chambers.)

MR. LUCZAK:  Hi.

THE COURT:  Oh, you're *** *****?

JUROR NO. 22:  Yes.

THE COURT:  Thanks for coming in.  We -- we're asking a few more questions of some jurors based on the information they submitted.

JUROR NO. 22:  Uh-huh.

THE COURT:  So that's why you're here.  I think there might be a few questions.

JUROR NO. 22:  Sure.

MR. FROHLING:  We can go.  Thank you.  Thank you, *** *****.  In your initial questionnaire, you indicated that you had either seen or read that the case involved a judge refusing to let ICE agents take someone away in a way that denied their constitutional rights; is that right?

JUROR NO. 22:  That sounds right.

MR. FROHLING:  Okay.  And where did you -- where did you get that impression or what was the source of that?

JUROR NO. 22:  I probably couldn't give you a specific source because there are many that I consume.

MR. FROHLING:  And that's just from -- might be from various sources of where you get your news?

JUROR NO. 22:  Uh-huh, yeah.

MR. FROHLING:  And what did you -- when you say that denied the person their constitutional rights, what did you mean by that?  Just give us a little sense of that.

JUROR NO. 22:  I probably, again, couldn't give you the specifics right now.

THE COURT:  Could you speak a little louder.

JUROR NO. 22:  Yeah.  I probably couldn't give you the specifics right now.  The impression that I got there, again it's something that I have not intentionally researched further since then, but just the way it was discussed from what I was consuming at the time.

MR. FROHLING:  Okay.  Sounds good.  And I think you indicated that you didn't know the facts, but you were generally anti-ICE; is that right?

JUROR NO. 22:  Yes.

MR. FROHLING:  And that that's -- I think on the supplemental questionnaire today, that's still your view?

JUROR NO. 22:  Yes.

MR. FROHLING:  And it's a strongly held view?

JUROR NO. 22:  Yes.

MR. FROHLING: And that's something that if the case involves, for example, someone being arrested in the courthouse by ICE agents or attempted to be arrested by ICE agents and those individuals as witnesses, that's something that you -- I think you said you'd have maybe internal bias that -- against what they were saying; is that right?

JUROR NO. 22: I would assume so, yeah.

MR. FROHLING: And that would impact how you would sort of assess the evidence here.

JUROR NO. 22: Right. I think I would, of course, do my best to be impartial, but just kind of how the mind works, I guess that would probably influence me in some ways.

MR. FROHLING: And you indicated, too, that you're opposed to a lot of actions of the current administration; is that correct?

JUROR NO. 22: Yes.

THE COURT: I didn't hear that.

MR. FROHLING: That -- opposed to lot of actions of the current administration.

THE COURT: Oh. Okay.

MR. FROHLING: That's it from us. Thank you.

MR. LUCZAK: So I have a few questions, so we're -- just so it's clear, so we're on the defense side --

JUROR NO. 22: Uh-huh.

MR. LUCZAK: -- representing Judge Dugan. Whenever

you got the questionnaire, you immediately stopped consuming like any sort of information about this case?

JUROR NO. 22: Uh-huh.

MR. LUCZAK: Why did you do that?

JUROR NO. 22: I think that it said on there to do that, and I guess I maybe just assumed that was best practice.

MR. LUCZAK: Yeah. So -- so you took that as an order, and you basically followed it; correct?

JUROR NO. 22: Uh-huh.

MR. LUCZAK: That's a yes? You just have to say yes or no.

JUROR NO. 22: Yes.

MR. LUCZAK: And so likewise in this case, you're going to hear evidence. And basically the idea is that you come in essentially as a blank slate, you don't have any prejudgments about this case. Would you say that as you sit here today you're willing and able to be able to put all of your, you know, potential biases aside to evaluate the evidence fairly for both sides, for the Government and for the defense?

JUROR NO. 22: I think that I would do my best to do that, yes.

MR. LUCZAK: Okay.

JUROR NO. 22: But like I said earlier, I can't guarantee that that wouldn't somehow influence me, but...

MR. LUCZAK: Yeah, and it's important that you be

certain, though.  So are you certain that you could set that aside and listen to Judge Adelman's orders and follow those orders that he gives you about how you're supposed to listen to the evidence, how you're supposed to decide the case, and require the Government to prove their case beyond a reasonable doubt?  Are you able to do that?

JUROR NO. 22:  Yes, I think I would be, yes.

MR. LUCZAK:  Okay.

MS. WATZKA:  Can I ask a couple follow-ups, please, Judge?

THE COURT:  Yeah, sure.

MS. WATZKA:  *** *****, you -- you've already talked about that you -- your beliefs about ICE are pretty strongly held.

JUROR NO. 22:  Yes.

MS. WATZKA:  And I notice that you've got some background in clinical mental health?

JUROR NO. 22:  Yes.

MS. WATZKA:  And you've made reference in your questionnaire to internal bias or unconscious implicit bias; is that accurate?

JUROR NO. 22:  Yes.

MS. WATZKA:  And so I think the concern is everybody says they would try and be willing to follow directions, but you've raised in your questionnaire concerns that you might not

be able to do that.  You believe you could be swayed in an unconscious way because you have such strong views against ICE, so that's -- that's the concern from our perspective.

JUROR NO. 22:  Uh-huh.

MS. WATZKA:  Not that there would be any intentional --

JUROR NO. 22:  Right.

MS. WATZKA:  -- ignoring of the judge's rules, but that because of your strongly held beliefs you might not be able to help it.  Is that something that we should be concerned about?

JUROR NO. 22:  I feel right now that even if it was a very uncomfortable choice if it was strictly within what you're stating is the law and just and in that basis, I would still be able to give the uncomfortable answer.  But like you said, I don't know if I unconsciously would be swayed or what the decision-making would be.

MR. FROHLING:  Thank you.

MS. WATZKA:  Thank you.

THE COURT:  Okay.  So we're going to hear a case. There's doing to be evidence presented.  And then I'm going to say what the law is.

JUROR NO. 22:  Uh-huh.

THE COURT:  And then the job of the jury is to decide whether the law and the evidence, what -- whether the evidence

amounts to a violation or not. That's what the job of the jury is.

JUROR NO. 22: Right.

THE COURT: You could do that?

JUROR NO. 22: Yes.

THE COURT: Okay.

JUROR NO. 22: I could set aside --

THE COURT: And you could be impartial? You could do that fairly; is that correct?

JUROR NO. 22: Yes.

THE COURT: And -- okay. I have no more. Thank you.

JUROR NO. 22: Yeah.

THE COURT: Thank you.

MR. LUCZAK: Thanks.

THE COURT: You're excused.

JUROR NO. 22: Thank you.

(Juror No. 22 left chambers.)

MR. FROHLING: We're going to move to strike him for cause. I know on about the third question, the third time he said he could be fair and impartial after about a three-second pause. And he's flagged multiple times that he's concerned he might have an unconscious bias given those strong feelings. So we don't believe he could be a fair juror in this case.

MR. LUCZAK: And, Judge, I actually think that pause is actually indicative that he's being truthful. And I think

that the unconscious bias issue, if you look at the research and how you handle an unconscious bias is you make it then a conscious bias. You make the person aware that they can't consider those things. So it's no longer an unconscious bias that he has. He'll be thinking about it and setting it to the side. And he was very clear and direct with your answers that he would follow your instructions. I don't think he should be struck for cause.

MR. FROHLING: I just would want to flag it was -- he has the background in the research. He's the one who flagged the concern himself multiple times, that he wants to be fair, but he's concerned because of that he can't, even though it was brought to his attention.

THE COURT: Well, he testified that he could be impartial. He testified that he could follow my instructions and set aside other matters, and so I find him credible. I -- I also think that with respect to the -- the comment about the unconscious, I think that somebody that's talking about the possibility of they themself being unconscious is really going out of their way to be honest, which is exactly what you want in a juror, to come in here and be honest. And I think that that's what this prospective juror was doing. And that combined with his statement that he could follow the law and -- and base his verdict on the facts, I don't think this is a cause.

THE CLERK:  The next is 23.

(Juror No. 23 entered chambers.)

THE COURT:  Hi.

JUROR NO. 23:  Hi, Judge.

THE COURT:  We're asking some jurors, prospective jurors, to answer a few more questions --

JUROR NO. 23:  Sure.

THE COURT:  -- based on previous answers.  And I think -- you have some questions?

