UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    *Plaintiff,*

    *v.*                                           Case No. 25-CR-0089-LA

HANNAH C. DUGAN,

    *Defendant.*

---

## DEFENDANT'S MOTION
## FOR JUDGMENT OF ACQUITTAL

---

    Hannah C. Dugan, by counsel, now moves for judgment of acquittal on both counts of the indictment, pursuant to FED. R. CRIM. P. 29(a). She does not submit a separate brief, but offers authority and argument here.

### I.

### EVIDENCE

    Most generously to the government, the evidence stands now as follows. On Friday, April 18, 2025, ICE agents and other federal agents had an administrative warrant for E.F.R.'s arrest and removal from the country. He had a pending misdemeanor case assigned to Judge Dugan's branch. Two judges in robes, Dugan and Cervera, approached the agents

in the hallway outside Judge Dugan's courtroom. Judge Dugan directed them to talk with the chief judge, whose offices were just down the hall.

While some agents were in the chief judge's offices and two remained in the public hallway outside her courtroom, Judge Dugan went back into the courtroom, interrupted another defendant's brief hearing and directed E.F.R. and his lawyer to step forward. E.F.R. spoke only Spanish and no Spanish interpreter then was available. Judge Dugan and her staff called E.F.R.'s case off the record and gave him a new date. She told E.F.R.'s counsel that he could appear by Zoom at the next date, if he wished. Then Judge Dugan ushered E.F.R. out a door near the bench in the courtroom with his lawyer. Court staff use that door and lawyers sometimes do, but parties and witnesses do not. Although a jury could find that she said something about "the stairs" and getting or taking "the heat" moments earlier as she spoke to court staff, on the undisputed evidence Judge Dugan in fact pointed E.F.R. and his lawyer to the right, down the corridor that ran parallel to the courtroom and opened into the public hallway under twelve feet from the public doors, as viewed from the public hallway. She did not point him and his lawyer to the left, where the stairwells were.

Judge Dugan then returned to the bench and continued with the rest of her docket. She did nothing more that morning that is relevant to these charges.

The federal agents could not see E.F.R. in the non-public corridor that led to the separate door into the public hallway. Neither could they see him in the courtroom, for none of them were in the courtroom.

E.F.R. in fact emerged into the public hallway twelve feet to the right of the public doors to Judge Dugan's courtroom. Two undercover federal agents in the public hallway

saw him emerge into that hallway. One of the agents in the hallway, Bryan Ayers, testified that he did not even know that E.F.R. had used the separate door into the public hallway until reviewing video later.

After texting with other agents and getting instructions, one followed E.F.R. onto the elevator down to the lobby. Once he left the courthouse, agents arrested E.F.R. outside after a brief foot chase.

The government offered no evidence that Judge Dugan acted "corruptly," either in the ordinary sense of that term's common usage or as courts have defined this motive element of 18 U.S.C. § 1505, the statute charged in Count Two. The government tendered no evidence of bribery, other graft, or any form of actual or attempted self-dealing by Judge Dugan. Agents never gave Judge Dugan E.F.R's name or identified him to her. They also never showed her the administrative warrant. Judge Cervera, though, testified that Judge Dugan said the name "Flores."

The agents saw E.F.R. when he re-entered the hallway and they followed him. They arrested him outside the courthouse.

The government's implicit suggestion through its evidence is that E.F.R. finished his court appearance and walked into the public hallway too quickly, not too slowly, that morning, because Dugan called his case almost immediately after returning to the courtroom. On any view of this evidence, though, E.F.R. returned to the public hallway at exactly the same time he would have, had he left the courtroom through the usual doors. He just took a different path straight into the public hallway. On the route he took, he was no more concealed from the agents—who again were not in the courtroom and could not

see what was happening there—than had he instead walked back through the courtroom gallery to the usual doors. The government's concealment and obstruction charges both rest entirely, then, on the immaterial distinction that E.F.R. emerged into the public hallway less than twelve feet away from where agents expected him, at the same time and in view of two agents just as he otherwise would have.

