UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

_____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 25-CR-89 |
| | ) | |
| v. | ) | Milwaukee, WI |
| | ) | |
| HANNAH C. DUGAN, | ) | December 16, 2025 |
| | ) | 9:00 a.m. |
| Defendant. | ) | |

_____

TRANSCRIPT OF JURY TRIAL - EXCERPT
TESTIMONY OF KRISTELA CERVERA
BEFORE THE HONORABLE LYNN ADELMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff
UNITED STATES OF AMERICA:          United States Dept. of Justice
                                   (ED-WI)
                                   By:  MR. RICHARD G. FROHLING
                                        MS. KELLY BROWN WATZKA
                                        MR. KEITH S. ALEXANDER
                                   Office of the US Attorney
                                   517 E. Wisconsin Ave., Rm. 530
                                   Milwaukee, WI  53202
                                   Ph:  414-297-1775
                                   richard.frohling@usdoj.gov
                                   kelly.watzka@usdoj.gov
                                   keith.alexander@usdoj.gov


For the Defendant                  Steven Biskupic Law Office, LLC
HANNAH C. DUGAN:                   By:  MR. STEVEN M. BISKUPIC
(Present)                          PO Box 456
                                   Thiensville, WI  53092
                                   Ph:  414-828-7233
                                   bisklaw@outlook.com

                                   Gimbel, Reilly, Guerin & Brown
                                   By:  MR. JASON D. LUCZAK
                                        MS. NICOLE M. MASNICA
                                   330 E. Kilbourn Ave., Ste. 1170
                                   Milwaukee, WI  53202
                                   Ph:  414-224-1440
                                   jluczak@grgblaw.com
                                   nmasnica@grgblaw.com

U.S. Official Court Reporter:  JENNIFER L. STAKE, RDR, CRR
Proceedings recorded by computerized stenography, transcript
produced by computer-aided transcription.

I N D E X

**WITNESSES**

ALL WITNESSES:                                          PAGE:

For the Government:

  KRISTELA CERVERA:
    Direct Examination by Ms. Watzka                    3
    Cross-Examination by Mr. Biskupic                  39
    Redirect Examination by Ms. Watzka                 46
    Recross-Examination by Mr. Biskupic                48
    Redirect Examination (Cont'd.) by Ms. Watzka       49

**EXHIBITS**

None

TRANSCRIPT OF PROCEEDINGS

THE COURT: All our jurors are here, Ann?

COURT SECURITY OFFICER: They are, your Honor.

THE COURT: Everybody ready?

MR. FROHLING: Yes.

MR. BISKUPIC: Yes.

THE COURT: Okay.

COURT SECURITY OFFICER: All rise for the jury.

(The jury entered the courtroom.)

* * * * *

MS. WATZKA: United States calls Judge Kristela Cervera.

(The witness is sworn.)

THE WITNESS: I do.

THE COURT: Okay. Have a seat. State your name for the record, spell your last name.

THE WITNESS: Kristela Cervera. Last name only?

THE COURT: Spell your last name.

THE WITNESS: C-E-R-V-E-R-A.

THE COURT: Thank you.

KRISTELA CERVERA,

called by the Government as a witness herein, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. WATZKA:

Q.   Good afternoon.  I'm right here.

A.   Good afternoon.

Q.   What do you do for a living?

A.   I'm a circuit court judge with Milwaukee County.

Q.   And what is your educational background?

A.   I am a graduate of the UW Law School.  I graduated in 2001. My undergraduate studies were also there.  I have a bachelor's in journalism.  That's from 1998.

Q.   Prior to becoming a Milwaukee County Circuit Court judge, did you practice law?

A.   I did.

Q.   And can you briefly describe what your practice involved.

A.   Just before becoming a judge, I was an assistant family court commissioner with Milwaukee County hearing cases primarily in family law.  And prior to that, I was a government lawyer.  I was a child support attorney with Milwaukee County representing the state in family-related cases.  And prior to that role, I prosecuted very briefly just out of law school just under two years in Kenosha County.  And I worked in the public interest for a brief time in -- with Esperanza Unida, a nonprofit organization in Milwaukee.

Q.   When did you become a Milwaukee County Circuit Court judge?

A.   I was appointed in October, 2021 and elected in April, 2022.

Q.   Do you recall being sworn in when you became a judge?

A.   I do.

Q.   Are all judges in the State of Wisconsin required to take an oath?

A.   Yes.

Q.   Does your oath require you to administer justice without respect to persons?

A.   It does.

Q.   Does your oath require you to faithfully and impartially discharge your duties?

A.   Yes.

Q.   What do those things mean to you?

A.   It means not prejudging cases, following the law, deciding the cases fairly no matter who appears before me.

Q.   If as a judge you were to personally disagree with a particular law, can you choose not to abide by that law?

A.   No.

Q.   Why not?

A.   I'm obligated to follow the law, as I've sworn to uphold the Constitution of the United States and the Constitution of the State of Wisconsin.

Q.   Are Milwaukee County Circuit Court judges assigned to a particular type of docket?

A.   Yes.

Q.   And where were you first assigned?

A.   I was first assigned in children's court when I was first

appointed. The judges have to rotate every so often, sometimes upon need, sometimes we're in our assignment for up to four years. So then I rotated to the misdemeanor calendar downtown.

Q. And when did your tenure in the criminal misdemeanor court begin?

A. August of 2024.

Q. Is that still your assignment?

A. Yes.

Q. And I take it the name means you handle criminal misdemeanor type cases, but can you give the jury a sense of what those might entail?

A. The cases before me range from traffic matters, there could be traffic citations, misdemeanor charges such as battery, retail theft. I also hear many OWI or operate motor vehicle while under the influence of an intoxicant, OWI cases.

Q. Where is your courtroom and chambers located?

A. I'm on the Sixth Floor, Room 622 specifically, in the Milwaukee County Courthouse.

Q. Whose courtroom is adjacent to your courtroom on the north side of the courthouse?

A. Judge Dugan's courtroom is next to mine.

Q. And was that -- strike that.

In April of 2025, what type of docket did Judge Dugan handle?

