**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

UNITED STATES OF AMERICA
        Plaintiff,

    v.                                      **Case No. 25-CR-89**

HANNAH C. DUGAN
        Defendant.

---

## DECISION AND ORDER

A jury convicted defendant Hannah Dugan, a state court judge, of obstructing a proceeding before the Department of Homeland Security (DHS), contrary to 18 U.S.C. § 1505. Defendant moves for judgment of acquittal, Fed. R. Crim. P. 29, and/or for a new trial, Fed. R. Crim. P. 33. For the reasons that follow, her motions will be denied.

### I. FACTS AND BACKGROUND

**A.**     **The Indictment**

The government obtained a two-count indictment charging defendant as follows:

### COUNT ONE

**THE GRAND JURY CHARGES THAT**:

On or about April 18, 2025, in the State and Eastern District of Wisconsin,

### HANNAH C. DUGAN

knowingly concealed E.F.R., a person for whose arrest a warrant and process had been issued under the provisions of the law of the United States, so as to prevent the discovery and arrest of E.F.R., after notice and knowledge of the fact that a warrant and process had been issued for the apprehension of E.F.R.

In violation of Title 18, United States Code, Section 1071.

<u>**COUNT TWO**</u>

**THE GRAND JURY FURTHER CHARGES THAT**:

On or about April 18, 2025, in the State and Eastern District of Wisconsin,

**HANNAH C. DUGAN**

did corruptly endeavor to influence, obstruct, and impede the due and proper administration of the law under which a pending proceeding was being had before a department and agency of the United States, namely the administrative arrest of E.F.R. for purposes of removal proceedings conducted by the United States Department of Homeland Security, by committing affirmative acts to assist E.F.R. to evade arrest, including:

> a) confronting members of a United States Immigration and Customs Enforcement (ICE) Task Force and falsely telling them they needed a judicial warrant to effectuate the arrest of E.F.R.;

> b) upon learning that they had an administrative warrant for E.F.R.'s arrest, directing all identified members of the ICE Task Force to leave the location of the planned arrest (a public hallway outside of Courtroom 615 of the Milwaukee County Courthouse) and go to the Chief Judge's office;

> c) addressing E.F.R.'s Milwaukee County Circuit Court criminal case off the record while ICE Task Force members were in the Chief Judge's office;

> d) directing E.F.R. and his counsel to exit Courtroom 615 through a non-public jury door; and

> e) advising E.F.R.'s counsel that E.F.R. could appear by "Zoom" for his next court date.

In violation of Title 18, United States Code, Section 1505.

(R. 6.)

**B.    Pre-Trial Motions**

Defendant filed a pre-trial motion to dismiss, arguing that: (1) she enjoyed absolute judicial immunity for the official acts alleged in the indictment; (2) the prosecution violated the Tenth Amendment and the Constitution's vertical separation of powers by intruding on the

2

authority of state judges to manage their own courtrooms and proceedings; and (3) §§ 1071 and 1505 should be construed so as to avoid the constitutional issues she raised. (R. 21 at 2.) The magistrate judge handling pre-trial proceedings in this case recommended that the motion be denied, and after receiving briefing I adopted the recommendation and declined to dismiss the indictment. (R. 48 at 27.) After surveying the caselaw, I concluded that there is no general rule of criminal immunity for judges, nor was there a basis for granting immunity simply because some of the allegations in the indictment described conduct that could be considered "part of a judge's job." (R. 48 at 21.)

Prior to trial, the parties filed motions in limine. As is pertinent here, defendant requested an order that the government could not rely on her lawful official acts to sustain the charges. She cited cases holding that an act one has a legal right to undertake does not obstruct or hinder. (R. 58 at 3, citing United States v. Edwards, 869 F.3d 490, 492-99 (7th Cir. 2017); United States v. Matthews, 505 F.3d 698, 705-06 (7th Cir. 2007); see also Arthur Andersen LLP v. United States, 544 U.S. 696, 705-06 (2005).) In these cases, the courts recognized that corrupt interference with an investigation would not exist where, e.g., a mother suggests her son invoke his right against compelled self-incrimination, a wife persuades her spouse not to disclose marital confidences, or a lawyer counsels a client not to turn over documents pursuant to a valid claim of privilege. Edwards, 869 F.3d at 498 (citing Arthur Andersen, 544 U.S. at 704); Matthews, 505 F.3d at 705. Rather, the term "corruptly" requires the person act with consciousness of wrongdoing. Edwards, 869 F.3d at 498 (citing Arthur Andersen, 544 U.S. at 706). In Matthews, the court stated:

> As explained in Arthur Andersen, under limited circumstances, a defendant is privileged to obstruct the prosecution of a crime. That privilege flows from the defendant's enjoyment of a legal right--such as the right to avoid

3

self-incrimination. By including the word "wrongfully" in the definition of "corruptly" and criminalizing only the act of "wrongfully impeding the due administration of justice," the instructions directed the jury to convict only those who have no legal right to impede justice.

505 F.3d at 706. Defendant argued that, because she had a legal right to do each of the five acts alleged in the indictment—all within the scope of her authority as a Wisconsin state judge—there necessarily was no consciousness of wrongdoing. (R. 58 at 4.) She accordingly moved to exclude all government evidence that she impeded or in any way hindered, within the scope of counts one and two, the efforts of federal agents to arrest E.F.R. in a state courthouse's public hallway by engaging in the five lawful acts that the indictment listed. (R. 58 at 5-7.)

The government responded that defendant's motion in limine would in effect confer partial judicial immunity and put much of the government's proof off limits. I agreed that the correct approach was to permit the jury to consider all of defendant's conduct on April 18, 2025, in deciding whether she concealed an alien under § 1071 or corruptly endeavored to obstruct a proceeding under § 1505. (R. 72 at 13.)

I further explained that the cases upon which defendant relied did not suggest a different result. Edwards and Matthews were jury instruction cases, construing the term "corruptly" to require wrongful conduct, not immunity cases placing official judicial acts outside the scope of the statutes. As I had noted in denying defendant's motion to dismiss, there was no basis for granting immunity simply because some of the allegations in the indictment describe conduct that could be considered part of a judge's job. (R. 72 at 13.) And as the Seventh Circuit had explained in rejecting a similar argument made by a lawyer:

> [I]t is not the means employed by the defendant that are specifically prohibited by the statute; instead, it is the defendant's corrupt endeavor which motivated the

4

action. Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids.

United States v. Cueto, 151 F.3d 620, 631 (7th Cir. 1998); see also United States v. Cintolo, 818 F.2d 980, 992 (1st Cir. 1987) (holding that means, though lawful in themselves, can cross the line of illegality if employed with a corrupt motive).

I declined to reconsider my previous ruling on the immunity motion or to adopt an evidentiary standard based on an official/unofficial distinction inconsistent with that ruling. I noted that defendant would be free to present evidence and argument that the events of April 18, 2025, involved the routine work of a state court and judge, and the government would be allowed to contend that defendant added extraneous activities to her usual duties in order to defeat enforcement of federal immigration law. With that understanding, I denied this defense motion in limine. (R. 72 at 13-14.)

**C.      The Trial**

The case proceeded to trial on December 15, 2025. (R. 92.) In its case-in-chief, the government presented evidence that the state of Wisconsin charged Eduardo Flores-Ruiz (referred to as E.F.R. in the indictment) with three counts of domestic violence battery, and his case was scheduled for a hearing in defendant's courtroom on the sixth floor of the Milwaukee County Courthouse on April 18, 2025, at 8:30 a.m. (Trial Tr. at 50-51, 52.) Following his arrest on those charges, Immigration and Customs Enforcement (ICE) learned that Flores-Ruiz was present in the United States without legal status, with a previous order of removal, and issued an administrative warrant for his arrest. (Tr. at 51, 54-55, 192, 215, 388-89; Ex. 1A.) Members of an ICE task force planned to arrest Flores-Ruiz at the courthouse on April 18, 2025. (Tr. at 53, 394.) Six federal agents—ICE/ERO Officer Joseph Vasconcellos, CBP Officer Joseph

Zuraw, FBI Agent Phillip Jackling, FBI Agent Jeffrey Baker, DEA Special Agent Bryan Ayers, and DEA Special Agent Janene Spitaletto—arrived to make the arrest,[1] identifying themselves at courthouse security checkpoints.[2] (Tr. at 54, 245, 247-48, 315, 355, 398, 533.) Agents Baker and Jackling also checked in with defendant's courtroom bailiff, advising that they planned to arrest Flores-Ruiz after his hearing. (Tr. at 248, 250-51, 317, 400.) The agents then sat in the public hallway to wait. (Tr. at 76, 79, 249, 356-57.) Zuraw and Ayers observed Flores-Ruiz arrive and walk towards the courtroom. (Tr. at 360-61, 536.)

