UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                    Case No. 25-CR-89 (LA)

HANNAH C. DUGAN,

Defendant.

## UNITED STATES' SENTENCING MEMORANDUM

Our system of justice is built on a simple but vital promise: that the law applies equally to everyone. Citizens enter courtrooms expecting that the rules will be followed, that justice will be administered fairly, and that the person wearing the robe will honor her oath to uphold the Constitution and to faithfully and impartially discharge her duties under the law. But when faced with a situation in which the defendant personally disagreed with the lawful actions of federal authorities, she abandoned that oath. Rather than uphold the rule of law, the defendant used the power and prestige of judicial office to obstruct federal agents carrying out their lawful duties in order to help an individual evade arrest. In doing so, she placed the interests of a criminal defendant above the rights of his victims, used her colleague to unwittingly facilitate the crime, and placed law enforcement agents and members of the public in danger by undermining an arrest plan, resulting in a foot chase through moving traffic outside of the courthouse. This was a serious offense, and it warrants a correspondingly serious sentence.

## I.      Introduction and Procedural History

On May 13, 2025, a federal grand jury in this district indicted the defendant. The indictment charged her with violations of 18 U.S.C. §§ 1071 (Count One: endeavoring to conceal an individual to prevent his discovery and arrest) and 1505 (Count Two: obstructing or impeding a proceeding before a department or agency of the United States). In the ensuing months, the defendant adopted an aggressive litigation strategy in which she claimed, among other things, that she was absolutely immune from prosecution and that she had a legal right to obstruct, provided she did so using the means available to her by virtue of her position. After the Court denied her pretrial motions, the case proceeded to trial, and on December 18, 2025, the jury found the defendant guilty of Count Two. Notwithstanding the jury's verdict, the defendant continues to insist that she did nothing wrong.

The Court has scheduled sentencing for July 8, 2026. This memorandum will address the applicable legal standards and the relevant factors the Court should consider under 18 U.S.C. § 3553(a) in determining an appropriate sentence.

## II.      Applicable Legal Standards

In fashioning a sentence, the Court should begin "by correctly calculating the applicable Guidelines range." *Peugh v. United States*, 569 U.S. 530, 536 (2013) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). After determining the Guidelines range, the Court must look to the factors set forth in § 3553(a) to determine a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). Those factors include the following: the nature and circumstances of the offense

2

and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes by the defendant; and to provide the defendant with needed training opportunities or medical care. The Court must also consider the kinds of sentences available, the Sentencing Guidelines range, policy statements of the Sentencing Commission, the need to avoid unwarranted disparities, and the need to provide restitution to victims. *See* § 3553(a). The United States will focus below on those factors most relevant to the defendant and her offense.

### III.    The Sentencing Guidelines

The amended Presentence Investigation Report ("PSR") has identified disagreements between the parties regarding the application of U.S.S.G. §§ 2X1.1 and 3B1.3. For the reasons set forth in the United States' response to the defendant's objections to the PSR, the PSR appropriately included the enhancement under § 3B1.3 and properly declined to reduce her offense level under § 2X1.1. In other words, the PSR is correct as written.

The Supreme Court has called the Guidelines the "framework for sentencing," the "starting point and ... initial benchmark," the "lodestar" of sentencing proceedings, and "the basis for the sentence." *Molina-Martinez v. United States*, 578 U.S. 189, 199 (2016) (quoting *Peugh* at 542 and *Gall* at 49). "Uniformity and proportionality in sentencing are achieved, in part, by the Guidelines' significant role in sentencing." *Id*. at 193.  Thus, while the sentencing range set forth in the PSR is advisory, it is an important consideration in

3

determining a reasonable sentence. With a total offense level of 14, and a criminal history category of I, the defendant's advisory Guidelines range is 15 months to 21 months' imprisonment.

### IV.      The Nature and Circumstances of the Offense

Having presided over this matter and listened carefully to the trial evidence, the Court is familiar with the defendant's offense conduct, which is also described in detail in ¶¶ 7 – 58 of the PSR. For these reasons, a description of her conduct need not be fully repeated here. Instead, this section addresses the serious nature of the defendant's offense and why her conduct warrants a meaningful sentence.

Unlike most who appear before this Court, the defendant understood precisely how the justice system functions and understood the dire consequences of her actions. That is especially clear from her statements, "I'll do it.  I'll get the heat," in response to her court reporter's offer to show Eduardo Flores-Ruiz the "right door," (i.e. the door to the stairwell), and "I'm in the doghouse with Carl because I tried to help that guy," made at a time when she hadn't even spoken with Chief Judge Ashley about the events of April 18, 2025. This was a calculated decision, made with a full understanding of the wrongfulness of her conduct. The fact that she was not deterred despite unquestionably knowing that she was crossing a line aggravates her offense.

