UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

    *Plaintiff,*

    *v.*                                      Case No. 25-CR-0089-LA

HANNAH C. DUGAN,

    *Defendant.*

_____

**DEFENDANT'S SENTENCING MEMORANDUM**

_____

## I.    OVERVIEW

As a result of her conviction in this case, Hannah Dugan has lost the judicial job she loved and that was the culmination of a career spent serving others. Sentencing need not do worse to her. In fact, to do so would run contrary to the interests of justice and the requirements of 18 U.S.C. § 3553(a).

Hannah Dugan for nearly seven decades has been an exemplary member of this community. She, of course, has no prior criminal record; the offense was isolated and unique; and there is no possibility of her repeating it. She was handcuffed and shackled during her arrest, photographed publicly by plan, and intentionally shamed from coast to coast by the leadership of the U.S. Department of Justice and FBI. There is no need for further deterrence, either specifically or generally.

## II.     LEGAL STANDARD

As this Court knows, the sentence to be imposed is dictated by the factors of 18 U.S.C. § 3553(a).  As recently summarized by the Seventh Circuit, the Court must consider all of the following.

> When fashioning an appropriate sentence, the district court "begins with a consideration of the [advisory] guidelines" as a rough approximation of the appropriate sentence and then ends with a consideration of the factors outlined in 18 U.S.C. § 3553(a). *United States v. Warner*, 792 F.3d 847, 855–56 (7th Cir. 2015). Those factors include: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for "a sentence that is sufficient, but not greater than necessary to accomplish the basic purposes of sentencing: just punishment, deterrence, incapacitation, and rehabilitation," *see Warner*, 792 F.3d at 855 (citation modified); (3) "the kinds of sentences available;" (4) "the kinds of sentence and the sentencing range" for that category of offense; (5) "any pertinent policy statement;" (6) "the need to avoid unwarranted sentence disparities among [similarly situated] defendants;" and (7) "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(1)–(7). It is only after the district court weighs and balances these factors that it can "make an individualized assessment based on the facts presented." *Warner*, 792 F.3d at 855 (quoting *Gall v. United States*, 552 U.S. 38, 50, 128 S. Ct. 586, 169 L. Ed.2d 445 (2007)).

*United States v. Corruthers*, 173 F.4th 915, 922  (7th Cir. 2026).

## III.     CHARACTER OF THE DEFENDANT

At 67 years old, Hannah Dugan has lived a life devoted to family, community, faith, and the law. A deeply religious Catholic, she has followed the Gospel message of serving others less fortunate. Her professional life has been devoted almost entirely to nonprofit agencies, educational institutions, and public service in government entities.  Below is just a partial list:

2

Legal Action of Wisconsin, 1987-1994

Benedict Center Board, 1990-2007

Legal Aid Society of Wisconsin, 1994-2005

State Bar of Wisconsin Board of Governors, 1996-1998, 2014-16

City of Milwaukee Ethics Board, 1999-2002

Milwaukee County Ethics Board & Ethics Study Committee, 2001-2008

Milwaukee Bar Association Board Member, 1991-2000

>    Officer, 1993-1999
>    President, 1999-2000

Wisconsin Judicial Commission, 2000-2006 (Chair 2004-2005)

Wisconsin Supreme Court Policy & Planning Advisory Committee, 2000-2008

>    Vice chair, *Alternatives to Incarceration Subcommittee,* 2004-2007

Catholic Charities of Milwaukee, 2006-2009

Wisconsin Supreme Court Referee for Attorney Discipline, 2010-2016

Social Development Commission, 2013

Independence First, 2014-15

Elected & Reelected Milwaukee County Circuit Court Judge, 2016-2025

Jewish Family Services, Inc., 2023 to present

Adjunct Professor/Visiting Professor/Clinical Supervisor/Advisor

>    Marquette University Law School (various dates)
>    Marquette University Graduate College of
>      Professional Studies, 2005-2007
>    Seattle University Law School, 2004-2005
>    University of Wisconsin Board of Visitors, 1997-present
>    American Bar Association – Ukraine educational initiative, 2000

3

Her private practice work, from 2010 to 2016, was primarily in service of veterans, the elderly and persons with disabilities.

This body of work prompted former Milwaukee County District Attorney, E. Michael McCann, to describe Hannah Dugan in the following terms:

> Some lawyers perform such work simply because it provides a living. I know Hannah Dugan and she was an attorney who assisted poor people because they were in need and required help. She was free of disdain for their often limited economic situations. Hannah Dugan was much influenced by her Catholic faith. To her the statement of Christ "that whatever you do for these the least of mine, you do for me" was a motivating factor. … She is thoughtful, careful, generous, respectful of citizens rich and poor. She is not vindictive, greedy, vengeful or self-seeking.