MS. MASNICA:  Yes.  I saw in your questionnaire that you filled out today that you had seen a headline about a possible plea deal and then generally had seen a headline about the hallway incident.  What --

JUROR NO. 23:  I've seen the all the headlines in the paper, but I purposely did not read the articles because of what it was about.

MS. MASNICA:  Okay.  And had -- prior to getting the questionnaire, had you read any articles or seen any news stories about this case?

JUROR NO. 23:  The first questionnaire?

MS. MASNICA:  Yep.

JUROR NO. 23:  Yeah, I probably saw the original initial coverage.

MS. MASNICA:  Okay.  At that point, I mean, did you have any impressions or thoughts about Ms. Dugan's conduct or

anything like that?

JUROR NO. 23: Not really, no.

MS. MASNICA: Now reading about that there had been a possible plea deal, I mean, do you take that in your -- I mean, what you believe you were reading that there was some sort of capitulation by Ms. Dugan that she was guilty or anything like that?

JUROR NO. 23: No, I just thought they may have reached some sort of agreement.

MS. MASNICA: Okay. I mean, in this case, there is no plea deal. We are going to trial.

JUROR NO. 23: Right.

MS. MASNICA: You know, sometimes -- I mean, would you accept that sometimes headlines are not accurate?

JUROR NO. 23: Actually, I was just hoping I wouldn't have to come to jury duty.

(Laughter.)

MS. MASNICA: I get that.

MR. LUCZAK: Fair enough.

MS. MASNICA: I appreciate your honesty. I mean, as you sit here, having that information, are you able to set that aside --

JUROR NO. 23: Yes.

MS. MASNICA: -- and accept that Judge Dugan is not entering a plea and is engaged in no plea deal?

JUROR NO. 23: Yes.

MS. MASNICA: Okay. What about the headlines about the hallway, do you remember anything specifically about that or...

JUROR NO. 23: That it just may play a role and that they showed a little map. I don't know if you saw it.

MS. MASNICA: Oh, was this the Journal Sentinel article?

JUROR NO. 23: The Journal Sentinel with a little picture, little green dots. I didn't read what those were about.

MS. MASNICA: Okay. And so that was a diagram that was created, or a 3D diagram by the Journal Sentinel. That's not evidence that's going to be introduced, and we didn't create that. There will be evidence about that hallway. But are you able to set aside, you know, what you saw in that diagram because it may not be accurate --

JUROR NO. 23: Yes. I didn't pay attention to that diagram very much. I just pretty much glanced at it.

MS. MASNICA: Okay. All right. Thank you.

MR. FROHLING: No, no questions from us.

THE COURT: I think you're excused.

JUROR NO. 23: Okay. Thank you.

THE COURT: Okay.

(Juror No. 23 left chambers.)

MR. BISKUPIC:  He's okay.

THE CLERK:  24 and 25 are okay?

MR. LUCZAK:  Yep.

THE CLERK:  Okay.  So 24 and 25 are okay.  The next one that I had marked was No. 26.

MR. FROHLING:  Yes.

THE CLERK:  Okay.  26, please, Ron.

(Juror No. 26 entered chambers.)

THE COURT:  Hello.

JUROR NO. 26:  Hi.

THE COURT:  *** ********?

JUROR NO. 26:  Yes.

THE COURT:  Yeah, what we're doing here right now is we're asking a few more questions of some of the jurors based on the earlier questions, okay?

JUROR NO. 26:  Okay.

THE COURT:  So I might have a few questions, and I -- maybe the lawyers do, too.  So just answer them as honestly, okay?

MR. FROHLING:  Sure.  Hi, *** ********, I guess I'll go.  Your answers on your initial questionnaire involved some discussion of ICE.  Do you remember that?

JUROR NO. 26:  (Indicating.)

MR. FROHLING:  That's a yes?  We've got to just do it so they can record the answers.

JUROR NO. 26:  Okay.  Oh, sorry, yes.

MR. FROHLING:  Thank you.  And you indicated that you believe that the administration is currently acting illegally; is that right?

JUROR NO. 26:  I do believe that.

MR. FROHLING:  Yeah.  Do you believe that today, too?

JUROR NO. 26:  Yes.

MR. FROHLING:  And you indicated that the pursuit of folks who are here undocumented unlawfully by the administration is a concern and a problem; correct?

JUROR NO. 26:  Yeah.

MR. FROHLING:  And I think you indicated that you had beliefs that would prevent you from being fair and impartial in this case because of that, and you'd also be concerned that if you didn't vote to convict in this case you'd be afraid of retribution from the administration?

JUROR NO. 26:  Yes.

MR. FROHLING:  And that -- and that's a concern today, too; right?

JUROR NO. 26:  Yeah.  Just from what I see, yes.

MR. FROHLING:  When you see -- what you see in the news and media and that sort of thing?

JUROR NO. 26:  Yeah.

MR. FROHLING:  And that -- so if you were listening to the evidence in this case and saw someone that an ICE task

force was attempting to arrest in a courthouse, those views would still be in the back of your mind?

JUROR NO. 26:  I think so, yes.

MR. FROHLING:  That's all I have.

MR. LUCZAK:  Hi.

JUROR NO. 26:  Hi.

MR. LUCZAK:  I have a few questions.  So just so I don't know if it's clear, but we represent Judge Dugan, okay.  So -- so it sounds like your issues with ICE and the administration are very generalized; correct?

JUROR NO. 26:  Yes.

MR. LUCZAK:  They're not specific to this case; correct?

JUROR NO. 26:  No.

MR. LUCZAK:  Have you read anything about this case?

JUROR NO. 26:  I haven't read anything.  But when it was on the news originally, I saw it.

MR. LUCZAK:  Okay.  And so you understand that you're going to have to listen to some, you know, testimony about ICE attempting to conduct an arrest in the courthouse.  Is there anything about that specifically that would cause you to immediately say, oh, well, Judge Dugan is not guilty of any of the crimes for which she's --

JUROR NO. 26:  No, because I don't know all the details.  I just know my feelings based on what I've seen.  But

I don't know the details of -- you know, I'd want -- I'd have to hear both sides to make a decision.

MR. LUCZAK: Okay. And so, I mean, everybody comes in with, you know, feelings and biases and things like that. Are -- the question, though, is are you willing to put those to the side, put those out of your mind, listen to the facts, listen to Judge Adelman's instructions, and follow the law when you're deliberating with your fellow jurors?

JUROR NO. 26: Yeah. I would follow the law, yeah.

MR. LUCZAK: Are you confident that you could do that?

JUROR NO. 26: Yeah. I don't think I -- I wouldn't purposely put myself on the jury to make sure it went the other way. I would -- I would follow the facts because I know I don't know them all.

MR. LUCZAK: And on the flip side, you wouldn't be afraid of returning a not guilty verdict because you thought that somehow the administration was going to come at you?

JUROR NO. 26: Um, I suppose, yes.

MR. LUCZAK: Okay. There was a little bit of hesitation there. Why?

JUROR NO. 26: Um, because of what I've seen happen, people that are innocent and getting arrested, so --

MR. LUCZAK: Okay. I have no further questions.

MS. WATZKA: Could I ask one more question?

THE COURT: Sure.

MS. WATZKA:  Thank you.

Appreciate your candor, *** ********.  I'm one of the attorneys that represents the Government in this case.  Having expressed your strong feelings about ICE and the fears that you've expressed about serving on this jury, if you were sitting in my shoes, would you feel comfortable having someone --

MR. LUCZAK:  Judge, I'd just --

MS. WATZKA:  -- who shares your views on the jury?

JUROR NO. 26:  Someone that shares my view?

MS. WATZKA:  Yeah.

JUROR NO. 26:  Yes.  I mean, I imagine everybody has an opinion one way or the other.

MS. WATZKA:  Okay.

JUROR NO. 26:  But I don't know if that -- I'm not a lawyer, so --

MS. WATZKA:  Yeah.  Because we're all trying to find folks who can set aside even strongly held beliefs or even fears, as you've expressed, and focus solely on what you hear in this courtroom and the judge's instructions.  And so that's -- I just want to make sure that I don't have a reason to be concerned because you do have strongly held feelings and fears that maybe that's not you.

JUROR NO. 26:  I mean, yeah, I agree.

MS. WATZKA:  You -- you think I'm probably right and

you'd agree with me?