## II.

## ARGUMENT

### A. Count One.

      1.    *No Crime Because No Concealment.*

The undisputed evidence here is that E.F.R. and his lawyer used a non-public corridor, at Judge Dugan's direction, to return to the public hallway. That non-public corridor ran parallel to the side wall of her courtroom. It led to a door that opened into the same public hallway as the main courtroom doors. That separate door was under twelve feet to the right of the main courtroom doors, as viewed from the public hallway.

Further, there is no dispute that two undercover agents saw E.F.R. emerge into the public hallway. One agent was to his left and one to his right, exactly as they would have been had E.F.R. used the main doors less than twelve feet to his right.

Again on the undisputed evidence, no agent was in the courtroom. No agent was able to see into the courtroom from their respective locations. Likewise, they could not see into—or were not trying to look into—the non-public corridor. Either way, they could not see E.F.R. in the courtroom or in the non-public corridor, but could see him immediately when he re-entered the public hallway. They saw him at the same time, and

with a difference of just under twelve feet, in the same place that he would have emerged had he used the main courtroom doors.

On those undisputed facts, drawing all reasonable inferences in the government's favor, Judge Dugan did nothing at all to conceal E.F.R., as § 1071 requires. She did nothing affirmative or actual at all to keep him any more out of sight than he would have been had he simply walked out the courtroom the way he entered, let alone to secrete or conceal him. E.F.R. reappeared to the agents at the same time and in the same hallway, less than twelve feet away, as he would have had he used the ordinary path out of the courtroom. They could not see him leaving by whichever path he had used. E.F.R. was no more concealed from agents stationed in the public hallway than anyone else who walked into or out of that courtroom that morning.

2. *No Crime Because Executing An Administrative Arrest Warrant in a Courthouse Would Violate a Longstanding Common Law Privilege.*

Federal and state courts long have recognized a common law privilege that prevents civil arrest or service of civil process as to parties and witnesses who are in or coming to or going from courthouses for a hearing or other proceeding in a courthouse. *See, e.g., Lamb v. Schmitt*, 285 U.S. 222, 225 (1932); *Page Co. v MacDonald*, 261 U.S. 446, 447 (1923); *Stewart v. Ramsay*, 242 U.S. 128, 129–30 (1916) (all three concerning federal law); *Lyf-Alum, Inc. v. C&M Aluminum Supply Corp.*, 29 Wis. 2d 593, 596–98, 139 N.W.2d 601, 603–04 (1966); *Harvey v. Harvey*, 199 Wis. 212, 225 N.W. 703 (1929); *Rix v. Sprague Canning Mach. Co.*, 157 Wis. 572, 144 N.W. 1001, 1002 (1914) (all three concerning Wisconsin law); *Durst v. Tautges, Wilder & McDonald*, 44 F.2d 507, 508–09 (7th Cir. 1930) (citing both federal and state cases, including but not limited to Wisconsin cases).

An 1894 Wisconsin Supreme Court decision describes well both Wisconsin law on this privilege and the common-law privilege more generally. It involved a judge who was served civil process in the courthouse:

> The service should have been set aside. The service of process upon a justice while holding court, or upon a party and witnesses in attendance upon, and in the presence of, the court, was a contempt of court. *Cole v. Hawkins*, And. 275; 1 Greenl. Ev. § 316. "It has long been settled that parties and witnesses attending in good faith any legal tribunal * * * are privileged from arrest on civil process during their attendance, and for a reasonable time in going and returning." *Larned v. Griffin*, 12 Fed. 590, and cases cited. The privilege extends to the service of a summons, as well as to arrest. [Five citations omitted]. The reasons for the rule are manifest. No court should be subject to such interruptions. Parties necessarily in attendance upon court should be free to attend to their duties without disturbance or fear of it. The rule is made to subserve the best interests of the public, and the due and speedy administration of justice. Order reversed, and cause remanded, with directions to grant the motion.

*Cameron v. Roberts*, 87 Wis. 291, 58 N.W. 376, 376–77 (1894).

While some of the Wisconsin cases and some others extend this privilege only to non-residents, that helps the government not at all here: its whole underlying point is that E.F.R. was a non-resident, and an unwelcome one, of both this state and the whole country.