A. Her cases were similar to mine, same type of cases,

traffic, misdemeanor cases.

Q. She was also assigned to a criminal misdemeanor docket?

A. Yes.

Q. Okay. Are all of the courtrooms on the Sixth Floor of the Milwaukee County Courthouse criminal courtrooms?

A. Yes.

Q. Is the Milwaukee County Courthouse a public building?

A. It is.

Q. Are there any limitations on who can enter the Milwaukee County Courthouse?

A. Technically, there are not.

Q. Somebody would have to pass through security?

A. That's right.

Q. But assuming that they pass through security, anyone is free to come to the courthouse?

A. That's right.

Q. And do you have to have official court business, like a hearing or an appointment or can you come for any reason?

A. Technically, you can come for any reason.

Q. Are there certain areas of the courthouse that are restricted to the public?

A. Yes.

Q. Would that include places like your judicial chambers, for example?

A. That would be restricted.

Q. I'm going to show you what has been introduced as Exhibit 34, I believe. Do you recognize what's depicted in -- ope, sorry. Do you see the image in front of you now?

A. (Indicating.)

Q. Okay. Do you recognize what's depicted in Exhibit 34?

A. Yes.

Q. What is that?

A. That is Door 615-1. It's the door that leads to the restricted hallway which leads to my chambers, Judge Dugan's chambers, and our courtrooms.

Q. And what does the sign next to that door say?

A. Jury, court staff, 615-1.

Q. So is that hallway is restricted to the public?

A. Yes.

Q. Do you need a key or some sort of access device to enter through that door?

A. You do.

Q. And who are the key holders for that?

A. The judges, the bailiffs, the court reporters if they're assigned to the -- if you have an official court reporter, the clerks of the court, and I think that's -- that's pretty much it.

Q. When you or perhaps Judge Dugan is presiding over a trial, would jurors use that hallway?

A. Jurors, yes. Jurors do use that hallway.

Q. They would have to be allowed in, though, they do not have a key or an access device; is that accurate?

A. That's accurate.

Q. Okay. Are criminal defendants who are not in the custody of a courtroom deputy typically allowed in that restricted hallway?

A. No.

Q. Have you ever allowed a criminal defendant to exit your courtroom through that restricted hallway?

A. No.

Q. Do arrests take place in public areas inside the Milwaukee County Courthouse?

A. Yes.

Q. How often in your experience does that happen?

A. It's hard to estimate. Well, in -- in my own courtroom, two to three times a week easily.

Q. You allow arrests to take place, actually, within your courtroom?

A. Yes.

Q. Okay. And arrests also take place, fair to say, in the public hallways?

A. Yes, they do. That -- that happens less frequently as far as I know.

Q. Okay.

A. But it has occurred before.

Q.   I'd like to now turn to the events of April 18th, 2025. Were you working that day?

A.   Yes.

Q.   And do you happen to recall what day of the week it was?

A.   It was a Friday.

Q.   Approximately when did you arrive to work that day?

A.   About 7:00 or a little after 7:00 a.m.

Q.   Why so early?

A.   I wanted to work on some decisions that I had, so I -- I was there much earlier than the start time of my calendar.

Q.   Do you recall what your docket looked like for that day?

A.   It was pretty busy.

Q.   What does that mean?  It might not -- it might mean different things to different people.  When you say it was pretty busy, do you know approximately how many cases would have been on your calendar for that morning, for example?

A.   It's hard to say.  It varies.  It's a high-volume court, many cases.  My calendar can range, as far as pages, anywhere from about 14 to 25 pages generally.  So we schedule many cases at 8:30 a.m., could be as high as 20 cases.  But that day I don't think it was as high, but it was -- it was still -- it was still a pretty busy calendar.

Q.   And you said earlier you had some motions or briefs you were working on in addition to your regular docket that you wanted to handle that day?

A.   Yes.

Q.   Okay.  Is it -- is it fair to say that the criminal misdemeanor courts are always pretty busy?

A.   Yes.

Q.   Lots of people are coming and going in and out of your courtroom, for example --

A.   Yes.

Q.   -- on a regular basis?

A.   Right, on a regular basis.

Q.   That would include defendants and defense attorneys?

A.   Yes.

Q.   Okay.  And it's your job to juggle all of that to move your calendar as efficiently and effectively as possible?

A.   That's right.

Q.   Once a case has been addressed in some fashion, do you typically concern yourself with how the litigants leave your courtroom?

A.   No.

Q.   Why not?

A.   I just assume they're going to exit through the main entrance.

Q.   Okay.  Thinking back to the morning of April 18th, do you recall what the weather was like that morning?

A.   Yes, a little bit.

Q.   And was there some significant weather event that was

brought to your attention?

A. There was. We received an e-mail by the district court administrator around 8:25 a.m. that softball or baseball-sized hail was predicted, and she suggested moving our cars. We park in a surface lot next to the courthouse. And in light of that prediction, she suggested that we move our vehicles.

Q. And did you take her up on that advice?

A. I did.

Q. Okay. So you left your courtroom and went out to move your car?

A. I did.

Q. At some point while you were out taking care of your car, did you run into Judge Dugan?

A. I did. We -- I think she did the same. I'm not sure, but we did run into each other.

Q. And then did you both accompany each other back to the Sixth Floor of the Milwaukee County Courthouse?

A. Yes.

Q. Let me show you Exhibit 50L. Before I start this video, I'm going to direct your attention to these two gentlemen sitting on the public bench there. At that -- at this point in the morning, which the time stamp says is 8:40:10 a.m., at that point in the morning as you're returning to the courthouse, did you know who these gentlemen were?

A. No.

Q.  Did there come a point in time later in the morning where you and Judge Dugan would have some interaction with them?

A.  Yes.

Q.  Okay.  Let me just play the video.

        (The video recording was played.)

    I'll stop you right there.  Is that -- do you recognize who's just entered the frame?