On learning of the agents' presence in the hall from her clerk, defendant left the bench, went to a neighboring courtroom, and gestured for Judge Kristela Cervera to come off her bench. (Tr. at 450-51, 634, 662-63, 758; Ex. 42.) On entering chambers, Judge Cervera began to take her judicial robe off, but defendant told her to leave her robe on. (Tr. at 452.) Defendant said, "ICE is here. We need to check a warrant." (Tr. at 452:9.) Defendant then proceeded to walk down a restricted hallway, with Judge Cervera following. Defendant was speaking as they were walking, and Judge Cervera testified that she "heard the name something about Flores." (Tr. at 452:14.) She asked, "Is that someone on my docket?" (Tr. at 453:6.) Defendant did not

---

[1]Vasconcellos, the team leader, testified that they chose to make the arrest at the courthouse because all persons entering must go through security and be screened for weapons. (Tr. at 396.) Vasconcellos explained that he had, during the course of his duties, been shot at and stabbed, ruptured his Achilles fighting with a suspect, and been in multiple high-speed pursuits leading to injury and accident. (Tr. at 395.)

[2]When Zuraw and Vasconcellos arrived, personnel at the security checkpoint made a phone call to a supervisor to determine whether they needed an escort. (Tr. at 355, 398.) Vasconcellos spoke to Milwaukee County Sheriff's Department Sgt. David DeSmet, who indicated they did not need an escort but asked they wait until after Flores-Ruiz's hearing to make the arrest. (Tr. at 399, 492, 493.) Vasconcellos agreed and further assured Sgt. DeSmet the arrest would not occur in the courtroom. (Tr. at 399.) Chief Deputy Brian Barkow also called Chief Judge Carl Ashley to advise that ICE was going to detain someone at the courthouse. (Tr. at 607.)

answer. Judge Cervera followed defendant down the restricted hallway out into the public hallway. (Tr. at 453-54.) Judge Cervera hesitated at the doorway because she did not want to enter the public hallway with her robe on. (Tr. at 454.)

Once in the public hallway, defendant confronted two of the agents (Vasconcellos and Jackling), who were seated on a bench, asking why they were there. (Tr. at 99, 102, 363, 403, 430, 456.) Vasconcellos indicated they were there to make an arrest of a person unlawfully present in the United States, and defendant asked if they had a judicial warrant. (Tr. at 456.) Vasconcellos responded they had an administrative warrant, and defendant replied that it had to be a judicial warrant. (Tr. at 457.) Defendant then directed them to go to the chief judge's office. (Tr. at 319-20, 364, 403, 430, 458.) Because Vasconcellos did not know where the chief judge's office was, Judge Cervera offered to walk him there. (Tr. at 104, 321, 404-05, 431, 458-59.) Defendant approached the other federal agents she identified in the hallway, directing them to the chief judge's office as well.[3] (Tr. at 105, 259, 322, 365, 368.) Defendant failed to identify Agent Spitaletto, who remained in the public hallway.[4] (Tr. at 292, 311, 323, 370, 539.)

After the agents had been cleared from the hallway, defendant returned to her courtroom and asked: "Which client is it?" (Tr. at 117:5; Ex. 42.) She also said: "We'll call it right away." (Tr. at 117:10; Ex. 42.) She told the attorney seated at counsel table, Walter Piel, who expected his case to be called first, to step back. (Tr. at 117, 736-37; Ex. 42.) She then turned to Flores-Ruiz's case, first telling Flores-Ruiz's lawyer, Mercedes de la Rosa, to take her client out and

---

[3]Zuraw testified defendant initially told him to "get out." (Tr. at 366:14-15.) She then said, "Get down to the chief judge's office." (Tr. at 366:24-25.) Ayers testified that he walked to the chief judge's area because he saw the other agents headed that day. (Tr. at 551.)

[4]Per the courtroom recording, the clerk told defendant there were "five ICE guys in the hall." (Ex. 42.)

come back and get a date. (Tr. at 117, 668, 760; Ex. 42.) She then instructed the clerk to just give her a new date. (Ex. 42.) A courtroom recording device captured whispered conversation between defendant and her court reporter, Joan Butz, in which they discussed de la Rosa and Flores-Ruiz leaving through the jury door, with defendant stating "down the stairs." (Tr. at 672:2, 761; Ex. 42.) The jury door opened into a restricted hallway leading to two doors, one opening to a set of stairs down to the fifth floor, the other back out into the public hallway. (Tr. at 71, 73, 761.) The restricted hallway is generally limited to court staff and jurors; criminal defendants are not ordinarily allowed to exit through this hallway. (Tr. at 71-72, 444-45.) Butz asked if she should show them, because de la Rosa might go out the "wrong door," i.e., the door back out to the public hallway where ICE was rather than the door leading downstairs. (Tr. at 118, 762-67; Ex. 42.) Defendant replied: "I'll do it. I'll get the heat." (Tr. at 119:4-5, 673:1-2, 765; Ex. 42.) She also indicated Flores-Ruiz could appear by Zoom for his next hearing. (Tr. at 725; Ex. 42.) Defendant then escorted de la Rosa and Flores-Ruiz through the jury door and directed them down the restricted hallway. (Tr. at 636, 674, 718-22, 741, 767-68.) De la Rosa and Flores-Ruiz took the door back out into the public hallway.[5] (Tr. at 123, 725.)

Neither the assistant district attorney nor the alleged victims in Flores-Ruiz's case, who were present for the hearing, were involved in this exchange. (Tr. at 136, 562, 638-39.) Unaware the case had been handled in this fashion, the alleged victims left after waiting for about an hour. (Tr. at 139, 568, 705.) Defendant's handling of Flores-Ruiz's matter differed from how she usually handled cases with victims, including one addressed off-the-record on April 18, 2025, with defendant typically ensuring compliance with victim notification

---

[5]De la Rosa testified she did not know there was an entrance to the stairs from that restricted hallway. (Tr. at 725.)

requirements and that the prosecutor was aware of the new date in the event the victims wanted to be there. (Tr. at 138,  678-79; Ex. 43.)

On her return to the bench, defendant's clerk, Alan Freed, asked if they should call the other interpreter cases first. Defendant responded by asking if there is "anybody else that looks . . ." (Tr. at 135:21; Ex. 42.) Freed replied: "I'm not sure." (Tr. at 135: 24; Ex. 42A.) Defendant then called Attorney Piel's case on the record. (Tr. at 136, 677; Ex. 43.)

Meanwhile, Vasconcellos had gone into the chief's judge's area with Judge Cervera, proceeding behind glass doors into the office, while the other four members of the team remained in the vestibule. (Tr. at 323, 368, 583.) Vasconcellos showed Judge Cervera the administrative warrant.[6] (Tr. at 405-06, 461, 586.) He also spoke with Chief Judge Ashley by phone. (Tr. at 406, 463, 584.) Vasconcellos later motioned for Zuraw to come behind the glass door, while he spoke to Chief Judge Ashley. (Tr. at 371-72, 406.)

A member of the sheriff's office entered the vestibule area, and Ayers heard him say something to the effect of "she's trying to speed him through." (Tr. at 540:8-9.) Ayers exited the vestibule, saw Flores-Ruiz and his attorney enter the public hallway, and followed them down in the elevator and outside the courthouse. (Tr. at 128-29, 262, 265, 324-25, 540-44.) After

---

[6]Judge Cervera testified that defendant did not follow them to the chief judge's office, which surprised her. (Tr. at 460.) She further testified that, after leaving the chief judge's office, she returned to her courtroom through defendant's courtroom, observing defendant back on the bench hearing cases. She indicated this irritated her; she felt abandoned after being pulled off her bench. (Tr. at 466.) Finally, Judge Cervera testified that later that day members of the state public defender's office congratulated her, which she found confusing. One explained, "Just so you know, our client was arrested on 10th Street. . . . Because we know what you guys were trying to do." (Tr. at 467:5-8.) When she learned the full circumstances, i.e., what the public defenders assumed the two judges were "trying to do," Judge Cervera testified she was "shocked." "Judges shouldn't be helping defendants evade arrest." (Tr. at 470:4.) She further testified that she felt "mortified" because someone might think she "was a part of . . . what happened." (Tr. at 470:11-14.)

9

other members of the team arrived, the agents attempted to arrest Flores-Ruiz, but he ran; agents were able to catch him and take him into custody across the street. (Tr. at 130, 267-69, 327, 329, 544-45.) On the following Monday, April 21, 2025, defendant told Judge Cervera she was "in the doghouse" with the chief judge (Tr. at 474:24) "[b]ecause I tried to help that guy." (Tr. at 475:8-9.)