The defendant was entrusted with authority and responsibility that few citizens possess. Rather than honoring those obligations, she used her position to interfere with the lawful administration of justice. That betrayal magnifies the seriousness of the offense. The harm caused by her conduct cannot be measured solely by the discrete acts

4

underlying her conviction. In addition to betraying the trust of those she was elected to serve, the defendant's conduct undermined public confidence in the judicial process itself. The public must know that there are consequences for those who abuse their trust. A serious sentence is necessary to reaffirm a foundational principle of our criminal justice system: no one is above the law, particularly those entrusted with administering it. Anything less risks sending the opposite message – that personal loyalties, subjective viewpoints, or self-interest can supersede legal duty.

In choosing to help Flores-Ruiz, the defendant placed her personal views, as well as the interests of a criminal defendant, above others. For example, Flores-Ruiz was charged with physically assaulting three victims, all of whom were present in the defendant's courtroom on the morning of April 18th. Those victims had constitutional and statutory rights to participate in the proceedings scheduled before the defendant. Typically, when victims were present in the defendant's courtroom, cases were called on the record and, in the unusual circumstance that a case was not called on the record, victims were notified. Trial Tr. 565. Neither of those things occurred here. Instead, Flores-Ruiz's victims waited in the defendant's courtroom for over an hour for the case to be called and left feeling "upset and confused" when they learned it had been adjourned without their knowledge or involvement. Trial Tr. 705. The defendant never bothered to inquire about the presence of victims because she was exclusively focused on getting Flores-Ruiz away from federal authorities as quickly and inconspicuously as possible.

The defendant also used her colleague, Judge Kristela Cervera, to unwittingly facilitate her offense. In doing so, the defendant disrupted proceedings in Judge Cervera's

courtroom, directed her to keep her robe on and to follow the defendant – all so that the defendant would have another judge with her as a show of force when she angrily confronted the agents. Of course, none of this had anything to do with Judge Cervera's docket. Rather, the defendant simply decided that her own desire to confront the agents with a show of force outweighed any burden, inconvenience, or stress caused to Judge Cervera from being brought unwittingly into this situation.

The defendant then further took advantage of Judge Cervera's kindness in offering to show the officers how to get to the Chief Judge's office when the defendant returned to her own courtroom to rush Flores-Ruiz's case while Judge Cervera occupied the officers' attention. Recognizing the devastating nature of Judge Cervera's testimony, the defendant also adopted an aggressive trial strategy which unfairly painted Judge Cervera as a liar. Anyone who observed Judge Cervera's demeanor in court understood that she took both her judicial oath and her oath to testify truthfully very seriously.

The defendant's treatment of Flores-Ruiz's victims and Judge Cervera was, frankly, appalling and further aggravates her offense.

Finally, by intentionally thwarting the plans of the arrest team, the defendant put others in danger. What was planned as a low-key, safe arrest involving six law enforcement officers in a public area within the courthouse turned into a foot chase outside of the courthouse by a portion of the team through moving traffic. The weather conditions and reduced visibility at the time could easily have resulted in injuries to Flores-Ruiz, the agents, and the drivers of the vehicles traveling on N. 10th Street. None of this would have happened but for the defendant's interference with law enforcement

6

officers who were merely attempting to do their duty in a peaceful and safe manner. While endangering others may not have been the defendant's intent, that outcome was reasonably foreseeable to her as a circuit court judge presiding over criminal cases.

Taken together, these facts establish the serious nature of the defendant's offense conduct and underscore the need for a meaningful sentence.

## V.      The Need to Promote Respect for the Law

This is not a case involving a momentary lapse in judgment followed by reflection or remorse. Instead, the defendant has continued to characterize her conduct, which a jury found criminal beyond a reasonable doubt, as appropriate, justified, and legally permissible. To be clear, the government does not seek punishment for the defendant's exercise of her Constitutional right to trial. Rather, the Court simply should consider the defendant's continued minimization of her conduct and persistent refusal to acknowledge wrongdoing when evaluating the need to promote respect for the law.

The defendant's refusal to acknowledge the wrongfulness of her conduct raises legitimate concerns about respect for the law and suggests a continuing belief that her personal disagreement with federal immigration law justified her obstruction of lawful government functions. That mindset does not reflect well on the defendant and heightens the need for the Court's sentence to promote respect for the law and restore confidence that the justice system holds itself accountable. Public officials must understand that they cannot substitute personal viewpoints for legal duty.