Other letters to the Court describe her as "inspiring" (Patti Keating Kahn and Chuck Kahn); "caring, thoughtful, and modest" (Pamela Fendt); "always willing to help" (Margaret Raymond); "a selfless contributor to the public good" (James Gramling); and "a solid member of our community who strives to improve that community for others" (Kathy Nusslock). Donald Christl calls her "one of the kindest and gentlest souls on the planet. She spent decades serving others." Joseph Wall describes her professional life as "a career-long commitment to the poor and powerless." Thomas Zander writes, "In her nearly three decades of work as a public interest lawyer, the principle of equal justice under law was made a reality for countless needy Wisconsinites by the dedication and hard work of Hannah Dugan."

4

Dugan family members reinforce these views regarding her life outside of the law. Every one of her seven siblings submitted a letter attesting to her good character, her unselfishness, and her life devoted to serving others. Nieces, nephews, and in-laws describe her as a person always thinking of others first.[1]

One would look in vain for any prior acts of Hannah Dugan that suggest disregard for adherence to the law, both its letter and spirit. The suggestion that similar disrespect for the law in the future must be deterred through additional punishment is unfathomable.

## IV.    NATURE AND CIRCUMSTANCES OF THE OFFENSE

### A.  Isolated, Unique and Not Capable of Being Repeated.

By any account, the nature and circumstances of the offense were isolated and unique. In January 2025, Immigration and Customs Enforcement (ICE) dramatically changed its policies to provide for aggressive enforcement of ICE administrative warrants at local courthouses, a change in policy that was recently vacated as unlawful.[2]

At the time of the change, controversy ensued as every state's interest in running its courts was expected to yield to some extent to federal executive branch policy. During the previous four years, such actions had been restricted by federal policy; for years, Milwaukee County judges operated with the understanding that ICE enforcement would not take place within courthouses.

---

[1] The bulk of these letters are attached to the addendum to the presentence report.  The remaining letters are attached to this memorandum.

[2] *See Pable Sequon et al. v. Albarron, et al.*, Case No. 25-cv-6487-pcb (N.D. Ca. June 23, 2026); *see also Federal Judge Bars ICE From Making Arrests in Immigration Courts*, N.Y. Times (June 23, 2026)  https://www.nytimes.com/2026/06/23/us/ice-arrests-immigration-courts-california.html (ICE policy change was arbitrary and capricious, in part, because it failed to consider concerns that policy would "disincentivize" court attendance).

The primary concern of those opposing this more aggressive ICE enforcement was that people whose attendance was most necessary to the cause of justice (not just defendants, but victims, witnesses, and the public generally) would simply refuse to come to court. That is what happened.

Between the time of that policy change in January 2025 and before April 18, 2025, armed ICE agents twice entered the Milwaukee County Courthouse to effectuate administrative arrests, both times without announcing their presence to the judiciary or even showing identification to judges.

The disruption to court proceedings was profound. Local attorneys reported that clients were choosing not to show up for fear of ICE arrest. The Milwaukee County judiciary reacted with concern. Local elected public officials held press conferences denouncing ICE practices.

Against this backdrop, the entire encounter on April 18, 2025, between Hannah Dugan and the federal agents in the sixth-floor hallway of the Milwaukee County Courthouse took under two minutes. The combined courtroom and hallway encounter between Judge Dugan and Assistant State Public Defender Mercedes de la Rosa and her client took under three minutes. By that measure, the nine-year judicial career of Judge Dugan (and almost 40-year legal career) came to an end because of approximately five minutes of immediate reactions to learning that an ICE enforcement action was to take place on the sixth floor near her courtroom.

Whatever the merits of the ongoing dispute between ICE and the authority of local judges, that dispute will continue without any participation from Hannah Dugan. Given her resignation from the bench, there is no possibility of the acts being repeated.

**B. Comparison to Similar Offenses.**

The only directly analogous case is *United States v. Shelly Joseph,* Case No. 19-cr-10141 (D. Mass.), where the federal government charged a Massachusetts judge with obstructing an ICE arrest that was to take place outside her courtroom. Yet the federal government dismissed those charges under a Deferred Prosecution Agreement, which included a referral to the state judicial commission.[3]

Also relevant to evaluating the Court's response to Hannah Dugan's conduct in full context is how the federal government treated Eduardo Flores Ruiz after his arrest at the Milwaukee County Courthouse. He was charged with illegal reentry to the United States, in violation of 18 U.S.C. § 1326(a)(2). *See United States v. Flores Ruiz*, No. 25-cr-80 (E.D. Wis.). He entered a guilty plea. His guideline range was 1 to 7 months (base offense level of 6, with a criminal history category II), and he was sentenced to time-served.