JUROR NO. 26: Yeah, that I might, you know, even though I don't -- I think I could put that to the side, you know, I guess it depends on the evidence, but there's probably something, you know, in my brain from what I know about what's going on with ICE that may change my answer or whatever, opinion.

MS. WATZKA: You're not -- you're not a hundred percent confident that you would be able to do what Judge Adelman is going to ask the jurors in this case to do?

JUROR NO. 26: Because I've never been a juror before, but I guess I'm not a hundred percent sure, maybe 70 percent.

MS. WATZKA: Thank you. I appreciate your candor.

THE COURT: So here's what happens. We have a trial, and there's evidence presented by -- by both sides, the Government and Judge Dugan. She's the defendant. You know that.

JUROR NO. 26: Uh-huh.

THE COURT: And then -- and you have -- if you're on the jury you have to decide the case based on two things, what the evidence is as to -- as to what Judge Dugan did and then what the law is and -- which I -- I instruct you on that. Those are the only two things, okay. You have to disregard whether you like ICE or don't like ICE and whether you like the administration or the -- you know, the Government or whether

you don't like it.  And you have to decide just on those two things, my instructions and the evidence.  Now, my question is: Could you do that?

THE COURT:  Well, you know, do you have -- is there any reason that you couldn't?

JUROR NO. 26:  No, I don't think so.  I mean, you know, if I had -- if I got picked, I would have to do that, follow the rules and the law.

THE COURT:  If you got pissed?

JUROR NO. 26:  No, picked, picked to be a juror.  I mean, I would understand that that's my duty to look at the facts on both sides and make a -- you know.

THE COURT:  Could you -- could you do your duty?

JUROR NO. 26:  I guess, yes.

THE COURT:  Why are you so tentative?

JUROR NO. 26:  Because I've never been a juror before, so I don't know really the process.

THE COURT:  Well, the process is just a question of making a decision based on the evidence and the law.

JUROR NO. 26:  Right.

THE COURT:  See, you have to -- could you set your beliefs about things aside and decide the case just based on evidence and the law?

JUROR NO. 26:  Yes.

THE COURT: Yes? And you also have to set aside any fear you have about, you know, somebody -- retribution. Could you do that?

JUROR NO. 26: Yes.

THE COURT: Okay. Could you decide the case fairly for both sides?

JUROR NO. 26: Yes.

THE COURT: Okay. That's all I have.

JUROR NO. 26: Am I done?

THE COURT: Oh, yeah, you're excused.

JUROR NO. 26: Thank you.

THE COURT: Thank you.

JUROR NO. 26: I'm sorry.

(Juror No. 26 left chambers.)

MS. WATZKA: Judge, we would move to strike her for cause. Her body language, her demeanor, her hesitation, and her answers all demonstrate repeatedly that she has strongly held feelings. She's uncomfortable. She's afraid. She -- she didn't -- she could not say that she was a hundred percent. She said she was 70 percent sure she could be impartial in this case. And the only time she changed those opinions was when she was sitting across from a federal judge who, with all due respect, just, you know, that she seemed to be a little -- she wants to agree with you.

THE COURT: She wanted to agree with everybody.

MS. WATZKA: Especially when you said, "Why are you so tentative?" You know, again, with all due respect, that put a little bit of pressure on her to agree with you. And this juror is not comfortable being on this, and she was candid and honest and she is I don't believe capable --

THE COURT: She said she'd never been a juror before, and that was what the hang up was, but --

MS. WATZKA: I --

THE COURT: Let me talk to my --

MS. WATZKA: Yeah.

THE COURT: Let me talk to my staff here.

(Discussion off the record.)

THE COURT: All right. I'm going to -- I'm going to grant the cause challenge. She was very, very equivocal, and 70 percent isn't adequate. And I pushed her to try to rehabilitate her, and I don't know that I really succeeded. And, also, this fear that somehow she's going to get retribution if she acquitted, it just kind of leaves you with a sense that it's very hard for her to exercise impartial independent judgment, so I'm granting the challenge.

THE CLERK: 27, please, Ron.

COURT SECURITY OFFICER: 27.

(Juror No. 27 enters chambers.)

THE COURT: Hi, *** ********?

JUROR NO. 27: Yes.

THE COURT: Well, we wanted to ask you a few more questions because based on the previous information.

JUROR NO. 27: Yeah.

THE COURT: So if one of the lawyers wants to.

MR. FROHLING: Sure. Hi. Your -- in your questionnaire, you indicated that you don't think the Government should -- the federal government should be involved in immigration laws at all; right?

JUROR NO. 27: Not at all.

MR. FROHLING: You indicated that it shouldn't be involved because this -- we're all occupying stolen land; is that right?

JUROR NO. 27: Some -- a part of it, yeah. I can't really like put like it all into the words, but yeah.

MR. FROHLING: Okay. Just help us -- help us understand, you know, what you mean by -- what you meant by the questionnaire saying we shouldn't be involved.

JUROR NO. 27: Well, the way that things are going right now, I don't agree with, like the way that the government's involved with it now, I don't agree with. But I do think like the government helps with it. And I think obviously it can like -- I mean, we need the government involved in that type of stuff, though. But it's just like right now, what's happening.

MR. FROHLING: Yeah. Well, can you help us. What do

you mean by what's happening right now?  Just help us get a sense of that.

JUROR NO. 27:  Like what the administration is doing to the new laws about immigrations and stuff.

MR. FROHLING:  Okay.  So like the way the administration is handling immigration right now?

JUROR NO. 27:  Yeah.

MR. FROHLING:  And that gives you concern?

JUROR NO. 27:  Yeah.

MR. FROHLING:  So do you find it pretty troubling?

JUROR NO. 27:  Yeah.

MR. FROHLING:  And that -- that's in your mind as you're hearing about cases with ICE and attempts by federal officials to arrest people who are here without lawful status?

JUROR NO. 27:  (Indicating.)

MR. FROHLING:  And this is a case involving a situation where there's a warrant issued for someone who didn't have a lawful status and an attempt to arrest and the things you're seeing going on right now, is that something that would impact how you would see what's -- what happened in this case.

JUROR NO. 27:  Probably.  Yeah.  But like -- I don't know, it's just like each case is different to me, like I look at it differently.

MR. FROHLING:  It's -- it's hard, and each case is different.  You have things that are concerning that are going

on right now.

JUROR NO. 27:  Uh-huh, yeah.

MR. FROHLING:  That's all that we have.

MR. LUCZAK:  You look nervous.

JUROR NO. 27:  Yeah.

MR. LUCZAK:  Yeah.  It's kind of nerve-racking being asked questions by everybody.  But one of the things, the reason why we're asking these questions is that both sides get to have jurors that are fair and impartial, so that means that Judge Adelman will instruct you on the law.  And then you listen to all the facts of the case, and then you go in with your fellow jurors and you make a decision.  Are you comfortable doing that?

JUROR NO. 27:  Yeah.

MR. LUCZAK:  Okay.  And if -- if Judge Adelman instructs you to do something, would you follow his order or would you say, you know what, no, I'm going to let whatever generalized impression I have about the administration affect how I'm going to, you know, conduct myself?

JUROR NO. 27:  I mean, he's the -- he's the judge.  I have to follow him.

MR. LUCZAK:  Yeah.

JUROR NO. 27:  I have to follow what he says.

MR. LUCZAK:  Yeah, okay.  All right.  I have no further questions.  Thanks.

THE COURT: So you could -- you could follow my instructions about what the law is?

JUROR NO. 27: Uh-huh.

THE COURT: And you could reach a decision based on the law and the evidence?

JUROR NO. 27: Yes.

THE COURT: You could do that?

JUROR NO. 27: Yes.

THE COURT: And you're sure?

JUROR NO. 27: Yes.

THE COURT: A hundred percent?

JUROR NO. 27: Yes.

THE COURT: You could be impartial? Impartial, that means fair to both sides.

JUROR NO. 27: Oh, yes. Yeah. I was like --

THE COURT: And -- I have nothing further.

MR. FROHLING: Can I just ask one question on an unrelated topic? Did you mention in the courtroom that you might have a work conflict?

JUROR NO. 27: Yeah, but I didn't -- okay. I raised my hand too fast before I thought about it, and I had already talked to my job about this, so they know I have court, so like it doesn't even matter.

MR. FROHLING: Okay. Thank you.

JUROR NO. 27: Yeah.

MR. LUCZAK:  Thanks.