Immigration generally and removal proceedings specifically are civil, of course, not criminal. *See Demore v. Kim*, 538 U.S. 510, 515 (2003) (noting that no-bail provision of immigration statute is "civil detention"); *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038–39 (1984), The process occurs in administrative courts and under civil burdens of persuasion. The goal of removal is deporting an alien, not incarcerating or punishing him.

As the Supreme Court explained at length in *Stewart v. Ramsay*, and both it and other courts have repeated since:

> The true rule, well founded in reason and sustained by the greater weight of authority, is that suitors, as well as witnesses, coming from another state or jurisdiction, are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going. A leading authority in the state courts is *Halsey v. Stewart*, 4 N.J.L. 366, decided in the New Jersey supreme court nearly one hundred years ago, upon the following reasoning: "Courts of justice ought everywhere to be open, accessible, free from interruption, and to cast a perfect protection around every man who necessarily approaches them. The citizen in every claim of right which he exhibits, and every defense which he is obliged to make, should be permitted to approach them, not only without subjecting himself to evil, but even free from the fear of molestation or hindrance. He should also be enabled to procure, without difficulty, the attendance of all such persons as are necessary to manifest his rights. Now, this great object in the administration of justice would in a variety of ways be obstructed if parties and witnesses were liable to be served with process while actually attending the court. It is often matter of great importance to the citizen, to prevent the institution and prosecution of a suit in any court, at a distance from his home and his means of defense; and the fear that a suit may be commenced there by summons will as effectually prevent his approach as if a *capias* [a civil arrest warrant] might be served upon him. This is especially the case with citizens of neighboring states, to whom the power which the court possesses of compelling attendance cannot reach."

*Stewart*, 242 U.S. at 129.

The Court went on to elaborate that, "'The privilege which is asserted here is the privilege of the court, rather than of the defendant. It is founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify. Witnesses would be

chary of coming within our jurisdiction, and would be exposed to dangerous influences, if they might be punished with a lawsuit for displeasing parties by their testimony; and even parties in interest, whether on the record or not, might be deterred from the rightfully fearless assertion of a claim or the rightfully fearless assertion of a defense, if they were liable to be visited on the instant with writs from the defeated party'" (quoting *Parker v. Hotchkiss*, Fed. Cas. No. 10,739 (1 Wall.) (1849)). *Stewart*, 242 U.S. at 130–31.

This is not judicial immunity. It is not a privilege of the party or witness directly or exclusively. Rather, the privilege attaches to the judiciary to assure proper administration of justice in courthouses. *Stewart*, 242 U.S. at 130–31; *Durst*, 44 F.2d 508–09. Just eight years ago, an academic article explained both the roots of this privilege, tracing to the fifteenth century, and its new relevance now with ICE arrests in courthouses. Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 YALE L.J. FORUM 410 (2017).

Importantly, the privilege remains vital today, and applies to modern immigration arrests for deportation or removal. *New York v. U.S. Immigration and Customs Enforcement*, 431 F. Supp.3d 377, 391 (S.D.N.Y. 2019) (Rakoff, J.) (later vacated by agreement when ICE consented to the relief sought, 2023 WL 2333979 (2d Cir. Feb. 28, 2023)); *but see Ryan v. U.S. Immigration and Customs Enforcement*, 974 F.3d 9, 24–26 (1st Cir. 2020) (agreeing that the privilege remains but vacating preliminary injunction on likelihood of success; privilege may not necessarily apply to arrests "on behalf of the sovereign;" the district court cases cited below explain why that is wrong, although another district court case, *African Communities Together v. Lyons*, 2025 WL 2633396 (S.D.N.Y. Sept. 12, 2025), agreed with *Rice*).

Even more importantly, immigration statutes do not abrogate this privilege as to administrative warrants or notices that ICE, CBP, or other federal agents involved in the civil process of removal or deportation may serve. *Velazquez-Hernandez v. U.S. Immigration and Customs Enforcement*, 500 F. Supp.3d 1132, 1136–48 (S.D. Cal. 2020) (relying on this privilege under federal law); *Doe v. U.S. Immigration and Customs Enforcement*, 490 F. Supp.3d 672, 679–81, 689–94 (S.D.N.Y. 2020) (relying only on this privilege under New York law and declining to decide whether federal law provides a similar privilege). Judicial warrants for criminal cases are different, *see, e.g.*, *Larned v. Griffin*, 12 F. 590, 590 (C.C.D. Mass. 1882); *Bridges v. Sheldon*, 7 F. 17, 43 (C.C.D. Vt. 1880), but all are agreed here that these agents had only an administrative warrant, not a judicial warrant.