A.  Yes.

Q.  Who is that?

A.  It's myself and Judge Dugan.

Q.  Okay.  And I'll just continue playing that.

        (The video recording was played.)

    I'll stop there.  Are you -- it's accurate to say that you've just walked by those gentlemen, and they did not appear to attract your attention?

A.  Right.  That's accurate.

Q.  Okay.  And then is that you heading towards Door 615-1 that we were just chatting about?

A.  It is.

Q.  Okay.  Where did you go next?

A.  I proceeded to my chambers.  I put on my robe.  And I wanted to get started with the calendar because we had 8:30 hearings scheduled, so I went into my courtroom, sat on the bench to get started.

Q.  And at this point, I think we just talked about this, this

video shows you returning from moving your car at about 8:40ish a.m.?

A. That's right.

Q. So you're already a little bit behind your 8:30 mark --

A. Yes.

Q -- and you want to get moving. So did you go to -- return to your bench?

A. I did.

Q. And begin conducting court business?

A. Right.

Q. Did there come a point in time when you saw Judge Dugan again that morning?

A. Yes.

Q. Can you describe when that was.

A. It was not long after I returned to the courtroom. I don't think I was even able to start calling any cases. She came in, and motioned that I -- that I come with her.

Q. Okay. She motioned in your direction?

A. Yes.

Q. Let me actually back it up. How did she -- how did she come into your courtroom?

A. There's -- the jury door, there's an entrance for jurors very much like in this courtroom to the side or my side, my right. And she had come in through that door and walked in a few steps into the courtroom.

Q.   How was she dressed at the time?

A.   She was wearing her robe.

Q.   And I think you've talked about a motion of some sort.  Can you demonstrate for the jurors what you're talking about?

A.   Yes.  She motioned with her finger for me to come to her.
        (Indicating.)

Q.   Okay.  And just for the record, you're indicating she's using her pointer finger to kind of gesture towards you?

A.   Yes, using her pointer finger.  That's correct.

Q.   Okay.  And did you have a reaction to being summoned by Judge Dugan in that manner?

A.   I did.  I thought something bad had happened, and it was embarrassing to be summoned that way.

Q.   Did you -- did you nevertheless comply with her directive?

A.   Yes.

Q.   Okay.  What happened next?

A.   I had to go into my chambers to meet her, so I unlocked the -- I had to let her into my chambers because the door was locked.  I used to keep it locked at that point in time.  And she came into my chambers.  I started to unzip my robe, and she said, "Leave your robe on."

Q.   Okay.  She -- so she -- you're starting to unzip your robe, and she tells you to stop, keep it on.  Do you do that?

A.   Yes.

Q.   Okay.  And what does she next say to you?

A.   She says, "ICE is here.  We need to check a warrant."  She starts to walk, and so I asked her, "Should I take my key," because everything happened so quickly.  And she didn't answer she was -- I don't know if she heard me.  She proceeded to walk back towards the restricted hallway.  I was following her.  I heard the name something about Flores, and I proceeded to follow her.  She was speaking as we were walking and talking.  It was a little hard to hear her in that hallway based on the acoustics and the speed because we were walking very quickly.

Q.   Okay.  So at this point, is she walking in front of you?

A.   Yes.

Q.   And at a quick pace?

A.   At a quick pace.

Q.   And you're following as best you can?

A.   I am, right.

Q.   And do I understand you to say that you -- you hear that she is speaking, but you're having a hard time understanding what she's saying?

A.   Right.  I was a little confused.

Q.   Okay.  Did -- at this point, did you understand why she had involved you in this?

A.   No.  I heard that name, and I -- I -- or a name, and I said, "Is that someone on my docket?"  She didn't answer me.  But we proceeded to walk into the hallway, and we were still in our robes.

Q. Okay. Before we get into the hallway, let me ask you this: As you're -- as you are having that encounter with Judge Dugan at your chambers door and then through the restricted hallway, how would you describe her demeanor?

A. She seemed -- it was urgent. She seemed irritated at this point.

Q. Okay. I'm going to show you Exhibit 55D. And I'm going to play a little bit -- actually let me ask you, Judge Cervera, what is the time stamp at the top of this radio?

A. 8:43 a.m.

Q. So this is, in fact, just a few minutes after you had originally reentered the courtroom with Judge Dugan that morning?

A. Right.

Q. The hallway, I should say. Okay. Let me play this.

(The video recording was played.)

Okay. Is that you and Judge Dugan exiting from the restricted hallway out into the public hallway?

A. Yes.

Q. Now, and it appears that Judge Dugan walks out first?

A. Right.

Q. And -- and do we see you hesitating?

A. Yes.

Q. Why are you hesitating?

A. I didn't want to walk into the hallway with my robe on.

Q.   Why not?

A.   It's not something that was common.

Q.   Okay.  Were you uncomfortable wearing your judicial robe into the public hallway?

A.   I was.

Q.   Let me ask you:  In your experience, when -- when do judges in the Milwaukee County Courthouse typically wear their robes?

A.   In my experience, it's usually during ceremonial functions, if another judge is going to be sworn in, or investiture.  We will line up in the hallway usually on the Fifth Floor of the historic courthouse and that's the time that we're wearing our robes, because we usually line up and then walk into the courtroom.  I can't think of another time in my experience when a robe is worn into the hallway for any other reason.

Q.   Okay.  And those -- that investiture or that swearing in ceremony, that is something that is -- is that a rare or a common occurrence?

A.   It's not often.  Lately, though, there's been many new judges.

Q.   Okay.

A.   I'd say maybe one a year.

Q.   Okay.  Certainly not a -- a routine sight to see judges in the public hallways wearing their robes?

A.   Not routine.  And it wasn't taking place either with the pandemic.  Those functions were put on hold.

Q.   Does a judicial robe signify a certain amount of formality and authority?

A.   To me, it does.  And I think it also does to the public.

Q.   I'm going to show you another video, 50M, which we have seen some times already, but I have not had an opportunity to show you.  I'm going to play a little bit of it and then ask you some questions.