Defendant moved for judgment of acquittal at the close of the government's case-in-chief, and I reserved decision. (Tr. at 774; R. 88.) The defense called four witnesses, including two circuit court judges who testified about previous ICE arrests in the courthouse and the development of a policy about the issue. (Tr. at 779- 814.) While the chief judge had produced a draft policy, no final policy had been created at the time of these events. (Tr. at 804.)

Following closing arguments, I instructed the jury that to find defendant guilty on count one the government had to prove four elements beyond a reasonable doubt: (1) a federal warrant or process had been issued for the arrest of an individual; (2) the defendant knew that the federal warrant or process had been issued for the individual's arrest; (3) the defendant actually harbored or concealed the individual; and (4) the defendant intended to prevent the individual's discovery or arrest. (Tr. at 901; R. 94 at 19.) I instructed that count two also had four elements: (1) there was a proceeding pending before a department or agency of the United States; (2) the defendant knew of the pending proceeding; (3) the defendant endeavored to influence, obstruct, or impede the pending proceeding; and (4) the defendant did so corruptly, that is, with the purpose of wrongfully impeding the proceeding. (Tr. at 902; R. 94 at 21.) For purposes of count two, I explained that the term "pending proceeding" simply means any process taking place in the manner and form prescribed for conducting business by or before a department or government agency, including all steps and stages in such an action from its

inception to its conclusion. (R. 94 at 22.) I further explained that the term "endeavored" means having acted purposefully, with knowledge that an action would have the natural and probable effect of wrongfully obstructing the proceeding. An "endeavor" need not be successful. (R. 94 at 22.) Finally, I explained that the term "corruptly" means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement. (R. 94 at 22.)

During deliberations, the jury asked: "As per Page 19 [setting forth the elements of count one], Bullet Point No. 2, we desire clarity as to whether or not Judge Dugan needed to know the identity of the subject of the arrest warrant, for example, his specific name." (Tr. at 909.) After hearing from counsel, I responded that "in order to commit the offense charged in Count 1, the defendant needed to know the identity the subject of the warrant." (Tr. at 918.) Later, the jury asked: "As per Page 21, Element No. 2, we desire clarity as to whether or not Judge Dugan needed to know the identity of the subject of the pending proceeding." (Tr. at 919.) After hearing from counsel and considering the issue in chambers, I responded: "To know of the pending proceeding, the defendant needed to have sufficient knowledge about the nature of the proceeding." (Tr. at 926.) The jury found the defendant not guilty of count one and guilty of count two. (Tr. at 927.)

Defendant subsequently renewed her motion for acquittal and added, in the alternative, a request for a new trial. The matter is fully briefed and ready for decision.

## II. DISCUSSION

### A.      Standards of Review

A defendant seeking entry of a judgment of acquittal under Rule 29 faces a nearly

insurmountable hurdle, as the court defers heavily to the jury's findings, views the evidence in the light most favorable to the government, and will grant relief only where no rational trier of fact could have found the defendant guilty. <u>United States v. Edwards</u>, 161 F.4th 1088, 1098 (7th Cir. 2025). When reviewing a challenge to the sufficiency of the evidence, the court will neither re-weigh the evidence nor second-guess the jury's credibility determinations. <u>Id.</u>

Rule 33 permits the district court to vacate a judgment and grant a new trial in a criminal case "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts have ordered new trials under Rule 33 in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial. <u>Edwards</u>, 161 F.4th at 1099. This may include situations where the court improperly instructed the jury. <u>See, e.g.</u>, <u>United States v. Cui</u>, 163 F.4th 1072, 1085 (7th Cir. 2026). A new trial may also be ordered where the evidence preponderates so heavily against the verdict that it would be a manifest injustice to let the verdict stand. <u>United States v. Conley</u>, 875 F.3d 391, 399 (7th Cir. 2017). Exercise of the power conferred by Rule 33 is reserved for only the most extreme cases. <u>Edwards</u>, 161 F.4th at 1099; <u>Conley</u>, 875 F.3d at 399.

## B. The Evidence Was Sufficient

Viewing "the totality of the evidence that the government presented in this case, it is sufficient to provide a rational basis upon which a jury could find guilt beyond a reasonable doubt." <u>United States v. Tinsley</u>, 62 F.4th 376, 388 (7th Cir. 2023) (cleaned up). The government demonstrated that on April 18, 2025, agents arrived at the Milwaukee County Courthouse to arrest Flores-Ruiz pursuant to an administrative warrant (Tr. at 54, 245, 247-48,

12

315, 355, 398, 533), a step in his pending removal proceeding (Tr. at 210-23, 414-18, 525-27).[7] The government further demonstrated that defendant was made aware of ICE's presence and the administrative warrant. (Tr. at 403, 450-51, 456; Ex. 42.) The government showed that defendant then engaged in a course of conduct that had the natural and probable effect of wrongfully obstructing the proceeding, including clearing the agents from the public hallway (Tr. at 105, 259, 322, 365, 368), stating that they needed a judicial warrant to make the arrest (Tr. at 457),[8] rushing Flores-Ruiz's case through while the agents were in the chief judge's office (Tr. at 540; Ex. 42), and ushering him out the jury door into the restricted hallway with the apparent intention that he go "down the stairs" to the fifth floor, rather than out the "wrong door" into the public hallway where the agents were (Tr. at 118, 762-67).[9] Finally, the government presented evidence that defendant acted wrongfully, including her statements that "I'll do it. I'll get the heat" (Tr. at 119, 765), and "I'm in the doghouse with Carl for trying to help that guy."

---

[7]In the original motion for acquittal, defendant argued that there was no "pending proceeding" because Flores-Ruiz's removal proceeding had ended. (R. 88 at 20.) However, defendant does not address the testimony from supervisory detention and deportation officer Anthony Nimtz discussing the steps in a removal proceeding, which in this situation began with Flores-Ruiz's arrest in April 2025 and concluded with his actual removal in November 2025. (Tr. at 210-23.) The government presented similar testimony from assistant field office director Cassandra Kubiszewski (Tr. at 525-27) and from agent Vasconcellos (Tr. at 414-18).

[8]Defendant notes that the agents did not testify she told them they needed a judicial warrant. (R. 109 at 9-10.) However, Judge Cervera testified that defendant did make this statement, repeating it three times. (Tr. at 457:8-14.) The jury was free to accept her testimony. See United States v. Wallace, 991 F.3d 810, 814 (7th Cir. 2021) ("The jury was free to believe Kristensen. We will not reassess credibility or reweigh the evidence. The evidence was sufficient for a rational jury to find Wallace guilty.").

[9]In the original motion, defendant argued that she pointed Flores-Ruiz and his lawyer to the door to the public hallway, not the door to the stairs. (R. 88 at 2, 17-18; see also R. 109 at 12.) However, a reasonable jury could find, based on her conversation with the court reporter, that defendant intended Flores-Ruiz take the door to the stairs, but Attorney de la Rosa used the "wrong door."

13

(Tr. at 474-75).[10]

## C.      Defendant's Arguments

Defendant's renewed motion brings four specific challenges to the verdict. I address each in turn.

### 1.      Privilege Against Civil Arrest in Courthouse

Defendant argues that she committed no crime because ICE arrests in courthouses violate the common law privilege against the execution of civil process or civil arrest warrants on a party appearing in a courthouse. (R. 109 at 2-3.) She contends that, because ICE had no legal authority to act on an administrative arrest warrant within the Milwaukee County Courthouse on April 18, 2025, she did not unlawfully impede the execution of a civil warrant in that building. (R. 109 at 3; see also R. 88 at 5-10, 18-19.)

Defendant relies on several district court decisions applying the common law privilege to civil ICE arrests in courthouses. (R. 109 at 13-17.) As she acknowledges, the only circuit court to address the issue has rejected her position that such arrests violate the privilege. See Ryan v. United States Immigration & Customs Enf't, 974 F.3d 9, 27 (1st Cir. 2020) (noting that the privilege has never been thought to protect against criminal arrests or other forms of criminal process in courthouses, and analogizing criminal arrests and civil immigration arrests). The Ryan court explained: "Just as criminal arrests implicate the uniquely sovereign interests in enforcing the penal laws and protecting the public, so too do civil immigration arrests seek

---

[10]Where, as here, the court reserves decision on a Rule 29 motion made at the close of the government's case, the court decides the motion on the basis of the evidence at the time the ruling was reserved. Fed. R. Crim. P. 29(b). As indicated in the text, the government presented sufficient evidence in its case-in-chief to enable a reasonable jury to find defendant guilty beyond a reasonable doubt. Defendant makes no argument that the defense case compels a different result.