7

## VI.     The History and Characteristics of the Defendant

Unlike many defendants who appear before this Court, the defendant has led a privileged life. She grew up in a stable, financially sound household, and she enjoyed the support and love of her large family. She was not exposed to drug or alcohol abuse, or violence in her home. Although she lost her mother to cancer at an early age, she remains exceptionally close to her seven siblings. She was the beneficiary of an outstanding education – having obtained multiple advanced degrees. She has been steadily employed since 1987 and has served as a member of numerous religious and non-profit civic organizations.

Her background suggests that she had no reason to involve herself in criminally obstructive conduct. As a lawyer and judge, she had a far better understanding than the average defendant of the type of conduct that constitutes obstruction. As an elected official, she also agreed to be held to a higher standard of ethical conduct. Wisconsin's judicial code of conduct made clear that she could not allow her personal beliefs to interfere with her professional obligations.[1] As an educated and civic-minded citizen, she was also fully aware of the avenues available to legally express her personal political views and opposition to ICE. Unlike defendants who, for example, are driven to criminal behavior due to addiction, poverty, or mental illness, this defendant knew she had

---

[1] *See* Wisconsin SCR 60.03(2) "A judge may not allow family, social, political or other relationships to influence the judge's judicial conduct or judgment. A judge may not lend the prestige of judicial office to advance the private interests of the judge or of others or convey or permit others to convey the impression that they are in a special position to influence the judge."

choices available to her. Nevertheless, as she has made clear in her pleadings, she insists there was virtually no limitation on the use of her robe, position, and access to restricted areas of the courthouse, even if she acted with the purpose of thwarting ICE.

Evaluated through this framework, the defendant's personal characteristics and history do not mitigate her conduct. Although she has lived an otherwise law-abiding life, her belief that her motives place her above the law represents a dangerous outlook.

### VII. The Need to Avoid Unwarranted Disparities

Section 3553(a)(6) counsels the Court to avoid unwarranted sentencing disparities in selecting an appropriate sentence. Since 2015, the United States Sentencing Commission has maintained sentencing data that is searchable via its Interactive Data Analyzer.[2] During that time, 935 cases were reported to the Commission which involved defendants in criminal history category I who committed offenses involving the administration of justice (applying U.S.S.G. § 2J1.2) and whose Guidelines range was in either Zone C or D. Seventy-nine percent of those cases involved defendants who fully accepted responsibility for their offense conduct and pled guilty. Taking into account the cases that resolved via guilty plea and those that proceeded to trial, the average sentence imposed was 16 months' imprisonment and the median sentence was 10 months' imprisonment.

---

[2] See https://ida.ussc.gov/analytics/saw.dll?Dashboard

### VIII.  Other Considerations

The United States acknowledges that the defendant has experienced collateral consequences because of her conduct, including the loss of her judicial position. Those consequences are appropriately considered under § 3553(a). They do not, however, outweigh the seriousness of her offense. The defendant was entrusted with exceptional authority and public confidence, and it was precisely that position of trust that enabled her offense conduct. The Court's sentence should not only reflect the personal consequences to the defendant but also the broader institutional harm caused when a judge obstructs the lawful administration of justice.

### CONCLUSION

Judges are entrusted with tremendous discretion, but there is a line they cannot cross. They may disagree with the law, question policy, or sympathize with those who appear before them. But they cannot use the power of judicial office to obstruct federal law enforcement officers to help someone evade arrest. The defendant crossed that line. That, combined with her lack of remorse or sense of accountability, merits a sentence that reflects the serious nature of her conduct and its broader impact on the justice system.

Respectfully submitted on July 1, 2026.

/s/ Richard G. Frohling
Executive Assistant U. S. Attorney
State Bar No.: 1021952
Email: richard.frohling@usdoj.gov

10

/s/ Keith Alexander
Criminal Division Chief
State Bar No.: 1053000
Email: keith.alexander@usdoj.gov

/s/ Kelly B. Watzka
Deputy Criminal Division Chief
State Bar No.: 1023186
Email: kelly.watzka@usdoj.gov

/s/ Jonathan H. Koenig
Appellate Chief
State Bar No.: 1045517
Email: jonathan.h.koenig@usdoj.gov

Attorneys for Plaintiff
Office of the United States Attorney
517 East Wisconsin Avenue, Rm. 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738