---

[3]Perhaps another recent comparison is *United States v. State of Illinois, JB Pritzker, et al.*, 25-cv-1285 (N.D. Ill.), where the federal government alleged that "sanctuary city" and other affirmative actions of senior Illinois public officials were "an intentional effort to obstruct" federal immigration law. The complaint filed by the federal government attempted to document the detrimental impact on federal immigration enforcement by Illinois officials that was certainly more widespread and impactful than the conduct charged in this case. The Illinois complaint alleged that the totality of the conduct violated federal criminal law prohibiting harboring of illegal aliens. Yet the relief sought in that case was not a criminal judgment against any individuals, but rather civil injunctive relief. A federal district court dismissed that government complaint altogether as encroaching on proper state powers. *United States v. Illinois*, 796 F. Supp.3d 494 (N.D. Ill. 2025). The government appealed and the case remains in briefing in the Seventh Circuit. *United States v. Illinois*, No. 25-2904 (7th Cir.).

## C. Lack of Motive for Personal or Private Gain.

The actions of Judge Dugan on April 18, 2025, were not driven by personal or private gain. There was no bribe, no personal favor, no violation of civil rights, no abuse of individual liberty. Judge Dugan never interacted with Eduardo Flores Ruiz prior to the three-minute court appearance. She never spoke to him directly, only through counsel, who was seeking a new scheduling date. She knew nothing about the facts of his case, other than that he was facing misdemeanor charges, was out on bond, and was meeting his attorney for the first time.

The government has repeatedly argued that, by her affirmative actions, Judge Dugan failed to acquiesce to the required demands of an ICE administrative warrant (a warrant that Judge Dugan never saw). That argument cannot be wholly separated from the question of whether state court judges possess lawful authority to resist the execution of such warrants in a state courthouse under the Tenth Amendment to the United States Constitution. Even if they do not, Judge Dugan's attempt to exercise her state law authority was not malicious or self-serving. Her effort to protect the state judiciary's authority and independence was not an attempt at personal or private gain.

## V.  SENTENCING DISPARITY AND ADVISORY SENTENCING GUIDELINES

The parties' dispute over the applicability of 18 U.S.C. § 1505 to the facts of this case has been litigated repeatedly, most recently in the motion for reconsideration. Yet once again, it is that *charge*, not the underlying *conduct*, that results in an offense level of

8

14 and guideline range of 15 to 21 months, as the government advocates under § 2J1.2(a) of the advisory sentencing guidelines.[4]

Focusing on the conduct instead of the charge yields a much lower advisory guideline range.

An offense involving "obstruction or impeding officers" falls under § 2A2.4 of the guidelines and results in an offense level of 10. Even applying all of the other enhancements and reductions of the presentence report, the resulting offense level would remain a level 10 and an advisory guideline range of 6 to 12 months.

This sentencing disparity is conceded under the commentary to § 2J1.2, which cautions the sentencing court that "[n]umerous offenses of varying seriousness may constitute obstruction of justice." Yet the cross-reference notes apply only to enhance offense level results under § 2X3.1 and 2L1.2. Had that very same cross-reference notes been applied in this case as potential reductions, the resulting guideline range against Hannah Dugan would have been an offense level 4 and a range of 0 to 6 months.

Thus, the proposed advisory sentencing guideline range of 15 to 21 months rests on how the case was charged, not on the specific conduct at issue. The top end of the range advocated by the government is triple the 1-to-7 month range applied to Flores Ruiz. The proposed guideline range also far exceeds the actual penalty imposed on Judge Joseph in the Massachusetts case referenced above.

---

[4] The Defense renews its objections to the guidelines as set forth in the addendum to the presentence report filed with the Court by the U.S. Probation Office. The Defense incorporates by reference the arguments raised therein.

For these reasons, the proposed advisory sentencing guideline range significantly overstates the seriousness of the offense conduct.[5]  Moreover, within the context of 18 U.S.C. § 3553(a), the guidelines fail to provide the required "individualized assessment" of culpability that this Court must undertake before determining the appropriate sentence. *See United States v. Washington*, No. 25-2379, 2026 WL 1661693, at *2 (7th Cir. June 9, 2026) (reversing guideline sentence where district court appeared to give rote consideration to individual § 3553(a) factors).