THE COURT:  Thank you very much.

(Juror No. 27 left chambers.)

MR. FROHLING:  No, it's fine.

THE COURT:  Okay.

THE CLERK:  All right.  So then to recap, from Page 3 we have struck 21 and 26.  Everyone else remains?

MR. BISKUPIC:  Yes.

THE CLERK:  Okay.  We're  going to go on the public record.

THE COURT:  Hi.  If the media -- if the media is still there, we've gone through Page 3.  We've struck by -- well, you know, we've struck what 20 -- 21 and 26 have been struck, and all the other prospective jurors remain in the pool.

So we're going to break for lunch now.  Is that it?  And we'll be back -- what time is it?

THE CLERK:  It's 12:16, Judge.

THE COURT:  We'll be back at 1:15.  Thank you.

So how many have we got?

MR. BISKUPIC:  Jon, are you up to 21?

THE CLERK:  Let me see.  Let me do my count.

MR. LUCZAK:  21.

THE CLERK:  21.

MR. BISKUPIC:  We need 11 more.

THE CLERK:  11 more.

MS. WATZKA:  Doable.

MR. FROHLING:  And we started at 9:30 or something.

THE CLERK:  Yeah.

MR. FROHLING:  No, we're just assessing timing.

THE COURT:  So are there a lot more that we have to question?  I mean --

THE CLERK:  If want you to do that now or after lunch, I can tell you the ones I have flagged from the next page.

THE COURT:  Yeah.  Let's see if we can get higher than 21.

THE CLERK:  On the next page I have flagged 32 and 34.

MR. BISKUPIC:  How about 28, also?

THE CLERK:  28.  Is that a questionnaire issue or --

MR. BISKUPIC:  I thought it was today's.  Am I wrong?

MR. LUCZAK:  I don't have 28, but --

MR. BISKUPIC:  Just give us -- we'll come back.

THE CLERK:  If you want to check your notes and come back.

MS. WATZKA:  That would be great.  Thank you.

MR. BISKUPIC:  And then 36, the lawyer.

THE CLERK:  36 had a work issue, I guess, I don't know if that's --

MS. WATZKA:  She's super important.

MS. MASNICA:  Everyone will miss her.

MR. BISKUPIC:  Do you want to strike her or not?

MR. FROHLING:  Sure.

MR. BISKUPIC:  All right.  We'll agree to strike 36, the lawyer.

THE CLERK:  Okay.

THE COURT:  Why?

MR. BISKUPIC:  She's got to be at work on the 22nd.

MS. WATZKA:  She's indispensable.

THE COURT:  Huh?

MR. BISKUPIC:  We're all --

MS. WATZKA:  She's indispensable.

THE COURT:  All right.  If you agree, fine.

THE CLERK:  Okay.  36 is struck by agreement.

MR. BISKUPIC:  All right.  So we'll -- we'll be back at 1:15, and it looks like we're going to get there, Judge.

MR. LUCZAK:  Yeah, 35 had a comment.  I'm sorry, I didn't mean --

MS. MASNICA:  Yeah, about the plea deal.  We probably should --

THE CLERK:  Oh, okay.  Was that in today's questionnaire?

MS. MASNICA:  Correct.

THE COURT:  Do we have enough left to get 32?

MR. LUCZAK:  Oh, yeah.

MS. WATZKA:  Oh, yeah.  We're going to be fine.

THE COURT:  Oh, good.

MR. BISKUPIC:  So once we get to 32, we're stopping; right?  We're not going to --

THE COURT:  Yeah, we're done.

MR. BISKUPIC:  Good.  Got it.

MR. LUCZAK:  Great.

THE COURT:  Case is -- okay.

MS. WATZKA:  Thank you.

(The following proceedings were held in open court:)

THE COURT:  I'm sorry that -- that you've been sitting like this.  We've made a lot of progress, and we're going to -- we're going to be able to finish, I think, this afternoon, probably by the -- probably by the middle of the afternoon.  We actually have lunch for you.

And so the lunch is where, Ann?

COURT SECURITY OFFICER:  Down in 225.

THE COURT:  Down in the room downstairs.  We're going to come back at 1:15 and -- and finish.  And -- and then the jury will be selected and sworn in.  And so your -- your involvement here, even though it's been passive, is indispensable, and we appreciate it.  And thank you.  Have a good lunch.

COURT SECURITY OFFICER:  All rise.

THE COURT:  Oh.  Don't -- don't talk about the case.

COURT SECURITY OFFICER:  Good now?

(The venire left the courtroom.)

(The proceedings recessed for lunch.)

* * * * *

THE COURT:  Okay.  Let's go.  Let's go.

(The venire entered the courtroom.)

COURT SECURITY OFFICER:  That should be everyone, your Honor.

THE COURT:  Okay.  Please be seated.  Let me apologize again for being late.  Dealing with all this is hard work.  And I know you're -- I know you appreciate it and you're sympathetic, and I'll have you out of here pretty soon.  I have one more question.  Did anybody read anything about the case over the noon hour?

(No response.)

THE COURT:  Good.  Good, good, good.  Okay.  I think what we're going to do now is resume where we were this morning.  We're going to go back into chambers, and we're going to call some individual jurors into chambers for a little additional questioning.  And then -- and as I told you, the reason for individually questioning some jurors is really a result of the questionnaires and the information.  And all this is solely for the purpose of getting a fair and impartial jury.  And I think we can probably finish that fairly quickly.  And I appreciate very, very much your cooperation.  And, I don't know, I hope you had a good lunch, I don't know.  But anyway, so that's where we're going.  Thank you.

(The following proceedings were held in chambers outside the presence of the venire with the Court and counsel present:)

THE COURT: Everyone make themselves comfortable. Sit down, please, so we can make sure everybody's -- okay. Who's the next -- who's the next juror?

THE CLERK: From this page, I've got 32, 34, and 35; is that agreeable?

MR. BISKUPIC: It's agreeable on our side. 28, 29, 30, and 31 are all acceptable.

THE COURT: So we've got four more?

MR. BISKUPIC: Depending on their view.

THE COURT: Oh.

MR. FROHLING: Yep, that's fine.

THE COURT: Great. Okay. Who's next?

THE CLERK: No. 32, please.

THE COURT: For the -- Mr. Spahn, the people that we just -- were all agreeable to be in the pool.

MR. SPAHN: I see.

THE COURT: There were four more that were not questioned.

MR. SPAHN: Thanks, Judge.

(Juror No. 32 entered chambers.)

THE COURT: Okay. We want to ask you a few additional questions --

JUROR NO. 32:  Okay.

THE COURT:  -- based on the answers that we've already received.

JUROR NO. 32:  Uh-huh.

THE COURT:  And we are not going to use your name --

JUROR NO. 32:  Okay.

THE COURT:  -- in this conference.  Do you understand?

JUROR NO. 32:  All right.

THE COURT:  So you should feel totally comfortable to answer honestly and candidly; okay?

JUROR NO. 32:  Uh-huh.

THE COURT:  Okay.  I think that maybe one of the lawyers wants to start on this?

MR. LUCZAK:  Sure, I'll start.  Hi.

JUROR NO. 32:  Hi.

MR. LUCZAK:  Hi, Juror 32.  So we all represent -- on this side of the room, we represent Judge Hannah Dugan.  And over there, those are the Government lawyers, just kind to of orient you.

JUROR NO. 32:  Okay.

MR. LUCZAK:  So you filled out a supplemental -- do you remember filling out this supplemental --

JUROR NO. 32:  This morning, uh-huh.

MR. LUCZAK:  -- questionnaire?  And it sounds like you -- you have read, you know, media about this case --

December 11, 2025

JUROR NO. 32:  Uh-huh.

MR. LUCZAK:  -- is that right?

JUROR NO. 32:  Yes.

MR. LUCZAK:  Did you form opinions, you know, based on what you read?

JUROR NO. 32:  Um, perhaps a little, yeah.  I mean, I think it's leaning more towards -- excuse me -- that -- that she did what she's been claimed to do.

MR. LUCZAK:  Sure.  Yeah.  And it's really important.  You shouldn't feel like embarrassed because part of this process is to make sure that we have a fair jury, okay.

JUROR NO. 32:  Uh-huh.

MR. LUCZAK:  Okay.  So based on -- you also said -- and this is in the supplemental questionnaire you filled out today --

JUROR NO. 32:  Uh-huh.