Here, then, E.F.R. was a non-resident. He had a court appearance in the Milwaukee County Courthouse on April 18. At least at the outset that morning, federal agents sought to arrest him in the courthouse after that hearing in his misdemeanor case. They had only an administrative warrant and removal is a civil process, not a criminal one. E.F.R. had no pending or contemplated federal criminal case. All of this is undisputed.

And it means that Judge Dugan did nothing in the courthouse that day that had the legal effect of concealing or harboring E.F.R. contrary to 18 U.S.C. § 1071, the statute at issue in Count One. He simply was out of reach of the federal agents on that day, in that place, and with the civil arrest warrant they possessed. He had a longstanding privilege under both federal law and Wisconsin law to come and go freely. As a matter of law, then, Judge Dugan's actions that day in the courthouse did not conceal or harbor E.F.R.

within the meaning of § 1071. The very attempt to arrest him would have violated this longstanding privilege. The Court should acquit on Count One.

      3.    *No Crime Because No Materiality.*

Judge Dugan disagrees with the Court's conclusion that materiality is not an essential element of 18 U.S.C. § 1071. Immaterial concealment or hindering logically is no concealment or hindrance at all, certainly when someone's liberty and reputation is at stake on a criminal charge.

Even in the civil setting of patent infringement, a defendant must sell or supply a component that forms a "significant" part of a plaintiff's invention. SEVENTH CIRCUIT PATTERN CIVIL JURY INSTRUCTIONS 11.2.13 at 282 (with the advisory committee comment explaining that "'significant' effectively is the definition of materiality"). Likewise in the setting of employment discrimination, a plaintiff must prove that an adverse employment action was material. SEVENTH CIRCUIT PATTERN CIVIL JURY INSTRUCTIONS 3.01, Committee Comment e at 61. That committee comment includes the following proposed wording that applies just as well here:

> Plaintiff must prove that his [alleged consequence of Defendant's conduct] was a "materially adverse employment action." Not everything that makes an employee unhappy is a materially adverse employment action. It must be something more than a minor or trivial inconvenience. For example, a materially adverse employment action exists when someone's pay or benefits are decreased; when his job is changed in a way that significantly reduces his career prospects; or when job conditions are changed in a way that significantly changes his work environment in an unfavorable way. Citing *Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742 (7th Cir. 2002); and *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993); *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996).

That is, not everything that makes an ICE agent "unhappy" is obstruction or impeding; that, too, requires more than "minor or trivial inconvenience." This logically should be even more true in a criminal case than in a civil one. And here, viewed in the light most favorable to the government, the agents experienced an inconvenience: that morning, they arrested E.F.R. right outside the courthouse, not in it.

Apart from an express requirement of materiality, though, the government's evidence fails even on the Court's chosen instruction. Judge Dugan's acts did not "actually" conceal E.F.R., as Count One requires. As Judge Dugan notes above, that is unavoidably true because E.F.R. no more was concealed from federal agents while he was invisible to them in the side non-public corridor than he would have been for the same time and the same distance of travel in the public courtroom itself. Agents were not in the courtroom and they were not looking into the courtroom. Then, E.F.R. emerged into the public hallway in full view of the agents at the same time he would have emerged in any event. The only difference is that he re-entered the public hallway less than twelve feet from the courtroom doors, still flanked by two agents who saw him return to that hallway. One of them, Ayers, did not even know then that E.F.R. had not used the main courtroom doors. That difference of less than twelve feet, and no time difference at all, was wholly immaterial to the agents' duties and efforts that morning. There was no *actual* concealment, as the Court agrees this count requires.

4. *No Crime Because Judge Dugan had a Legal Right to Do Everything She Did.*

Finally, Judge Dugan reiterates and relies on her earlier arguments that she may not be prosecuted in federal court for official acts that her state employment authorized her to do. She will not belabor that point here.