(The video recording was played.)

Okay.  So did you just see Judge Dugan and yourself enter into the public hallway there?

A.   Yes.

Q.   Okay.  And now we see sort of from the other perspective, is that you again still really hesitating to walk out?

A.   Yes.

Q.   And do you see other members of the public around?

A.   Yes, I do.

Q.   Is that something that you're concerned about?

A.   Yes.  It was a busy -- there were many people in the hallway.  It's often like that very early in the morning.

Q.   Okay.  Let me continue to play it for a bit.

(The video recording was played.)

Okay.  I'm going to stop it there.  Do you see the person to whom Judge Dugan first addresses?

A.   Yes.

Q.   And did you -- at that time, did you know who that

individual was?

A. No.

Q. Do you now know that to be Officer Joseph Vasconcellos?

A. Yes.

Q. Okay. Do you -- do you know why Judge Dugan appears to have gone directly to Officer Vasconcellos?

A. I don't.

Q. What do you recall the first exchanges being between Judge Dugan and Officer Vasconcellos?

A. When -- when she first spoke to him, she asked what his business was at the courthouse, she asked who he was.

Q. And how did he respond?

A. He identified himself, and he said that -- he said, "We are here to apprehend a person who is unlawfully present in the United States." He was formal in his response.

Q. Okay. How would you describe his tone or demeanor?

A. He was cooperative.

Q. Okay. And how was -- would you describe Judge Dugan's demeanor when interacting with Officer Vasconcellos?

A. As soon as she asked if he had a warrant, she -- she asked what kind warrant it was, her irritation seemed to progress into anger.

Q. Okay. So you mentioned a discussion about a warrant. What do you recall about that discussion?

A. She -- she asked him if he had a warrant, he said he did,

she said what kind of warrant, he said an administrative one, and she -- that's when she responded, "It has to be a judicial warrant. It has to be a judicial warrant. It has to be a judicial warrant," in quick succession.

Q. Okay. She repeated herself three times?

A. She did.

Q. Okay. At that point, is it really a discussion or is it just Judge Dugan expressing her views to Officer Vasconcellos?

A. She was expressing her views to the officer.

Q. Were you comfortable or uncomfortable with Judge Dugan's tone?

A. I thought she could have been a little more diplomatic at that point. I wanted to tone things down. I simply said, "I think she's right about that." I also asked him, "Well, where is the warrant," because I didn't see him hold a paper in his hand. And I -- I'm -- I asked at this point, "Is it on your cell phone?" But everything was happening so quickly, I didn't get a response to that.

Q. Okay. And when you say everything was happening so quickly, what do you mean?

A. The interaction was pretty straightforward and -- and -- and quick.

Q. Okay.

A. It didn't last -- he said he had one. She then sent him to the chief judge's office.

Q. Okay. So after the discussion of the warrant, she quickly tells him to go to the chief judge's office?

A. That's right.

Q. Okay. And I think you indicated that you -- you -- your impression was maybe he did need a judicial warrant?

A. Right.

Q. Okay. Did you at that time consider yourself to be well-versed in the difference between administrative warrants and judicial warrants?

A. No, not in immigration law.

Q. Okay. After Judge Dugan directed Officer Vasconcellos to the chief judge's area, did you offer to help show him the way?

A. He stood up. He looked at me and said, "Well, I don't know where that is," so I proceeded to point toward the doors. And I said, "It's just past those double doors. You can go right through there." He then, I think, walks around and looks at me again and says, "Well, I don't know where that is," and at this point -- because I agree it looks a little confusing. You can't really tell on the video here, but it does appear as if you can't just enter. So I offered to escort him to the chief's office.

Q. From this distance, you're right, it is hard to tell. There's a set of double wooden doors, and somebody who is not familiar with the area might think that you're not supposed to go back there?

A.   I think so.

Q.   Okay.  And so did you then show Officer Vasconcellos where to go?

A.   Yes, I did.

Q.   Okay.  Well, let me continue playing the video here.

(The video recording was played.)

I'm going to stop it right there.  At this point, you now realize that there's a second officer that's joining you?

A.   Actually, I didn't realize it right away.

Q.   When did you -- when did you -- you're holding the door, so when did you realize it?

A.   Well, I suppose at -- probably at that point.

Q.   Okay.

A.   But the only officer I was expecting to follow me was Officer Vasconcellos.

Q.   What did you understand the purpose to be of having Officer Vasconcellos go to the chief judge's office?

A.   To show the warrant.

Q.   And how many people does it take to do that?

A.   I thought it just -- he would be enough.

Q.   Okay.  And so did you direct that second agent or officer to accompany you?

A.   No, I did not.

Q.   Where was Judge Dugan?

A.   I don't know.

Q.   Did that surprise you?

A.   Yes.

Q.   Why?

A.   I turned -- I know it's hard to tell in the video, but I looked back.  I didn't see her.  I thought maybe she had gone into her own courtroom at that point.  I thought she had followed us and then walked into her courtroom, which would have been on the right just before the chief judge's entrance, so I was amazed that I -- I thought she'd left me.

Q.   Were you expecting her to follow through on this warrant issue?

A.   Yes, I thought she was following with us.

Q.   So once you go beyond that initial set of double doors, there's a long hallway, right, into the chief judge's area?

A.   That's right.

Q.   And there's a second set of doors; right?

A.   Right.

Q.   And did you go into that area with Officer Vasconcellos?

A.   Yes.

Q.   Do you have to be buzzed in?

A.   You do.

Q.   Okay.  Once you're inside that area, did Officer Vasconcellos offer to show you the warrant?

A.   Yes.

Q.   And what did he show you?

A.   He took out his credentials.  He set his ID -- it was in a wallet, bifold, put it on the counter and produced the actual warrant, an actual paper warrant.  And I did -- I did say to him, "Well, since we're waiting here, I might as well take a look at that warrant now."

Q.   And maybe I jumped ahead a little bit.  You said, "Since we're waiting here, I might as well take a look."  What were you waiting for?  I should have asked you about that.