14

to vindicate similar kinds of interests in controlling immigration and the presence of noncitizens in the country." Id. Defendant counters that the purpose of the privilege is to protect the court, an independent branch of government. (R. 109 at 15.) "The holding in Ryan wholly ignores this purpose. Civil arrest—whether by a private individual or by the government—runs afoul of this privilege of the court. The Executive may have sovereign power over immigration enforcement, but the Executive does not have sovereign power over the court." Velazquez-Hernandez v. United States Immigration & Customs Enf't, 500 F. Supp. 3d 1132, 1145 (S.D. Cal. 2020); see also United States v. New York, 810 F. Supp. 3d 329, 346 (N.D.N.Y. 2025) (holding that the 1952 Immigration & Nationality Act did not displace the common law privilege), appeal docketed, No. 26-104 (2d Cir. Jan. 16, 2026).

Defendant continues that, here, her actions were on behalf of the court itself. She contends that, by donning her robe and directing the agents to the chief judge's office, she acted well within her judicial authority. (R. 109 at 19.) She concludes that, because Flores-Ruiz had a privilege to come and go from his court appearance without execution of a civil arrest warrant, there could have been no obstructing or impeding. (R. 109 at 20-21.)

For two reasons, I reject defendant's argument.

First, I agree with the government that defendant waived the argument by failing to raise it via pre-trial motion. (R. 113 at 16-17.) Under Fed. R. Crim. P. 12(b)(3), certain motions "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Among these are motions alleging a defect in the indictment, such as "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). Here, defendant filed a detailed pre-trial motion to dismiss the indictment, which included claims that she enjoyed judicial immunity, that the Tenth Amendment precluded the

15

prosecution, and that § 1505 should be construed to not cover the conduct alleged in the indictment. (R. 48 at 3.) Absent from the motion was any claim that Flores-Ruiz was privileged from arrest at the courthouse, such that "no crime occurred" when defendant allegedly obstructed ICE's efforts. (R. 109 at 13.) An argument that the conduct alleged in an indictment does not, "as a matter of law" (R. 109 at 21), constitute a crime is properly raised under Rule 12(b)(3). Defendant makes no attempt to show "good cause" for her failure to timely raise the issue, as Rule 12(c)(3) requires. United States v. Aron, 98 F.4th 879, 882 (7th Cir. 2024).

Defendant replies that the problem was not a defect in the indictment but a failure of proof. She indicates that the indictment was not defective on its face: it cited a specific federal statute and alleged all of the essential elements. (R. 115 at 4.) She contends that the factual basis for a motion relating to the civil arrest privilege was not reasonably available before trial and could not have been determined without hearing the government's case-in-chief in full. (R. 115 at 4-5.) She continues that the indictment did not establish the privilege's application factually; the indictment also permitted the government to offer a more expansive factual case, which it did. (R. 115 at 6.)

The indictment plainly alleged that ICE task force agents had an administrative warrant for Flores-Ruiz, that they planned to arrest him in the public hallway of the courthouse, and that Flores-Ruiz was in the courthouse that day to address his criminal case. (R. 6 at 2.) These allegations made available an argument based on the privilege. Defendant posits that the government could have offered evidence that might have taken Flores-Ruiz outside the scope of the privilege, e.g., by converting to a criminal arrest or by changing the location of his intended arrest (R. 115 at 6), but this speculation does not make the argument unavailable for pre-trial determination. That the evidence presented at trial confirmed the factual predicate for

16

a privilege argument (as defendant concedes, R. 115 at 6-7) also does not mean the argument could be saved for a post-verdict motion.

Tellingly, defendant never explains how her privilege argument fits under either Rule 29 or Rule 33. The argument does not go to the sufficiency of the evidence under 18 U.S.C. § 1505. Nor is it based on some prejudicial error in the manner in which the case was presented to the jury. See United States v. Maclin, 915 F.3d 440, 444 (7th Cir. 2019) ("The applicable standard under Rule 33 requires a new trial only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict.") (internal quote marks omitted). As the government notes, the argument is instead that the indictment does not state an offense because there was no crime as a matter of law. "If that were accurate, the proper remedy would have been dismissal pretrial, not a new trial." (R. 113 at 17 n.3.)

Second, even if defendant had not waived the argument, and even if the district court cases defendant cites are right and Ryan is wrong regarding the applicability of the privilege to civil ICE arrests in courthouses (an issue I need not decide), defendant cites no authority that she may assert the privilege in this context. As the government notes, while courts have articulated the policy justification for the privilege in terms of promoting access to the courts and ensuring the efficient administration of justice, in the cases defendant cites the privilege was asserted by or for the benefit of a party or witness who was subject to civil process or arrest while attending court. (R. 113 at 20.) In the present context, accordingly, the privilege would belong to Flores-Ruiz, not defendant. Defendant cites no authority that she may assert the privilege derivatively to avoid criminal liability for obstructing Flores-Ruiz's arrest.

Even if the privilege may be asserted by a judge, the facts presented at trial do not support defendant's contention that her actions here "were on behalf of the court itself." (R. 109

17

at 19.) No court policy forbid civil ICE arrests in public areas of the Milwaukee County Courthouse or otherwise sanctioned defendant's course of conduct on April 18, 2025. As the government notes, the operating assumption of those involved in creating a policy was that civil ICE arrests in public areas of the courthouse were lawful and the judiciary did not have the ability to stop them. (R. 113 at 4, 21.) Shortly before the incident in question, defendant was forwarded training materials by one of her colleagues indicating that "ICE can legally conduct enforcement, i.e., take people into custody, in public areas of the courthouse." (Tr. at 114:21-23, 596:20-21.) Defendant's statements that she would "take the heat" for her actions (Tr. at 673) and that she was "in the doghouse" with the chief judge for "trying to help that guy" (Tr. at 474-75) suggest that she knew her actions were not "on behalf of the court."

Defendant replies that judges have standing to speak for, and as, the court. (R. 115 at 8.) She cites the statute defining the jurisdiction of circuit courts, Wis. Stat. § 753.03, but she fails to reply to the government's argument that her actions in this case found no support in court policy. Defendant also cites cases describing the nature of the privilege. Stewart v. Ramsay, 242 U.S. 128, 130 (1916) ("The privilege which is asserted here is the privilege of the court, rather than of the defendant. It is founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court for the protection of his rights, or the witness while attending to testify.") (internal quote marks omitted); Durst v. Tautges, Wilder & McDonald, 44 F.2d 507, 508-09 (7th Cir. 1930) ("It is not simply a personal privilege, but it is also the privilege of the court, and is deemed necessary for the maintenance of its authority and in order to promote the due and efficient administration of justice."). Importantly, though, in neither case was the privilege actually asserted by the court, as opposed to a private party attending a court

18

proceeding. Defendant cites no case where the privilege was asserted by a judge charged with obstructing civil process or arrest in a courthouse.[11] (R. 115 at 8-9.)

### 2. The Required "Nexus" on Count Two

Defendant notes that count two alleged a violation of § 1505 through five specific acts, all tied to the administrative arrest of E.F.R. She states that the indictment left no doubt that the government was bound to prove she acted with specific knowledge that the administrative warrant was for E.F.R. (R. 109 at 21.) She accordingly argues that I erred in responding to the jury's second question. (R. 109 at 22.) I should have answered that question the same, she contends, as I did the question about count one, i.e., that defendant needed to know the identity of the subject of the warrant/pending proceeding. (R. 109 at 22-23.) Defendant argues that knowledge of the particular proceeding is a required element under § 1505, since that knowledge provides the required "nexus" between the obstructive acts and the charged proceeding. (R. 109 at 23-24.) The answer also betrayed the indictment, which identified the proceeding by reference to Flores-Ruiz's arrest and removal. (R. 109 at 24.)

Defendant begins with the contention that § 1505 must be construed narrowly, consistent with the Supreme Court's recent decisions in public corruption cases. (R. 109 at 24.) Citing United States v. Aguilar, 515 U.S. 593 (1995) and like cases, defendant argues these

---

[11]In Velazquez-Hernandez, the case upon which defendant primarily relies, the court granted to non-citizen plaintiffs a temporary restraining order barring courthouse arrests. 500 F. Supp. 3d at 1136-37; see also Doe v. United States Immigration & Customs Enf't, 490 F. Supp. 3d 672 (S.D.N.Y. 2020) (civil action brought by an individual plaintiff who feared arrest by ICE should he go to court and organizational plaintiffs who provided services to such persons). In United States v. New York, 810 F. Spp. 3d at 333, the court discussed the privilege in addressing a federal government suit seeking to enjoin New York state laws generally forbidding civil ICE actions in courthouses. None of these cases involved invocation of the privilege by a judge.