## VI. OTHER EFFECTS

Contrary to local practice for non-violent offenses and crimes posing no ongoing or immediate threat or risk of flight, federal agents arrested Judge Dugan as she arrived for work at the Milwaukee County Courthouse. They handcuffed her and later shackled her ankles as she was walked through the federal courthouse. Local FBI agents were instructed to photograph the arrest. Immediately upon arrest, the Director of the FBI posted a picture of the arrest on social media.[6] The then-Attorney General of the United States soon followed with a public statement calling Dugan "deranged."[7]  These and other public statements by administration officials obviously elevated this case to

---

[5]This Court has repeatedly noted reliance on the guidelines is "overvalued" because of multiple factors, particularly the guidelines failure to provide a transparent, rational basis for offense levels and failure to consider such important and individual sentencing factors as the character of the offender, the motive and moral culpability involved in the offense, and the likelihood that a defendant will re-offend. *See, for example, Federal Sentencing Under "Advisory" Guidelines: Observations By District Judges,* 75 Fordham Law Review 1 (2006).
[6]https://www.cnn.com/2025/04/26/politics/patel-wisconsin-judge-photo-violate-conduct
[7]https://abovethelaw.com/2025/04/we-will-find-you-ag-pam-bondi-issues-chilling-warning-to-judges/

10

national and even international prominence and were intended to scare and cast public shame on those judges acting contrary to ICE enforcement at county courthouses.

Whether deserved or not, the ongoing residual effect was to force Hannah Dugan into life as a recluse. Based on actual threats and a legitimate fear of those threats against her and those associated with her, she moved out of her home. She gave up her usual life of attending community events,[8] including public religious services. Security measures needed to be taken before she could travel, even to her required court proceedings in this case. These effects will persist well into the future regardless of the sentence this Court imposes.

## VII. ADDITIONAL SENTENCING STATEMENTS

Hannah Dugan will address the Court directly at sentencing. The defense also asks that the Court permit brief oral statements in support of Hannah Dugan by Janine Geske and Gregory P. O'Meara, S.J.

## VIII. CONCLUSION

As former ambassador and mayor Tom Barrett wrote in his letter to the Court, the guilty verdict in this case alone caused Hannah Dugan to resign her judicial position: "For her, it was an extraordinarily deep price to pay." Joseph Wall, referring to the intentional and unnecessary public humiliation of Dugan's arrest, echoes the sentiment that she already has been punished enough.

---

[8]As Darry Morin noted in his letter to the Court, Hannah Dugan routinely attended these community events out of "genuine civic interest rather than political gain." He notes one particularly moving event where Hannah Dugan spoke about traveling to Ukraine to participate in a democracy education initiative.

For the reasons set forth above and in the presentence report, the § 3553(a) factors of punishment and deterrence already have been met and exceeded. Every other applicable factor under § 3553(a) warrants leniency. The Defense respectfully requests a sentence of time served.

Dated this 1st day of July, 2026.

Respectfully submitted,

HANNAH C. DUGAN, *Defendant*

*s/ Steven M. Biskupic*
Steven M. Biskupic
 Wisconsin Bar No. 1018217

STEVEN BISKUPIC LAW OFFICE, LLC
P.O. Box 456
Thiensville, Wisconsin 53092
bisklaw@outlook.com

*s/ Jason D. Luczak, Nicole M. Masnica*
Jason D. Luczak
 Wisconsin Bar No.  1070883
Nicole M. Masnica
 Wisconsin Bar No. 1079819

GIMBEL, REILLY, GUERIN & BROWN LLP
330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
(414) 271-1440
jluczak@grgblaw.com
nmasnica@grgblaw.com

12

s/ Dean A. Strang_
R. Rick Resch
  Wisconsin Bar No. 1117722
Dean A. Strang
  Wisconsin Bar No. 1009868

STRANGBRADLEY, LLC
613 Williamson Street, Suite 204
Madison, Wisconsin 53703
(608) 535-1550
rick@strangbradley.com
dean@strangbradley.com



# THOMAS K. ZANDER

June 19, 2026

Honorable Lynn Adelman
Judge, United States District Court
517 East Wisconsin Avenue, Room 364
Milwaukee, WI 53202

Dear Judge Adelman:

I welcome the opportunity to outline the 29 years of Hannah Dugan's career that she was a public interest lawyer – prior to being elected as a judge of the Milwaukee County Circuit Court. I was the executive director of the Legal Aid Society of Milwaukee from 1981 to 1994. During those 13 years, I was always on the lookout for excellent lawyers whom I could recruit to the firm.