MR. LUCZAK:  -- it would be difficult to believe in the innocence of the defendant, who's Hannah Dugan; correct?

JUROR NO. 32:  Yes.

MR. LUCZAK:  And you still hold that belief; right?

JUROR NO. 32:  Yes.

MR. LUCZAK:  Okay.  And nothing's changed since you filled this out --

JUROR NO. 32:  No.

MR. LUCZAK:  -- a few hours ago?

Case 2:25-cr-00089-LA   Filed 12/12/25   Page 99 of 132   Document 86

99

JUROR NO. 32: No.

MR. LUCZAK: Okay. Thank you.

THE COURT: You --

(Government attorneys confer off the record.)

MR. FROHLING: Just a couple of questions. Appreciate your candor. So you've expressed, Juror No. 32, that view. If the judge instructs you that you need to follow the law that he provides --

JUROR NO. 32: Uh-huh.

MR. FROHLING: -- and base your decision solely on the facts -- nothing that you've heard, read, things that you might have had a first impression about in the public -- but based solely on what happens in the courtroom, is that something you could do?

JUROR NO. 32: Yes.

MR. ALEXANDER: Let me ask: You could presume the defendant is innocent until proven guilty?

JUROR NO. 32: Um, yes, I believe so. Yes. I mean, I do have a little bias based on what I've heard, but I do think I could start from that -- that baseline, uh-huh.

THE COURT: Okay. You're excused.

JUROR NO. 32: Okay. Thank you.

(Juror No. 32 left chambers.)

MR. LUCZAK: I'd move to strike her for cause. She said she would find it difficult to believe in the innocence of

the defendant. She paused whenever Mr. Alexander was trying to rehabilitate her in questioning if she could believe in the presumption of innocence. I think that she should be struck for cause. And she obviously has formed a lot of opinions, which I think would be very difficult for her to put aside and be a fair juror in this case.

MR. FROHLING: Yeah.

MS. WATZKA: Yeah.

MR. FROHLING: Your Honor, we're not going to oppose the motion to strike in this case.

We just ask, you know, that like the procedure we used this morning, after the parties go, if the Court asks the follow-up questions to determine the ultimate issue. We would just ask that your Honor do that. Not with this juror. We're good with this juror.

THE COURT: Okay. Thank you. She's excused. She's cause, then.

THE CLERK: 34, Ann.

MR. BISKUPIC: So 33 is good?

MS. WATZKA: Yep.

(Juror No. 34 entered chambers.)

MR. LUCZAK: Hello.

THE COURT: We've asked you to come back here just because we're asking some jurors a few more questions --

JUROR NO. 34: Yep.

THE COURT: -- based on the questionnaires.

JUROR NO. 34: Okay.

THE COURT: Okay? So -- and don't be intimidated by all these people. Okay?

JUROR NO. 34: Yep.

THE COURT: Thank you. And your name is not being used in this, so you're --

JUROR NO. 34: Okay.

THE COURT: Okay? I -- in your questionnaire -- let's see. Why don't I turn this over to counsel if they want to ask a question.

MS. MASNICA: Yes. Juror No. 34, when you had filled out the original questionnaire, back -- way back when, a couple weeks ago or month ago or so, you had indicated that you had looked at multiple articles about the case.

JUROR NO. 34: Yeah.

MS. MASNICA: I mean, is it fair to say -- I mean, are you talking about, you know, did you look at videos, did you see news articles, things online?

JUROR NO. 34: More just Googling the court incident and just kind of what people's thoughts were -- not really what people's thoughts were but just kind of actually getting familiar with it. I don't watch the news really or anything. I heard of something happening of helping someone escape possibly or whatever, but I knew nothing about the actual

details if it was true because headlines can be completely misleading.

MS. MASNICA: Was that before you received a questionnaire or after?

JUROR NO. 34: A little bit before, and then a bit more afterwards.

MS. MASNICA: Okay.

JUROR NO. 34: Before I actually filled it out.

MS. MASNICA: You had indicated you felt they she should have held the hearing and that -- and not let him use the jury exit. So is that just based on your initial impressions on what you had seen, like you had developed an idea of what you thought should have happened?

JUROR NO. 34: Yeah.

MS. MASNICA: Okay. Is it fair to say, I mean, you still have that opinion?

JUROR NO. 34: More that I need to know about it because now understanding that there is different rulings for judges, it could be completely different, so I actually need to understand that better.

MS. MASNICA: Okay. And you had used the language, I think you had just said that she had helped -- the allegation is she had helped someone escape.

JUROR NO. 34: Yeah.

MS. MASNICA: I mean, is that kind of your view of

what you believe happened based on what you've read so far?

JUROR NO. 34: Yeah.

MS. MASNICA: Okay. And then you had indicated just on today's questionnaire that you had learned that there was sort of political motivations related to the trial. Can you tell me a little bit about that.

JUROR NO. 34: I would say nothing that's really surprise, more of just there's a political backing to try and make an example of a liberal and then -- pretty much just that.

MS. MASNICA: So that there might be a political backing of the prosecution?

JUROR NO. 34: Yeah.

MS. MASNICA: Have you read anything about potential political motivation alleged to have been involved with Judge Dugan?

JUROR NO. 34: No.

MS. MASNICA: Okay. All right. Thank you.

JUROR NO. 34: Okay.

MR. FROHLING: Thank you, Juror No. 34. You were asked some questions about your impressions of the case and --

THE COURT: Could you speak a little louder.

MR. FROHLING: Yeah. Juror No. 34, you'd been asked some questions about your impressions listed on the questionnaire. Do you recall that?

JUROR NO. 34: Yeah.

MR. FROHLING: Are you able to focus on the evidence provided in court and what the judge says the law is in this case and base your decision solely on what you hear in court?

JUROR NO. 34: Yeah.

MR. FROHLING: And is that something that would be -- you would be able to do that would be fair to both parties, including, you know --

JUROR NO. 34: Uh-huh.

MR. FROHLING: -- the -- Ms. Dugan's on trial here and there are allegations. She's presumed innocent at this point.

JUROR NO. 34: Yeah.

MR. FROHLING: But that despite whatever you've read or heard about alleged political motivations, you'd make your decision based on what you see and hear in court, and that's it?

JUROR NO. 34: Yeah. At the end of the day, the law is the law. There was actually a different question on the questionnaire about like -- I don't remember exactly what it was, but like dealing with political dealings. And to me at the end of the day this country is too divided and politics are way too involved. At the end of the day, the law is the law. So it's just a question of whether or not was it illegal or was it not, or what was actually done.

MR. FROHLING: Got you. You've indicated the country is too divided, and there are things on both sides that are --

JUROR NO. 34: Yeah.

MR. FROHLING: -- to be concerned.

JUROR NO. 34: Yeah. Me and my girlfriend view different things politically and even I'll say this and kind of laugh, sometimes the directions our arguments are going, it's just like it seems like we're trying to be right more than actually get somewhere.

MR. FROHLING: Okay. Thank you.

THE COURT: So if you're a juror, you have to decide the case based on really two things, one, the evidence that is introduced in court and then the instructions on the law that I give you.

JUROR NO. 34: Okay.

THE COURT: You understand that?

JUROR NO. 34: Yeah.

THE COURT: And is that something that -- that you could do?

JUROR NO. 34: Yeah. You're going to know better about what the law is than I am.

THE COURT: And could you set aside any ideas or opinions that you might have about the case before you heard all the evidence?

JUROR NO. 34: Yeah.

THE COURT: You could?

JUROR NO. 34: Yeah.

THE COURT: Okay. Okay. Thank you very much. Unless there's some more questions.

MS. MASNICA: No.

THE COURT: Thank you. You're excused.

JUROR NO. 34: Thank you.

(Juror No. 34 left chambers.)

MR. FROHLING: He's okay.

THE COURT: He's okay?

MR. LUCZAK: Yeah.

THE COURT: Okay. Next witness.

THE CLERK: Okay. So now we're up to 27, Judge. Next is 35?

THE COURT: We need five more?

MR. LUCZAK: Yes.

THE CLERK: We're at 27.

THE COURT: Oh, good.

MR. BISKUPIC: I think 35 is okay for both sides.

MR. FROHLING: Yep.

THE CLERK: Oh, okay.

MS. MASNICA: I think we needed to see.

THE COURT: You want 35?

THE CLERK: I had that one flagged.