Rather, she adds only this: the government's actual evidence, in part as clarified on cross-examination, shows unequivocally that each of the five acts that the indictment alleges ranged from very common to not unprecedented to unremarkable. Many misdemeanor status appearances get called off the record. Lawyers often use the door that Judge Dugan directed the assistant state public defender and her client to use here, in returning to the public hallway. Appearances by Zoom have been common since the COVID pandemic, and a sign on the courtroom door here even invited members of the public and lawyers to request them. A judge talking with people in the hallway, especially if they present a risk of disruption, is not unprecedented. A judge inquiring about the nature of a warrant hardly is odd or indicative of any guilt. Sending federal agents to the chief judge's office to get courthouse policy clarified also is unremarkable, on this evidence.

In short, everything Judge Dugan did fell well within her state judicial powers. *See* WIS. STAT. § 753.03 (giving Wisconsin circuit court judges "all the powers, according to the usages of courts of law and equity, necessary to the full and complete jurisdiction of the causes and parties and the full and complete administration of justice, and to carry into effect their judgments, orders and determinations, subject to review by the court of appeals or the supreme court as provided by law"). And what a defendant has a right to do does not violate 18 U.S.C. § 1071, the statute at issue in Count One, or logically

any of the other obstruction offenses. *See United States v. Matthews*, 505 F.3d 698, 705–06 (7th Cir. 2007) (concerning offenses under 18 U.S.C. § 1512).[*]

**B. Count Two.**

       1.     *No Crime Because the Government Offered No Evidence of Corrupt, or Even Wrongful, Motive.*

The government proposes a jury instruction that defines the "corruptly" element in § 1505 only as "wrongful." Dkt. 55 at 25. The Court preliminarily has suggested it will accede to the government's proposal. While the Seventh Circuit has concluded that a similar instruction was not error—was adequate—it has gone no further. It has not said that this is the only way, or even the best way, to explain the "corruptly" element to a jury.

That instruction is not, for two reasons. First, the term "wrongfully" reduces this element, and very nearly the whole crime itself, to an empty tautology. Because it is "wrongful" to commit any crime, a jury might conclude that doing the acts in § 1505 is inherently wrongful and therefore satisfies this mental element of the offense. The very notion that all crimes are wrongful would bootstrap the government to a conviction on its

---

[*] In *Matthews*, the court's example of innocent "obstruction" was a lawyer advising her client to remain silent. Because both lawyer and client have a legal right to do that, there could be no corrupt intent as the § 1512 offenses require the government to prove a defendant acted "corruptly" (just as 18 U.S.C. § 1505, charged in Count Two here, does). But note: a lawyer might well give that advice to a client entirely or partly because the lawyer has a dim opinion of, say, DEA agents and wishes to hinder or block their investigation out of malice or spite. That motive does not change the legal right to give the advice to remain silent. Either way, the lawyer and the client have committed no crime.

Here, though, the government seeks to peer behind the motive of Judge Dugan in doing the acts that she had a legal right and lawful power to do. Indeed, the defense does not understand the government to deny that Judge Dugan had the lawful authority to act as she did; rather, it claims that her motive ("corruptly") by itself can convert the lawful and innocent into the unlawful and guilty. Implicitly but necessarily, *Matthews* rejects that reasoning.

proposed instruction: what the accused did is "wrongful" because the statute makes it wrongful. At very least, it would allow a prosecutor to make a pure *ipse dixit* argument for conviction. The government comes very close to doing exactly that in its proposed instruction defining corruptly, which ends by asserting that the government need prove as to Judge Dugan "only that she intended to do something the law prohibited, whether she knew of the law or not." Dkt. 55 at 25.

Second, and relatedly, the description of wrongfulness alone drains the term "corruptly" of its ordinary meaning. Corrupt acts are not merely wrongful. Rather, they are wrongful *because* they entail an improper purpose, deception, or conscious wrongdoing, as the Seventh Circuit has said in a case arising under the similar standard of § 1512(b)(3). *United States v. Edwards*, 869 F.3d 490, 499 (7th Cir. 2017). So, while every corrupt act is wrongful in some sense, not every wrongful act is corrupt. The government seeks to conflate the two here with its proposed jury instruction.