A.   So I encountered the chief's assistant, the person who -- the receptionist at the front desk.  And one other person was present.  And I asked whether the acting deputy -- or acting chief, the deputy chief, was present that day, because I knew that Chief Judge Ashley was off.  And they -- they looked at me because we all know that she's usually out at children's court.  I simply asked in the event that she happened to be there that day.  So then one of the assistants went to bring the district court administrator, but it took some time.  So while we were standing there, I did tell Officer Vasconcellos that "I might as well look at that warrant."

Q.   I'm going to show you what's been marked as Exhibit 1A.  Does this document look familiar to you?

A.   It does.

Q.   Is this the warrant that Officer Vasconcellos showed you on the morning of April 18th?

A.   Yes.

Q.   Okay.  And what do you recall reviewing when you took a look at it?

A.   I was reading through it.  I remembered the name, seeing the name.  I also asked him whether -- because -- just to confirm that it was an administrative warrant versus a judicial warrant.  And I confirmed with him that it wasn't signed by an administrative law judge or a federal judge, for example.  And he confirmed that.

Q.   Did you -- does this warrant have a probable cause -- does it include a probable cause determination?

A.   It does.

Q.   How would you describe your interaction with Officer Vasconcellos?

A.   He was cooperative.  He was professional.

Q.   Did there come a point in time when you realized that there were other officers that had been moved to the chief judge's area?

A.   Yes.

Q.   What did you notice?

A.   Well, I was still reading through the warrant, and someone in the room said should -- something like, "Should the other officers come in here?"  The reception area is very small.  And that's when I glanced up and I was surprised to see the other agents.  I counted that there were about six very quickly.  And I -- since I was still focused on reviewing the warrant, I just

said, "Sure, they can come in," but I was confused by that. And I didn't think -- I really didn't think they needed to.

Q. Okay. There was no policy or expectation that you were aware of that you felt that those officers all needed to accompany you to the chief judge's office?

A. Correct.

Q. Did someone eventually get the chief judge on the phone?

A. Yes.

Q. And -- and do you recall who that was?

A. Stephanie Garbo.

Q. Okay. And did Ms. Garbo have the chief judge on her -- like a speaker phone on her cell phone?

A. I think so. I could hear a voice. I knew it was a male's voice, and it's -- I later learned and pretty quickly confirmed it was the chief.

Q. Okay. Did you remain in the chief judge's area and participate in the conversation?

A. There was some discussion about making a copy of the warrant. Stephanie Garbo asked for that copy to be made. As soon as I knew that she was in communication with the chief that I knew they would be able to take it over from there, and I needed to get back to my own docket, so I thanked Officer Vasconcellos, and I returned to my courtroom because I needed to start calling cases.

Q. I'm going to show you what's been marked as Exhibit 51G.

I'm going to move this all the way down to the three minute and 26 second mark, almost to the end. Oops. I didn't quite get there with the mouse.

(The video recording was played.)

Do you recognize yourself exiting the chief judge's chambers?

A.   Yes.  Yes, I do.

Q.   And what's the time stamp on this video or at what point are you exiting?

A.   8:49 a.m.

Q.   Okay.  And it looks like you start heading down the hallway as if to go to your chamber -- or to Courtroom 615, but then you suddenly turn into Judge Dugan's courtroom; is that right?

A.   Right.

Q.   Why did you do that?

A.   We left so quickly I didn't get my -- I didn't take my key, and I needed to get back to my courtroom.  Rather than walk the long way through that hallway that was busy with -- and filled with people, I didn't want to do that.  So I decided to walk through her courtroom so that I could get to mine.  It's a quicker route.

Q.   Quicker and, also, you might encounter less people --

A.   Might encounter --

Q.   -- along the way?

A   -- less people, I wouldn't be in my robe, and I didn't want

to encounter litigants in the hallway who might be in my own courtroom just a few minutes from that point.

Q. If you had gone through the public hallways to your courtroom and entered through the public entrance to your courtroom, would that require you to walk into your courtroom from the public entrance in your robe?

A. It would, yes.

Q. And is that something you wanted to do?

A. That's not something I wanted to do.

Q. All right. So you go through Judge Dugan's public entrance to her courtroom. What happens next?

A. I saw that she was on the bench. It seemed as if she was hearing a case. I saw a man that was sitting at the front counsel table. I don't know who it was. I didn't really want to look at anyone else because I was wearing my robe and just wanted to get back to my courtroom, so I walked in, walked right through. I waved at Judge Dugan apologetically because I was interrupting what I thought was a hearing, and I went back through my chambers back to the bench and back to my courtroom.

Q. Now, when you walked into Judge Dugan's courtroom and you saw that she was on the bench conducting proceedings, did you have a reaction to that?

A. I did.

Q. What was your reaction?

A. I was irritated at that point.

Q.   Why?

A.   Because I felt abandoned and because she was able to get back to her calendar after having pulled me out of my court.  I just -- I don't like to keep the public waiting longer than necessary.

Q.   So when you returned to your courtroom, did you return to conducting court business?

A.   I did.

Q.   At that point or at any point later that morning, did you have any unusual interactions with members of the state public defender's office?

A.   I did.

Q.   And can you describe your observations.

A.   One of the attorneys came in and pumped his fist and said, "Go, Judge," and another attorney came in said, "Judge, you're GOAT'ed now."  And I said, "What?"  And I think he thought I didn't understand what it meant to be the GOAT.  I understand that.  I didn't understand why he was saying it to me.

Q.   All right.  Any other interactions that were puzzling to you?

A.   Yes.  There was one other attorney who later that morning came closer to where my clerk was seated, and she said, "Just so you know, our client was arrested on 10th Street."  And I just -- I didn't know what to make of that.  And she said, "Because we know what you guys were trying to do."

Q.  What was the name of that attorney?

A.  It was Attorney Maura Gingerich.

Q.  I'm going to show what has been marked as Exhibit 53F, play a little bit of that for you.

(The video recording was played.)

Do you recognize the person in this video?