19

obstruction statutes cannot be converted into catch-all provisions where inadequate notice is given as to what does and does not constitute a crime. (R. 109 at 25.)

Defendant continues that the government should have been required to prove that she had knowledge of "the" charged proceeding, not "a" proceeding or the "nature" of some proceeding. (R. 109 at 25.) Drawing on Aguilar, she phrases this in terms of the required "nexus" between the obstructive acts and the particular/specific proceeding. Here, defendant contends, she was never told that the administrative proceeding (or even the warrant) concerned Flores-Ruiz. (R. 109 at 26.)

Defendant further argues that my answer to the jury's second question constructively amended the indictment, broadening the possible bases for conviction beyond those presented by the grand jury. (R. 109 at 27.) Specifically, she contends that the phrase "nature of the proceeding" is found nowhere in § 1505, runs contrary to Aguilar, and its use relieved the government of proving beyond a reasonable doubt that she knew the administrative arrest warrant at issue in this case was specifically for Flores-Ruiz, the particular proceeding alleged in the indictment. (R. 109 at 27-28.)

Finally, defendant contends that, by acquitting on count one, the jury must have found that she did not know the identity of the subject of the warrant. Had the jury been similarly instructed on count two, a not guilty verdict would logically have followed on that count as well. (R. 109 at 28.)

Defendant's arguments fail. As the Supreme Court held in Aguilar, there must indeed be a "nexus" between the obstructive conduct and the proceeding at issue. 515 U.S. at 600. Absent such a connection, the conduct "cannot be said to have the 'natural and probable effect' of interfering with the due administration of justice." Id. at 601. The instructions in this case

20

included that requirement. As indicated above, the jury was told the government needed to prove that defendant "endeavored to influence, obstruct or impede the pending proceeding" (R. 94 at 21 #3), meaning she "acted purposefully, with knowledge that an action would have the natural and probable effect of wrongfully obstructing the proceeding." (R. 94 at 22.) The jury was also told the government was required to prove that she "did so corruptly, that is, with the purpose of wrongfully impeding the proceeding." (R. 94 at 21 #4.) By focusing solely on my response to the jury's second question, defendant ignores that the instructions as a whole plainly required a nexus between defendant's conduct and the pending proceeding. See United States v. Christophel, 92 F.4th 723, 727 (7th Cir. 2024) ("Because jury instructions must be considered as a whole, even if one instruction falls short on clarity, a court may consider the jury properly directed where the totality of the instructions sets forth the proper requirements for conviction.").

In any event, defendant fails to show that my response to the jury's second question was wrong. This question concerned the level of detail needed for the jury to find, as required by the second element, that defendant "knew of" the pending proceeding. Defendant cites no authority that such knowledge must include the identity of the person or persons involved in the proceeding.[12] In arguing that such knowledge is required to ensure the required nexus between the conduct and the proceeding, defendant overlooks that the third and fourth elements,

---

[12]The government notes that such a requirement could lead to absurd results, allowing a defendant to obstruct the arrest of a person she does not know by name. (R. 113 at 26-27.) Defendant replies that you can know the "identity" of a wanted person without knowing their name. (R. 115 at 15.) This debate pertains more to my answer to the first question, "whether or not Judge Dugan needed to know the identity of the subject of the arrest warrant, for example, his specific name." (Tr. at 909.) The operative term in count two is "pending proceeding."

summarized in the preceding paragraph, encompass that requirement. And here, these elements referred to "the proceeding," not "a proceeding," "any proceeding," or "some proceeding."

The evidence presented at trial concerned just one proceeding, involving Flores-Ruiz's removal from the United States. The evidence permitted the jury to find that defendant knew the person whose arrest she sought to prevent was the same person subject to the pending removal proceeding, whether or not she knew his name.[13] (R. 113 at 25.) Defendant cannot claim surprise at the manner in which the case was presented. Nor can she reasonably claim that my answer to the jury's second question permitted the jury to convict based obstruction of some other proceeding.

Defendant argues that because the indictment identified the "proceeding" by reference to Flores-Ruiz's arrest and removal, the government was required to prove she knew his name.

---

[13]In reply, defendant contends that she had no reason to know that Flores-Ruiz, as opposed to any of the other people on her docket that morning, was the one wanted for removal. (R. 115 at 12.) Judge Cervera testified that, as she and defendant walked down the restricted hallway to confront the agents, she "heard the name something about Flores." (Tr. at 452:14.) Defendant's clerk testified that prior to court starting he printed out the calendar and placed a copy on the judge's dais. (Tr. at 658.) That calendar listed the matter of Eduardo Flores-Ruiz. (Tr. at 52; Ex. 11.) Further, the courtroom recording showed that, after clearing the ICE agents from the hallway and returning to court, defendant asked, "Which client is it?" (Tr. at 117:5.) The recording captured her addressing Flores-Ruiz's lawyer, asking "What's the name of the client?" (Ex. 42.) In response, Attorney de la Rosa said the name Eduardo Flores-Ruiz. (Ex. 42.) Defendant then directed Flores-Ruiz quickly be given a date off the record before escorting him and his lawyer out the jury door and down the restricted hallway. As defendant notes, the agents never showed her the warrant or told her the name of the man they were after. (R. 109 at 13; R. 115 at 12.) But a reasonable jury could find that ICE agent Vasconcellos told defendant they were there to "apprehend a person who is unlawfully present in the United States" (Tr. at 456:22-23), and that he had an administrative warrant (Tr. at 403, 457). Judge Cevera also testified that she started to ask to see the warrant while they were still in the hallway, but defendant quickly sent him to the chief judge's office. (Tr. at 457-58.) And as discussed above, it is undisputed that defendant learned Flores-Ruiz's name prior to ushering him out the jury door and down the restricted hallway.

(R. 115 at 11-13.) The primary purpose of an indictment is to provide the defendant with notice of the charges against her so that she may prepare a defense; it also serves to cabin the government's evidence so as to avoid unfair surprise at trial and avoid the possibility the petit jury will convict on a crime different from the one approved the grand jury. See, e.g., United States v. Fassnacht, 332 F.3d 440, 444-45 (7th Cir. 2003). In some cases, specific language in an indictment that provides detail beyond the general elements of the crime may make the specified detail essential to the charged crime, which must be proven beyond a reasonable doubt. E.g., United States v. Pierson, 925 F.3d 913, 920 (7th Cir. 2019), vacated on other grounds, Pierson v. United States, 589 U.S. 1262 (2020).

However, an indictment does not by including certain details about the offense necessarily alter the knowledge requirements set in the charging statute. By way of analogy, in felon in possession prosecutions the government typically identifies the firearm by make, model, and serial number. But no one would argue the government is therefore required to prove the defendant knew the gun's serial number. Rather, in that situation, the government must prove that the defendant knowingly possessed the same gun identified in the indictment. Cf. United States v. Leichtnam, 948 F.2d 370, 379-81 (7th Cir. 1991) (finding constructive amendment where the indictment charged possession of a Mossberg rifle, but at trial the jury was shown three guns, not just the Mossberg, and then received an instruction that it could convict if convinced that the defendant possessed "a firearm"—in effect, any one of the three). Here, the government had to prove defendant obstructed the same "pending proceeding" identified in the indictment, but it did not have to prove specific knowledge of each and every

23

detail of that proceeding.[14]

Defendant also fails to demonstrate that my answer to the second question constructively amended the indictment. A constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury. United States v. Haas, 37 F.4th 1256, 1266 (7th Cir. 2022). Not all variations between an indictment and the evidence or jury instructions amount to a constructive amendment, however. Id. at 1266-67. Rather, the offense charged in the indictment must be materially different or substantially altered at trial, such that it is impossible to know whether the grand jury would have indicted for the crime actually proved. Id. at 1267.