I observed the excellent work that a then-young lawyer named Hannah Dugan was doing at Milwaukee's other legal services program, Legal Action of Wisconsin. She organized and grew their 10-county Volunteer Lawyer Project, dramatically expanding the role of lawyers in private practice delivering free legal services to low-income people in southeastern Wisconsin. At the same time, she supervised the representation of clients with Social Security claims, winning two major federal court decisions for her clients. Hannah was a rising star in public interest law, so I wanted to find a place for her talents at the Legal Aid Society.

That opportunity came in 1994 when my own health forced me into medical retirement. One of my final and best accomplishments as executive director of the Legal Aid Society was the recruitment and hiring of Hannah Dugan to be one of our staff attorneys. My initial assignment of her was to run our Municipal Ordinance Defense Project, representing low-income Milwaukeeans who had meritorious defenses to prosecutions in Milwaukee Municipal Court and who faced a high likelihood of incarceration if they were found guilty and could not afford to pay court-imposed fines. This project operated as a clinical program with Marquette Law School. Hannah's aggressive advocacy as a lawyer and her excellent mentoring skills with Marquette Law students ensured that needy Milwaukeeans had the opportunity for equal justice by representing them in court, by challenging unconstitutional ordinances, and by developing non-incarceration alternatives for those unable to pay municipal court fines.

During the 11 years that Hannah Dugan worked at the Legal Aid Society, she went on to perform many other roles to promote equal justice for low-income Milwaukeeans. She was an integral part of the team of Legal Aid lawyers who successfully challenged the mandatory arbitration provisions of widely-used loan agreements in which low-income people used their cars as collateral and then were denied the opportunity to contest the repossession of their cars in court even though their lenders had full access to the courts. The Wisconsin Supreme Court held

this contract provision denying court access to borrowers to be unconscionable and unenforceable. Another way in which Hannah promoted the mission of the nonprofit Legal Aid Society was in seeking financial support for it from state and federal grants, foundations, corporations, and individual donors. After her 11 years of service at the Legal Aid Society, Hannah became the executive director of Catholic Charities of the Milwaukee Archdiocese, where she strengthened the management of that organization and helped to start and run its immigration legal services program.

The majestic building in Washington, D.C. that houses the United State Supreme Court has carved into its façade the words "Equal Justice Under Law." In her nearly three decades of work as a public interest lawyer, the principle of equal justice under law was made a reality for countless needy Wisconsinites by the dedication and hard work of Hannah Dugan.

Respectfully yours,

Thomas K. Zander

June 20, 2026

Judge Lynn Adelman
United States Courthouse Room 364
517 East Wisconsin Avenue
Milwaukee, WI 53202

Dear Judge Adelman,

I am writing this letter in support of Hannah Dugan who faces sentencing in your court on July 8, 2026.

Judge Dugan and I are not social friends but she is someone I have long admired. Many of our interactions and conversations have taken place at organized events, some focusing on children, and many involving the indigent and those living in poverty.

The record of her career-long commitment to the poor and the powerless begins immediately after her law school graduation with employment at Legal Action of Wisconsin. There, and very quickly, she became the Pro Bono Coordinator of a ten-county pro bono program that eventually trained more than 1,000 pro bono attorneys.

She later worked for Catholic Charities of the Archdiocese of Milwaukee. During her entire time there she was the Managing Attorney of the Immigration Legal Services program. So, immigration and the plight of those fleeing life-and-death danger in their own countries have been at the forefront of her legal service.

Her work on behalf of the poor continued unbroken as she taught, spoke, and wrote about issues at the forefront of poverty law. This included her founding, staffing, and leading no less than ten programs and projects that provided legal services and other assistance to immigrants, the poor, and the unrepresented. Furthermore, she has published more than a dozen articles focusing on public service.

My hope in writing this letter is to provide additional context and background for the Court's consideration.

I understand that Judge Dugan's sentencing guidelines put her at risk of a prison sentence and her attorneys are preparing for a recommendation of prison. Such a recommendation would be, quite frankly, immoral.

My final thought is that Hannah Dugan has already been punished. As you well know, she was arrested and handcuffed in her own courthouse; she was walked cuffed through the halls of the courthouse and paraded in view of her colleagues, attorneys, and the general public, as though she were a common criminal. I also understand that later her legs were shackled, as though while in custody she was a flight risk. Of course, none of that was necessary. It was all meant to humiliate her. It was meant to humiliate her in the eyes of her colleagues and the general public.

I understand that Judge Dugan has one day in custody as a result of her arrest and short confinement in the Federal Courthouse. That strikes me as more than enough. One day, time served. Again, she has already been sentenced.

Thank you for your time, your Honor.

Very truly yours,

Joseph Wall

2