MS. MASNICA: There was a comment in the --

MR. BISKUPIC: In the new questionnaire?

MS. MASNICA: Yep.

MR. BISKUPIC:  Oh, Sorry.

THE CLERK:  35, please.

(Juror No. 35 entered chambers.)

THE COURT:  I -- hold on.

THE CLERK:  Oh, this was based on something this morning.  Hold on a second.

MR. BISKUPIC:  Do you want us to just go ahead?

THE COURT:  You're No. 35?

JUROR NO. 35:  Yes, sir.

THE COURT:  Oh, yeah, sure, why don't you just go ahead.

MS. MASNICA:  Yes.  Juror No. 35, you had indicated on today's questionnaire that you had filled out that since you filled out the last questionnaire that you had read about that there had been a plea deal offered and that Judge Dugan had said no to that.

JUROR NO. 35:  Yes.

MS. MASNICA:  Okay.

JUROR NO. 35:  Yes.  I did hear that in the local media, uh-huh.

MS. MASNICA:  What did you learn about that plea deal or --

JUROR NO. 35:  Nothing.  Nothing at all.  No details whatsoever, just that a plea deal was offered and it was not accepted.  That's it.

MS. MASNICA: Okay. Knowing that there was a plea offer made or that Judge Dugan decided to accept it, I mean, does that give you indication one way or another whether she's --

JUROR NO. 35: No, absolutely not. I just -- that's part of the legal process, so...

MS. MASNICA: -- guilty or not? Okay.

MR. FROHLING: We don't have any questions.

THE COURT: Okay. You could decide the case based on my instructions on the law and the evidence you hear in court?

JUROR NO. 35: Yes, absolutely.

THE COURT: Good. Thank you. You're excused.

JUROR NO. 35: Okay. Thank you, your Honor.

(Juror No. 35 left chambers.)

THE CLERK: I believe you previously agreed 36 was out; correct?

MR. LUCZAK: Yes.

MR. ALEXANDER: Right.

THE CLERK: So then on to the next page.

THE COURT: Should I say something? Are they all listening?

MR. SPAHN: They're listening.

THE COURT: Okay. Well, I don't have to sum up the pages. So the next -- the next person interview -- said in court that it was a personal issue that they didn't want to

mention in court. So, Counsel, I'm going to turn off the machine for the second -- for the moment; is that okay?

MR. SPAHN: Yes.

THE COURT: Okay.

MR. SPAHN: Would you like me to leave or should I --

THE COURT: Well, yeah, you should probably -- you should probably go. I mean, yeah, I guess you should probably excuse yourself.

MR. SPAHN: Okay.

MR. BISKUPIC: Also, though, it's fine jumping to 39. But we want to have 37 and 38 come in.

THE CLERK: Oh, okay. All right.

MR. FROHLING: He stepped out. Do you want to do 39?

MR. BISKUPIC: Let's just do 39.

THE CLERK: 39 please, Ann.

MR. BISKUPIC: We'll recheck 37 and 38 while 39 comes in.

THE CLERK: And I'm turning this off now.

THE COURT: Okay.

THE CLERK: He didn't say what it was, but he said he had a personal issue.

(Juror No. 39 entered chambers.)

THE COURT: Hi.

JUROR NO. 39: Hello.

THE COURT: No. 39?

JUROR NO. 39:  Yes, sir.

THE COURT:  How are you?

JUROR NO. 39:  I ain't dead yet, so pretty good.

THE COURT:  You indicated a personal issue on -- you didn't want to --

JUROR NO. 39:  Yeah, I --

THE COURT:  -- bring up out there.

JUROR NO. 39:  I had not only child custody in Milwaukee, but I was also arrested for child neglect, but nothing ever came of it.

THE COURT:  And you were -- you were arrested for child neglect?

JUROR NO. 39:  Yeah.

THE COURT:  In Milwaukee?

JUROR NO. 39:  Yeah.

THE COURT:  And when was that?

JUROR NO. 39:  12 years ago, 13.

THE COURT:  And would that -- would that situation have any impact on your ability to be a fair juror here?

JUROR NO. 39:  No.

THE COURT:  No.

JUROR NO. 39:  No.

THE COURT:  So you could follow my instructions and decide the case based on the evidence?

JUROR NO. 39:  Yes.

THE COURT: I have nothing further. Does anybody?

MR. BISKUPIC: Not us.

THE COURT: Okay.

MR. FROHLING: Just a -- just a couple of things. Juror 39, you indicated in your questionnaire that an ex-wife had applied for a job with the FBI and was not hired. Would that impact your ability to --

JUROR NO. 39: No.

MR. FROHLING: -- be fair in this case?

And then thank you for describing the situation from years ago. Were there -- were you -- did you have any legal issues since that sort of child custody case? Have you been involved in any court proceedings since then?

JUROR NO. 39: Well, lots of them with my children.

MR. FROHLING: No, just in general.

JUROR NO. 39: In general, I mean, I have one currently.

MR. FROHLING: And what do you have currently?

JUROR NO. 39: So I don't know how to explain it. It's like a pending domestic because I took my ex-wife's truck, but as long as I'm good for X amount of day -- or for a year or whatever it is, then it goes away off my record.

MR. FROHLING: Okay. Sort of like a deferred prosecution agreement?

JUROR NO. 39: Yes, yep.

MR. FROHLING: Okay. Thank you.

THE COURT: Thank you. You're excused.

JUROR NO. 39: All right. Thanks.

THE COURT: Appreciate it.

JUROR NO. 39: No problem.

(Juror No. 39 left chambers.)

THE COURT: So any -- what -- no problem?

MR. LUCZAK: No issues.

MS. WATZKA: None.

THE COURT: Okay. Bring the -- what's the next one?

THE CLERK: You wanted 37, Mr. Biskupic?

MR. BISKUPIC: We did.

THE COURT: Okay. 37, please.

MR. BISKUPIC: I think we're back on the green.

THE CLERK: Turn this back on.

(Juror No. 37 entered chambers.)

THE COURT: Hi.

JUROR NO. 37: Hello.

THE COURT: You're Juror No. 37?

JUROR NO. 37: Yes, sir.

THE COURT: Okay. There's some jurors based on various answers are being asked a few more questions. I think somebody has a question.

MR. LUCZAK: I do. Hi. My name is Jason Luczak. This side over here, we represent Judge Dugan, and the

Government's over there, just to kind of orient you.

Are you kind of nervous to be here?

JUROR NO. 37: Yeah.

MR. LUCZAK: Yeah.

THE COURT: Don't be nervous.

MR. LUCZAK: It's not a great room with all these people staring at you, but --

THE COURT: They're just lawyers. They can't hurt you.

(Laughter.)

MR. LUCZAK: So we just have some questions because we want to make sure that if you get selected to be on the jury that you can be fair and impartial.

JUROR NO. 37: Okay.

MR. LUCZAK: And you indicated in your juror questionnaire -- do you remember filling that out a while ago -- that you think that the federal government should regulate and make sure that immigrants come into America legally. What did you -- what did you mean by that?

JUROR NO. 37: What was the question on the answer?

MR. LUCZAK: You know, I'm not sure what the question is. I think it was related to if you have any sort of opinions about ICE or immigration policies in the United States.

JUROR NO. 37: Yeah, I don't know what I meant by -- I thought I was just answering the question.

MR. LUCZAK:  Okay.

JUROR NO. 37:  But basically I just meant people should come in legally.

MR. LUCZAK:  Okay.  And --

JUROR NO. 37:  And --

MR. LUCZAK:  -- the fact that in this case you're going to hear evidence that ICE was attempting to arrest someone at the courthouse, does that -- the fact that you hold the opinion that, you know, people should come here legally, do you think that that would affect your opinion or how you view the evidence in this case?

JUROR NO. 37:  I mean, if -- it's possible if they're getting arrested for being here illegally.

MR. LUCZAK:  Yeah.  So -- so the answer is, yeah, it probably would factor into like how you would view the evidence and kind of weigh things?

And let me just tell you, because you're pausing, like there's no right or wrong answers here, okay.  Like it's just -- you just have to, you know, tell us what is actually on your mind, because it's really important that, you know, we pick jurors who can be fair.  So, you know, I kind of noticed your hesitation there to answer that.  You should not feel -- you're not in the hot seat, okay, even though it feels that way.