"Corruptly" rightly requires that a defendant intend to procure an unlawful benefit for herself or for someone else. That is the better instruction on the meaning of "corruptly" that a concurring judge on the D.C. Circuit proposed, and that Chief Justice Roberts later endorsed in authoring the Court's opinion. *See United States v. Fischer*, 64 F.4th 329, 361–62 (D.C. Cir. 2023) (Walker, J., concurring in part) ("When used as a criminal mental state, 'corruptly' is a term of art that requires a defendant to act with an 'intent to procure an unlawful benefit either for himself or for some other person'"), *vacated on other grounds*, 603 U.S. 480 (2024) (with Chief Justice Roberts, for the majority, quoting Judge Walker's description of "corruptly" approvingly, 603 U.S. at 485).

In short, the term "corruptly" has a common meaning and it both differs from and is more specific than "wrongful." There is no reason to dilute that here. But even if the Court views this statutory element as ambiguous or subject to two possible meanings, the rule of lenity then counsels a construction favoring liberty. *Brown v. United States*, 602 U.S. 101, 122 (2024) (rule of lenity applies when statute remains grievously ambiguous after consulting "everything from which aid can be derived;" internal citation omitted). Here, nothing remains for the Court to consult if the Supreme Court's most recent comments on the term "corruptly" in *Fischer* and *Snyder* do not clarify that it means something more than merely wrongful. So, when reasonable doubt remains about the scope of statutory text, "judges are bound by the ancient rule of lenity to decide the case . . . not for the prosecutor but for the presumptively free individual." *Snyder v. United States*, 603 U.S. 1, 20 (2024) (Gorsuch, J., concurring) (agreeing with the majority's narrowing construction of the "corruptly" element of 18 U.S.C. § 201(b) as applying only when the government official accepts or agrees to accept a payment "intending to be influenced in the official act;" that distinguishing bribes from gratuities for past acts).

However the Court defines "corruptly," though, the government's evidence falls short. There is no evidence at all that Judge Dugan acted "corruptly" in the ordinary sense or in the way that the Seventh Circuit explained that term in *Edwards*, let alone in the more accurate way that Chief Justice Roberts approved in *Fischer*.

At very worst, this jury could infer on the evidence here that Dugan disagreed with ICE's enforcement tactics in state courthouses (as opposed to, say, that she was trying to understand and comply with a tentative courthouse policy that the chief judge

had not yet issued in final form). Taking that worst possible inference, so what? There is nothing corrupt or even wrongful about a state judge—or any person—disagreeing with a federal enforcement policy executed in a state courthouse. And on this evidence and the indictment's own express allegations, the only acts Dugan did all were within the ambit of her state statutory powers as a judge. All five of them were "part of a judge's job," as this Court held in adopting the magistrate judge's recommendation on Dugan's motion to dismiss. Dkt. 43 at 30 (July 7, 2025), adopted by Dkt. 48 at 27 (August 26, 2025).

There is no evidence that she acted "corruptly" here, or even wrongfully. Her five acts, things like calling a case off the record, inviting the defendant to appear by Zoom, and choosing which courtroom door he would use to re-enter the public hallway all were mundane and well within the scope of her official duties and prerogatives as a state judge. She neither sought nor obtained unlawful gain for herself or others, engaged in any deception, or evinced an improper purpose on any reasonable view of this evidence. At most, her motive was not corrupt; it was that she disagreed with what several federal agents proposed to do right outside her courtroom.

She had every right to do that. No act that the government's case-in-chief arguably proved, in the light most favorable to the prosecution, fell outside her state judicial powers. *See again* WIS. STAT. § 753.03 (giving Wisconsin circuit court judges "all the powers, according to the usages of courts of law and equity, necessary to the full and complete jurisdiction of the causes and parties and the full and complete administration of justice, and to carry into effect their judgments, orders and determinations, subject to review by the court of appeals or the supreme court as provided by law"). Once more, what a

defendant has a right to do does not violate 18 U.S.C. § 1505, the statute at issue in Count Two, or logically any of the other obstruction offenses. *See United States v. Matthews*, 505 F.3d 698, 705–06 (7th Cir. 2007) (concerning offenses under 18 U.S.C. § 1512; *see also* fn. * above).