A.  I do.

Q.  Who is that?

A.  The person on the left with the briefcase, that's Attorney Maura Gingerich.

Q.  Can you tell what she's doing in this video?

A.  It appears she's taking a photo with her cell phone.

Q.  Did there come a point in time later on April 18th when you spoke to Chief Judge Ashley about what had happened that morning?

A.  Yes.

Q.  And at the time that you spoke with Chief Judge Ashley, were you -- did you have an understanding of what -- if anything had happened with respect to the arrest warrant that you had reviewed earlier that morning?

A.  No.

Q.  So who initiated the call?

A.  Well, the Chief Ashley called me, but I had already informed the deputy chief of the events of that day.  I -- I didn't mention that earlier.  So I -- I believed that he was

calling me back in response to the communication that I had provided.

Q. Okay. And -- and so when he calls you back, what did you talk about?

A. He asked what happened. I went over it with him. I -- I explained that I didn't call him right way because I thought he was off that day, and -- or I didn't contact him or reach him for that reason, his office. But I told him what happened.

He asked, "Is there anything else that happened," and -- or "Anything else want you to tell me," something like that. And I said, "Well, her demeanor." And he said, "Well, what was it about her demeanor?" And because I didn't know why -- what else he was pressing for, I didn't know what more -- what other information he wanted. And he said, "Well, what about her demeanor?" And I said, "Well, it wasn't ideal."

Q. Did he react to that?

A. He did.

Q. How so?

A. He -- he laughed about that.

Q. Okay. Did there -- so, again, at that point, you don't have kind of the full understanding of what happened with respect to the arrest of the individual that was named on the warrant?

A. No.

Q. Did there come a point later in time when you received more

information about what had happened?

A.   Yes.

Q.   And when was that?

A.   The following day, the following Saturday.

Q.   And who relayed that news to you?

A.   Deputy -- the deputy chief judge, Jane Carroll.

Q.   Okay.  And you had a phone conversation with Judge Carroll?

A.   She -- yes.

Q.   And what did you learn about the circumstances leading up to that individual's arrest?

A.   She informed me that the FBI was going to be involved and that the FBI may be contacting me because Judge Dugan helped Mr. Flores-Ruiz go down the restricted hallway.  She did tell me that there was a chase of Mr. Flores-Ruiz and that he was eventually arrested on 10th Street.

Q.   And did you have a reaction to what you had heard?

A.   I did.

Q.   What was your reaction?

A.   I was shocked.

Q.   Why?

A.   Judges shouldn't be helping defendants evade arrest.

Q.   When you understood the circumstances -- when you received more information about the circumstances of the arrest, did the comments that members of the state public defender's office made to you on Friday make more sense to you?

A. Then it made more sense.

Q. And how did you feel about that?

A. I was mortified.

Q. Why?

A. I -- I thought that someone may think that I was a part of -- in a -- some -- some of what happened.

Q. Were you a part of helping Mr. Flores-Ruiz through the restricted hallway?

A. No.

Q. On April 18th or that day, was there a policy in effect regarding ICE enforcement actions inside the Milwaukee County Courthouse?

A. No.

Q. Had there been discussions amongst court staff or judges about whether there should be a policy?

A. Yes.

Q. And had a draft policy or policy been -- policies been circulated by the chief judge prior to April 18th?

A. Yes.

Q. And do you recall receiving copies of those via e-mail from Chief Judge Ashley?

A. Yes.

Q. And had you familiarized yourself with any of those policies at that time?

A. At that time, I had -- I'd printed it. I skimmed it. But

I was working on decisions. I was pretty busy that week and wasn't able to read it as thoroughly as I would have liked, and it wasn't finalized.

Q. So it was -- it didn't bind you to anything at that point in time?

A. No.

Q. Would you have paid attention if it had been communicated to you that this is -- these the rules now and you've got to follow them?

A. Yes.

Q. But that wasn't what was conveyed to you?

A. Right.

Q. Okay. I'd like to direct your attention to the following Monday, April 21st. Did you participate in a conversation with Judge Dugan and June Cabrera that day?

A. Yes.

Q. Where did the conversation between the three of you take place?

A. In the hallway just probably right in front of that bench on the side of Door 615-1, just outside of that.

Q. And what was the general topic of the conversation?

A. Whether there should be a policy regarding immigration arrests or not.

Q. And who brought that topic up?

A. Well, Judge Cabrera actually did.

Q.   Okay.  Now, you just testified that at this point you've only skimmed the draft policy that has been circulated?

A.   Right.

Q.   And so you're not intimately familiar with it?

A.   No.

Q.   Based upon your conversation with Judges Dugan and Cabrera, did they seem to be more familiar with it?

A.   Yes.

Q.   And what was -- generally speaking, what was the nature of the conversation?

A.   They were debating it.  I remember Judge Cabrera basically saying that she didn't feel we should have a policy because it would give people a false sense of security because we really couldn't do anything.  It would appear as if we were.

Q.   And the reason you couldn't do anything was because Milwaukee County Courthouse is a public place?

A.   It's a public place, and if -- we can't stop arrests.

Q.   I'm going to show you what has been marked as Exhibit 29 and 30.  I'm going to show you 30 first, and then I'll -- to put it in context, I'm going to show you 29.  Do you recognize generally what's depicted in these photographs?

A.   Yes.

Q.   What is it?

A.   It's a sign that was placed on Judge Dugan's courtroom door.

Q. And is there a date that is associated with that sign?

A. At the very bottom, it's dated April 14th, 2025.

Q. Okay. Do you -- did -- when do you first -- when did you first see it?

A. I saw it actually before -- before the 18th. It was texted to me in a group text.

Q. Who texted it to you?

A. Judge Dugan did.

Q. Okay. And did you understand this sign to have some relationship to ICE?

A. Yes.

Q. And what was the basis of your understanding?

A. That if anyone felt unsafe coming to the courtroom or courthouse that they could appear in their hearing -- or request to appear by Zoom versus come in person.