Defendant cites no authority supporting her contention that the answer was wrong simply because the words I used do not appear in the statute. And as discussed above, the instructions included Aguilar's nexus requirement and required the government to prove

<hr>

[14]In reply, defendant cites United States v. Coleman, 138 F.4th 489 (7th Cir. 2025), a felon in possession case where the indictment specified the firearm by make, model, and serial number. (R. 115 at 14.) Yet at trial, the government presented evidence of two other firearms and the court instructed the jury that the government had to prove the defendant possessed "a firearm." Id. at 499. The Seventh Circuit explained that "the indictment did not have to include the make and serial number of the firearm, but because it did, the jury had to find, beyond a reasonable doubt, that Coleman possessed a Glock with serial number NLW237." Id. at 499-500. However, because the defendant failed to object at trial, the court reviewed only for plain error, declining to grant relief because the evidence focused on the Glock and the instructions referred the jury back to the indictment. Id. at 501-04. Defendant argues that there is no plain error hatch here, as she objected to the court's supplemental instruction. (R. 115 at 14-15.) As discussed in the text, cases like Coleman and Leichtnam stand for the proposition that the government must at trial prove the defendant possessed the same gun identified in the indictment. These cases do not support the enhanced knowledge requirement she demands, i.e., that the defendant must know the gun's serial number or all the details of the pending proceeding included in the indictment.

defendant obstructed "the proceeding"—the same one referenced in the indictment. Nothing in my answer undermined these requirements or otherwise permitted the jury to convict defendant of an offense different from the one charged in the indictment.

In reply, defendant appears to argue that I should have answered the question more specifically, noting that the jury asked about the <u>subject</u> of the proceeding while I gave a general answer about the <u>nature</u> of the proceeding. She also suggests the phrase "sufficient knowledge" was vague. (R. 115 at 10.)

"District judges have considerable discretion on both whether and how to answer a jury's question." <u>United States v. Zhao</u>, 141 F.4th 833, 845 (7th Cir. 2025). The Seventh Circuit considers three factors when reviewing the language of a supplemental instruction or answer to a jury question: (1) whether the instructions as a whole fairly and adequately treated the issue; (2) whether the supplemental instruction was a correct statement of law; and (3) whether the district court answered the jury's question specifically. <u>Id.</u>

For the reasons set forth above, the instructions as a whole fairly treated the issue, including the nexus requirement upon which defendant insists and ensuring that the "proceeding" referred to in element #1 (and the indictment) was the same proceeding referenced in elements #2-4. For the reasons also set forth above, defendant fails to show that her preferred answer was a correct statement of the law. Perhaps the answer could have been more specific: "no." But defendant fails to demonstrate that she was prejudiced by the one I gave.

### 3. Breadth of § 1505

As indicated, the government charged defendant with concealing Flores-Ruiz from arrest under 18 U.S.C. § 1071, a misdemeanor, and with obstruction of Flores-Ruiz's removal

proceeding, under 18 U.S.C. § 1505, a felony. Defendant argues that nothing in the text or history of § 1505 demonstrates congressional intent to make a felony the same conduct labeled a misdemeanor under other statutes. (R. 109 at 28-29.) She cites Fischer v. United States, 603 U.S. 480, 491-92 (2024), where the Supreme Court reversed the conviction of a January 6 defendant under the "otherwise" clause in 18 U.S.C. § 1512(c)(2), holding that the scope of that clause must be limited by the specific examples list in § 1512(c)(1), which pertained to records, documents, or other objects. Defendant specifically relies on Justice Jackson's concurrence, which noted that "nearly all of the broad, all-purpose obstruction statutes that various States have enacted are classified as misdemeanors," id. at 504, while § 1512(c)(2) is a 20-year felony. See id. at 505 ("Here, it beggars belief that Congress would have inserted a breathtakingly broad, first-of-its-kind criminal obstruction statute (accompanied by a substantial 20-year maximum penalty) in the midst of a significantly more granular series of obstruction prohibitions without clarifying its intent to do so[.]").

Defendant also cites Marinello v. United States, 584 U.S. 1 (2018), where the Court reversed an obstruction conviction under the omnibus clause in 26 U.S.C. § 7212(a). Relying on Aguilar, the Court held that under this clause there must be a nexus between the defendant's obstructive conduct and a particular administrative proceeding, such as an investigation, an audit, or other targeted administrative action. Id. at 13. In the course of explaining its holding, the Court noted:

> Viewing the Omnibus Clause in the broader statutory context of the full Internal Revenue Code also counsels against adopting the Government's broad reading. That is because the Code creates numerous misdemeanors, ranging from willful failure to furnish a required statement to employees, §7204, to failure to keep required records, §7203, to misrepresenting the number of exemptions to which an employee is entitled on IRS Form W-4, §7205, to failure to pay any tax owed, however small the amount, §7203. To interpret the Omnibus Clause as applying

26

> to all Code administration would potentially transform many, if not all, of these misdemeanor provisions into felonies, making the specific provisions redundant, or perhaps the subject matter of plea bargaining. Some overlap in criminal provisions is, of course, inevitable. Indeed, as the dissent notes, post, at 22 (opinion of Thomas, J.), Marinello's preferred reading of §7212 potentially overlaps with another provision of federal law that criminalizes the obstuction of the "due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States," 18 U. S. C. §1505. But we have not found any case from this Court interpreting a statutory provision that would create overlap and redundancy to the degree that would result from the Government's broad reading of §7212—particularly when it would render superfluous other provisions in the same enactment.

Id. at 9 (internal citations and quote marks omitted).

Defendant argues that in this case the government turned a misdemeanor obstruction of an arrest into felony obstruction of a pending proceeding. She argues that, under this construction, the potential arrest of every illegal immigrant in the country is part of a pending administrative proceeding covered by § 1505. (R. 109 at 32.) She concludes that, under the reasoning of Fischer and Marinello, the guilty verdict on count two should be set aside. In the alternative, the court should grant a new trial with proper instructions. (R. 109 at 33.)

In ruling on the party's jury instruction dispute over the meaning of the term "proceeding," I found United States v. Hernandez, No. 3:23cr122 (RCY), 2024 U.S. Dist. LEXIS 649, at *7 (E.D. Va. Jan. 2, 2024) (citing Rice v. United States, 356 F.2d 709, 712 (8th Cir. 1966)), persuasive. (R. 97 at 5.) As defendant notes, Hernandez is on appeal, with the case argued before the Fourth Circuit in January 2026. (R. 109 at 33 n.7.) However, nothing in the current submission persuades me that the instructions were wrong. As I noted in the instructions order, the Seventh Circuit has held that the term "proceeding" is defined "rather broadly" for the purpose of § 1505, United States v. Senffner, 280 F.3d 755, 761 (7th Cir. 2002), undermining defendant's claim, based on Supreme Court decisions construing different statutes, that § 1505

27

must be construed narrowly. As the government notes, other circuits construing § 1505 have also recognized the broad nature of the term "proceeding." (R. 113 at 29, collecting cases.)

The government further argues that there is little overlap between § 1071 and § 1505, as the latter requires the person act "corruptly," i.e., with an improper purpose, and is focused on obstruction of a proceeding, as opposed to the concealment of a person. (R. 113 at 30-31.) In any event, as the Supreme Court has noted: "Redundancies across statutes are not unusual events in drafting, and so long as there is no positive repugnancy between two laws, a court must give effect to both." Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992) (internal citation and quote marks omitted). Indeed, the Court in Marinello acknowledged the overlap between the narrow construction of § 7212(a) pressed by the defendant and § 1505, stating: "Some overlap in criminal provisions is, of course, inevitable." 584 U.S. at 9. As indicated in the block quote above, the Court went on to accept the defendant's construction in part because the government's broad reading of § 7212 would render superfluous other provisions in the same enactment. Id. at 9. As the government demonstrates, while Congress placed § 1071 and § 1505 in their current locations in the U.S. Code—chapters 49 and 73, respectively—as part of its June 1948 reorganization of the criminal laws, they are not fairly deemed part of the "same enactment," as were the provisions of the Internal Revenue Code discussed in Marinello. (R. 113 at 33-34.)

Fischer is likewise distinguishable. As indicated, that case addressed the catchall provision in § 1512(c)(2), which penalized one who "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so." Applying the canons of noscitur a sociis and ejusdem generis, the Court held that the provision should be limited based on the specific examples of obstructive conduct listed in § 1512(c)(1), i.e., altering, destroying, mutilating, or

28

concealing a record, document, or other object. 603 U.S. at 487. The Court also noted that the government's contention that (c)(2) covers all forms of obstructive conduct left (c)(1) with no work to do. Id. at 490. The Court further noted that § 1512(c)(2) was enacted to close a gap in the law exposed by the Enron scandal, i.e., that the former statute imposed criminal liability on a person who persuaded another to destroy documents but did not cover a person who destroyed the records herself. Id. at 492. The Court found it unlikely that "Congress actually hid away in the second part of the third subsection of Section 1512 a catchall provision that reaches far beyond the document shredding and similar scenarios that prompted the legislation in the first place." Id. Finally, the Court noted that a broad construction of § 1512(c)(2) could render superfluous other obstruction statutes in chapter 73, including § 1505. Id. at 492-93.