JUROR NO. 37:  Okay.  I feel like I'm --

MR. LUCZAK:  It is also very physically hot in here,

too.

JUROR NO. 37:  Yeah, it's warm in here.

MR. LUCZAK:  So kind of going back to my question, would you find it difficult to kind of put all of those opinions to the side and, you know, not let them come into your mind whenever you're considering like the facts of this case and whether the Government has proven their case beyond a reasonable doubt?

JUROR NO. 37:  I believe so.

MR. LUCZAK:  Okay.

JUROR NO. 37:  Yes.

MR. LUCZAK:  And so if ICE agents were to take the stand, would you typically believe what they say, you know, because they're ICE agents and they're --

JUROR NO. 37:  No.

MR. LUCZAK:  Okay.  All right.  And what about other law enforcement agents?

JUROR NO. 37:  No.

MR. LUCZAK:  Okay.  All right.  Thank you.

MR. FROHLING:  No.  Nothing.

THE COURT:  There may be -- nothing?

MR. FROHLING:  No.

JUROR NO. 37:  All right.

THE COURT:  Thank you.

JUROR NO. 37:  Yes, sir.

(Juror No. 37 left chambers.)

THE COURT: He's okay, right?

MR. LUCZAK: Yeah. I mean, I have some concerns, but I'm not going to make a motion.

THE COURT: Okay. Next?

COURT SECURITY OFFICER: Which one?

THE CLERK: Did you want 38?

MR. BISKUPIC: Yeah.

THE CLERK: Okay. 38, please.

MR. BISKUPIC: John, are you up to 31?

THE CLERK: I'm at 30.

MR. BISKUPIC: 30, I'm sorry.

THE CLERK: Yeah. We need two more.

(Juror No. 38 entered chambers.)

THE COURT: Okay. No. 38, thanks for coming in. There's -- there's -- we're asking a few additional questions.

JUROR NO. 38: Okay.

THE COURT: Okay? So I think you would like to talk to --

MS. MASNICA: Yes.

THE COURT: Go ahead.

MS. MASNICA: Thank you, Judge.

Yes, Juror No. 38, in your initial questionnaire when you were asked about just generally the government and your feeling toward the government, you had indicated you fully support the

government generally.

JUROR NO. 38:  The federal government?

MS. MASNICA:  Yes.

JUROR NO. 38:  Yeah, I would say so.

MS. MASNICA:  Okay.  And, you know, the federal government -- and so we're the attorneys for Judge Dugan, and then the Government is obviously prosecuting this case.

JUROR NO. 38:  Uh-huh.

MS. MASNICA:  So just as like a base level, I mean, you know, knowing you're -- that you were supportive of the federal government and knowing that the prosecution really is representing the federal government, would you tend to be more supportive of their cause just from a very basic premise?

JUROR NO. 38:  No.  I can compartmentalize pretty well.

MS. MASNICA:  Okay.  And you had talked about that one of the main jobs of the federal government and one thing that you did support was immigration enforcement.  Is that still kind of your perspective on this?

JUROR NO. 38:  Yeah, uh-huh.

MS. MASNICA:  Okay.  And with immigration enforcement, I mean, one of the -- I mean, several of the witnesses are going to be employees for the federal government, ICE agents, Customs and Border Protection, I mean, knowing that those individuals will be testifying, I mean, are you -- would you

generally give them, you know, a little bit more weight in terms of credibility since they're officers in law enforcement?

JUROR NO. 38: Yes.

MS. MASNICA: Okay.

JUROR NO. 38: Yeah.

MS. MASNICA: As opposed to, you know, maybe just a person who was walking through the hallway, a citizen, someone like that? I mean, do you tend to think that law enforcement or someone working for ICE would be more credible?

JUROR NO. 38: Just from the standpoint that they have to go through vetting and all that stuff to get their job in the first place.

MS. MASNICA: Understandable. And you had talked about that you were generally, you know, favorable of law enforcement and that you had had a lot positive experiences with law enforcement officers in the past?

JUROR NO. 38: Yes.

MS. MASNICA: And with that experience, again, was that -- is that something where you would find them to be more trustworthy or credible based on your prior experiences with law enforcement?

JUROR NO. 38: Yeah, based on my run-ins with law enforcement, they were all -- they were all courteous and did everything by the book.

MS. MASNICA: Okay.

JUROR NO. 38: I had good experiences, yeah.

MS. MASNICA: Okay. All right. Thank you.

MR. FROHLING: Thank you. Just a few questions. So you'd mentioned that you're able, Juror 38, to compartmentalize. Are you able to follow the judge's instructions -- and the judge tells you what the law is and you should treat all witnesses the same, whether it's a law enforcement, a citizen witness -- that you be able to treat those individuals and weigh their credibility and testimony the same, in the same fashion?

JUROR NO. 38: Yeah. They all have to tell the truth under oath, so, yeah, definitely.

MR. FROHLING: Okay. So law enforcement may have been vetted, but every witness who swears an oath to tell the truth swears that same oath, and you're willing to judge their testimony?

JUROR NO. 38: Absolutely.

MR. BISKUPIC: If there are -- sorry, Rick.

MR. FROHLING: No, go ahead.

MR. BISKUPIC: So if everybody who's going to testify is going to swear under oath and there may be Person A who says fact one and Person B says, no, that wasn't true, are you going to give more weight to the law enforcement person in that instance if there's a conflict between testimony?

JUROR NO. 38: I would just all -- without seeing

anything in front of me, I would just say I would go where the facts lead the case.

MR. BISKUPIC:  Okay.

JUROR NO. 38:  I can absolutely be objective.

MR. BISKUPIC:  Okay.  Thank you.

THE COURT:  Thank you.  I think you're excused.

(Juror No. 38 left chambers.)

MS. MASNICA:  We would move to strike for cause.  I mean, we believe that based on his initial answers, while he was -- I mean, there might be an argument he was slightly rehabilitated.  He expressed that he had both personal beliefs and actual experiences with law enforcement that would tend to give him -- tend to make him believe that law enforcement was credible and that the Government's case is going to be put on by days of law enforcement testimony.  I mean, that will be the primary conflict in this case and there will be many credibility decisions that need to be made by the jury about who is telling the truth versus not.

While there is video in this case, there is not audio.  So much of what is discussed as being potentially obstructionist conduct is what was said; and that is going to be, you know, developed through the testimony of several different law enforcement officers and then other citizen witnesses.  So if he is -- generally leans toward trusting law enforcement, that puts us in a situation where he will very likely have a bias.

And he generally -- he said he generally supports the federal government fully, which is, I mean, the prosecution in this case. And Ms. Dugan has the right to a fair and impartial jury. And I think based on the questions, I don't think he was fully rehabilitated.

MR. FROHLING: And we would oppose that. The questions were asked. You saw the juror's demeanor, heard his answers. He was unequivocal in saying that he can absolutely do that. And that when asked a question about how he would view this, he would say you follow where the facts would lead and wouldn't necessarily side one way or another. So there's -- there's no basis for a challenge for cause here.

THE COURT: Yeah, he did say that he could absolutely be objective. And given that and his statement about going where the facts lead, I think that I have to deny the cause challenge.

THE CLERK: Is No. 40 acceptable?

MR. LUCZAK: We would like 40 brought in based on the questionnaire.

THE CLERK: We were so close. Okay. No. 40, please.

MR. LUCZAK: Sorry.

MR. FROHLING: Is that based on the questionnaire today?

MS. MASNICA: No, the original.

MR. LUCZAK: No, the original.

(Juror No. 40 entered chambers.)

THE COURT:  Hi.

JUROR NO. 40:  Hi.

THE COURT:  So some jurors are getting special questioning.

JUROR NO. 40:  Oh, boy.

THE COURT:  You're number -- what's your number?

JUROR NO. 40:  So am I special?

THE COURT:  40.  Yeah, no it's based just on past questionnaires and stuff.

JUROR NO. 40:  Okay.

THE COURT:  So who has a question for No. 40?

MR. LUCZAK:  I do.  Hi.

JUROR NO. 40:  Hi.

MR. LUCZAK:  We're just using your juror number for, you know, privacy sake.

JUROR NO. 40:  Yep.

MR. LUCZAK:  So -- and we represent Ms. Dugan here --

JUROR NO. 40:  Okay.

MR. LUCZAK:  -- just so you kind of understand the room.  And over there is the Government.

JUROR NO. 40:  Uh-huh.