2.     *No Crime Because No Endeavor.*

The government's case includes courtroom audio recordings that, viewed in the light most favorable to the government, would allow jurors reasonably to conclude that Judge Dugan made a reference to "the stairs" and that she said that she would "take the heat." But that all was, indisputably, *before* she ushered E.F.R. and his lawyer into the non-public corridor. After that, the evidence is undisputed: Judge Dugan led E.F.R. into the non-public corridor, steered them to the right with her—toward the public hallway— and gestured emphatically that they should go in that direction. They did.

An "endeavor" within the meaning of § 1505 and Count Two requires purposeful action, not just words. *Cf.* SEVENTH CIRCUIT PATTERN CRIMINAL JURY INSTRUCTIONS at 698 (2023) (for 18 U.S.C. § 1503). This Court also accurately has proposed to instruct the jury that an "endeavor" here requires that Judge Dugan had knowledge that her action would have the natural and probable consequence of obstructing a proceeding. In that respect, common usage of the term "endeavor" supports its legal meaning here.

Judge Dugan's actions, as opposed to her earlier words, are undisputed on this record. She pointed E.F.R. demonstratively and clearly toward the same public hallway where two agents remained, and where Judge Dugan had spoken to other agents a few minutes earlier. She did not point E.F.R. to a stairway or to any non-public exit from the floor or the building. Again, this is undisputed.

That falls far short of a purposeful action that she knew would have the natural and probable consequence of obstructing a proceeding. Her actions assured that E.F.R. would re-enter the same public hallway, at the same time, that the main courtroom doors would have allowed him to re-enter. There was no temporal difference and the spatial difference was just under twelve feet—leaving E.F.R. entirely within view of awaiting federal agents, who in fact saw him just as they would have if he had emerged from the main courtroom doors.

For that matter, the Supreme Court has held, in construing a similar statute, 18 U.S.C. § 1503, also requiring an "endeavor" to obstruct, that there must be a "nexus." "The act must have a relationship in time, causation, or logic with the judicial proceeding." *United States v. Aguilar*, 515 U.S. 593, 599 (1995). In *Aguilar*, it was not enough that the defendant made a false statement to an FBI agent who later might have testified before a grand jury or at trial. *Aguilar*, 515 U.S. at 600. All the more is there no nexus here to obstructing a proceeding by words in the courtroom *before* Judge Dugan physically pointed E.F.R. and his lawyer to the public hallway. *See also Arthur Andersen LLP v. United States*, 544 U.S. 696, 708 (2005) (reaffirming *Aguilar* on this point, as to acting "corruptly").

There is not sufficient evidence, then, of an "endeavor" necessary to violate § 1505. Count Two fails for this reason as well.

3.    *No Crime Because Executing An Administrative Arrest Warrant in a Courthouse Would Violate a Longstanding Common Law Privilege.*

If anything, the privilege of parties and witnesses not to be arrested on a civil matter or served civil process in a courthouse while attending for another proceeding, or on the way to or from a courthouse applies even more strongly to Count Two than it does

Case 2:25-cr-00089-LA    Filed 12/17/25    Page 18 of 22    Document 88

to Count One. So Judge Dugan relies here on section II.A.2 above, but here adds points relevant specifically to 18 U.S.C. § 1505, the statute at issue in Count Two.

There is no dispute that agents had an administrative warrant, not a judicial warrant. Likewise, there is no dispute that removal is a civil process and that this warrant was civil, not criminal. *INS v. Lopez-Mendoza*, 468 U.S. at 1038–39; *Velazquez-Hernandez*, 500 F. Supp.3d at 1139–40; *Doe*, 490 F. Supp.3d at 692. The government was seeking only to deport E.F.R., not to charge him with a crime.

Throughout this case, the government's claim has been that executing the arrest warrant in the Milwaukee County Courthouse was a step in a "pending proceeding," as it (and the Court, tentatively) define that term broadly. The prosecution theory, then, is that Dugan obstructed or impeded that pending proceeding corruptly by her acts that morning.