Q. And would that include criminal defendants?

A. It would.

Q. Turning back to Monday, April 21st and your conversation with Judges Dugan and Cabrera, prior to that discussion, did you have a one-on-one conversation with Judge Dugan?

A. Yes.

Q. Where and when did that take place?

A. Just -- I had just come up through the elevators, and it was in that hallway probably right before that bench right outside Door 615-1.

Q.   Was this your first time seeing Judge Dugan since the morning of Friday, April 18th?

A.   Yes.

Q.   And how did you feel about running into her?

A.   I really didn't want to run into her at that point.

Q.   Why not?

A.   Because I knew the FBI was involved, and I knew they would be contacting me, and I -- I wasn't sure if I could reveal that.  I felt that I couldn't.

Q.   Okay.  When you encountered Judge Dugan on Monday the 21st, did she approach you?

A.   Yes.

Q.   And how would you describe her general demeanor during this encounter?

A.   She seemed eager to tell me about what had happened on Friday, that she -- she did say she was in the doghouse with Carl.  She went on to describe why and --

Q.   Let me just stop you there.  Who did you understand Carl to be?

A.   The chief, chief judge.

Q.   Carl Ashley?

A.   Yes.  Chief Judge Carl Ashley.

Q.   Okay.  So she said she was in the doghouse with Carl, and did she tell you why she was in the doghouse with Carl?

A.   She said something to the effect of, "Because I tried to

help that guy."

Q. And what did she help that guy do?

A. From what I understood, she demonstrated a little bit that she had directed him to go through the restricted hallway to exit her courtroom.

MS. WATZKA: That's all the questions I have for you.

THE WITNESS: Okay.

CROSS-EXAMINATION

BY MR. BISKUPIC:

Q. Judge, you hold off-the-record hearings; right?

A. Yes.

Q. Hundreds?

A. Many, yes. I don't know if it's hundreds, but...

Q. How long have you been a judge?

A. Four years now.

Q. Okay. Do you need anyone's permission to hold -- to decide that a case is held off the record?

A. No.

Q. Have you --

A. I've only started that practice much more frequently more recently.

Q. Okay.

A. So that's why I couldn't say that it was hundreds yet.

Q. Okay. And did you have to get anyone's permission to start that process?

A.  No.

Q.  What about having parties appear by Zoom?  Do you let people do that?

A.  Yes, I do.

Q.  Do you have to ask anyone's permission to do that?

A.  No.

Q.  You described this private hallway.  You have let lawyers go down that hallway; correct?

A.  Officers of the court, attorneys, yes.

Q.  Okay.  And did you have to ask anyone's permission to do that?

A.  No.

Q.  You have said that you could let a defendant walk down there if the circumstances required; correct?

A.  I have said it would be a unique set of circumstances, but yes.

Q.  You wouldn't have to ask anyone's permission; correct?

A.  No.

Q.  Were you aware or made aware of the two prior ICE arrests on March 20th and April 3rd?

A.  I had heard.

Q.  You were aware your fellow judges were upset by that?

A.  Yes.

Q.  Were you told the details of what happened on March 20th and April 3rd?

40

A.   I learned a little bit about what happened in one of the instances.

Q.   What did you learn about that instance?

A.   That the person was apprehended prior to a hearing even taking place, is what I believe, and that the agent or officer was refusing to identify him or herself to a judge who was -- who I believe was wearing a robe at the time.

Q.   And which judge was that?

A.   Judge Kori Ashley.

Q.   Is she related to Carl Ashley?

A.   Yes.

Q.   How are they related?

A.   She is his niece.

Q.   These interactions you had with the public defenders, did you ever tell them that you felt uncomfortable about it?

A.   I'm sorry, can you repeat that?

Q.   Sure.  You've testified about the public defenders who came into your courtroom on April 18th and they made a bunch of comments that made you uncomfortable; correct?

A.   Oh, I didn't understand why they were making the comments to me.

Q.   Did you ever ask them why?

A.   No.

Q.   Did you ever tell them that you later learned things and felt uncomfortable about it?

A.   No, I didn't think that would be appropriate.

Q.   Okay.  Did you ever tell Judge Dugan that you didn't want to wear your robe walking down the hall?

A.   No.

Q.   Did you ever tell her you felt uncomfortable in the hallway wearing your robe?

A.   No.

Q.   Did you ever tell her that you thought she was being too bossy in the hallway?

A.   No.

Q.   Okay.  You told the ICE agents in the hallway that you thought Judge Dugan was right that they might need a judicial warrant.

A.   I did say that.

Q.   When you went into the chambers without Judge Dugan, did you tell the agents that you might have been wrong about that?

     Did you correct your statement in any way?

A.   I don't recall.  I don't think did.

Q.   Okay.  When Judge Dugan told you she was in the doghouse, she was referring to the hallway, not a stairway; right?

A.   Well, when she was in the -- she said she was in the doghouse with Carl.  She proceeded to tell me what happened and she was referencing the hall -- the restricted hallway.

Q.   Okay.  Did she ever mention stairway?

A.   No.

Q.  Did you know a federal agent was sitting outside your chambers on that morn -- excuse me, outside your courtroom on that morning?

A.  At what point?

Q.  On April 18th.

A.  Well, when we -- when I accompanied Judge Dugan.

Q.  No, no, not that -- not that hallway.  You have a -- you have to go around the corner to your chambers; right -- or, excuse me, I keep saying chambers -- to your courtroom; correct?

A.  Right.

Q.  Okay.  That's the long way around you said you didn't want --

A.  Oh --

Q   -- to take?

A   -- right, right.