Nothing in the Court's reasoning implicates defendant's conviction on count two. Section 1505 contains one obstruction provision, rather than the two provisions in § 1512(c) at issue in Fischer. Defendant cites no legislative history suggesting § 1505 must be construed narrowly, as she contends. While Fischer mentions § 1505 as another obstruction statute within chapter 73, the Court did not discuss the meaning of that statute or the term "proceeding." Finally, as the government notes, Congress may have intended the harsher penalty in § 1512(c) (up to 20 years) apply to a person who obstructs "an official proceeding" as opposed to the lesser penalty (up to 5 years) that applies to those who obstruct "any pending proceeding" under § 1505. (R. 113 at 35.) And, as the government further notes, courts have construed the statutes differently because an "official proceeding" must be different than "any pending proceeding."[15] (R. 113 at 36-37.)

_____

[15]In reply, defendant contends that Fischer was concerned not just with consistency within § 1512(c) but with the obstruction chapter as a whole. (R. 115 at 17-18.) But this concern

29

Defendant replies that none of the cases cited by the government construing § 1505 involved ICE arrests as part of a removal proceeding (R. 115 at 16), but this simply reflects the fact that the statute applies to many different agency proceedings; it is no reason to disregard the manner in which these courts construed the key term. Defendant further replies that these cases pre-date Marinello and Fischer, which marked a shift in the manner in which the Court interpreted obstruction statutes. (R. 115 at 16.) As discussed above, however, the instructions in this case included the "nexus" requirement from Aguilar and Marinello. In other words, defendant could not have been convicted based on her obstruction of some unknown proceeding or the general work of DHS.[16]

### 4.    Legal Acts

Finally, defendant argues that the verdict on count two was based on conduct, e.g., addressing a case off the record, directing Flores-Ruiz to leave through the jury door, and permitting him to appear by Zoom for his next hearing, that is not inherently illegal or corrupt. Instead, she was convicted based on acts that were part of her job and within her authority as a judge. (R. 109 at 33-36.)

---

was that an overbroad construction of § 1512(c)(2) would swallow other obstruction provisions in chapter 73. This does not help defendant's argument that § 1505 renders § 1071 superfluous. Nor does it help her argument regarding the meaning of the term "proceeding" in § 1505. Defendant argues that my answer to the second question relieved the government of its burden to prove the proceeding was "pending" (R. 115 at 18-19), but the answer itself included the word "pending." As discussed above, the government presented sufficient evidence regarding the "proceeding" for Flores-Ruiz.

[16]Defendant contends that because Vasconcellos declined to check the box on the warrant form indicating probable cause was based upon "the pendency of ongoing removal proceedings" against Flores-Ruiz there could have been no pending removal proceeding. (R. 115 at 17; see also R. 109 at 8-9, 31-32.) However, the manner in which an agent fills out a form does not alter the meaning of a statutory term.

These arguments are largely a rehash of those presented in defendant's previous motions and in her proposed jury instructions. As I noted in denying defendant's motion to dismiss (R. 48 at 21), there is no basis for granting immunity simply because some of the allegations in the indictment describe conduct that could be considered part of a judge's job. Further, as I noted in denying her motion in limine (R. 72 at 11-14), otherwise lawful conduct can amount to a crime if done with a corrupt motive. Again, as the Seventh Circuit put it,

> [I]t is not the means employed by the defendant that are specifically prohibited by the statute; instead, it is the defendant's corrupt endeavor which motivated the action. Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids.

Cueto, 151 F.3d at 631; see also Cintolo, 818 F.2d at 992 ("[M]eans, though lawful in themselves, can cross the line of illegality if (i) employed with a corrupt motive, (ii) to hinder the due administration of justice, so long as (iii) the means have the capacity to obstruct.").

Defendant argues that the term "corruptly" should be limited to inherently evil conduct, and that there is no evidence here that she engaged in "corruption" in the ordinary sense. (R. 109 at 37-38.) The instructions here included the definition of the term "corruptly" adopted by Congress. (R. 97 at 5, citing 18 U.S.C. § 1515(b).) Defendant cites no authority that a conviction under § 1505 cannot stand absent evidence of extortion, bribery, or destroying evidence.[17]

---

[17]Contrary to the suggestion in the original motion (R. 88 at 14), the instructions here required the government prove defendant acted with an "improper purpose" (R. 94 at 22), consistent with Edwards, 869 F.3d at 499. Defendant suggests that the term "corruptly" requires a defendant act with the intent to procure an improper benefit for herself or some other person. (R. 88 at 14 & R. 109 at 38, citing United States v. Fischer, 64 F.4th 329, 361-62 (D.C. Cir. 2023) (Walker, J., concurring in part), vacated, 603 U.S. 480 (2024).) As I explained in the jury instruction decision, Fischer is a § 1512 case and does not control here. (R. 97 at 6.) And for the reasons set forth above, the evidence was sufficient for the jury to find defendant acted

31

Defendant further argues that the instructions left no room for good faith. (R. 109 at 38.) Defendant did not request a specific jury instruction on good faith. (See R. 57.) In any event, the instructions permitted her to argue that the government failed to prove she acted wrongfully or with an improper purpose. See United States v. Smith, 150 F.4th 832, 850 (7th Cir. 2025) (noting the court can find a good faith instruction unnecessary where a lack of good faith is a part of the charge); see also United States v. Blagojevich, 794 F.3d 729, 738 (7th Cir. 2015) (discussing when a good faith instruction is needed). Defendant contends the government offered nothing to impugn her good faith (R. 109 at 39), but that was an issue for the jury to decide. Defendant argued to the jury that her conduct was a legitimate exercise of judicial authority and that she tried to comply with the expectations of Chief Judge Ashley. The government countered that defendant committed a series of acts, including making false statements, not sanctioned by court policy, and that she did so to corruptly undermine proceedings with which she disagreed. (R. 113 at 40.) A reasonable jury could accept the government's version.

Defendant next takes issue with the definition of "endeavor," which permitted the government to argue the crime was complete as soon as she allowed Flores-Ruiz to leave through the jury door, regardless of the fact that he emerged into the same public hallway (where the agents were waiting). (R. 109 at 39.) I drew this instruction from the Seventh Circuit's pattern for § 1503, which makes clear than an endeavor need not be successful. (R.

for an "improper purpose." Defendant also argued in the original motion that the rule of lenity required the court to adopt her preferred meaning of "corruptly." (R. 88 at 15.) The rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the court must simply guess as to what Congress intended. Maracich v. Spears, 570 U.S. 48, 76 (2013). Here, Congress provided a specific definition of the term "corruptly" as used in § 1505. 18 U.S.C. § 1515(b).

32

97 at 5.) Defendant repeats the argument she made to the jury—that Flores-Ruiz emerged into the same public hallway, less than 12 feet from the public courtroom door (R. 109 at 40)—but she fails to explain how any error in the jury instructions prevented the jury from considering that argument.[18] Defendant also fails to appreciate that, so long as the government proved a corrupt intent to obstruct, it does not matter that her endeavor did not succeed. As discussed above, the "endeavored" instruction required that she have acted purposefully, with knowledge that an action would have the natural and probable effect of wrongfully obstructing the proceeding. This provided the required nexus.

Defendant next disputes my refusal to give a "materiality" instruction. (R. 109 at 41; see also R. 88 at 10-11, 20-21.) But she again cites no authority for its inclusion in a § 1505 prosecution. Instead, she cites Neder v. United States, 527 U.S. 1 (1999), a mail/wire/bank fraud prosecution, and civil instructions in patent infringement and employment discrimination cases. (R. 109 at 41-42.) Section 1505 contains no materiality requirement, and the Seventh Circuit has declined to include such a requirement under § 1512(c), another obstruction statute in chapter 73. See United States v. McKibbins, 656 F.3d 707, 712 (7th Cir. 2011) ("The relevant intention is directed at making the government's job harder in proving its case, not at actually succeeding in that effort."). Further, as I noted in the jury instruction decision, the definition of

---

[18]Defendant also overlooks the evidence that the restricted hallway permitted Flores-Ruiz to go "down the stairs" to the fifth floor without being seen by the agents on the sixth floor. In the original motion, defendant argued that the evidence showed she directed Flores-Ruiz and his lawyer to exit into the public hallway. (R. 88 at 17-18.) But a reasonable jury could conclude that defendant endeavored for defendant to exit into the stairway down to the fifth floor, as she and her court reporter discussed, rather than using the "wrong door" back out into the public hallway. (Tr. at 764.) Ultimately, defendant's factual arguments, which break her course of conduct into discrete acts, each of which she had the authority to do, overlooks the totality of the evidence.