MR. LUCZAK:  So whenever you filled out the questionnaire, the first one, you -- you indicated that you had the belief that she, meaning Judge Dugan, allegedly snuck an

illegal immigrant out of the courthouse when ICE entered with a warrant for the arrest of the individual. How did you -- I mean, did you -- I mean, you made that -- you wrote that down, right --

JUROR NO. 40: Yeah.

MR. LUCZAK: -- in the questionnaire? I mean, what was that based off of? Did you see media reports about it or --

JUROR NO. 40: Well, can you -- is the question in there?

MR. LUCZAK: Yeah. The question was basically like have you heard anything about the case and like --

JUROR NO. 40: Right. So that was just stating based on what I was seeing in the news.

MR. LUCZAK: Okay, I got you. So basically you were just kind of like repeating what the media coverage was --

JUROR NO. 40: Yes.

MR. LUCZAK: -- not necessarily like what the facts in the case were.

JUROR NO. 40: Correct. That was -- I interpreted the question as what I understood of what the case is about.

MR. LUCZAK: Sure. Okay. And you know that, you know, sometimes the media like doesn't --

JUROR NO. 40: Sure.

MR. LUCZAK: -- like give all the facts out there;

right?

JUROR NO. 40:  Correct.

MR. LUCZAK:  Okay.  And you also wrote in there -- and this was -- I believe they should be able to do their job they have been given orders for.  And I think that was in relation to like ICE and law enforcement.

JUROR NO. 40:  Like law enforcement.

MR. LUCZAK:  Do you have any like strong beliefs about that a police officer and ICE agent who would testify would be more credible than, let's say, just an average citizen that comes off the street?

JUROR NO. 40:  No, not necessarily.

MR. LUCZAK:  Okay.  And then you also wrote, "I believe the federal government should be able to enforce immigration laws to enforce the country's sovereignty," is that -- that's a belief that you still hold today?

JUROR NO. 40:  Just, yeah.  It is.

MR. LUCZAK:  Okay.  And what is that -- what is that belief based off of?  Like if you could just describe it, like what you mean by that.

JUROR NO. 40:  I would say just as, you know, a country you, know and, the rights to enforce laws that are on the books, just say that that's basically what I mean by that.

MR. LUCZAK:  Yeah.  And if you had heard facts that, let's say, the person who ICE was at the courthouse looking for

was here illegally, would that affect the way that you kind of weigh all the facts of whether or not Judge Dugan did anything wrong in this case or committed a crime?

JUROR NO. 40: No.

MR. LUCZAK: Okay. And do you think that -- so Judge Adelman's going to give you instructions about all the elements of the crime and then, also, that you're supposed to consider all the evidence and the law --

JUROR NO. 40: Uh-huh.

MR. LUCZAK: -- kind of apply that. If you -- if in your determination you believe that the Government did not meet their burden of proving all of the elements beyond a reasonable doubt, would you have any hesitation about finding Judge Dugan not guilty of the crimes?

JUROR NO. 40: No, based on whatever facts and evidence are given, anything I would base off of would be on that.

MR. LUCZAK: Okay. All right. Thanks. I appreciate it, your answers.

JUROR NO. 40: You're welcome.

MR. FROHLING: No, nothing. Nothing from us.

THE COURT: So you don't -- you don't have any opinions or biases that would cause you to have a disposition as to whether the defendant was guilty or not guilty?

JUROR NO. 40: No, sir.

THE COURT: You don't?

JUROR NO. 40: Nope.

THE COURT: And you could be impartial?

JUROR NO. 40: Absolutely.

THE COURT: And you could follow my instructions and the evidence?

JUROR NO. 40: Yes, sir.

THE COURT: Thank you. You're excused.

JUROR NO. 40: You're welcome. Thank you.

(Juror No. 40 left chambers.)

THE COURT: We got 32?

THE CLERK: That's 32, folks.

THE COURT: Okay.

MR. BISKUPIC: Can we -- Judge, can you give us -- can you give us 15-, 20-minute break so we can -- I mean, we've got -- both have big groups, instead of doing this in the courtroom, where we can caucus and then we'll come in and do our strikes?

THE COURT: Sure. Sure. Where do you want to go?

MR. BISKUPIC: Well, we've got space.

THE COURT: You've got a room? Okay, sure.

THE CLERK: Do you want to confirm with me who's -- who we're dealing with?

MR. LUCZAK: Sure.

THE CLERK: I can let you know so I can offer the

same.  So on the first page, two through nine are in.

MR. LUCZAK:  Yes.

THE CLERK:  Okay.  On the second page, 13 through 18 are in.

MS. MASNICA:  Yes.

MR. LUCZAK:  Yes.

MR. FROHLING:  Yep.

THE CLERK:  On the third page, 19, 20 are in.

MR. LUCZAK:  Yes.

THE CLERK:  22 through 25 are in.

MR. FROHLING:  Uh-huh.

MR. LUCZAK:  Yes.

THE CLERK:  27 is in.

MR. LUCZAK:  Yes.

THE CLERK:  And the next page, 28 through 31 are in.

MR. LUCZAK:  Yes.

MS. MASNICA:  Yes.

THE CLERK:  And then 33 through 35 are in.

MS. MASNICA:  Yes.

MR. LUCZAK:  Yes.

MR. FROHLING:  Uh-huh.

THE CLERK:  And then on the last page, I believe it's Page 5, it's 37 through 40.

MR. FROHLING:  Correct.

MR. BISKUPIC:  Judge, we have one more matter outside

the press, confidential, that Mr. Frohling wanted us to raise --

THE COURT: Okay.

MR. BISKUPIC: -- on the record, so it's a sealed matter.

MR. SPAHN: Understood.

THE COURT: Okay. Do you want more privacy?

MR. FROHLING: No, no.

(This portion of the transcript has been sealed by the Court.)

* * * * *

THE COURT: So, see, that wasn't so bad, was it?

MR. FROHLING: We couldn't -- we couldn't joke -- no, no, I'm just --

THE COURT: Oh, you couldn't joke?

MR. FROHLING: I'm kidding. It's a serious matter. I'm kidding.

THE CLERK: Do we want to release them while we're breaking?

THE COURT: Can we release the jurors?

THE CLERK: Not to leave the building, but to go to the bathroom or whatever.

COURT SECURITY OFFICER: They've been going to the bathroom in the jury room.

THE CLERK: Oh, all right. Well, then, I guess they

can stay, then.

THE COURT: Well, they've got to do the causes.

THE CLERK: I know. They can't leave the building, but I meant -- if they've been going to the bathroom, that's what I meant.

MR. BISKUPIC: Okay. So we'll just go caucus and be been here in quarter, 20 minutes or so.

THE COURT: Yeah, that's fine.

MR. BISKUPIC: Okay.

THE CLERK: Do you want to go tell the jurors that?

THE COURT: Yeah.

THE CLERK: That we're almost there.

THE COURT: Yeah, I'll go tell them.

(The following proceedings were held in open court:)

THE COURT: It's much cooler in here than there, much more comfortable. So let me just bring you up to date and thank you again.

We're basically almost done. And I would say we'll be done in -- completely done in about, oh, 20 minutes, maybe a little more. And then we'll be able to -- you'll be -- we can -- we can sort of talk about what's left to do. But many of you will be excused. So -- anyway that's where we are. And we've made good progress because of you, because you're conscientious and you showed up today and do your duty as citizens. And, you know, justice doesn't come easy. We have to work hard to

accomplish it, and you're the essential part of that. So thank you, again.

MR. BISKUPIC: So, Judge, the jurors are going to stay here, and we're going to go?

THE COURT: Yeah.

MR. BISKUPIC: All right.

THE COURT: So just continue to hang out here. If you have to use the facilities, that's fine.

(A recess was taken.)

* * * * *

(At 3:24 p.m. the hearing ended.)

C E R T I F I C A T E

I, JENNIFER L. STAKE, RDR, CRR, an Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing is a true and correct transcript of all the proceedings had in the above-titled matter as the same are contained in my original machine shorthand notes on the said trial or proceeding.

Dated this 12th day of December, 2025.
Milwaukee, Wisconsin.

Jennifer L. Stake, RDR, CRR
United States Official Court Reporter
517 East Wisconsin Avenue, Room 324
Milwaukee, WI  53202

Jennifer_Stake@wied.uscourts.gov

ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
Official Court Reporter, RDR, CRR
_____