But that is not possible, as a matter of law. E.F.R. had a pending misdemeanor case in the Milwaukee courthouse with a scheduled appearance that morning; this, too, is undisputed. He therefore enjoyed the privilege to come and go from his court appearance that day without execution of a civil arrest warrant or service of civil process. Whatever the accuracy of the government's claim that there was a pending proceeding against E.F.R., he was out of reach in that courthouse on that day. Even if Judge Dugan had prevented his arrest altogether, which she did not on the undisputed evidence, there could have been no obstructing or impeding. In that place and on that day, the federal agents had no right to execute that civil warrant or otherwise serve civil process at all.

Like Count One, Count Two fails for legal reasons on this evidence. The Court should enter judgment of acquittal for this reason, too.

    4.    *No Crime Because There Was No Pending Proceeding, and None Reasonably Foreseeable.*

The defense disagrees with the Court's proposed definition of "pending proceeding" and has tendered proposed instructions that more accurately and fairly define that term. Assuming, though, that the Court does not change its proposed jury instruction on that term, the government's case still fails.

Even on the Court's definition of a "pending proceeding," it involves "all steps and stages in such an *action* from its inception to its conclusion" (italics added). The unavoidable difficulty for the government is that the "action" had ended: it ended in a final order of removal by an immigration judge, as to which E.F.R. had not appealed or otherwise challenged that final order. There no longer was any "process taking place." The arrest of E.F.R. and transporting him out of the country, without further process, was all that remained. State or local officers could have arrested him for any other reason or E.F.R. could have departed voluntarily himself, and the effect on any DHS process would have been exactly the same: nothing.

    5.    *No Crime Because No Materiality.*

Judge Dugan again disagrees with the Court's conclusion that materiality is not an essential element of 18 U.S.C. § 1505. Immaterial obstruction logically is no obstruction at all, certainly when someone's liberty and reputation is at stake on a criminal charge.

Once more, Judge Dugan no more obstructed federal agents by sending E.F.R. out the back door through a non-public corridor to the public hallway than she would have by sending him out the usual courtroom doors. He emerged into the same public hallway in full view of the agents at the same time he would have emerged in any event; again, one did not even know then which door E.F.R. had used. The only difference is that he re-entered the public hallway less than twelve feet from the courtroom doors, still flanked by two agents who saw him return to that hallway. That difference was wholly immaterial to the agents' duties and efforts that morning. At worst, it was a "minor or trivial inconvenience."

6. *No Crime Because Judge Dugan had a Legal Right to Do Everything She Did.*

Again, Judge Dugan renews her earlier arguments that she may not be prosecuted in federal court for official acts that her state employment authorized her to do. She has, and should have, judicial immunity for official acts that do not violate rights guaranteed by the Thirteenth, Fourteenth, or Fifteenth Amendments. This prosecution has presented nothing but official acts entitled to immunity. The defense relies here on section II.A.4 above and on her earlier motion and briefs.

## III.

## CONCLUSION

For all of the reasons she explains here and those she addressed in her earlier motion to dismiss on grounds of judicial immunity and motions *in limine*, and in briefs supporting

those motions, Judge Dugan asks the Court to enter a judgment of acquittal on both Count

One and Count Two.

Dated at Madison, Wisconsin, December 17, 2025.

Respectfully submitted,

HON. HANNAH C. DUGAN, *Defendant*


s/ *Steven M. Biskupic*
Steven M. Biskupic
  Wisconsin Bar No. 1018217

STEVEN BISKUPIC LAW OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com


s/ *Jason D. Luczak, Nicole M. Masnica*
Jason D. Luczak
  Wisconsin Bar No.  1070883
Nicole M. Masnica
  Wisconsin Bar No. 1079819

GIMBEL, REILLY, GUERIN & BROWN LLP
330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
(414) 271-1440
jluczak@grgblaw.com
nmasnica@grgblaw.com


s/ *Dean A. Strang, Rick Resch*
R. Rick Resch
  Wisconsin Bar No. 1117722
Dean A. Strang
  Wisconsin Bar No. 1009868

STRANGBRADLEY, LLC
613 Williamson Street, Suite 204
Madison, Wisconsin 53703
(608) 535-1550
rick@strangbradley.com
dean@strangbradley.com