Q.  And you have benches that are only in your hallway; right?

A.  Yes.

Q.  And if a federal agent was sitting there, were you told about that?

A.  No.

Q.  You described a pleasant interaction with Officer Vasconcellos; correct?

A.  Yes.

Q.  Okay.  You later Googled his name?

A.   Yes.

Q.   Did you do that in your chambers or at home?

A.   I did that I think in my chambers.

Q.   Did you do that before or after you started your next hearing?

A.   Um, before, after -- I don't recall.

Q.   Okay.  You have a sister who is a criminal defense attorney; correct?

A.   Yes.  Well, she's primarily a family lawyer.

Q.   And she also does criminal cases, too; right?

A.   She takes some on.

Q.   She comes to the county building quite a bit; correct?

A.   She does.

Q.   Okay.  You texted her that morning; right?

A.   I did.

Q.   You told her ICE was in the building; right?

A.   Yes.

Q.   You wanted to warn her; right?

A.   I -- I was -- that's fair.

Q.   Okay.  You were worried that she might have clients coming in the building, and ICE was there; right?

A.   I felt -- I mean, yeah, sure.

Q.   Okay.  You had seen the warrant.  You knew that the warrant was in somebody else's name; right?

A.   I'm -- can you repeat the question.

Q.   Sure.  You were in the chief judge's chambers, you looked at the warrant, you saw the name; right?

A.   Yes.

Q.   Do you think that was your sister's client?

A.   No, I -- I had no idea.

Q.   Okay.  So you had a general fear that ICE might arrest other people in the courthouse that day?

A.   No.

Q.   You wanted your sister to know that ICE was in the building?

A.   It was more about what was happening in our country at that point in time, that ICE was making these sweeping arrests or what seemed to be.  It had to do more with that.

Q.   Is it a coincidence that your sister had a hearing the following Monday in front of Judge Swanson in the Safety Building?

A.   I didn't -- if she did, I don't know about it.

Q.   Did she respond to your text?

A.   No.

Q.   You testified before the grand jury; right?

A.   Yes.

Q.   Prosecution let you write out a statement ahead of time; right?

A.   Yes.

Q.   Did you tell the grand jury in your statement that you had

warned your sister about ICE being in the building?

A.   I don't think anyone asked me about it.  I -- I don't --

Q.   You got to volunteer what was in your statement; right?

A.   I did.

Q.   You chose not to put in your grand jury statement that you had warned your sister; right?

A.   It was just the text message.  I didn't even think anything of it.

Q.   Okay.  Sure.  And when did you do that text message?

A.   When I returned to my courtroom that day on April 18th.

Q.   Okay.  Before you started hearing any hearings; correct?

A.   I -- that seems about right.

        MR. BISKUPIC:  Thank you.  Those are all the questions I have.

        THE COURT:  Okay.

        MS. WATZKA:  I have few brief questions, not many.

                    REDIRECT EXAMINATION

                    BY MS. WATZKA:

Q.   You recall Mr. Biskupic asking you whether you stopped and asked Judge Dugan or told Judge Dugan, "Judge Dugan, I'm uncomfortable wearing my robe into the public hallway."  Do you recall being asked that question?

A.   Yes.  I recall that.

Q.   Why didn't you tell her -- why didn't you have that conversation?  Did you have an opportunity to tell her that?

A.   No.

Q.   Did she give you an opportunity to weigh in on any of this?

A.   No.   And actually she told me to keep my robe on, so I -- I did as she asked.

Q.   Has Judge Dugan been on the bench a lot longer than you have?

A.   Yes.

Q.   Were you trying to be respectful of her?

A.   Yes.

Q.   Do you -- was this an unusual day for you?

A.   It was.

Q.   You -- you already mentioned you were out in the public hallway with another judge in your robe.

A.   Right.

Q.   And you are -- during that conversation, your colleague is confronting law enforcement agents; right?

A.   Right.

Q.   And her tone made you uncomfortable?

A.   It did.

Q.   And then she abandoned you?

A.   Yes.

Q.   And then you were behind on your docket?

A.   Right.

Q.   And you were irritated when you saw that she had returned to her courtroom.

MR. BISKUPIC: Objection, Judge. This is all cumulative. It's argumentative.

THE COURT: Sustained.

BY MS. WATZKA:

Q. Do you recall Mr. Biskupic asking you about whether you would let a defendant go down the restricted hallway?

A. Can you repeat that?

Q. Do you recall Mr. Biskupic asking you about whether there would be a circumstance where you might let a criminal defendant go down the restricted hallway?

A. Oh, yes.

Q. And do you recall I believe you said it would be an unusual circumstance?

A. A unique set of circumstances.

Q. Would -- would allowing someone to use that restricted hallway to avoid federal law enforcement officers with a warrant be an appropriate unique circumstance?

A. Not in my view.

MS. WATZKA: That's all.

RECROSS-EXAMINATION

BY MR. BISKUPIC:

Q. Just one quick follow-up, Judge. Can you tell the ladies and gentlemen of the jury how many other ICE arrests prior to March 20 your colleagues were concerned about?

A. I'd only heard of about two.

Q. The March 20 and April 3rd?

A. I believe so.

MR. BISKUPIC: Thank you. That's all I have, Judge.

MS. WATZKA: And, I'm sorry, but I have just one question related to that since it exceeded the scope of redirect.

REDIRECT EXAMINATION

(Continued.)

BY MS. WATZKA:

Q. Do you have any personal knowledge of any other courthouse arrests?

A. No.

MS. WATZKA: That's it.

A. (Continuing.) Well, related to immigration?

Q. Yes.

A. No.

MS. WATZKA: That's all.

THE COURT: I think you're excused. Thank you.

THE WITNESS: Thank you.

(The witness is excused.)

* * * * *

(At 4:27 p.m. the hearing ended.)

C E R T I F I C A T E

I, JENNIFER L. STAKE, RDR, CRR, an Official Court Reporter for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing is a true and correct transcript of the excerpt of proceedings had and testimony taken in the above-titled matter as the same are contained in my original machine shorthand notes on the said trial or proceeding.

Dated this 17th day of December, 2025.
Milwaukee, Wisconsin.

Jennifer L. Stake, RDR, CRR
United States Official Court Reporter
517 East Wisconsin Avenue, Room 324
Milwaukee, WI  53202

Jennifer_Stake@wied.uscourts.gov

ELECTRONICALLY SIGNED BY JENNIFER L. STAKE
Official Court Reporter, RDR, CRR
_____