"endeavored" used in the instructions permitted defendant to argue that her conduct did not have the natural and probable effect of wrongfully obstructing the proceeding. (R. 97 at 6.) Defendant argues that because Flores-Ruiz emerged into the same public hallway, just a few feet from the regular courtroom door, her conduct was a minor or trivial inconvenience to the agents. (R. 109 at 42; see also R. 88 at 11, 21.) The government responds that, aside from the fact that the statute does not require successful obstruction, defendant's course of conduct that morning changed what was supposed to be a low-key arrest in the hallway by a team of agents into a foot chase through moving traffic by a portion of the team. (R. 113 at 43-44.) At all events, these were issues for the jury to consider.

Defendant argues that the instructions gave the jury no context or guidance for how to consider her legal right to act. She points to her proposed instruction that a defendant who has a legal right to act as she did does not corruptly endeavor to influence, obstruct, or impede the due and proper administration of the law or a federal proceeding. (R. 109 at 42, citing R. 57 at 21.) I rejected this and similar instructions as a rehash of her immunity argument and unsupported by caselaw. (R. 97 at 6.) As I noted in denying the motion to dismiss, there was no basis for granting immunity simply because the indictment described conduct that could be considered "part of a judge's job." The same would be true in a bribery case where the judge is prosecuted for performing official acts intertwined with bribery. Put another way, a judge may use judicial acts or tools as the means to accomplish an unlawful end. (R. 48 at 21.) Defendant's contention that she was authorized to act as she did, regardless of motive (R. 109 at 36; see also R. 88 at 16-17) finds no support in the law. See Cueto, 151 F.3d at 631 ("Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the

34

statute forbids."). Defendant complains that I cited no authority for limiting "legal rights" to taking the Fifth or asserting a valid privilege (R. 109 at 43; R. 97 at 6), as citizens retain all sorts of rights not specifically enumerated. Those were the rights referenced in the cases defendant cited. Defendant's citation of Arthur Andersen LLP v. United States, 544 U.S. 696 (2005), does not help her because the instructions here required that she act corruptly, that is, with the purpose of wrongfully impeding the proceeding. (R. 94 at 21.) As the Seventh Circuit has noted, "the word 'wrongfully' performs the 'limiting work' discussed in Arthur Andersen." Matthews, 505 F.3d at 706.

In reply, defendant contends that my denial of her proposed instructions—providing that acts a defendant has a legal right to undertake to do not violate § 1505—wholly negated state law as a source of lawful authority. (R. 115 at 20.) In these instructions, defendant proposed the jury be told that a state court judge's official acts, including acts that were part of her job, do not violate count two. These proposed instructions then told the jury that it could not consider in any way the claim that defendant did the various things charged in the indictment, i.e., telling the agents they needed a judicial warrant (R. 57 at 25), directing them to the chief judge's office (R. 57 at 26), calling Flores-Ruiz's case off the record (R. 57 at 27), and directing Flores-Ruiz out through the jury door (R. 57 at 28). These proposed instructions echoed her previous motion in limine seeking to exclude evidence of her "lawful acts" based on the same authority. (R. 58 at 3, citing United States v. Edwards, 869 F.3d 490, 492-99 (7th Cir. 2017); United States v. Matthews, 505 F.3d 698, 705-06 (7th Cir. 2007); Arthur Andersen LLP v. United States, 544 U.S. 696, 705-06 (2005).)

As I explained my order denying the motion in limine, and again in the instructions decision, these arguments essentially requested judicial immunity for the acts alleged, which

35

I had already denied. (R. 72 at 13; R. 97 at 6.) As I further explained in the motion in limine decision, Edwards and Matthews did not support defendant's position that official judicial acts are outside the scope of § 1505. (R. 72 at 13.) Defendant's arguments also overlooked Cueto, 151 F.3d at 631, and Cintolo, 818 F.2d at 992, cited above. (R. 72 at 13.)

Defendant takes issue with the concept that a corrupt motive can make lawful acts unlawful, citing a number hypotheticals where an "improper" motive would make otherwise lawful and protected activity a felony if it inconvenienced ICE. (R. 115 at 20-22.) It suffices to say that this case is different from those defendant posits, and that it would be improper to hold § 1505 cannot be applied to the conduct at issue here just because difficult line drawing issues may arise in other cases.

Defendant attempts in reply to distinguish Cueto because it involved § 1503, not § 1505. (R. 115 at 22.) However, the operative language in both statutes is the same. 18 U.S.C. § 1503(a) ("Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States . . ."); 18 U.S.C. § 1505 ("Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had . . ."). Defendant complains that the government previously argued—inconsistently—that §§ 1503 and 1512 cases were inapplicable, but that was primarily in the context of the statutes different use of the term "proceeding." 18 U.S.C. § 1505 ("any pending proceeding"); 18 U.S.C. § 1512(c) ("an official proceeding").

Defendant also attempts to distinguish Cueto on its facts, noting that the lawyer-defendant in that case, the business partner of a man engaged in an illegal gambling operation,

36

had a financial interest in the operation. He also made false statements in court filings. (R. 115 at 23.) Defendant notes that she derived no profits from Flores-Ruiz, nor did she make repeated false statements in legal filings. (R. 115 at 24.)

Defendant correctly notes that Cueto's otherwise legal conduct was motivated by his desire to protect the illegal gambling operation and safeguard his own financial interest. 151 F.3d at 631. But nothing in the court's decision suggests the improper motive must be a financial one, and defendant cites no other authority for that proposition. (See R. 115 at 24.) Instead, the Cueto court spoke in broad terms:

> There is little case authority directly on point to consider whether an attorney acting in his professional capacity could be criminally liable under the omnibus clause of § 1503 for traditional litigation-related conduct that results in an obstruction of justice. Correct application of Section 1503 thus requires, in a very real sense, that the factfinder discern--by direct evidence or from inference--the motive which led an individual to perform particular actions. . . . Intent may make any otherwise innocent act criminal, if it is a step in a plot. Therefore, it is not the means employed by the defendant that are specifically prohibited by the statute; instead, it is the defendant's corrupt endeavor which motivated the action. Otherwise lawful conduct, even acts undertaken by an attorney in the course of representing a client, can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids.
> . . .
> Even though courts may be hesitant, with good reason and caution, to include traditional litigation-related conduct within the scope of § 1503, the omnibus clause has been interpreted broadly in accordance with congressional intent to promote the due administration of justice and to prevent the miscarriage of justice, and an individual's status as an attorney engaged in litigation-related conduct does not provide protection from prosecution for criminal conduct.

Id. at 631 (internal citations and quote marks omitted).

The other case defendant cites (R. 115 at 24), United States v. Gerace, 731 F. Supp. 3d 497 (W.D.N.Y. 2024), is far afield. There, the court denied a motion to disqualify a defendant's lawyer, in which the government argued the lawyer engaged in criminal conduct by including names on a witness list that triggered the assigned judge's recusal. Id. at 505. In

the course of denying the motion, the court noted that the government overlooked 18 U.S.C. § 1515(c), which provides: "This chapter does not prohibit or punish the providing of lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding." The court stated that "the safe harbor protects defense attorneys from being accused of obstructing justice merely for doing their jobs." 731 F. Supp. 3d at 515. As I noted in denying defendant's motion in limine, she would be free to present evidence and argument that the events of April 18, 2025, involved the routine work of a state court and judge, and the government would be allowed to contend that defendant added extraneous activities to her usual duties in order to defeat enforcement of federal immigration law. (R. 72 at 14.) The jury was tasked with choosing which version to accept. Defendant indicates that, had she been a lawyer in the courtroom, § 1515(c) would have given her safe harbor, and that judges should not get less consideration. (R. 115 at 25.) It suffices to say that no statute insulates her conduct here.

Defendant also contends in reply that the court's instructions denied her a perfectly valid defense, i.e., the privilege against civil arrests in courthouses, raised in her first argument. She argues that the privilege warrants acquittal or, in the alternative, a new trial with proper instructions. (R. 115 at 25-26.) Defendant requested no instruction touching on the privilege against civil arrest in a courthouse (just as she did not raise the issue via pre-trial motion). In any event, as discussed above, the privilege is not defendant's to assert.

Finally, defendant reasserts her immunity and Tenth Amendment arguments, previously rejected on the motion to dismiss the indictment, in light of the full trial record. (R. 115 at 27-29; R. 109 at 44-45; see also R. 88 at 21.) Defendant provides no new authority or analysis, so I decline to revisit those rulings.

38

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion and renewed motion (R. 88, 109) are denied.

Dated at Milwaukee, Wisconsin, this 6th day of April, 2026.

/s/ Lynn Adelman  
LYNN ADELMAN  
District Judge